UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x
                                                  :

UNITED STATES OF AMERICA          :

                                    :

             - v. -                :    S1 24 Cr. 293 (JGLC)

                                    :

ANTON PERAIRE-BUENO and       :
JAMES PERAIRE-BUENO,         :

                                    :

                Defendants.        :

                                    :

----------------------------------------------------x

## THE GOVERNMENT'S OMNIBUS MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney

Jerry Fang
Danielle Kudla
Benjamin Levander
Assistant United States Attorneys

*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ....................................................................................................................... 11

I. Statements of the Defendants, Their Co-Conspirators, and Their Agents Are Not Barred by the
   Rule Against Hearsay if Offered by the Government ........................................................ 11

    A.  Applicable Law ......................................................................................................... 11

        1.  The Rule Against Hearsay .................................................................................. 11

        2.  Rule 801(d)(2)(A) .............................................................................................. 12

        3.  Rule 801(d)(2)(D) .............................................................................................. 12

        4.  Rule 801(d)(2)(E) .............................................................................................. 13

    B.  Discussion ................................................................................................................. 14

        1.  The Defendants' Own Statements in Various Communication Platforms Are Not
           Hearsay .............................................................................................................. 14

        2.  Ledgers, Notes, and Other Contemporaneous Documentation Are Not Hearsay. 18

        3.  CC-3's Statement to CC-1 After the Exploit is Not Hearsay .............................. 22

        4.  Publicly Available Documents Saved to the Defendants' Electronic Accounts and
           Devices or Circulated Among the Defendants and Co-Conspirators Are Not
           Hearsay .............................................................................................................. 23

        5.  Flashbots' Public Guides for MEV-Boost, Flashbots Announcements,  and the
           Flashbots Post Mortem and Disclosure Are Not Hearsay ................................... 26

II. Certain Evidence Is Admissible as Direct Evidence or Pursuant to Rule 404(b) .................. 28

    A.  Applicable Law ......................................................................................................... 28

        1.  Direct Evidence .................................................................................................. 28

        2.  Rule 404(b) ........................................................................................................ 29

        3.  Rule 403 ............................................................................................................. 30

    B.  Discussion ................................................................................................................. 31

III.  Hypothetical Questions To Show Materiality Are Proper .............................................. 38

IV.  The Court Should Preclude the Defendants from Introducing Evidence and Arguments
    That Are Irrelevant and Unfairly Prejudicial .................................................................. 42

    A.  The Court Should Preclude Evidence or Argument That the Victims Engaged in
        Inappropriate Trading Strategies .............................................................................. 43

        1.  Relevant Facts .................................................................................................... 43

        2.  Discussion .......................................................................................................... 44

    B.  The Court Should Exclude Evidence and Argument that Cryptocurrency Is
        Unregulated or that the Government's Charging Decisions Were Improper ........... 47

    C.  The Court Should Preclude the Defendants from Arguing that "Code is Law" ....... 50

        1.  Technological Feasibility Is Not a Defense to Fraud.......................................... 51

        2.  The Court Should Exclude "Code is Law" Arguments and Restrict Related
           Evidence............................................................................................................. 53

    D.  Absent a Formal Advice of Counsel Defense, the Court Should Preclude Argument
        and Evidence Regarding the Involvement of Counsel ............................................ 55

    E.  The Court Should Exclude Evidence of the Defendants' Personal Circumstances and
        Potential Punishment ................................................................................................ 55

V. The Court Should Limit the Scope of Cross-Examination to Appropriate Topics ................ 57

    A.   Cross-Examination of Victim-1 Regarding "Market Manipulation" ....................... 57

    B.   Cross-Examination of Records Custodians and Witnesses Called for Limited Purposes ........................................................................................................................ 60

VI.   The Court Should Permit the Authentication of Certain Records Under Rules 902(11), (13), and (14) ..................................................................................................................... 62

CONCLUSION ........................................................................................................................ 64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Atkins v. Clarke*, No. 23 Civ. 565 (HEH), 2024 WL 4193821 (E.D. Va. Sept. 13, 2024) .......... 17

*Baker v. Goldman Sachs & Co.*, 669 F.3d 105 (2d Cir. 2012) .................................................... 61

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................................... 13, 19

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ................................................................ 25

*Crawford v. Washington*, 541 U.S. 36 (2004) ........................................................................ 14

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ..................................................................... 59

*Dervishaj v. United States*, No. 22-2226-pr, 2024 WL 3856971 (2d Cir. 2024)......................... 24

*Feis v. United States*, 394 F. App'x 797 (2d Cir. 2010) .......................................................... 12

*George v. Celotex Corp.*, 914 F.2d 26 (2d Cir. 1990) .............................................................. 12

*Mandal v. City of New York*, 02 Cr. 1234 (WHP), 2006 WL 3405005 (S.D.N.Y. Nov. 26, 2006) ... 28

*Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534 (2d Cir. 1992)............................... 12, 13, 21

*People of Territory of Guam v. Ojeda*, 758 F.2d 403 (9th Cir. 1985) ......................................... 12

*People v. Dunn*, 2020 WL 908476 (Mich. Ct. App. 2020)......................................................... 17

*Powers v. Memorial Sloan Kettering Cancer Ctr.*, 20 Civ. 2625 (LGS), 2023 WL 1927826
  (S.D.N.Y. Feb. 10, 2023) ................................................................................................ 27

*Rogers v. United States*, 422 U.S. 35 (1975) ......................................................................... 58

*SEC v. Lek Securities Corp.*, 17 Civ. 1789 (DLC), 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019)..... 57

*SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013)............................................................. 57

*Shannon v. United States*, 512 U.S. 573 (1994)..................................................................... 58

*State v. French*, 24 Wash. App. 2d 1040, 2022 WL 17423735 (Wash. Ct. App. 2022)............... 18

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016)............. 54

*United States v. Abad*, 514 F.3d 271 (2d Cir. 2008)................................................................ 15

*United States v. Abu-Jihaad,* 630 F.3d 102 (2d Cir. 2010)............................................... 17, 36

*United States v. Adelekan*, 567 F. Supp. 3d 459 (S.D.N.Y. 2021) ............................................ 48

*United States v. Adeniyi*, No. 03 Cr. 86 (LTS), 2004 WL 1077963 (S.D.N.Y. May 12, 2004) ... 64

*United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004) ........................................................... 24

*United States v. Ashraf*, 320 F. App'x 26 (2d Cir. 2009) ........................................................ 20

*United States v. Atilla*, 966 F.3d 118 (2d Cir. 2020) .............................................................. 39

*United States v. Ayers*, No. 20 Cr. 239 (BMC), 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024) .. 24

*United States v. Bailey*, 444 U.S. 394 (1980) ........................................................................ 44

*United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir. 1990) ....................................................... 44

*United States v. Bankman-Fried*, 2023 WL 6283509 (S.D.N.Y. Sept. 26, 2023) ....................... 56

*United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043
  (S.D.N.Y. Feb. 7, 2024).................................................................................................. 57

*United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .... 58

*United States v. Bellomo*, 176 F.3d 580 (2d Cir. 1999) .......................................................... 27

*United States v. Briguet*, 2020 WL 6945929 (E.D.N.Y. Nov. 25, 2020) .................................... 24

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ............................................................. 30

*United States v. Caruso*, 225 F.3d 646, 2000 WL 1134359 (2d Cir. 2000) ............................... 19

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ............................................................ 54

*United States v. Cheung Kin Ping*, 555 F.2d 1069 (2d Cir. 1977).......................................... 50, 51

*United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044 (S.D.N.Y. May 2, 2019) . 46, 49

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991)............................................... 30

*United States v. Crowley*, 318 F.3d 401 (2d Cir. 2003)................................................ 59

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) ..................................................... 40

*United States v. Daly*, 842 F.2d 1380 (2d Cir.).......................................................... 30

*United States v. Demosthene*, 334 F. Supp. 2d 378 (S.D.N.Y. 2004)........................... 51

*United States v. Dendy*, 995 F.2d 233, 1993 WL 175264 (9th Cir. May 25, 1993) .................... 21

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001) ...................................... 13, 14, 22

*United States v. Borrero*, No. 13 Cr. 58 (KBF), 2013 WL 6020773 (S.D.N.Y. Nov. 1, 2013) ......... 50

*United States v. Detrick*, 865 F.2d 17 (2d Cir. 1988) .......................................... 24, 49

*United States v. Devery*, 935 F. Supp. 393 (S.D.N.Y. 1996)........................................ 59

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)...................................... 14, 22, 30, 31

*United States v. Donovan*, 55 F. App'x 16 (2d Cir. 2003) ..................................... 19, 21

*United States v. Dukes*, 242 F. App'x 37 (4th Cir. 2007).......................................... 41

*United States v. Dupre*, 462 F.3d.................................................................. 15

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ............................................ 11

*United States v. Dupree*, 870 F.3d 62 (2d Cir. 2017) ............................................. 31

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006)............................................. 55

*United States v. Ellis*, 156 F.3d 493 (3d Cir. 1998) .............................................. 62

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ...................................... 25, 32

*United States v. Fiumano*, 14 Cr. 518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) .......... 46

*United States v. Galanis*, 844 F. App'x 400 (2d Cir. 2021) ............................. 46, 47, 60

*United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021) ...................................... 46, 47, 61

*United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969) .......................................... 43

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995)............................................. 32

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ........................................... 13

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ......................................... 30

*United States v. Gonzalez*, 399 F. App'x 641 (2d Cir. 2010) ..................................... 15

*United States v. Gotti*, 457 F. Supp. 2d 395 (S.D.N.Y. 2006) .................................... 12

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) .................................... 13, 22, 61

*United States v. Hill*, 643 F.3d 807 (11th Cir. 2011) ............................................ 41

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) ........................................... 15

*United States v. Jennings*, 487 F.3d 564 (8th Cir. 2007)......................................... 41

*United States v. Johnson*, 117 F.4th 28 (2d Cir. 2024)........................................... 17

*United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019) .......................................... 40

*United States v. Korogodsky*, 4 F. Supp. 2d 262 (S.D.N.Y. 1998) ................................ 46

United States v. Kuthuru, 665 F. App'x 34 (2d Cir. 2016).......................................... 16

*United States v. Kwong*, 69 F.3d 663 (2d Cir. 1995) ............................................. 44

*United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010) ....................................... 41

*United States v. Lesniewski*, 11 Cr. 1091 (VM), 2013 WL 3776235 (S.D.N.Y. July 12, 2013)........ 48

*United States v. Levy*, 594 F. Supp. 2d 427 (S.D.N.Y. 2009)...................................... 25

*United States v. Logan*, 419 F.3d 172 (2d Cir. 2004) ............................................ 14

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ................................ 13

*United States v. Malpeso*, 115 F.3d 155 (2d Cir. 1997)........................................... 51

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) ............................................. 15

*United States v. Matlock*, 415 U.S. 164 (1974) ................................................. 15

*United States v. McLaughlin*, 957 F.2d 12 (1st Cir. 1992) ....................................... 63

iv

*United States v. McPartlin*, 595 F.2d 1321 (7th Cir. 1979) .......................................... 21

*United States v. Middendorf*, 18 Cr. 36, 2019 WL 4254025 (S.D.N.Y. Sept. 9, 2019) ............... 50

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) ................................................ 44

*United States v. Montsalvage*, 850 F.3d 483 (2d Cir. 2017) ........................................ 26

*United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020) .......................................... 24, 49

*United States v. Motovich*, 21 Cr. 497 (WFK), 2024 WL 3303723 (E.D.N.Y. July 2, 2024) ......... 60

*United States v. Moyhernandez*, 17 F. App'x 62 (2d Cir. 2001) .................................... 16

*United States v. Musselwhite*, 709 F. App'x 958 (11th Cir. 2017) ................................ 41

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001) ......................................... 60

*United States v. Oguns*, 921 F.2d 442 (2d Cir. 1990) ............................................. 16

*United States v. Oldbear*, 568 F.3d 814 (10th Cir. 2009) ......................................... 47

*United States v. Orr*, 692 F.3d 1079 (10th Cir. 2012) ............................................ 41

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991) ......................................... 58

*United States v. Padilla*, 203 F.3d 156 (2d Cir. 2000) ........................................... 13

*United States v. Patel*, No. 21 Cr. 220 (VAB), 2023 WL 2643815 (D. Conn. Mar. 27, 2023) ....... 42

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997) .......................................... 44, 55

*United States v. Peraire-Bueno*, 24 Cr. 293 (JGLC), 2025 WL 2062021 (S.D.N.Y. July 23, 2025) . 60

*United States v. Perez*, 387 F.3d 201 (2d Cir. 2004) ............................................. 24

*United States v. Persing*, 436 F. App'x 13 (2d Cir. 2011) ........................................ 20

*United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684 (S.D.N.Y. 2017) .................. 39

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) .......................................... 30

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) .............................................. 14

*United States v. Ramirez*, 894 F.2d 565 (2d Cir. 1990) ........................................... 31

*United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989) .......................................... 14

*United States v. Reese*, 933 F. Supp. 2d 579 (S.D.N.Y. 2013) ..................................... 51

*United States v. Regan*, 103 F.3d 1072 (2d Cir. 1997) ............................................ 50

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ............................................. 55

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994) ......................................... 13, 20

*United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015) ............................................ 46

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................................. 29, 31

*United States v. Rosado*, 728 F.2d 89 (2d Cir. 1984) ............................................. 50

*United States v. Rosemond*, 841 F.3d 95 (2d Cir. 2016) ........................................... 23

*United States v. Rossy*, No. 22 Cr. 550 (NSR), 2023 WL 8039500 (S.D.N.Y. Nov. 20, 2023) ....... 61

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002) .......................................... 22, 35

*United States v. Rutigliano*, 614 F. App'x 542 (2d Cir. 2015) ............................... 15, 48

*United States v. Salah*, No. 24 Cr. 43 (DC), 2025 WL 689491 (E.D. Cal. Mar. 4, 2025) ........... 17

*United States v. Schlussel*, 08 Cr. 694 (JFK), 2009 WL 536066 (S.D.N.Y. Feb. 27, 2009) ........ 59

*United States v. Simmons*, 923 F.2d 934 (2d Cir. 1991) ........................................... 14

*United States v. Simon*, 425 F.2d 796 (2d Cir. 1969) ............................................. 55

*United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83 (2d Cir. 1999) ......................... 20

*United States v. Smith*, --- F. 4th ---, 2025 WL 2406104 (7th Cir. 2025) ......................... 54

*United States v. Snype*, 441 F.3d 119 (2d Cir. 2006) ............................................. 32

*United States v. Sorrentino*, 72 F.3d 294 (2d Cir. 1995) ......................................... 15

*United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) .. 49, 51

*United States v. Stoecker*, 215 F.3d 788 (7th Cir. 2000) ......................................... 60

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) ...................................... 14

v

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ........................................................ 30

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004)............................................. 46, 60

*United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993) .............................................. 19, 43

*United States v. Tussa*, 816 F.2d 58 (2d Cir. 1987) .................................................... 32

*United States v. Vallee*, 304 F. App'x 916 (2d Cir. 2008) ........................................... 25

*United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2022 WL 17076747

    (S.D.N.Y. Nov. 18, 2022) ......................................................................................... 41

*United States v. Vidal*, No. 22 Cr. 2857, 2024 WL 397630 (2d Cir. Feb. 2, 2024).................... 43

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) .................................................. 48

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) .............................................. 14

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) ............................................... 31

*Victoria's Secret Stores Brand Mgmt. v. Sexy Hair Concepts, LLC*, No. 07 Civ. 5804 (GEL),

    2009 WL 959775 (S.D.N.Y. Apr. 8, 2009) ............................................................... 17

**Rules**

Fed. R. Evid. 104 ............................................................................................................ 13

Fed. R. Evid. 401 ..................................................................................................... 24, 51

Fed. R. Evid. 402 ............................................................................................................ 44

Fed. R. Evid. 403 ..................................................................................................... *passim*

Fed. R. Evid. 404 ..................................................................................................... *passim*

Fed. R. Evid. 611 ............................................................................................. 23, 59, 61

Fed. R. Evid. 701 ............................................................................................................ 40

Fed. R. Evid. 801 ..................................................................................................... *passim*

Fed. R. Evid. 802 ............................................................................................................ 11

Fed. R. Evid. 803 ..................................................................................................... 17, 63

Fed. R. Evid. 902 ............................................................................................................ 64

## PRELIMINARY STATEMENT

The Government respectfully submits this omnibus[1] memorandum of law in support of its motions *in limine* in advance of trial of defendants, Anton Peraire-Bueno ("Anton") and James Peraire-Bueno ("James"). Specifically, the Government seeks the following rulings:

(1) That certain out-of-court statements are admissible;

(2) That certain evidence is admissible as direct evidence or pursuant to Rule 404(b);

(3) That hypothetical questions to show materiality are proper;

(4) Precluding evidence and argument that Victim Traders were engaged in inappropriate trading strategies;

(5) Precluding evidence and argument that cryptocurrency is unregulated or that the Government's charging decisions were improper;

(6) Precluding evidence and argument that "code is law";

(7) Precluding evidence and argument regarding the involvement of counsel absent a formal advice of counsel defense;

(8) Precluding evidence of the defendants' personal circumstances and potential punishment;

(9) Limiting cross-examination of government witnesses on certain overly prejudicial topics and topics that do not bear on their credibility; and

(10) That certain business and electronic records are admissible and self-authenticating.[2]

---

[1] For efficiency, the Government respectfully submits this omnibus memorandum of law in lieu of individually filed motions *in limine*. Consistent with the Court's individual trial rules and procedures, the Government has limited its omnibus memorandum to fewer than ten pages per motion. *See* Individual Rule 1(b)(i).

[2] In accordance with the Court's Individual Rules, the parties met and conferred on August 20, 2025, regarding the parties' proposed motions *in limine*. The parties were unable to resolve their dispute with regard to motions (1)-(6), (8) and (9), listed above. The Government has included motions (7) and (10) to reflect the parties' agreement on those topics and to provide written notice regarding custodian declarations required pursuant to Federal Rule of Evidence 901.

## FACTUAL BACKGROUND

On May 8, 2024, a Grand Jury in this District returned Indictment 24 Cr. 293, charging the defendants with conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering. Superseding Indictment S1 24 Cr. 293 was subsequently returned on March 17, 2025, (the "Indictment").[3] The charges arise out of the defendants' meticulously planned fraud scheme, which culminated in the theft of approximately $25 million in cryptocurrency from victim cryptocurrency traders (the "Victim Traders") in mere seconds on April 2, 2023 (the "Exploit"). Once in possession of the Exploit proceeds (the "Crime Proceeds"), the defendants refused requests to return the stolen funds. Instead, the defendants, along with other co-conspirators, took elaborate steps to conceal the origins of the Crime Proceeds and convert them to U.S. dollars, which were deposited into the defendants' bank accounts in the months following the Exploit.

Trial is set to begin on October 14, 2025.

The Government intends to offer testimony from a co-conspirator ("CC-1"), a former employee of the defendants, who has entered into a non-prosecution agreement with the Government, and will testify about conspiring to commit, and committing the Exploit and the laundering of the Crime Proceeds with the defendants; a representative from Flashbots (the "Flashbots Representative"), the research and development organization that developed the open-source MEV-Boost software that was exploited as part of the fraud scheme; and a victim trader ("Victim-1"), who lost more than $13 million worth of cryptocurrency as a result of the Exploit. In addition, the Government expects to call, among other witnesses, a cryptocurrency tracing

_____

[3] The Indictment included the same crimes as initially charged, with an additional count of conspiring to receive stolen property. By letter dated May 12, 2025, the Government advised the Court of its intent not to proceed on Count Four of the Superseding Indictment (*i.e.*, conspiracy to receive stolen property).

expert, whose tracing analysis will show the extent to which the defendants took actions to conceal their participation in the Exploit and the source of the Crime Proceeds.  The Government also intends to introduce documentary evidence of the defendants' crimes, including, among other things, text messages; communications between the defendants and third-parties regarding the Exploit and topics relevant to the planning of the Exploit; documents obtained from electronic devices belonging to the defendants; communications from Slack, a cloud-based communication application, and Discord, a social messaging application, amongst the defendants, their co-conspirators, and others; various Google documents relevant to the charged offenses; and the defendants' own Internet search histories, browsing histories, and public documents and news articles accessed from their electronic devices, reflecting their planning of the Exploit and their consciousness of guilt.

### A.  The Exploit Planning and Execution

In or around December 2022, the defendants set forth the contours of the Exploit in a planning document, which included baiting the Victim Traders and using a MEV-Boost validator to gain access to otherwise private trading data.  That same month, the defendants organized a conference call, which included CC-1 and another employee and co-conspirator, ("CC-2," and, collectively with the defendants and CC-1, the "Exploit Team"), to explain the general details of the plan, which CC-1 documented in contemporaneous notes.[4]  During the meeting, the defendants explained their understanding of how the MEV-Boost system was supposed to work, which included privacy and commitment protocols designed to keep trading data private.  For example,

---

[4] In addition to the defendants and CC-1 and CC-2, the Exploit Team also included, to a more limited extent, ██████████████ ("CC-3"), who assisted with certain mathematical computations and with off-ramping the Crime Proceeds.

CC-1's notes contain the following description of the MEV-Boost system: "MEV-boost propose builder separation. Validators never see the blocks. . . valida[tors] sign hashes and flashbots propagate block. *validators don't see block until after it's done*[.]" (emphasis added). In accordance with the defendants' plan, the Exploit Team agreed to submit "bait transactions" designed to make the Victim Traders propose bundled transactions that included the "bait transactions." As reflected in CC-1's notes—despite the Exploit Team's understanding that "validators don't see block until after" validating it—the next step of the plan required "[u]nblinding the [b]lock"—*i.e.*, "set[ting] up [a] mev-boost validator" through which the defendants would obtain private trading data revealing the Victim Traders' proposed bundled transactions. After obtaining access to those proposed bundled transactions, the Exploit Team would, instead, quickly unbundle the Victim Traders' transactions and switch out the "bait transactions" for their own new transactions that would enable the Exploit Team to take the Victim Traders' cryptocurrency. Once this bait-and-switch was complete, the Exploit Team planned to deposit the Victim Traders' cryptocurrency into their own "digital" wallets by publishing their newly constructed block to the blockchain. From start to finish, the highly-coordinated scheme needed to be completed within 12 seconds—that is, the duration of the Exploit Team's MEV-Boost validator's "turn to produce a block." As reflected in CC-1's contemporaneous notes, the defendants understood that the Victim Traders and Flashbots would be upset with their actions: "tell nobody outside of ppl working on it. bigger concern is don't want targets on our back[.]"

In the months leading up to the Exploit, the Exploit Team—led and supervised by the defendants—researched, tested, and refined their plan as they learned more about how the Exploit code would take advantage of the Victim Traders and the MEV-Boost system. Many of the Exploit Team's communications took place over private Slack channels dedicated to the Exploit Team.

Through these communications, which the Government intends to introduce at trial, the defendants and their co-conspirators: circulated a spreadsheet—referred to as the "menu"—that identified the most profitable Exploit targets; discussed the characteristics of the bait transactions that would cause the Victim Traders to propose the precise transaction bundles needed to execute the fraud scheme; explained the coding vulnerability specific to the MEV-Boost relay that was used to "unblind the block"—specifically by submitting an invalid blockheader containing a valid public key signature while also invalidly setting the "parent root" and "state root" fields to a series of zeroes (the "False Signature")—and take the Victim Traders' cryptocurrency; and outlined various anonymity procedures designed to conceal their participation in the Exploit. In preparation for the Exploit, the Exploit Team tested the effectiveness of their bait transactions through limited transactions on the public blockchain while they concealed their knowledge of the MEV-Boost relay code vulnerability lest anyone patch it prior to the Exploit. To further conceal their planning and participation in the Exploit, the defendants took numerous steps to cover their tracks through the use of, among other things, virtual private networks ("VPNs"); dozens of "pass-through" cryptocurrency wallets (*i.e.*, accounts used primarily, if not exclusively, to receive and transfer a set of funds); cryptocurrency privacy protocols designed to obscure the source and origin of cryptocurrency deposits and withdrawals; and dozens of cryptocurrency transfers, varying in dates, times, and amounts. While taking these actions, the defendants' Internet search history, which the Government also expects to offer into evidence, shows that they searched for topics such as, "wash crypto," "sending fake ID for kyc verification," "fake protonmail generator," and "tornado cash alternatives."

On April 2, 2023, after months of preparation, the defendants executed the Exploit code, which resulted in the theft of approximately $25 million worth of cryptocurrency.

### B.  The Concealment and Money Laundering

Upon learning that the Exploit was successful, Anton texted James, "25mn executed."  Text messages, which the Government expects to introduce, show that, within minutes, the defendants began privately discussing how to move the Crime Proceeds and monitoring public posts concerning the Exploit.  As part of these cover-up plans, Anton texted James a false alibi, stating that if the Flashbots Representative "messages or asks," they should say "we're on vaca[tion.]"  James then directed Anton to "take down the validstors [sic]" and warned that he was "in the car now with someone so cant talk[.]"  Within 24 hours, James emailed a Chase Bank representative to inquire if there was a branch in the area with safety deposit boxes that could "fit [a] large book/laptop[.]"

The next day, as the defendants continued to work to hide their participation in the Exploit, the Flashbots Representative woke up to multiple messages that millions of dollars' worth of cryptocurrency had been taken in an exploit that involved the MEV-Boost system.  In response, the Flashbots Representative, other Flashbots employees, and other stakeholders promptly assembled to investigate and repair any coding vulnerability.  On April 4, 2023, the Flashbots Representative published a "post mortem" analysis to the public Flashbots website (the "Flashbots Post Mortem"), documenting the results of the investigation.  The Flashbots Post Mortem described the defendants' actions as an exploit that took advantage of a coding vulnerability in the "open sourced mev-boost-relay implementation maintained by Flashbots," which enabled the defendants to "steal ~$20M from multiple sandwich bots"—*i.e.*, the Victim Traders.

After publishing the Flashbots Post Mortem, the Flashbots Representative was contacted anonymously by a particular email account—low.carb.crusader@proton.me (the "Low Carb Crusader Proton Account").  These communications are reflected in screenshots saved to the

defendants' computer, which the Government expects to introduce, along with anticipated testimony from CC-1 and browsing history indicating that the defendants controlled the Low Carb Crusader Proton Account.  The defendants, communicating anonymously via the Low Carb Crusader Proton Account, wrote to the Flashbots Representative and two others, including a researcher at the Ethereum Foundation (the "Ethereum Foundation Researcher"), that "it has saddened me to see the situation reported as a 'relay exploit.'"  The defendants threatened that there were "elements" of their "strategy" that made their actions "still possible today" despite the mitigation efforts that Flashbots had already taken.  The defendants, however, refused to disclose the information concerning the purportedly existing, yet unidentified, vulnerabilities unless the Flashbots Representative agreed to, among other things, (i) publicly announce that "what is currently being referred to as the 'relay exploit' was a non-critical part" of the defendants' "strategy," and (ii) affirm that the Flashbots Representative would no longer refer to the individual communicating through the Low Carb Crusader Proton Account as the "relay exploiter."   The Government anticipates that the Flashbots Representative will testify that he ceded to the defendants' demands and that he subsequently published another announcement to the public Flashbots website that disclosed these communications (the "Flashbots Disclosure") to prevent any further damage to the MEV-Boost system.

In the days that followed the Exploit, Victim-1, a CEO of a quantitative trading firm that was defrauded of more than $13 million worth of cryptocurrency as part of the fraud scheme, also took actions to identify how the Exploit occurred and who was responsible.  The Government anticipates that Victim-1 will explain that prior to the Exploit, Victim-1 chose to use the MEV-Boost system to effectuate a particular trading strategy whose profitability depends on the execution of bundled transactions in a precise order.  Based on publicly recorded blockchain

information, Victim-1 observed that, during the Exploit, his automated trading bots (the "MEV Bots") proposed a bundle of transactions that included the bait transactions, the proposed bundled transaction was subsequently unbundled, contrary to the standard operation of the MEV-Boost system, and the bait transactions were then switched with transactions that, in effect, stole Victim-1's cryptocurrency.   Victim-1 further discovered that, in the months prior to the Exploit, particular Ethereum user(s) appeared to have learned Victim-1's MEV Bots trading strategy by proposing particular transactions that caused Victim-1's MEV Bots to trade—in essence, Victim-1 learned that he had been tricked as part of the Exploit, which resulted in the theft of his cryptocurrency, and that the fraudsters had spent months learning how to bait his MEV Bots into trading.

Victim-1 will further describe his efforts to get his money back, including his communications with the individuals he believed stole his money (*i.e.*, the defendants) via, among other means, communications with the Low Carb Crusader Proton Account.  Victim-1 requested that the defendants return the stolen funds, noting that he had successfully petitioned Tether, the issuer of one of the cryptocurrency tokens that the defendants stole as part of the Exploit, to freeze approximately $3 million worth of the Crime Proceeds.  In the weeks that followed, Victim-1 continued to pressure the defendants to return the stolen funds or risk litigation or reports to law enforcement.  During this period, the Ethereum Foundation Researcher also privately messaged the Low Carb Crusader Proton Account, asking that they "return the tens of millions acquired from the equivocation" (*i.e.* the Exploit), as reflected by Low Carb Crusader Proton Account screenshots

saved to the defendants' computer.  The Ethereum Foundation Researcher further asked, "What's your next step?  I hope it's to build something amazing, not to spend years laundering millions."

Despite these requests, the defendants refused to return the Crime Proceeds.  Instead, they proceeded to launder them.  In particular, the Government intends to call a cryptocurrency tracing expert who will describe how public blockchain data shows that between April 3, 2023 and November 20, 2023, the various cryptocurrency tokens constituting the Crime Proceeds were eventually converted to the same cryptocurrency stablecoin using an intricate series of token swaps that broke the Crime Proceeds up into smaller transaction amounts and routed them through multiple digital wallets and cryptocurrency protocols—all of which culminated in the transfer of more than $20 million worth of cryptocurrency from the Exploit to a fiat bank account controlled by the defendants.  Documents saved on the defendants' electronic devices, including a cellphone recovered from a safe in Anton's residence, will show that, at the time they were taking these steps, they knew that several public reports had characterized their actions as an "exploit" and a "hack," reported that Tether had frozen certain cryptocurrency traced to the Exploit and blacklisted their digital wallet address, and described those responsible for the Exploit as a "malicious validator." Additionally, screenshots saved to Anton's personal electronic devices show that the defendants also saved messages from a particular individual operating under the username "Godel," who warned that "the validator exploited a bug in relay code . . . we find exploiter soon" and asked James whether he recently had any Tether "frozen."  When James denied the inquiry, Godel responded, "looked like you on chain hahaha I think people know btw."

Moreover, the Government anticipates that many of the cryptocurrency transfers that the tracing expert will identify and explain occurred after Victim-1 sent a demand letter to the defendants and CC-3 on June 2, 2023, requesting the return of the Crime Proceeds and notifying

the defendants and CC-3 that Victim-1 had "made reports to multiple international law enforcement authorities."

Even after receiving Victim-1's demand letter, the defendants continued to launder the Crime Proceeds through additional swaps and transfers to covertly off-ramp the funds. Communicating anonymously through the Low Carb Crusader Proton Account, the defendants also contacted Tether to obtain the portion of the Crime Proceeds that was frozen shortly after the Exploit. In response, Tether directed the defendants to contact "the Cyber division, Israel police" at a particular email address to inquire about the frozen funds. Ultimately, through a series of fifteen separate transactions between October 2023 and November 2023, the defendants transferred the unfrozen portion of the Crime Proceeds—totaling more than $20 million worth of cryptocurrency—from their cryptocurrency wallet to a particular Coinbase account controlled by the defendants in the name of a shell company registered in Wyoming (the "Pine Needle Coinbase Account") before immediately converting the cryptocurrency to U.S. dollars that were then transferred to the defendants' fiat banking account.

All the while, the defendants searched the Internet for, among other things, "money laundering," "charge by indictment vs charge by complaint," "does Coinbase freeze accounts?," "exploit," "computer fraud and abuse act," "prosecuting computer crimes—department of justice," "can you report a tax loss on stolen property," "israeli head of cyber division crypto," and "israel-united states extradition." Anton's Internet search history on his cellphone, which was seized at the time of his arrest on May 14, 2024, shows that he searched for additional topics probative of fraudulent intent, including, among other things:

- "is prison or jail worse"

- "low carb crusader"

- "how to get early release prison"

- "best us prisons"

- "where do criminals keep dollars"

- "how much can money help in low security prison."

## ARGUMENT

**I.    Statements of the Defendants, Their Co-Conspirators, and Their Agents Are Not Barred by the Rule Against Hearsay if Offered by the Government**

At trial, the Government will seek to introduce for their truth out-of-court statements made by or adopted by the defendants and their co-conspirators—two of whom were the defendants' employees.  Such statements, including particular statements described below, are not barred by the rule against hearsay.

### A.  Applicable Law

1.  <u>The Rule Against Hearsay</u>

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Hearsay is admissible only if it falls within an enumerated exception. Fed. R. Evid. 802. However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Thus, a statement offered to show its effect on the listener is not hearsay. *Id.*; *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

2.  Rule 801(d)(2)(A)

Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if the statement "is offered against an opposing party and . . . was made by the party in an individual or representative capacity." Statements admitted under Rule 801(d)(2)(A) "need not be incriminating to fall within the exception to the hearsay rule." *United States v. Gotti*, 457 F. Supp. 2d 395, 401 (S.D.N.Y. 2006) (citing *People of Territory of Guam v. Ojeda*, 758 F.2d 403, 408 (9th Cir. 1985) ("Cases interpreting section 801(d)(2)(A) are in agreement that statements need not be incriminating to be admissions. For statements to constitute admissions they need only relate to the offense."). Rule 801(d)(2)(A) requires only that the statement be "offered against an opposing party." *See also Gotti*, 457 F. Supp.2d at 401 (same).

3.  Rule 801(d)(2)(D)

Federal Rule of Evidence 801(d)(2)(D) provides that a statement is not hearsay if "the statement is offered against an opposing party and … was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." To admit a statement under this rule, the court must find "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)). As the Second Circuit has explained, "admissibility under this rule should be granted freely," and there is a "liberal" standard for admissibility rooted in the understanding that agents and employees are usually the people "best informed about certain acts committed in the course of [their] employment." *Pappas*, 963 F.2d at 537.

4. Rule 801(d)(2)(E)

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not

hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's

co-conspirator during and in furtherance of the conspiracy."  To admit a statement under this rule,

a district court must find two facts by a preponderance of the evidence: (i) that a conspiracy that

included the defendant and the declarant existed; and (ii) that the statement was made during the

course of, and in furtherance of, that conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175

(1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).  "In determining the existence

and membership of the alleged conspiracy, the court must consider the circumstances surrounding

the statement, as well as the contents of the alleged coconspirator's statement itself." *United States*

*v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014).  When determining whether the predicate conspiracy

has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid.

104(a), and "the district court may consider the hearsay statement itself" as evidence of "the

existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing

*Bourjaily*, 483 U.S. at 181).

To be in furtherance of a conspiracy, a statement "must in some way have been designed

to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22

F.3d 430, 436 (2d Cir. 1994).  Statements are in furtherance of the conspiracy if they, for example:

(i) inform or provide an update as to the status or progress of the conspiracy, *see United States v.*

*Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (ii) "prompt the listener . . . to respond in a way that

promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*,

922 F.2d 934, 958 (2d Cir. 1990); (iii) "seek to induce a co-conspirator's assistance," *Desena*, 260

F.3d at 158 (internal quotations omitted); (iv) "provide reassurance," *id.*; (v) "serve to foster trust

13

and cohesiveness," *id.*; *accord United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (vi) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (viii) inform a co-conspirator of "the identity and activities of his coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987); *see also United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988) (co-conspirator statements admissible if they "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy").[5]

**B. Discussion**

>   1. The Defendants' Own Statements in Various Communication Platforms Are Not Hearsay

The Government intends to offer into evidence documents—including Exploit planning documents made by the defendants and saved to their Google accounts; text messages, emails, Slack and Discord communications between the defendants and/or their co-conspirators; and screenshots saved to the defendants' computers preserving their own communications with third parties—concerning the Exploit and the subsequent laundering of the Crime Proceeds. When offered by the Government, a defendant's statement is not hearsay. *See* Fed. R. Evid. 801(d)(2)(A); *United States v. Matlock*, 415 U.S. 164, 172 n.8 (1974); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). Moreover, the statements of others within these

---

[5] Because statements to associates about crimes in which the declarant participated are not testimonial, the admission of such statements does not violate the Confrontation Clause or run afoul of *Crawford v. Washington*, 541 U.S. 36 (2004). *See, e.g.*, *United States v. Logan*, 419 F.3d 172, 178 (2d Cir. 2004) (noting that "[i]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial" and are therefore not barred by *Crawford*); *United States v. Williams*, 506 F.3d 151, 157 (2d Cir. 2007).

communications can be admitted to provide necessary context to the defendants' statements. *See United States v. Dupre*, 462 F.3d at 137 (email messages properly admitted not for truth of matters asserted, but rather to provide context for defendant's messages sent in response); *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995) (recorded statements of a confidential informant were properly admitted as non-hearsay to render intelligible defendant's recorded, responsive statements), *overruled on other grounds United States v. Abad*, 514 F.3d 271 (2d Cir. 2008).[6]

The Government also intends to offer portions of the Exploit code and the defendants' Internet search histories, which are non-hearsay and admissible under Rule 801. Specifically, pursuant to Rule 801(a), a "statement" includes as a person's "oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." The Government anticipates that CC-1 will testify that the Exploit code was written by the defendants, CC-1, and CC-2, during CC-1's and CC-2's employment at the defendants' company. As a result, any portion of the Exploit code, if offered by the Government, is admissible as non-hearsay pursuant to Rule 801(d)(2)(A) (as statements of the defendants), 801(d)(2)(D) (as statements of CC-1 and CC-2 within the scope of their employment relationship with the defendants), and/or 801(d)(2)(E) (as co-conspirator statements during and in furtherance of the conspiracy).

---

[6] The Government is in the process of finalizing the excerpts it intends to offer and will provide that information to the defense as soon as practicable to facilitate the resolution of any disputes as to the potential applicability of the rule of completeness before trial. Notably, the rule of completeness "is not a mechanism to bypass hearsay rules for any self-serving testimony." *United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010); *see also United States v. Rutigliano*, 614 F. App'x 542, 545 (2d Cir. 2015) (affirming exclusion of "post-hoc explanations" of criminal conduct); *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (affirming exclusion of recording excerpts that "consisted largely of [defendant's] own self-serving statements, which, as offered by him, are inadmissible hearsay").

The defendants' Internet search histories are admissible for similar reasons.  In particular, the defendants' inquiries and questions captured in their search histories before and after the Exploit are relevant to their knowledge and intent.  For example, prior to the Exploit, the defendants searched for, among other things, "how to wash crypto" and "protonmail fake email"— questions relevant to the planning of the Exploit and laundering of the Crime Proceeds and probative of the defendants' consciousness of guilt.  After the Exploit, and during the money laundering conspiracy, the defendants searched for, among other things, "money laundering statue [sic] of limitations," "chainalysis hacks data set," "validator hide ip Ethereum," and "can you report tax losses on stolen property"—additional questions relevant to their money laundering plans and consciousness of guilt.  Here, the defendants' Internet searches—which are, in their most basic form, questions—are not hearsay.  *See, e.g.*, *United States v. Kuthuru*,  665 F. App'x 34, 38 (2d Cir. 2016) ("Questions . . . are ordinarily not hearsay[.]");  *United States v. Moyhernandez*, 17 F. App'x 62, 71 (2d Cir. 2001) (finding that questions or inquiries do not typically constitute hearsay statements because they are not assertions offered for their truth); *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("Because a question cannot be used to show the truth of the matter asserted, the dangers necessitating the hearsay rule are not present.").  And even if a search inquiry were a "statement," the *defendants*' search histories are non-hearsay party opponent statements if offered by the Government pursuant to Rule 801(d)(2)(A).

Moreover, the defendants' search histories are not being offered to show the truth of the underlying content that resulted from the searches (*e.g.*, the statute of limitations for money laundering or methods to "wash" cryptocurrency), but rather to show (i) the effect of the search histories results on defendants' state of mind, *see Victoria's Secret Stores Brand Mgmt. v. Sexy Hair Concepts, LLC*, No. 07 Civ. 5804 (GEL), 2009 WL 959775, at *9 n.6 (S.D.N.Y. Apr. 8, 2009)

16

(admitting Google search results, which were relevant to show the results observed by the searches and effect on the listener, not to prove the truth of the underlying content of the websites found in the search), and (ii) the defendants' knowledge, intent, and consciousness of guilt at the time of the charged offenses—*i.e.*, from the start of planning the Exploit to the completion of the conspiracy to launder the Crime Proceeds.[7] *See, e.g., United States v. Salah*, No. 24 Cr. 43 (DC), 2025 WL 689491, at *10 (E.D. Cal. Mar. 4, 2025) (admitting defendant's YouTube search history as probative of the defendant's intent and motive in committing the charged crime and citing in support, *United States v. Abu-Jihaad,* 630 F.3d 102, 134 (2d Cir. 2010) (affirming admission of excerpts of videos that a defendant purchased as relevant to understanding the defendants' motive and intent)); *Atkins v. Clarke*, No. 23 Civ. 565 (HEH), 2024 WL 4193821, at *2 (E.D. Va. Sept. 13, 2024) (affirming admission of evidence extracted from a defendant's phone, which included his internet history and search history during the time period of the charged offense as relevant to show his motive to commit the crimes for which he was charged); *People v. Dunn*, 2020 WL 908476, at *2 (Mich. Ct. App. 2020) (affirming lower court's admission of defendant's search of "4 Ways to Cheat a Polygraph Test" as relevant to demonstrate

---

[7] The defendants' Internet search histories are also admissible pursuant to Rule 803(3), which provides a hearsay exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)[.]"  Here, the defendants' search histories are being offered to show that they were, at the very least, contemplating topics relevant to their criminal intent prior to the Exploit and after the Exploit when they were taking actions to launder the Crime Proceeds.  *See United States v. Johnson*, 117 F.4th 28, 47 (2d Cir. 2024) (affirming the admission of an email to demonstrate the degree to which a victim perceived a message to be a threat, not whether the message was a true threat; noting that "when a declaration is admitted only to prove a relevant state of mind, it does not appear to matter whether admissibility is predicated on the declaration not being hearsay or under the Rule 803(3) hearsay exception for declaration of states of mind because under either theory, a state of mind can be proved circumstantially by statements which are not intended to assert the truth of the fact being proved").

defendant's consciousness of guilt because it indicated he planned to answer questions dishonestly, noting that trial court instructed jury that it was to consider evidence of defendant's search history only as it related to his consciousness of guilt); *State v. French*, 24 Wash. App. 2d 1040, 2022 WL 17423735, at *19 (Wash. Ct. App. 2022) (approving lower court's admission of defendant's Internet search history, following a shooting and before defendant's arrest, which showed he was on the run and was looking for information about how to evade law enforcement, which was relevant and admissible as to the defendant's consciousness of guilt).

2.    Ledgers, Notes, and Other Contemporaneous Documentation Are Not Hearsay

At trial, the Government intends to offer documents, including ledgers and notes made contemporaneously with the conduct at issue in this trial by CC-1, the defendants, and other co-conspirators. These contemporaneous materials contain two levels of statements: an underlying statement by the defendants or another member of the Exploit Team, each of whom was a co-conspirator and agent of the defendants during the relevant period, and the notes reflecting that underlying statement, which were written by CC-1 or another member of the Exploit Team. Because both levels of statements in these contemporaneous materials were made (i) by co-conspirators and in furtherance of their conspiracy, and/or (ii) within the scope of CC-1's agency relationship with the defendants, the notes and the statements reflected therein are not precluded by the rule against hearsay.

As an initial matter, the evidence at trial readily will show by a preponderance that the defendants conspired with CC-1, who entered into a non-prosecution agreement related to his participation in the Exploit and subsequent money laundering of the Crime Proceeds. *See Bourjaily*, 483 U.S. at 175. The Court can make a preliminary ruling that these statements are admissible, subject to the introduction of trial evidence (including the statements themselves) that

is sufficient to show the existence of a conspiracy.  *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("[S]tatements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed.); *see also Bourjaily*, 483 U.S. at 178 ("Rule [104] on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege.").

The Government will also establish that the relevant statements, and the contemporaneous documents reflecting those statements, were made during the course of, and in furtherance, of the wire fraud and money laundering conspiracies. Among other things, the Government intends to offer into evidence statements made by the defendants, CC-1, and other co-conspirators in the form of spreadsheets, notes, and other documentary evidence. With respect to spreadsheets, the defendants and their co-conspirators, including CC-1, created and shared with each other an Excel document that, among other things, kept a ledger of the potential targets of the Exploit, including those targets' MEV Bot contract address, asset totals, and trading patterns.  These types of ledgers are routinely admitted as co-conspirator statements under Rule 801(d)(2)(E). *See, e.g.*, *United States v. Caruso*, 225 F.3d 646, 2000 WL 1134359, at *2 (2d Cir. 2000) (affirming trial court's conclusion in mail fraud conspiracy trial that "ledger entries were made in the course and furtherance of [the conspiracy]"); *United States v. Donovan*, 55 F. App'x 16, 21-22 (2d Cir. 2003) (affirming trial court's admission in securities fraud conspiracy trial of a "ledger and . . . list [that] were both made during the conspiracy, as ways to keep track of the commissions to the coldcallers, thereby indicating that the documents furthered the operations and efficiency of the conspiracy"); *United States v. Ashraf*, 320 F. App'x 26, 28-29 (2d Cir. 2009) (detecting "no error" in trial court's

19

admission of "drug ledgers" and "a co-conspirator's testimony as to the meaning of the ledgers" because the statements fell within Rule 801(d)(2)(E)).

Similarly, the Government intends to offer into evidence certain typed notes that CC-1 maintained to keep track of the conspiracy's activities. For example, on or about December 29, 2022, CC-1 took contemporaneous notes during a teleconference with the defendants and CC-2, during which they discussed, among other things, the Exploit plan, including the defendants' understanding of how the MEV-Boost system was designed to operate. CC-1's personal notes and "to do" lists include entries with links to public documents outlining the intended design and purpose of the MEV-Boost system, such as: "https://ethresear.ch/t/mev-boost-merge-ready-flashbots-architecture/11177." That MEV-Boost link, when accessed, describes (and thereby put CC-1 on notice about) how the MEV-Boost system is intended to function, noting that "[s]ince the *execution payload* header does not include the transaction content, the risk of validators frontrunning is eliminated." CC-1's follow-up questions contained in the same "to do" list—such as, "we sent the poison block to relay(s)? / just propagate the poison block as validator (?)"—outline the technical considerations about how the Exploit Team intended to thwart the intended design and purpose of the MEV-Boost system.

These writings are not inadmissible hearsay because CC-1 took notes "to memorialize information supplied to [him] . . . and to provide a reference to help . . . carry out his role in the conspiracy." *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88-89 (2d Cir. 1999). For one, keeping track of the Exploit plan's details and objectives clearly constitutes a statement "designed to promote or facilitate achievement of the goals of [the] conspiracy." *Rivera*, 22 F.3d at 436; *see also United States v. Persing*, 436 F. App'x 13, 19 (2d Cir. 2011) (affirming the trial court's conclusion that co-conspirator's notes, which were "designed to assist him in conducting

his loan-shark business . . . were taken during the course of and in furtherance of that conspiracy"). Moreover, like the Exploit target spreadsheet discussed above, these notes were "ways to keep track of" important issues that could implicate the conspiracy's success, "thereby indicating that the documents furthered the operations and efficiency of the conspiracy." *Donovan*, 55 F. App'x at 22; *see also United States v. McPartlin*, 595 F.2d 1321, 1351 (7th Cir. 1979) (finding that "since [diary] entries were made so that [co-conspirator] could rely on them in carrying out his scheme, they aided and were in furtherance of the conspiracy"); *United States v. Dendy*, 995 F.2d 233, 1993 WL 175264, at *1 (9th Cir. May 25, 1993) (affirming trial court's conclusion that statements made in co-conspirator's diary were intended to "keep [defendant] and/or other persons advised" of the conspiracy).

For many of the same reasons, these materials are also statements of the defendants' agents under Rule 801(d)(2)(D). As the proof at trial will demonstrate, CC-1 and CC-2 were employees and agents of the defendants, and the defendants not only directed the operations of their cryptocurrency trading firm, but in particular directed the business activities of CC-1 and CC-2. Moreover, as is apparent from the nature of the documents described above, these materials were created within the scope of those agency relationships, including a work meeting organized at the defendants' behest, and are therefore not hearsay pursuant to Rule 801(d)(2)(D). *See, e.g.*, *Pappas*, 963 F.2d at 537.

To the extent the defense may argue that the notes and ledgers document legitimate business discussions, as opposed to discussions designed to further a criminal scheme, that argument (which the Government disputes) would not undermine the admissibility of those materials under Rule 801(d)(2)(D). In particular, Rule 801(d) authorizes the admission of statements designed to further a joint venture with the defendant, whether or not the goal of that

venture is criminal. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("[T]he objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all.").

        3.   <u>CC-3's Statement to CC-1 After the Exploit is Not Hearsay</u>

The Government also seeks to admit statements that were made by CC-3 to CC-1 at a work retreat, following the Exploit and during the period of the money laundering conspiracy, as non-hearsay under Rule 801(d)(2)(E).  CC-3, ███████████████████████████████ ████████████████████████████████████ to carry out the Exploit and the laundering of the Crime Proceeds, and he assisted the rest of the Exploit Team in planning and carrying out their scheme, including by providing necessary funds, performing certain mathematical computations for the Exploit code, and consulting regarding off-ramping the Crime Proceeds.  The Government anticipates that CC-1 will testify that in the weeks that followed the Exploit, the defendants received communications from the Victim Traders requesting the return of the Crime Proceeds and threatening litigation and/or reporting the Exploit to law enforcement.  During the same time, the defendants organized an international work retreat on behalf of their cryptocurrency firm.  At the retreat, while in the presence only of members of the Exploit Team, CC-3 joked that he hoped that the next time the Exploit Team met would not be in jail.  This joke by CC-3 is, first, not a "statement," as it is a forward-looking declaration of intent or desire (the hope that the Exploit Team would not be imprisoned), as opposed to asserting the "truth" of any matter.  In any event, such a statement would also fall within the scope of Rule 801(d)(2)(E) because it was made by a co-conspirator during and in furtherance of the money laundering conspiracy by "provid[ing] reassurance," *Desena*, 260 F.3d at 158, and "facilitat[ing] and protect[ing]" the conspiratorial activities, *Diaz*, 176 F.3d at 87; *see Gupta*, 747 F.3d at 123 (court may consider circumstances and

content of alleged coconspirator statement in determining the existence and membership of the alleged conspiracy).

4.   Publicly Available Documents Saved to the Defendants' Electronic Accounts and Devices or Circulated Among the Defendants and Co-Conspirators Are Not Hearsay

The Government intends to offer into evidence news articles and public documents saved to the defendants' electronic accounts and devices or shared amongst the defendants and their co-conspirators about the Exploit, including references to, among other things, a "theft," "hack," "exploit," and frozen Tether linked to the Crime Proceeds.[8]  Each of these articles is offered not for its truth, but for its effect on the defendants who sent or received them and to demonstrate both the defendants' interest in their own criminal activity and their knowledge of how that activity was publicly perceived.  For example, one such article, dated April 12, 2023, and saved to Anton's iCloud account, stated, "MEV relays are designed to protect against frontrunning attacks . . . . This attacker exploited a vulnerability in how mev-boost-relay worked, causing it to reveal the contents of blocks that would never reach the network."  Another article, dated April 11, 2023, and saved to Anton's iCloud account, was titled, "Sandwich the Ripper MEV Exploiter Joins Tether Graveyard of Blacklisted Addresses."  These articles put the defendants on notice that, following the Exploit, numerous sources described their conduct as criminal.  Yet, despite this notice, the defendants nonetheless proceeded to secretly launder the Crime Proceeds.

---

[8] To the extent any witness colloquially refers to the defendants' actions as a "hack" or "exploit" when describing his/her understanding of the defendants' actions based on the witness's first-hand observations, and for which the defendants wish to challenge that characterization, the appropriate means is through cross examination, not testimony preclusion.  *See* Fed. R. Evid. 611; *see also United States v. Rosemond*, 841 F.3d 95, 108 (2d Cir. 2016) (noting that defense counsel may cross-examine a witness in a manner that "challenge[s] a witness's perception").

Because the defendants dispute their awareness that their conduct both prior to and following the Exploit was illegal, their having received and reviewed numerous statements to the contrary is highly probative of their intent—particularly, when the defendants were simultaneously taking numerous covert steps to transfer and convert the Crime Proceeds into fiat currency (*e.g.*, cryptocurrency swaps, structured transactions, multiple digital wallet deposits, and various cryptocurrency protocol transfers).  *See, e.g.*, *United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020) (prior complaints that defendant was acting illegally properly admitted to show defendant on notice that his acts were unlawful); *United States v. Ansaldi*, 372 F.3d 118, 130 (2d Cir. 2004) (Food and Drug Administration paper circulated to defendants' employees and discussed in his presence properly admitted as evidence that defendant was on notice that his conduct was illegal), *abrogation on other grounds recognized by Dervishaj v. United States,* No. 22-2226-pr, 2024 WL 3856971 (2d Cir. Aug. 16, 2024); *United States v. Briguet*, 17 Civ. 3482 (RJD), 2020 WL 6945929, at *1 (E.D.N.Y. Nov. 25, 2020) (admitting newspaper articles to show defendant's awareness where defendant acknowledged that he regularly read the newspaper section in which the articles appeared, and the articles' headlines were "likely to catch Defendant's eye given their relevance to him"); *see also United States v. Detrick*, 865 F.2d 17, 21 (2d Cir. 1988) (an out of court statement offered to demonstrate its effect on a witness's state of mind is not hearsay).

Because the defendants' receipt, reading, sharing and/or saving of these articles tends to prove their consciousness of guilt, the articles are highly relevant under Rule 401 and easily survive Rule 403's balancing test.  *See, e.g.*, *United States v. Perez,* 387 F.3d 201, 209 (2d Cir.2004) ("Evidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt."); *United States v. Ayers*, No. 20 Cr. 239 (BMC), 2024 WL 1158686, at *15 (E.D.N.Y. Mar. 18, 2024) (admitting news articles that

defendants circulated amongst each other or to others concerning crimes committed by their gang, or otherwise reacted to, as "highly probative of the sender and recipient's state of mind concerning the subject matter of the articles").  That these articles will make it difficult for the defendants to deny that they knew (or were aware of the high probability) what they were doing was illegal does not make the articles *unfairly* prejudicial—it only makes them especially probative.  *See United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) ("All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rules of evidence.  Evidence is [unfairly] prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.").  With respect to the news articles where a percipient witness, such as the Flashbots Representative, will not be present to testify regarding the underlying facts, the Government has no objection to a limiting instruction that the exhibits are offered not to establish the truth of their contents, but solely for their effect on the defendants' state of mind and as relevant to the defendants' consciousness of guilt and knowledge of illegality of their conduct.  *See id.* at 498 (movie clips properly admitted as probative of intent, with similar limiting instructions).[9]

---

[9] These public articles are admissible only to the extent a party (i) lays a proper foundation through testimony and documentary evidence that the Exploit Team was aware of these publications prior to or before the Exploit—*e.g.*, evidence that the defendants followed public information concerning Flashbots, MEV-Boost, and statements from Flashbots' representatives, evidence that the defendants received a particular article, opened a particular webpage, or saved a particular document on their electronic devices—and (ii) offers them for their effect on the defendants, not their truth.  By contrast, should the defendants seek to admit articles or other public documents either for their truth or without laying a foundation that the defendants *actually* read those articles, they should be precluded from doing so unless and until the defendant(s) testify to such an effect (*e.g.*, academic articles concerning "sandwich trading," many of which post-date the Exploit).

5.  Flashbots' Public Guides for MEV-Boost, Flashbots Announcements, and the Flashbots Post Mortem and Disclosure Are Not Hearsay

The Government also expects to offer MEV-Boost online user guides and instructions that Flashbots made available to its users and members of the public on its website and other online repositories on or before April 2, 2023, the date of the Exploit.[10]  These documents describe the MEV-Boost software's purpose, design, functionality, and intended use.  The Government will also seek to introduce certain public announcements and postings made by the Flashbots Representative on a Flashbots website, including the April 4, 2023 Flashbots Post Mortem and another announcement on April 28, 2023 disclosing communications that the Flashbots Representative and others received from the perpetrators of the Exploit (*i.e.*, the defendants) requesting that the perpetrators be identified by a more neutral moniker (*i.e.*, "low-carb-crusader" instead of "sandwich the ripper") in exchange for disclosing a potential vulnerability that the perpetrators believed should be mitigated (*i.e.*, the Flashbots Disclosure).

Each of these categories of evidence is highly relevant, and neither is precluded by the hearsay bar or any Rule 403 considerations.  *First*, the portions of the MEV-Boost user guides that contain instructions on MEV-Boost's use, design, functionality, and purpose establish how MEV-Boost was designed to operate and what MEV-Boost users—including the defendants, as reflected in CC-1's contemporaneous notes, the defendants' and the co-conspirators' communications, and the defendants' browsing and search history—knew prior to and at the time of the Exploit about how MEV-Boost was designed to operate.  These user guides are thus directly probative of the charged scheme to defraud, the materiality of the defendants' misrepresentations, and the defendants' intent to defraud.  Moreover, these instructions set forth in Flashbots' online

---

[10] *See* Section VI, concerning the admissibility of the Internet Archive's Wayback Machine as business records.

MEV-Boost user guides are not hearsay, and the factual assertions and descriptions regarding MEV-Boost's functionality are admissible to provide context for those instructions. *See Powers v. Memorial Sloan Kettering Cancer Center*, 20 Civ. 2625 (LGS), 2023 WL 1927826, at *1 (S.D.N.Y. Feb. 10, 2023) (admitting relevant pages of user reference manual and instructions for using medical equipment as background and for context); *cf. United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) (statements offered as evidence of commands or rules are not hearsay). The MEV-Boost user guides are not barred by the hearsay rule for another independent reason— that is, they are admissible for their effect on MEV-Boost users, such as the defendants and Victim-1, and to show MEV-Boost users' knowledge regarding the functionality, design, and usage of MEV-Boost at the time of the Exploit. Finally, there is no discernable basis for exclusion under Rule 403, and these public MEV-Boost materials should be admitted at trial.

*Second*, the Flashbots Post Mortem and the Flashbots Disclosure are also highly relevant. For example, the Government anticipates that CC-1 will testify that the defendants discussed the content of the Flashbots Post Mortem with the Exploit Team, including the fact, that the report described their actions as an "exploit." Moreover, the defendants received a letter from counsel for Victim-1 on or about June 2, 2023, which requested the return of Victim-1's cryptocurrency and explicitly included a link to the Flashbots Post Mortem. The Flashbots Post Mortem is thus squarely probative of what the defendants knew about Flashbots' investigation of the Exploit, including (i) the steps that Flashbots took to discover the Exploit, how it occurred, and who was responsible; (ii) the conclusions that Flashbots reached and its intended path forward; and (iii) how Flashbots viewed the Exploit. These topics bear directly on, among other things, the defendants' subsequent efforts to conceal their fraud scheme and lend context to, for example, Internet search history and browsing history that is probative of their consciousness of guilt. Similarly, the

27

Flashbots Disclosure—which the defendants also discussed with their co-conspirators via Slack—also goes directly to the defendants' consciousness of guilt and is relevant to their efforts to conceal their fraud scheme in the wake of the Exploit.[11]  As with the Flashbots Post Mortem, the Flashbots Disclosure relates to the same conduct that will be the subject of the trial.  It therefore does not contain references to any conduct "any more sensational or disturbing than the crimes with which [the defendants are] charged."  *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Accordingly, the Court should admit them.

## II.    Certain Evidence Is Admissible as Direct Evidence or Pursuant to Rule 404(b)

The Government seeks to offer at trial evidence of certain conduct of the defendants as direct evidence of the charged crimes and, in the alternative, as evidence of other acts under Rule 404(b).   Specifically, the Government intends to offer evidence of (i) the defendants' communications regarding other blockchain and/or smart contract hacks and exploits; (ii) the defendants' pre- and post-2022 communications concerning Flashbots and MEV-Boost; and (iii) the defendants' communications with Coinbase, including prior to the Exploit.

### A.   Applicable Law

#### 1.   Direct Evidence

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*;

---

[11] The Flashbots Disclosure also attributes certain statements to the defendants, which are admissible for their truth under Rule 801(d)(2)(A).  *See Mandal v. City of New York*, 02 Cr. 1234 (WHP), 2006 WL 3405005, at *2 (S.D.N.Y. Nov. 26, 2006) (admitting portions of news articles and contemporaneous notes regarding specific statements specifically attributable to party opponents).

*accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Thus, where, as here, an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *Diaz*, 176 F.3d at 79; *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Moreover, evidence of uncharged acts is properly admitted to provide background for the existence of a charged conspiracy, or the motive and intent for a charged crime. *Coonan*, 938 F.2d at 1561. In particular, "[b]ackground evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821 (1988)); *see also* Weinstein's Fed. Evid. § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged").

### 2. Rule 404(b)

Evidence of a defendant's prior crimes, wrongs, or acts are admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit follows an "inclusionary approach" under which "prior act evidence is admissible if offered for any purpose other than to show a

defendant's criminal propensity." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017). Such evidence is admissible if (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990). Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Dupree*, 870 F.3d at 76 (citing *Diaz*, 176 F.3d at 79).

### 3. Rule 403

Whether evidence is admitted as direct evidence or under Rule 404(b), the probative value of such evidence must not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The touchstone of the prejudice analysis under Rule 403 is whether the proffered evidence of uncharged acts does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." *Roldan-Zapata*, 916 F.2d at 804. Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *Figueroa*, 618 F.2d at 943). To the extent that there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to

preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

### B. Discussion

#### 1. Defendants' Communications Regarding Other Hacks and Exploits

The Government expects to offer the defendants' conversations with others regarding other hacks and exploits, including before the Exploit, to show the defendants knew the difference between drawing public attention to a coding vulnerability (a "white hat" hack) and taking advantage of that coding vulnerability to steal from others (a "black hat" hack). For example, on May 25, 2021, Anton texted another individual ("Individual-1") that he and James "just found a hack that could've drained our contract of all its $$," and further explained that he and James had "patched it" and "**very likely we could hack other contracts for a lot of $$.**" (emphasis added). In response to Individual-1's question about whether the defendants would in fact do so, Anton responded as follows:

> Very grey area. Talking with some experts rn who have done similar hacks. I think if we did it we'd most likely hack the funds then return it to their safe wallets
>
> As a white-hat hack
>
> But there's one or two bots who have done similar things to others, **so if we got theirs we'd keep it**
>
> tldr, **depends who the target is and whether we'd want to take their money**

(emphasis added).

In another conversation on May 31, 2021, Anton received a text from another individual ("Individual-2") who sent him a link to an article regarding an exploit of another cryptocurrency blockchain and asked Anton if that exploit was "related to what you do?" In response, Anton replied to Individual-2 as follows:

> Somewhat
>
> It's on a different chain (Binance Smart Chain) which is a cheaper centralized copy-cat of Ethereum with tons of fraudulent projects
>
> **But what they did is a black hat hack (stealing)**
>
> **If I found a vulnerability in a contract like that I would probably white hat hack it (steal + return)**

(emphasis added).

As another example, on August 1, 2022, the defendants exchanged Slack messages regarding a smart contract hack that another individual ("Individual-3") messaged them about. Among other things, Anton messaged James ". . . you seeing [Individual-3's] messages." Later in that chain, James replied "i think i can drain the contract" | $202643 at a time." In response, Anton messaged "ok try to white hat it maybe?," to which James replied "should i start draining" | "maybe."

These conversations between the defendants, which are admissible as party-opponent statements under Rule 801(d)(2)(A), are direct evidence of the crimes charged. Among other things, they establish that the defendants—who never reported to Flashbots the MEV-Boost vulnerability that they eventually exploited and who refused Victim-1's requests to return the fraud proceeds after the Exploit—knew the difference between "white hat" and "black hat" conduct. Specifically, they knew, at a minimum, that exploiting a vulnerability was a "black hat hack (stealing)" if they did not return the funds, and yet, when it came to their own Exploit, they refused a direct request to return the Crime Proceeds and took many calculated steps to hide their involvement in the Exploit. This is relevant to their (i) fraudulent intent, (ii) knowledge regarding the wrongful nature of their conduct, and (iii) knowledge that the cryptocurrency that they obtained from the Exploit and subsequently moved around in a complex array of off-chain and on-chain transactions resulted from unlawful activity. In addition, as noted above, the defendants have vigorously disputed their knowledge that their conduct was wrong and that they harbored the

requisite intent to defraud with respect to the Exploit.  The jury should be permitted to evaluate these prior statements related to the defendants' knowledge and understanding of what conduct was wrongful when assessing the defendants' intent to commit this crime.

In the alternative, these conversations are relevant and admissible under Rule 404(b) to prove the defendants' motive, opportunity, preparation, plan, identity, knowledge, absence of mistake, and lack of accident. *See* Fed. R. Evid. 404(b)(2).  For the same reasons that these conversations are direct evidence of the charged conspiracies, they also go squarely to the defendants' knowledge, preparation, absence of mistake, and lack of accident.  The defendants *knew*, at a minimum, that exploiting a coding vulnerability and keeping the money was wrongful. They knew that was "black hat" behavior, *i.e.* "stealing," and they were explicit that they would be willing to steal if the victims fit a certain profile—in their own words, "depends who the target is and whether we'd want to take their money."  The specific use of the word "steal" by the defendants is also probative of intent and should be assessed by the jury.  "Stealing" is a wrongful act and a crime.  The defendants did not mistakenly believe the Exploit was just a clever trade or that the Crime Proceeds were legal profits that could be legally transferred to their fiat bank accounts.  These conversations tend to show the defendants' conduct was neither an accident nor an honest mistake.  Accordingly, they are admissible, as direct evidence of the charged offenses or alternatively under Rule 404(b).

### 2. The Defendants' Pre- and Post-2022 Statements Regarding Flashbots, MEV-Boost, Privacy Protocols and Bundled Transactions

The Government seeks to introduce at trial the defendants' communications both before and after 2022, reflecting their knowledge and understanding of Flashbots and how its MEV-Boost software worked, including that the software was designed to keep contents of proposed blocks private from validators, as well as their knowledge and understanding of the importance of

transaction ordering in a bundle and the profitability traders may obtain from executing ordered transactions. Such communications are directly relevant to the defendants' knowledge and intent at the time of the Exploit and are not barred by the rule against hearsay. *See Russo*, 302 F.3d at 43. Indeed, the defendants have indicated, through expert disclosures and otherwise, that they intend to contest that they understood that their scheme contravened the operation and expectations of the MEV-Boost system, including the significance of a validator "unblinding" a proposed MEV-Boost block, and the importance of bundled transactions being executed in order.

As relevant to these motions, in various pre-Exploit communications in emails, text messages, and social messaging platforms, Anton (i) identified himself as the individual using a particular Discord username, which later participated in conversations with the Flashbots Representative regarding the use of the MEV-Boost system, (ii) described his own use of Flashbots bundling to generate trading profits, and (iii) sent an email in late 2021, in which he included a link to public statements made by the Flashbots Representative concerning the need for privacy protocols to keep the contents of proposed blocks secret from validators, which is also relevant to establishing that Anton followed the Flashbots Representative's public comments prior to the Exploit. Additionally, the Government anticipates that CC-1 will testify that, separate and apart from the Exploit, the defendants, along with CC-1 as an employee of the defendants, used MEV-Boost when it was released to execute ordered transactions as part of their own arbitrage trading strategy.

Such evidence is highly probative of the defendants' knowledge of the MEV-Boost system's rules and protocols, its intended purpose, and the importance of ordered transaction execution to cryptocurrency traders in the MEV-Boost system. Evidence of the defendants' knowledge of how the software was meant to work would allow the jury to assess their intent in

taking steps that explicitly took advantage of parts of that software to commit the charged crime and to evaluate the credibility of any claims that the defendants had a different understanding of the software (or no understanding). In the alternative, these communications are admissible under Rule 404(b) to show the defendants' plans regarding, and preparation for, the Exploit, as well as their knowledge of the very software that they exploited. Moreover, nothing about these communications, which relate to topics directly relevant to the fraud scheme, is prejudicial or inflammatory, let alone, in a manner that substantially outweighs their probative value concerning the defendants' knowledge and intent. *See United States v. Abu-Jihaad*, 630 F.3d 102, 131-33 (2d Cir. 2010) (affirming admission of defendant's statements concerning topics relevant to his knowledge and intent with respect to the commission of the charged crimes, whose probative value was not substantially outweighed by the risk of unfair prejudice).

### 3.  Defendants' Communications With Coinbase

At trial, the Government also expects to offer evidence of the defendants' communications with Coinbase, including: (i) James's communications with Coinbase's compliance department between April 2022 and May 2022 regarding his personal Coinbase account; (ii) Anton's communications with Coinbase's support department in April 2022 regarding his personal Coinbase account; and (iii) Anton's communications with Coinbase's support department in February 2023, late 2023, and early 2024 regarding both Pine Needle Inc.'s (one of the entities used for the Exploit and laundering of the Crime Proceeds) Coinbase account and his personal Coinbase account—that is, during the period of the money laundering conspiracy.

The defendants have signaled their intent, including through their briefing and expert disclosures, to present evidence and argument that the byzantine steps they took to conceal their identities and the source of their funds merely reflects a desire to remain anonymous that is common among cryptocurrency traders generally. As relevant here, these steps included (i) the

defendants' staking of validators (including the validator involved with the Exploit) with cryptocurrency that they transferred from the Pine Needle Coinbase account through multiple transactions, multiple intermediary wallets, and the Aztec privacy layer; (ii) the subsequent withdrawal of the staked cryptocurrency used in connection with the Exploit back into the Pine Needle Coinbase Account; and (iii) the eventual deposit of the Crime Proceeds into the Pine Needle Coinbase Account following a complex series of cryptocurrency token swaps.  In broad strokes, these Coinbase communications evince the defendants' knowledge that Coinbase, as a regulated entity, collected "know your customer" information and performed reviews of newly opened accounts.  As a result, this pre-Exploit knowledge is directly relevant to the money laundering count,[12] as it supports the inference that the defendants acted with fraudulent intent in executing the Exploit and that they engaged in concealment money laundering—*i.e.*, that the defendants used multiple business entities, accounts, and transactions (including through privacy protocols) to reduce the risk that Coinbase or others would detect the unlawful source of the Crime Proceeds and the cryptocurrency used to execute the Exploit.

For example, the defendants' 2022 and early 2023 communications with Coinbase demonstrate their knowledge,[13] among other things, that (i) Coinbase is a regulated entity that conducts periodic reviews of Coinbase accounts and reviews of newly opened Coinbase accounts; and (ii) that Coinbase users are required to provide "know your customer" information to

---

[12] The same evidence is also relevant to the fraud counts as evidence of intent and consciousness of guilt.

[13] As explained above, the communications that the defendants received from Coinbase representatives are admissible for non-hearsay purposes, including their effect on the listener (*i.e.*, to show what the defendants knew about Coinbase's transaction and account monitoring) and for the fact that the defendants received those communications.  The defendants' own messages to Coinbase, which are party opponent statements, are not hearsay under Rule 801(d)(2)(A).

Coinbase, including information regarding the user's employment and the source of the user's funds. This pre-Exploit knowledge is directly relevant to the inference that the defendants used multiple business entities, accounts, and transactions (including through privacy protocols) to conceal the movement of the fraud proceeds and reduce the risk that Coinbase would detect the unlawful source of the Crime Proceeds and the cryptocurrency used to carry out the Exploit.

Similarly, the defendants' 2022 and February 2023 communications with Coinbase show that they had previously responded to information requests from Coinbase in a timely manner and that James informed Coinbase that the source of funds in his personal Coinbase account was through arbitrage on the Ethereum blockchain. However, the communications show a change in the defendants' candor to Coinbase after the Exploit. Specifically, the late 2023 and early 2024 communications reflect that (i) Coinbase repeatedly requested information and documentation relating to the Pine Needle Coinbase account that received the Crime Proceeds, the purpose of the Pine Needle Coinbase account, and the source and nature of the funds in the Pine Needle Coinbase account; (ii) Coinbase alerted the defendants that the information previously provided about the source of funds in the Pine Needle Coinbase account did not match the current deposits or activity on the account; and (iii) neither defendant responded to Coinbase's requests for further information and documentation. The 2022 and February 2023 communications, when juxtaposed with the late 2023 and early 2024 communications, are thus, probative of the defendants' consciousness of guilt, their fraudulent intent relating to the fraud scheme, and their subsequent intent to conceal the fraudulent nature of the Crime Proceeds. *See United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 696 (S.D.N.Y. 2017) ("[T]he 'existence of more than one transaction, coupled with either direct evidence of intent to conceal or sufficiently complex transactions that such an intent could be inferred; funneling illegal funds through various fictitious business accounts and highly

unusual transactions involving cashier's checks, third party deposits, and trust accounts used to disguise the source of funds' can establish that the financial transactions at issue were part of the money laundering scheme." (citation omitted)).

Alternatively, the defendants' pre-Exploit and post-Exploit communications with Coinbase are admissible under Rule 404(b) to prove their motive, knowledge, and intent with respect to the charged fraud and money laundering offenses. They are also admissible under Rule 404(b) to show the defendants' motive, preparation, and plan—that is, to explain to the jury that the defendants deliberately used multiple cryptocurrency and fiat accounts, privacy protocols, and transactions to move the Exploit proceeds precisely because they were aware of Coinbase's transaction and account monitoring. *See, e.g.*, *United States v. Atilla*, 966 F.3d 118, 129 (2d Cir. 2020) ("The jury could reasonably infer, based on the fact that Atilla lied to and concealed information from U.S. officials charged with sanctions enforcement [at the United States Treasury Department], that he was aware that the scheme involved international payments through U.S. banks that were violations of U.S. sanctions.");

## III. Hypothetical Questions To Show Materiality Are Proper

The Court should permit the Government to ask hypothetical questions of fact witnesses—such as Victim-1 and the Flashbots Representative—to prove an element of wire fraud, specifically the materiality of false and misleading representations and half-truths. *See, e.g.*, *United States v. Johnson*, 945 F.3d 606, 612, 614 (2d Cir. 2019) (discussing requirement of materiality).

The propriety of such questions is well-established and has been affirmed by the Second Circuit. In *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), the Second Circuit affirmed the use of "what-if-you-had-known" questions in the securities fraud prosecution of two defendants who had schemed to inflate their company's reported earnings. *See id.* at 455-57. In that case, two accountants testified at trial about "how they had accounted for the proceeds from the fraudulent

38

transactions; how they would have accounted for the transactions had they been aware of the full

facts; and how the material information that was withheld from them led to misstatements in the

company's financial statements." *Id.* at 456.  The Court held that such testimony "was properly

admitted as factual testimony," and "alternatively h[e]ld that it [was] admissible as lay opinion."

*Id.* at 459. The Court reasoned, where "the issue for the fact-finder's determination is reduced to

impact—whether a witness would have acted differently if he had been aware of additional

information—the witness so testifying is engaged in 'a process of reasoning familiar in everyday

life'" and is properly understood as offering lay opinion testimony. *Id.* (quoting Fed. R. Evid. 701,

advisory committee's note, 2000 amend.).  At bottom, the Second Circuit concluded that:

> a witness may testify to the fact of what he did not know and how, if he had known
> that independently established fact, it would have affected his conduct or behavior.
> As this case illustrates, 'what-if-you-had-known' questions that present withheld
> facts to a witness are especially useful to elicit testimony about the impact of fraud.

*Id.*[14]

---

[14] As the Second Circuit noted in *Cuti*, its holding is in accord with that of other Circuits to have
considered the issue. *See United States v. Musselwhite*, 709 F. App'x 958, 972 (11th Cir. 2017)
(not error to "allow[] the bank representatives to testify as to their respective banks' mortgage-
approval procedures and to answer hypothetical questions about whether their respective banks
would have approved the loans had the banks known that the buyer's income, employment history,
assets, earnest money deposit, and cash-to-close were misrepresented"); *United States v. Hill*, 643
F.3d 807, 841-42 (11th Cir. 2011) (rejecting argument that "lender representatives should not have
been allowed to testify about what their institutions would have done had they known that several
representations in various loan applications were falsified"); *United States v. Orr*, 692 F.3d 1079,
1095-97 (10th Cir. 2012) (affirming propriety of hypothetical question—"Q. What affect, [sic] if
any, would it have had upon you if you had been told that all tests done on Mr. Orr's own fuel did
not show the advantages disclosed in those documents?"—because the "prosecutor's question
went to the material nature of Orr's statements"); *United States v. Laurienti*, 611 F.3d 530, 549-
50 (9th Cir. 2010) (affirming propriety of hypothetical question—"If you had known prior to
purchasing [a house stock] that Hampton Porter prevented or discouraged their brokers from
allowing their clients to sell their shares of [the house stock], would you have purchased the [shares

Accordingly, provided the framework set forth in *Cuti* is followed, the Government respectfully requests that the Court permit the Government to ask "what-if-you-had-known" questions in order to prove materiality. *See, e.g.*, *United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2022 WL 17076747, at *1, *4 (S.D.N.Y. Nov. 18, 2022) (explaining "well-established legal principles," including that "[w]hen a fact witness is asked a hypothetical question about facts for which a foundation is laid in the record, and asked as well in answering the question to apply a reasoning process similar to that in which the witness normally engages, such testimony is admissible as testimony from a fact witness or, depending on the question, as lay opinion testimony." (citing *Cuti*)); *see also United States v. Patel*, No. 21 Cr. 220 (VAB), 2023 WL 2643815, at *44 (D. Conn. Mar. 27, 2023) (following *Cuti* and concluding that "the Government may solicit answers to hypothetical questions that fall within this framework and have the proper foundation").

The Government's evidence at trial will lay the factual foundation that: (i) Flashbots's MEV-Boost software was designed to separate the dual roles of building a block and validating the block; (ii) MEV-Boost's architecture included a relay to act as an intermediary between the block builder and a MEV-Boost validator, which had a dual benefit of providing trading privacy and greater block publication certainty desired by cryptocurrency traders while enabling MEV-Boost validators to validate proposed blocks with the highest validation rewards; (iii)

---

of the house stock]?"—in order to establish materiality); *United States v. Jennings*, 487 F.3d 564, 581-82 (8th Cir. 2007) (holding that, unlike with respect to character witnesses, it is generally permissible to ask guilt-assuming hypotheticals of fact witnesses to prove materiality, and noting that "[t]he government would be hard pressed to prove this element [*i.e.*, materiality] without asking whether the undisclosed information would have affected the decision maker's analysis."); *United States v. Dukes*, 242 F. App'x 37, 45 (4th Cir. 2007) (affirming propriety of the hypothetical question, "And if he had told you that [fact which was omitted], would that have affected your decision to invest in Financial Warfare Club?").

Victim-1 and the Flashbots Representative accordingly understood that the MEV-Boost system provided certainty that proposed bundles included within a block would be published to the chain either as originally ordered and structured or not at all; and (iv) the defendants submitted the bait transactions to lure Victim-1 and others into trading and submitting proposed transaction bundles in accordance with these protocols, and then used the False Signature to exploit a vulnerability in the MEV-Boost relay code to take approximately $25 million worth of cryptocurrency from the Victim Traders.

Accordingly, pursuant to *Cuti*, the Government anticipates asking Victim-1 whether Victim-1 would have traded had Victim-1 known that the trades could be prematurely viewed by a validator, unbundled, and switched—*i.e.*, had Victim-1 known about the defendants' Exploit.[15] The Government expects that Victim-1 will testify that, had Victim-1 known that (i) the bundle transactions included Bait Transactions that were never intended to be executed in Victim-1's proposed transaction bundles, or that (ii) the MEV-Boost validator would take actions to unbundle Victim-1's transaction bundles and switch the transactions within those bundles in a manner designed to take Victim-1's money, Victim-1 would have found such information—at the very least—material to his trading decisions. Similarly, the Government should be permitted to ask the

---

[15] Just as courts allow co-conspirator statements to be admitted subject to connection to subsequent trial evidence establishing the declarant as a co-conspirator, *see, e.g.*, *United States v. Vidal*, No. 22 Cr. 2857, 2024 WL 397630, at *4 (2d Cir. Feb. 2, 2024) (affirming Judge Cote's employing such a procedure, over the objections of the defense); *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("[S]tatements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of those . . . prerequisites."); *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969) ("[T]he practicalities of a conspiracy trial may require that hearsay be admitted 'subject to connection[]' . . . when all the evidence is in."), the Court should permit the Government to pose these hypothetical questions to witnesses who testify early in the trial, subject to connection with evidence establishing the details of the Exploit and the defendants' participation therein.

Flashbots Representative whether, *absent* the False Signature, the MEV-Boost relay would have submitted a valid block for publication consistent with the Victim Traders' ordered transactions. The Government anticipates that the Flashbots Representative will testify that, consistent with the design and purpose of the MEV-Boost system, absent the False Signature, the relay would have submitted a proposed block, which included the Victim Traders' proposed bundled transactions, in a manner that would have been accepted by other Ethereum users and published on chain (*i.e.*, thereby thwarting the Exploit).   Accordingly, the Government should be permitted to elicit admissible evidence probative of the importance that Victim-1 and the Flashbots Representative placed on the operation of the MEV-Boost relay, including the understandings that (i) bundled trades would be executed in order or not at all; and (ii) the existence of rules and protocols designed to prevent MEV-Boost validators from taking malicious actions to change otherwise private transactions to their economic advantage (*i.e.*, take the money of cryptocurrency traders).

## IV.   The Court Should Preclude the Defendants from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to

present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

The Government moves to preclude evidence and argument on the following topics, each of which would be improper or so irrelevant that any potential probative value would be overshadowed by the attendant risks of confusion, misleading the jury, delay, and waste of time.[16]

## A. The Court Should Preclude Evidence or Argument That the Victims Engaged in Inappropriate Trading Strategies

### 1. Relevant Facts

Victim-1 is the CEO of a quantitative trading firm that the defendants defrauded of more than $13 million worth of cryptocurrency on the day of the Exploit. At trial, the Government expects Victim-1 will testify that, prior to the Exploit, Victim-1's trading firm owned and controlled trading bots (the MEV Bots) that identify potential profitable trading opportunities based on publicly available trading data in the mempool. Victim-1 will explain how these trades take place in bundles of transactions: (i) Victim-1's first trade, to buy the same token as the potentially profitable trade identified in the mempool ("Trade-1"); (ii) the mempool transaction ("Trade-2"), which increases the price of the token the MEV Bots bought in Trade-1; and (iii) Victim-1's sell transaction, which makes a profit by the increased price caused by Trade-2. Victim-1 will further explain that Victim-1 chose to use the MEV-Boost trading system to effectuate this trading strategy based on Victim-1's understanding that the MEV-Boost system provided certainty that the proposed bundles would be published to the chain as originally ordered and structured, or not at all. The Government further expects Victim-1 to testify about, among

---

[16] While the Government has endeavored to identify the most likely topics and themes in this filing based on prior filings in this case, the Government respectfully reserves the right to respond to any additional matters that may be raised by the defense.

other topics, how he learned his cryptocurrency was stolen, and the steps Victim-1 took to investigate the fraud.

### 2. Discussion

The defendants have repeatedly attempted to cast the trading strategies employed by the Victim Traders as "manipulative, unlawful, and even criminal."  Dkt. 49 ("Defs.' MTD") at 17; *see* Dkt. 50 ("Defs.' *Brady* Motion) at 9-10 (describing "sandwich" trading as a form of "market manipulation").  At trial, the defendants should precluded from presenting argument or evidence— or suggesting on cross-examination, as discussed *infra*—that the victims' own trading strategies constituted misconduct—*i.e.*, that the victims were really the villains.

"It is no defense that the victims of the fraud may have been engaged in some misconduct" and therefore "possible misconduct of the victim [is] not relevant" to a fraud charge.  *United States v. Korogodsky*, 4 F. Supp. 2d 262, 265-66 (S.D.N.Y. 1998); *see United States v. Gatto*, 986 F.3d 104, 133 (2d Cir. 2021) (Lynch, J., concurring) (agreeing with the majority that evidence that "the [victims] were corrupt, exploitative institutions who deserved whatever happened to them" was properly precluded because "[s]uch a 'Robin Hood' defense—that the defendants were essentially robbing the rich to help the poor—is of course also not a legal defense"); *cf. United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019) (the fact that "everybody is doing it" is "not a defense to the crime of wire fraud or conspiracy to commit wire fraud; just as 'everyone speeds' is not a defense if your car happens to get picked up on the radar").

Here, whether Victim-1's sandwich trading strategy was typical, desirable, or even lawful is irrelevant to the question of the *defendants*' guilt or whether they acted with the requisite intent to defraud.  *See, e.g.*, *United States v. Galanis*, 844 F. App'x 400, 403 (2d Cir. 2021) (evidence of a victim's participation in making payday loans is irrelevant to a defendant's guilt for defrauding the victim); *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (explaining that victim's

44

attributes are irrelevant to defendant's criminal intent by reference to prior holding that a victim's "own criminal background is not relevant to the inquiry as to whether the defendants were properly convicted under" 18 U.S.C. § 2314); *United States v. Fiumano*, 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) (finding "victim's later act" to be irrelevant to defendant's "earlier culpable mental state" and explaining that defendant's fraudulent intent "focuses on the violator, not the victim"); *see also, e.g.*, *United States v. Rivera*, 799 F.3d 180, 185 (2d Cir. 2015) (evidence of a victim's prior prostitution is irrelevant to a defendant's guilt for coercing the victim to engage in sexual activity); *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (holding that "only [defendant's] actions and state of mind were material to her guilt," and "the fact that others may have been the beneficiaries of improper conduct does nothing to excuse [the defendant]").  Accordingly, evidence and argument regarding the merits of Victim-1's trading activity has little purpose other than to "cast the victims of the charged crime in an unfavorable light based on irrelevant matters," *Galanis*, 844 F. App'x at 403, and it is not relevant to the defendants' intent to defraud.

Moreover, even if the defendants' self-serving attempts at victim-blaming were relevant to the issues to be decided at trial, any evidence or argument on the highly contested issue of the merits of the victims' trading strategies would be substantially more prejudicial than probative and likely lead to a mini-trial on that topic.  *See, e.g.*, *United States v. Rossy*, No. 22 Cr. 550 (NSR), 2023 WL 8039500, at *3 (S.D.N.Y. Nov. 20, 2023) (precluding evidence of victim's criminal misconduct as irrelevant to the defendant's state of mind and because it "risks creating a multi-ringed sideshow of mini-trials" that would "confus[e] the issues and wast[e] time"); *Gatto*, 986 F.3d at 117-18 (affirming district court's exclusion of expert testimony that "could have invited improper acquittals by enticing the jury to base its decision on the perceived unreasonableness or

unfairness of the NCAA's amateurism rules" as "substantially more prejudicial than probative"). Here, any aspersions the defendants would cast on the victims' trading strategies "would not . . . change[] whether [the] [d]efendants [are] guilty of wire fraud" and would "cloud[] the issue for the jury." *Gatto*, 986 F.3d at 118. Accordingly, any such evidence or argument should be precluded.

Similarly, the defendants' expert disclosures suggest that they plan to argue that the victims were insufficiently careful in protecting themselves from the defendants' fraud. *See, e.g.*, Dkt. No. 122, Ex. 1 (Falk Disclosure) ¶¶ 55-65 (arguing that the victims "exposed themselves to an especially high amount of risk by using millions of dollars of tokens" in executing their trading strategy and that the amount "lost by the [victims] was therefore decided solely by the [victims]"). The law is clear that "any evidence proffered by [d]efendants for the purpose of establishing that [a fraud victim] was negligent or careless would be irrelevant to the inquiry of whether [the defendants] possessed the requisite intent to commit the fraud at issue in this case." *United States v. Lesniewski*, 11 Cr. 1091 (VM), 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013), *aff'd*, 614 F. App'x 542; *see, e.g.*, *United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021); *United States v. Weaver*, 860 F.3d 90, 95-96 (2d Cir. 2017). Accordingly, the defendants should be precluded from arguing or adducing evidence—including expert testimony—that any victims of the defendants' fraudulent scheme were negligent or insufficiently diligent when being defrauded.[17]

---

[17] The Government expects to address this and other deficiencies in the defendants' expert disclosures in greater detail in its upcoming *Daubert* motions.

**B.  The Court Should Exclude Evidence and Argument that Cryptocurrency Is Unregulated or that the Government's Charging Decisions Were Improper**

The defendants should be precluded from arguing or adducing evidence—including on cross examination of the Government's witnesses—that cryptocurrency is unregulated, that the charges in this case are somehow improper due to the novelty of cryptocurrency, that the defendants' conduct could or should have been redressed through civil proceedings, or that other alleged fraudsters have not been prosecuted.

In their motion to dismiss the defendants argued that the charges against them are inappropriate because they: (i) represent "an unusual government intervention into the Ethereum Network, which is decentralized and 'trustless' by design" with "[n]o government regulation" governing "the rights and duties of searches and validators, Defs.' MTD at 12-15; (ii) the "government has yet to prosecute entities . . . that perpetrate 'sandwich attacks' on the Ethereum Network" and such "conspicuous inaction" suggested that the "government did not view intervention in adversarial trading on decentralized cryptocurrency exchanges like Ethereum as appropriate," *id.* at 16-18 (emphasis omitted); and (iii) the "government also has not prosecuted other attempts to *counter* sandwich trades," such as a trader's creation, in 2021, of "a new cryptocurrency token named Salmonella,"[18] designed to "turn the tables on sandwich traders," *id.* at 18-19.

---

[18] Notably, the "Salmonella" "counter" that the defendants cite was executed prior to the launch of the MEV-Boost system *and* referenced in an article circulated and promoted by Anton in May 2021 as a "a clever attack that stole" cryptocurrency and resulted in "wasted resources and potential [Ethereum] consensus instability."  The fact that the defendant was aware that "Salmonella" was characterized by at least one source as a theft and occurred *prior to* the introduction of the software that was exploited in this case further emphasizes the irrelevant and misleading nature of any such evidence and arguments and warrants preclusion.

Arguments about the state of regulation in the cryptocurrency industry have no relevance to any fact of consequence. *See United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *2 (S.D.N.Y. Jan. 26, 2004) (concluding that "[t]he defense may not argue or present evidence to the jury that tends to show that [a securities fraud] count is an unusual or unprecedented application of the securities laws" because such evidence "is irrelevant to the jury's consideration of the indictment in this case"); *Connolly*, 2019 WL 2125044, at *13 (explaining that "everybody is doing it" is "not a defense to the crime of wire fraud or conspiracy to commit wire fraud"). Similarly, it is well established that the Government's motives for and conduct during the investigation and prosecution of a defendant are irrelevant to guilt or innocence. *See United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (affirming decision precluding "evidence at trial that the grand jury investigation was illegitimate"); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial").

At bottom, the sole question before the jury is whether the facts prove beyond a reasonable doubt that each defendant is guilty. Whether the defendants specifically knew that they were committing a crime and intended to commit a particular crime is not an element of wire fraud, which simply requires proof that the defendants acted knowingly and with the specific intent to defraud. *See, e.g.*, *United States v. Middendorf*, 18 Cr. 36, 2019 WL 4254025, at *7 (S.D.N.Y. Sept. 9, 2019); *Rosado*, 728 F.2d at 93; *United States v. Borrero*, No. 13 Cr. 58 (KBF), 2013 WL 6020773, at *2 (S.D.N.Y. Nov. 1, 2013) (precluding cross examination regarding a government charging decision in part because "the limited amount of probative value that the . . . charging

decisions add is substantially outweighed by the risk of undue confusion and an unnecessary sideshow").

This trial is not a referendum on regulation in the cryptocurrency industry generally, how the defendants' conduct should be characterized or addressed, or the Government's charging decisions in this matter, or any other matter. *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1074 (2d Cir. 1977) (defendant may not argue for acquittal "on the basis of extraneous public policy considerations"). Indeed, courts routinely bar attempts to shift the focus of criminal trials from the charges against the defendant to the conduct of the investigation, under Rules 401 and 403. *See*, *e.g.*, *United States v. Malpeso*, 115 F.3d 155, 162-63 (2d Cir. 1997); *see also Cheung Kin Ping*, 555 F.2d at 1073 (affirming jury instruction that "law enforcement policy was not its concern"); *United States v. Reese*, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("a defendant 'may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case'" (quoting *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)); *Stewart*, 2004 WL 113506, at *1 (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]").[19]

---

[19] The Government expects to elicit testimony from Victim-1 that he reported the theft of his cryptocurrency to Israeli and American law enforcement. Israeli law enforcement's charging decisions—like the Government's charging decisions—are irrelevant to the defendant's guilt or innocence because there are any number of reasons that a jurisdiction may exercise its discretion to prosecute or not prosecute that have nothing to do with the defendants' factual guilt or innocence. Accordingly, the Court should also preclude the defendants from introducing evidence or eliciting testimony (including on cross examination) regarding foreign law enforcement's charging decisions—*i.e.*, the presence or absence of foreign criminal charges against the defendants—absent an offer of proof, which would, as a threshold matter, necessitate a proffer as to percipient knowledge of any such decisions, along with a Rule 401 and 403 proffer.

Moreover, any plausible relevance is substantially outweighed by the danger of confusing issues, misleading the jury, and wasting time. Opening the door to arguments about the state of regulation in cryptocurrency or how cryptocurrency ought to be regulated would necessarily involve a digression into the various agencies responsible for regulating the industry and the different ways in which they have or have not regulated (or should or should not regulate) the space. Claims about the Government's prosecutorial decisions would, similarly, require a detour into the similarities and dissimilarities between this case and others charging (or not charging) fraud and/or money laundering and are probative of no matter before the jury. These would be time-wasting sideshows that would risk confusing the jury about the facts relevant to this case and misleading jurors into believing the case was a referendum on cryptocurrency regulation writ large. None of that is pertinent to the jury's task of deciding whether the defendants committed fraud and money laundering. Such argument and evidence should be excluded entirely.

### C. The Court Should Preclude the Defendants from Arguing that "Code is Law"

In their motion to dismiss, the defendants argued that the charges against them were "surprising where the underlying code that permitted the alleged 'Exploit' was as visible to the alleged victims' MEV-Bots as to the defendants" and that "it cannot be said that . . . conduct permitted by the relevant code could be considered fraudulent." (Defs.' MTD at 14). This appears to be a version of an argument that "code is law": namely, that because the MEV-Boost code did not prevent the defendants' Exploit, their conduct was legal.

This argument is wrong and fundamentally misunderstands the charges in this case. The defendants are charged with fraud based on their execution of the Exploit. It is no defense to claim that the Exploit was technologically feasible. The criminal laws protect people from fraud regardless of whether privately designed computer codes, contracts, or economic incentives do the same. Accordingly, the defendants' "code is law" claim is not a legally valid defense and presents

50

a high risk of confusing the jury. The Court should exclude arguments to that effect and restrict how the defense is permitted to use evidence about the MEV-Boost code.

1.   Technological Feasibility Is Not a Defense to Fraud.

The Government expects that a representative from Flashbots—the research and development organization that developed the open-source MEV-Boost software—will testify that Flashbots learned on April 3, 2023, that there was a vulnerability in the MEV-Boost software after the defendants exploited that vulnerability. The Flashbots Representative will explain that Flashbots designed the MEV-Boost software to enable anyone to participate competitively in the Ethereum consensus and realize the economic benefits of MEV, regardless of their size, sophistication, or resources. Specifically, Flashbots designed the MEV-Boost software to separate the dual roles of building a block (*i.e.*, selecting the transactions in the block) and validating the block, allowing parties to participate as validators so long as they "staked" a certain amount of Ether. However, to address the lack of trust between block builders and validators who may be unknown each other—*e.g.*, to address a block builder's concern that a validator could unbundle or change the precise ordering of a block—Flashbots included a feature in the MEV-Boost software: a relay to act as an intermediary between a block builder and a validator. Flashbots designed the MEV-Boost software to permit the following steps: (i) the block builder orders a block and sends it to the relay; (ii) the validator asks the relay for the highest-value blockheader; (iii) the relay sends the blockheader *without transaction contents* to the validator; and (iv) the validator commits to publishing the block as structured by digitally signing the blockheader that is sent to the relay, after which the block is published to the Ethereum network. The Government expects that the Flashbots Representative will testify that the defendants' scheme exploited a previously unknown vulnerability in the MEV-Boost software particular to the relay, by using the False Signature to

transmit invalid data to the relay, which guaranteed that the block—as proposed by the block builder and submitted to the relay—would not be published to the blockchain.[20]

The defendants here are charged with fraud arising out of their use of the bait transactions and the False Signature to change the order of trades in a proposed block on the Ethereum Network, and thereby obtain $25 million in cryptocurrency from victims. That the defendants' fraud was technologically feasible using MEV-Boost is not a defense to the charges in this case.[21] The decision in *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022), illustrates the principle. There, the Seventh Circuit held that "spoofing"—where a trader manipulates prices by placing orders to buy or sell, with the intent to cancel those orders—constitutes wire fraud. *Id.* (holding that spoofing is wire fraud); *see, e.g.*, *United States v. Smith*, --- F. 4th ---, 2025 WL 2406104, at *6 (7th Cir. 2025) (holding that, in light of recent Supreme Court precedent, "we easily conclude . . . that spoofing constitutes a scheme to defraud within the meaning of the wire and commodities fraud statutes"); *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658-59 (2d Cir. 2016) (explaining that promise without intent to keep promise is fraud). The Court reached that decision without requiring any proof that "spoofing" was technologically or contractually

---

[20] The Government further expects that the Flashbots Representative will describe that the way the MEV-Boost software is designed to work—including the MEV-Boost architecture and the roles and interaction of the different MEV-Boost participants—is set forth on various online repositories that are open to the public, including a "read-me" that accompanies the MEV-Boost software and user guides that are available on Flashbots's website. As described further in Section I(B)(V), *supra*, & Section VI, *infra*, the rules of MEV-Boost and other Flashbots literature published before the Exploit—as archived by the Wayback Machine—are admissible for their effect on the reader and can be authenticated under Rules 902(13) and (14).

[21] That is particularly true here, where the Government expects the evidence at trial will show that Flashbots published the aforementioned "read-me" document and MEV-Boost user guides on public repositories, which made clear that the design and function of MEV-Boost was intended to prevent conduct like the Exploit.

prohibited on the platforms the defendants used. That makes perfect sense: what matters in a fraud case is whether the scheme was deceptive, not whether it involved hacking or breaking private contractual rules. Any suggestion otherwise is also conceptually out-of-step with fundamental understandings of criminal law. The defendants are arguing that because they *could* commit the crime, the crime was therefore permissible. This is not the law. One is not allowed to rob a bank because the door to the bank was left unlocked. The legality of the same exact conduct does not depend on whether a particular victim or third party has patched (*i.e.*, fixed) coding errors in their software. Any argument along these lines is essentially an argument for jury nullification.

These basic principles appear time and again in fraud cases. For example, the Second Circuit has repeatedly held that financial statements can be fraudulent, even if they are compliant with Generally Accepted Accounting Principles. *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 125-126 (2d Cir. 2006) (rejecting argument that, in a fraud case, the Government had to prove "that the underlying accounting was improper under GAAP") (citing *United States v. Simon*, 425 F.2d 796, 805-06 (2d Cir. 1969) (Friendly, J.)); *United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007) ("It has been the long-held view in this Circuit that GAAP neither establishes nor shields guilt in a securities fraud case."). This shows that a representation can be fraudulent, even if it complies with other rules or standards applicable to the representation. This is on all fours with the case here: the Government does not need to prove that the defendants' scheme was rendered technologically impossible by the MEV-Boost code to prove that it was fraudulent.

2. The Court Should Exclude "Code is Law" Arguments and Restrict Related Evidence.

The criminal laws protect people from fraud, regardless of whether private entities design code or create contracts that prohibit the same conduct. Because it is no defense to the charges in this case that the defendant's scheme was technologically feasible, the Court should limit the

defense in two ways:  First, the Court should prevent the defendants from arguing to the jury that they are not guilty if the code did not bar the scheme.  And second, the Court should restrict the presentation on evidence about the MEV-Boost code to prevent such an improper suggestion, including potentially through a limiting instruction.

Any argument that the charged conduct was legal if it was not prevented by the code should be precluded because it is legally wrong.  *See Paul*, 110 F.3d at 871 ("If . . . the court finds that the defendant's evidence is insufficient as a matter of law to establish [a] defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury.").  Cryptocurrency is not unique.  People who utilized the MEV-Boost relay did not give up the protections of federal law simply because the defendants figured out a way to steal their money through the Exploit.  *See United States v. Bankman-Fried*, 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023) (precluding evidence that customers or investors were "negligent, gullible, or insufficiently vigilant" because "the unreasonableness of a fraud victim . . . does not bear on a defendant's criminal intent" (collecting cases)).  Allowing the argument to the contrary would confuse and mislead the jury about the applicable law, and so should be prohibited in its entirety.  This restriction is necessary to ensure that the jury does not take away the misimpression that, when it comes to cryptocurrency (and cryptocurrency alone), anything goes so long as the code allows it.

The laws prohibiting fraud protect investors by virtue of Congress's decision to criminalize such activity.  It is no defense that private actors have not perfectly designed software code to separately prohibit what is already illegal.  The defense should not be able to suggest otherwise to the jury.

### D. Absent a Formal Advice of Counsel Defense, the Court Should Preclude Argument and Evidence Regarding the Involvement of Counsel

The defendants have not yet informed the Government whether they will assert a formal advice-of-counsel defense at trial.[22]  In accordance with the Court's Individual Rules, the parties met and conferred on August 20, 2025, and the defendants represented that—if they do not assert a formal advice-of-counsel defense—they do not intend to adduce evidence or make arguments regarding the presence or involvement of attorneys at certain meetings or on certain emails or documents to suggest that the defendants lacked criminal intent.  Any such evidence or argument would be improper and should be precluded.  *See, e.g.*, *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024); *United States v. Gillier*, 11 Cr. 409 (PAE) (S.D.N.Y.) (July 5, 2022 Hr'g Tr. at 15); *SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013); *SEC v. Lek Securities Corp.*, 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019).[23]

### E. The Court Should Exclude Evidence of the Defendants' Personal Circumstances and Potential Punishment

The Government is unaware of any lawful basis for the defendants to offer evidence or argument concerning their family background, lack of criminal history, age, or any other similar factors.  Here, in particular, the defendants may attempt to improperly suggest either (i) that they

---

[22] The deadline for defendants' notice to the Government of an advice of counsel defense is September 8, 2025.  Dkt. 46.

[23] If, despite their representation to the contrary, the defendants improperly introduce the involvement of counsel during trial, the Court should provide a cautioning instruction as has been done in other cases in this District.  *See, e.g.*, *United States v. Shea*, No. 20 Cr. 412 (AT) (S.D.N.Y.), Dkt. 245, May 31, 2022 Tr. at 787 ("A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case.  The defense has not claimed, and cannot claim, that the defendant's conduct was lawful because he acted in good faith on the advice of a lawyer."); *Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.), Oct. 26, 2020 Tr. at 2402 ("[T]here is no defense in this case of so-called reliance on counsel.").

were young and naïve, or (ii) that they are otherwise law-abiding U.S. citizens, in contrast with their foreign victims—whom the defendants previously suggested, without any admissible basis, may be "associated with sanctioned entities, criminal enterprises, or potentially illegal activity," Dkt. 51 ("Defs.' *Brady* Mot.").[24]  They should be precluded from doing so, and from mentioning such subjects in their opening statements, absent a showing that such a factor bears on their guilt. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *see generally* Section IV(A), *supra* (discussing irrelevance of victims' attributes and/or misconduct to the issue of defendants' guilt in a fraud trial).

The defendants should similarly be precluded from offering evidence or argument concerning the punishment or consequences they face if convicted.  Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).  This is so for good reason:  argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*  There is no proper basis for the defendant to put these issues before the jury in any form, and the defendant should not be permitted to offer evidence or argument inviting the jury to consider them. *See, e.g.*, *United States v. Avenatti*, No. 19 Cr. 374, Dkt. 288 (JMF) (S.D.N.Y. Jan. 13, 2022) (Tr. 9-10)

---

[24] The Government expects the evidence at trial will include post-Exploit Internet searches by James Peraire-Bueno regarding certain foreign government's criminal laws applicable to the Exploit—evidencing the defendant's consciousness of guilt—including the following searches: "israeli head of cyber division crypto," and "does the united states extradite to israel."

56

("anything that adverts to possible punishments, including possibility of incarceration, however obliquely, is improper and will not be permitted," including, for example, a statement in opening or closing arguments that the defendant's "liberty is at stake," which would be "a not-so-thinly veiled reference to the prospect of incarceration, which is altogether improper").

## V.    The Court Should Limit the Scope of Cross-Examination to Appropriate Topics

At trial, the Government expects to present (i) testimony by Victim-1 regarding his trading activity as it relates to the Exploit; (ii) testimony by records custodians should the defendants not agree to the authenticity or admissibility of certain documents; (iii) testimony by fact witnesses on certain discrete topics (*e.g.*, the existence of an interstate wire); and (iv) testimony by summary witnesses, including law enforcement agents or employees of the U.S. Attorney's Office, who will present evidence admissible under Federal Rule of Evidence 1006.  For the reasons below, the Court should preclude the defendants from pursuing certain lines of cross-examination of Victim-1 on irrelevant and unfairly prejudicial topics, and should limit the scope of cross-examination of witnesses called to testify regarding discrete topics or for limited purposes to the scope of their direct examination.

### A.  Cross-Examination of Victim-1 Regarding "Market Manipulation"

Trial courts must "protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611.  The Federal Rules of Evidence also prohibit the use of extrinsic evidence to prove specific instances of a witness's conduct, except for criminal convictions under Rule 609 or on cross-examination if the specific instance is probative of truthfulness.  *United States v. Schlussel*, 08 Cr. 694 (JFK), 2009 WL 536066, at *3 (S.D.N.Y. Feb. 27, 2009) (Rule 608(b) "does not authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of truthfulness" (cleaned up, citation omitted)).  But even if "the prior act does concern the witness's character for truthfulness under Rule 608(b), its probative value must not be substantially

outweighed by its unfairly prejudicial effect under Rule 403." *United States v. Devery*, 935 F. Supp. 393, 407-08 (S.D.N.Y. 1996). Thus, "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Crowley,* 318 F.3d 401, 417 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

For the same reasons outlined in Section IV(A), *supra*, the Court should preclude the defendants from cross-examining Victim-1 regarding whether the trading strategy Victim-1 was engaged in at the time of the Exploit is "manipulative, unlawful, and even criminal." (Defs.' MTD at 17; *see* Dkt. 50 ("Defs.' *Brady* Motion) at 9-10 (describing "sandwich" trading as a form of "market manipulation"). These topics are entirely irrelevant to the central matters at issue in this trial—namely, whether the *defendants* acted with the requisite intent to defraud. *See Thomas*, 377 F.3d at 243 (explaining that victim's attributes are irrelevant to defendant's criminal intent by reference to prior holding that a victim's "own criminal background is not relevant to the inquiry as to whether the defendants were properly convicted under" 18 U.S.C. § 2314); *accord Galanis*, 844 F. App'x at 403 (evidence of a victim's participation in making payday loans irrelevant to a defendant's guilt for defrauding the victim). Likewise, Victim-1's trading profits and his other trading activity *unrelated* to the Exploit have no bearing on his credibility and no relevance to whether the defendants defrauded Victim-1, as this Court has already held. *See United States v. Peraire-Bueno*, 24 Cr. 293 (JGLC), 2025 WL 2062021, at *16 (S.D.N.Y. July 23, 2025) (quashing defendants' request to compel Victim-1 to provide "financial reports and information about [his] trading strategies" on relevance grounds and explaining that defendants have "failed to establish

how [Victim-1's] strategies for trades in transactions other than the ones at issue or their financial reports make any element of the charged crimes more or less likely").

Importantly, speculative allegations that Victim-1 was involved in "manipulative, unlawful, and even criminal" is not probative of Victim-1's credibility. *Cf. United States v. Motovich*, 21 Cr. 497 (WFK), 2024 WL 3303723, at *18 (E.D.N.Y. July 2, 2024) (finding allegations in complaint "unproven and therefore, not probative"); *accord United States v. Novaton*, 271 F.3d 968, 1006 (11th Cir. 2001) (affirming preclusion of cross-examination concerning prosecution witnesses' alleged misconduct where witnesses were not criminally charged and allegations were unproven); *United States v. Stoecker*, 215 F.3d 788, 790 (7th Cir. 2000) (affirming exclusion of evidence of complaint filed against witness by government agency where no assessment of guilt was made).[25]  Indeed, even if a trader did engage in misconduct, that is not alone a basis to impeach a witness.  That is because the nature of the business's practices does not necessarily reflect on an individual witness's character for truthfulness.  And particularly given the speculative and assumption-laden nature of this theory of impeachment, even with a limiting instruction, it would be exceedingly difficult for a lay juror to properly assess the minimal value of any such evidence, purportedly offered solely for impeachment. *Cf. Gupta*, 747 F.3d at 132 (Rule 403 requires the preclusion of statements for which it would be difficult for the jury to distinguish between that portion that could possibly go to state of mind or intent of the declarant, and the truth of the assertions themselves).  Finally, as explained above, permitting the defendants

---

[25] As the Government will establish in its *Daubert* briefing, any attempt to establish that the Victim Traders were engaged in "manipulative, unlawful, and even criminal" conduct, which therefore, justified their victimization by the defendants, is not only a legally improper defense, but based on expert opinions that lack a reliable methodology or basis in facts and data, and are irrelevant, unfairly prejudicial, and confusing to the jury.

to adduce evidence regarding the merits of the victims' trading strategies would be confusing, misleading, substantially more prejudicial than probative, and likely lead to a digressive mini-trial on this topic. *See Rossy*, 2023 WL 8039500, at *3; *Gatto*, 986 F.3d at 117-18.

### B. Cross-Examination of Records Custodians and Witnesses Called for Limited Purposes

At trial, the Government expects to call certain witnesses for limited purposes, which generally fall into the categories of witnesses discussed below. For each of these categories, the Court should limit cross-examination to the subject matter of the witness's direct examination and matters affecting their credibility. Fed. R. Evid. 611(b); *see also Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 110 (2d Cir. 2012).

*First*, these witnesses include records custodians for financial institutions and electronic communications providers, whose testimony will be limited solely to authenticating routine records and establishing the factual predicates for the business records exception to the hearsay rule if the defendants will not stipulate to the authenticity or admissibility of certain records. The Court should preclude cross-examination concerning other responsibilities of the witness or other topics unrelated to authenticating records or maintaining records in the normal course of business. *Accord United States v. Ellis*, 156 F.3d 493, 497-99 (3d Cir. 1998) (affirming district court's ruling that where agent's testimony was limited to authenticity of tape recordings which defendant did not challenge, agent could not be examined on other topics because his credibility was not at issue). To the extent defendants wish to question these records custodians about topics beyond the exceedingly limited scope of their direct examination, the Court should require the defendants to provide a proffer before trial as to why the proposed topics of examination are admissible, and if so, require the defendants to disclose the witness on their witness lists and call the witness in any defense case-in-chief. *See United States v. Londonio*, 17 Cr. 89 (CS), Dkt. 857 (S.D.N.Y. 2019)

60

(granting request that scope of cross be limited to scope of direct for purposes of efficiency, and that exploration of other matters be conducted during defense case); *United States v. Parnas*, 19 Cr. 725 (JPO), Dkt. 275 (S.D.N.Y. Oct. 5, 2021) (explaining that the "Court will not allow the defendant to use [cross-examination of agents] as an opportunity to present their case").

*Second*, absent factual stipulations between the parties, the Government anticipates eliciting testimony regarding certain discrete topics, including, by way of example, that (i) all wire transactions processed using FedWire after 2009 involved the use of FedWire's data centers located in New Jersey and Texas; (ii) after the Exploit, the defendants never contacted TRM Labs, Inc., a blockchain intelligence firm that identifies and labels cryptocurrency addresses, to request any changes to the labeling of the defendants' cryptocurrency addresses; and (iii) the past content of websites is archived through what is commonly known as the "Wayback Machine," which, as relevant to this case, captured certain Flashbots and other publications relevant to the Exploit. Given the similarly limited nature of the anticipated testimony of these witnesses (*i.e.*, to establish foundational facts that are not reasonably subject to dispute), the Court should also preclude cross-examination on topics of marginal relevance that is likely to be substantially outweighed by the risk of confusing the issues, wasting time, and undue delay, such as the methods that TRM uses to identify and label cryptocurrency addresses, or that Coinbase uses to detect and flag potentially fraudulent accounts or transactions. *See* Fed. R. Evid. 403. Should defendants wish to question these witnesses regarding topics outside the limited testimony the Government intends to elicit, the Court should also require them to provide an offer of proof before trial as to the admissibility of the proposed topics of examination, and if so, to disclose the witness on their witness lists, and call the witness in any defense case-in-chief.

*Third*, the Government expects to call certain witnesses employed by the U.S. Attorney's Office for the Southern District of New York as summary witnesses, and, absent a stipulation, IRS-CI agents to testify regarding the seizure and extraction of evidence recovered from electronic devices belonging to the defendants.  These witness's knowledge of the case is limited either to the narrow set of materials they were instructed to review or forensic data they were responsible for seizing and/or extracting.  The mere fact that these witnesses may be government employees or agents does not justify exceeding the scope of their direct examination.  *See United States v. McLaughlin*, 957 F.2d 12, 18 (1st Cir. 1992) (affirming limitation of cross-examination of government agents to scope of direct because "a party has no right, unless the court in the exercise of its discretion allows, to cross-examine a witness beyond the subject matter of his direct examination and beyond matters affecting credibility"); *United States v. Adeniyi*, No. 03 Cr. 86 (LTS), 2004 WL 1077963, at *3 (S.D.N.Y. May 12, 2004) ("The Court is also unpersuaded by Defendant's apparent contention that [the case agent's] acknowledgment during direct examination that he had participated in an investigation of Defendant, coupled with [the case agent's] testimony regarding certain specific aspects of that investigation, combined to give defense counsel carte blanche to inquire into any subject related to the investigation of Defendant.").

## VI.    The Court Should Permit the Authentication of Certain Records Under Rules 902(11), (13), and (14)

In accordance with the Court's Individual Rules, the parties met and conferred on August 20, 2025, and agreed that certain records could be authenticated pursuant to Federal Rules of

Evidence 902(11), (13), and (14).[26]  Specifically, the parties have agreed not to challenge the authenticity of: (i) certain records that were created and maintained in the regular course of business by certain third parties (*e.g.*, Google, Slack, Discord, X Corp., FedWire, GitHub, Apple, and various banks and cryptocurrency exchanges), which are self-authenticating business records that may be admitted pursuant to Rules 803(6) and 902(11); (ii) screenshots from the Wayback Machine, which are self-authenticating electronic evidence that may be admitted pursuant to Rules 902(13) and 902(14); and (iii) publicly available blockchain records (*e.g.*, from blockchain explorer websites including Etherscan and Beaconchain), which are self-authenticating records that may be admitted pursuant to Rule 902(11) and 902(13).  Accordingly, pursuant to those rules and the parties' agreement, the Government respectfully requests that the Court allow such records to be authenticated without the need for testimony from a custodian of records.[27]

---

[26] Although the parties anticipate reaching a further agreement regarding the authentication of routine business and electronic records by stipulation, no formal agreement has yet been reached. Even in the absence of stipulations, the parties of agreed not to challenge the authenticity of the records discussed in this section.

[27] The parties may object to certain of the records in the categories described above on grounds other than authenticity, such as relevance or hearsay.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
        August 22, 2025

                    Respectfully submitted,

                    JAY CLAYTON
                    United States Attorney


        By:     _____/s/_____
                Jerry Fang / Danielle Kudla / Benjamin Levander
                Assistant United States Attorneys
                Tel: (212) 637-2584 / -2308 / (914) 993-1930

64