**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>ANTON PERAIRE-BUENO, and JAMES<br>PERAIRE-BUENO,<br><br>     Defendants. | Case No.:  1:24-cr-00293-JGLC |

**DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTIONS *IN LIMINE***

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ........................................................................................................................5

I.    The Court Should Deny the Government's Motion for an Order Stating That Certain Categories of Evidence Are Not Hearsay. ..........................................5

    A.    Category 1: Defendants' Statements, Alleged Exploit Code, and Internet Search Histories ...............................................................................6

        1.    Defendants' Statements ............................................................6

        2.    Alleged Exploit Code..................................................................6

        3.    Internet Search Histories ...........................................................7

    B.    Category 2: Ledgers and Notes................................................................11

    C.    Category 3: CC-3's Alleged Joke to CC-1 ...............................................12

    D.    Category 4: News Articles .......................................................................15

    E.    Category 5: Flashbots Documents ...........................................................18

        1.    Online User Guides and Instructions .......................................18

        2.    Flashbots "Post Mortem" and "Disclosure" ............................21

II.   The Court Should Deny the Government's Motion to Admit Certain Evidence Pursuant to Rule 404(b). ...........................................................................23

    A.    Communications Regarding Other Hacks and Exploits .........................23

    B.    Pre- and Post-2022 Statements Regarding Flashbots, MEV-Boost, Privacy Protocols, and Bundled Transactions.......................................................25

    C.    Communications with Coinbase ..............................................................25

III.  The Court Should Deny the Government's Motion to Elicit Testimony from Lay Witnesses Through Hypothetical Questions. ....................................................26

IV.   The Court Should Deny the Government's Motion to Preclude Evidence and Argument That Are Supposedly Irrelevant and Unfairly Prejudicial. ...............32

    A.    Evidence and Argument Concerning the Alleged Victim Traders' Trading Strategies.................................................................................................33

B.      Evidence and Argument Concerning Lack of Cryptocurrency Regulation or the Government's Charging Decisions .................................................37

C.      What the Government Calls a "Code Is Law" Argument .....................................39

D.      Argument and Evidence About the Involvement of Counsel ..............................43

E.      Evidence of Defendants' Personal Circumstances and Potential Punishment.................................................................................................47

V.      The Court Should Deny the Government's Motion to Preclude Cross-Examination on Certain Topics. ...........................................................................................48

A.      Cross-Examination of the Witness for Nonparty-1 Regarding "Market Manipulation" .....................................................................................48

B.      Cross-Examination of Records Custodians and Witnesses Called for Limited Purposes .....................................................................................51

VI.     The Government's Motion to Permit Authentication of Certain Records Under Rules 902(11), (13), and (14) Is Moot. ...........................................................53

CONCLUSION...............................................................................................................53

## **TABLE OF AUTHORITIES**

**Page(s)**

### **CASES**

*Ap-Fonden v. GE*, 2024 WL 4246159 (S.D.N.Y. Sept. 18, 2024)................................................44

*Athridge v. Iglesias*, 2004 WL 7345458 (D.D.C. Dec. 21, 2004)..........................................30

*Atkins v. Clarke*, 2024 WL 4193821 (E.D. Va. Sept. 13, 2024).............................................10

*California v. Green*, 399 U.S. 149 (1970) ........................................................................48

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014)......................................13

*Davis v. Alaska*, 415 U.S. 308 (1974)............................................................................48, 50, 51

*Definitive Holdings, LLC v. Powerteq LLC*, 731 F. Supp. 3d 1243 (D. Utah 2024).......................7

*Educ. Credit Mgmt. Corp. v. Frushour*, 433 F.3d 393 (4th Cir. 2005)..........................................51

*Evanston Bank v. Brink's, Inc.*, 853 F.2d 512 (7th Cir. 1988)..........................................30

*Funk v. Belneftekhim*, 2018 WL 11169575 (E.D.N.Y. Nov. 30, 2018)..........................................14

*In re Customs & Tax Admin. of the Kingdom of Denmark (Skat) Tax Refund Litig.*,
    2024 WL 4696085 (S.D.N.Y. Nov. 6, 2024)....................................................................44

*Kloepfer v. Honda Motor Co.*, 898 F.2d 1452 (10th Cir. 1990)..........................................30

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98 (2d Cir. 2002) ...............................7

*People v. Dunn*, 2020 WL 908476 (Mich. Ct. App. Feb. 25, 2020)..........................................11

*Phillips v. Duane Morris, LLP*, 2015 WL 72336 (D. Colo. Jan. 5, 2015)....................................29

*Powers v. Memorial Sloan Kettering Cancer Center*,
    2023 WL 1927826 (S.D.N.Y. Feb. 10, 2023)....................................................................19

*SEC v. LEK Securities Corp.*, 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019)...............................45

*SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013).......................................................45

*Sherman v. Fivesky, LLC*, 2020 WL 5105164 (S.D.N.Y. Aug. 31, 2020)..................................50

*State v. French*, 2022 WL 17423735 (Wash. Ct. App. Dec. 6, 2022) ..........................................11

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010)..................................................11

*United States v. Amirov*, 2025 WL 660197 (S.D.N.Y. Feb. 28, 2025)...........................................7

*United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004) ...............................................................16

*United States v. Ayers*, 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024)...................................16, 47

*United States v. Bankman-Fried*, 2023 WL 6392718 (S.D.N.Y. Oct. 1, 2023) ...............44, 45, 46

*United States v. Bankman-Fried*, 2024 WL 477043 (S.D.N.Y. Feb. 7, 2024) .......................44, 45

*United States v. Briguet*, 2020 WL 6945929 (E.D.N.Y. Nov. 25, 2020) ......................................16

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000)..................................................................24

*United States v. Chang*, 2024 WL 3303717 (E.D.N.Y. July 3, 2024) ..........................................12

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ..................................................................42

*United States v. Coffman*, 94 F.3d 330 (7th Cir. 1996) ................................................................34

*United States v. Crowley*, 318 F.3d 401 (2d Cir. 2003)................................................................49

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) ............................................................ *passim*

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ................................................................8

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001) .................................................................14

*United States v. Eisenberg*, --- F. Supp. 3d ---,
2025 WL 1489248 (S.D.N.Y. May 23, 2025) ................................................................38, 42

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008)................................................................43

*United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005).................................................................24

*United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969) ..............................................................12

*United States v. Gillier*, No. 11-cr-409 (PAE) (S.D.N.Y. July 5, 2022).......................................45

*United States v. Guo*, 2024 WL 3275265 (S.D.N.Y. July 1, 2024)...............................................12

*United States v. Hill*, 643 F.3d 807 (11th Cir. 2011)...................................................................29

*United States v. Kohan*, 806 F.2d 18 (2d Cir. 1986)....................................................................48

*United States v. Kuthuru*, 665 F. App'x 34 (2d Cir. 2016)...........................................................7

*United States v. Lieberman*, 637 F.2d 95 (2d Cir. 1980) .............................................................14

*United States v. Lingat*, 2024 WL 1051633 (S.D.N.Y. Mar. 11, 2024) .........................................6

*United States v. Londonio*, No. 17-cr-89 (CS) (S.D.N.Y. 2019) ....................................................52

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ...............................................14

*United States v. Mallay*, 712 F.3d 79 (2d Cir. 2013) ..................................................................48

*United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984) ................................................................10

*United States v. Miller*, 2012 WL 3264516 (D. Vt. Aug. 10, 2012) ............................................47

*United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020) ..................................................................16

*United States v. Motovich*, 2024 WL 3303723 (E.D.N.Y. July 2, 2024) ......................................46

*United States v. Orr*, 692 F.3d 1079 (10th Cir. 2012) .................................................................30

*United States v. Paredes*, 2001 WL 1478810 (S.D.N.Y. Nov. 20, 2001) ....................................50

*United States v. Salah*, 2025 WL 689491 (E.D. Cal. Mar. 4, 2025) ............................................11

*United States v. Sampson*, 2015 WL 2066073 (E.D.N.Y. May 4, 2015) ......................................52

*United States v. Saneaux*, 365 F. Supp. 2d 493 (S.D.N.Y. 2005) ...............................................14

*United States v. Wagner*, 2022 WL 19179 (S.D.N.Y. Jan. 3, 2022) ............................................52

*United States v. Weinstein*, 2025 WL 438344 (D.N.J. Feb. 9, 2025) ..........................................44

*United States v. White*, 887 F.2d 267 (D.C. Cir. 1989) ..............................................................44

*Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC*,
    2009 WL 959775 (S.D.N.Y. Apr. 8, 2009) ............................................................................11

*Washington v. Dep't of Transp.*, 8 F.3d 296 (5th Cir. 1993) .......................................................30

## CONSTITUTION AND RULES

U.S. Const., amend. VI ................................................................................................................48

Fed. R. Evid. 104(b) ....................................................................................................................8

Fed. R. Evid. 401 ....................................................................................................................8, 24

Fed. R. Evid. 402 ....................................................................................................................8, 24

Fed. R. Evid. 403 ............................................................................................................... *passim*

Fed. R. Evid. 404(a)(2)(A) ...........................................................................................................47

Fed. R. Evid. 404(b) ...................................................................................................1, 23, 24, 26

Fed. R. Evid. 404(b)(2) ................................................................................................23

Fed. R. Evid. 602 ................................................................................................ *passim*

Fed. R. Evid. 611(a) ................................................................................................51

Fed. R. Evid. 611(b) ................................................................................................52

Fed. R. Evid. 701 ................................................................................................ *passim*

Fed. R. Evid. 702 ................................................................................22, 28, 30

Fed. R. Evid. 801(a) ................................................................................................13

Fed. R. Evid. 801(c) ................................................................................................13

Fed. R. Evid. 801(d)(2)(A) ................................................................................................6

Fed. R. Evid. 801(d)(2)(D) ................................................................................................12

Fed. R. Evid. 801(d)(2)(E) ................................................................................11, 12, 14

Fed. R. Evid. 802 ................................................................................................13, 21

Fed. R. Evid. 803(6) ................................................................................................7

Fed. R. Evid. 902 ................................................................................................53

## OTHER AUTHORITIES

ASSERTION, Black's Law Dictionary (12th ed. 2024) ................................................13

*Two Brothers Arrested For Attacking The Ethereum Blockchain And Stealing $25 Million In Cryptocurrency*, U.S. Attorney's Office, Southern District of New York, https://www.justice.gov/usao-sdny/pr/two-brothers-arrested-attacking-ethereum-blockchain-and-stealing-25-million (last accessed Sept. 7, 2025) ................................................39

Defendants James and Anton Peraire-Bueno respectfully submit this opposition to the government's motions *in limine* (ECF 125).

## PRELIMINARY STATEMENT

The government's motions *in limine* seek to admit entire categories of vaguely described evidence while simultaneously seeking to preclude in broad strokes evidence and arguments that are central to the government's own allegations and essential to the Peraire-Buenos' defenses. For the reasons explained herein, the government's arguments are variously premature, unsupported, or plain wrong—and often all three—and should be denied. While each motion fails on its own merits, together they betray fundamental problems with the charges and the way that the government apparently intends to prove or, in significant ways, evade them. The Peraire-Buenos raise these concerns below when addressing the relevant motions. A few points bear emphasis at the outset because they recur throughout the motions.

*First*, the government will seek to introduce several categories of evidence to either avoid or confuse the core question in the case—*i.e.*, whether the two alleged misrepresentations (the Lure Transactions and the False Signature) were materially misleading. This strategy is evident across the motions. In its opening pages, the government says that it will seek to prove that the alleged Exploit was "contrary to the standard operation of the MEV-Boost system." ECF 125 at 8. It urges the admission of statements by the Peraire-Buenos from long before the alleged Exploit under Rule 404(b) to show that they supposedly understood that the Exploit "contravened the operation and expectations of the MEV-Boost system," and knew "how the software was meant to work." *Id.* at 34. It will seek to admit notes by CC-1 to establish that the "Exploit team intended to thwart the intended design and purpose of the MEV-Boost system." *Id.* at 20. And it seeks to bolster the claim that the alleged Exploit was contrary to the supposed "intended" use of MEV-Boost through testimony of the Flashbots Representative about what MEV-Boost was "designed

. . . to permit," *id.* at 51, and the admission of online documents describing the "software's purpose, design, functionality and intended use," *id.* at 26. *See also id.* at 52 n.1 (arguing that "user guides" will show that MEV-Boost "was intended to prevent conduct like the Exploit").

But these contentions, even if substantiated, don't show a materially false statement. And acting contrary to the "intended" function of software is not fraud. As the Peraire-Buenos explained in their motion to exclude evidence of promises by third parties, this evidence risks distracting the jury from whether fraud was committed through material misrepresentations and encouraging it to convict on a legally invalid theory that upsetting the expectations of MEV-Boost users is fraud regardless of whether the defendants' statements shaped those expectations. *See* ECF 130.

This theory is also notably different than the case the government has promised through the Indictment and in representations to the Court. The Indictment alleges a "False Signature," but the government now concedes that by "false" it meant a true signature on a block that was allegedly "invalid" under the Ethereum protocol. *See* ECF 125 at 5 (defining "False Signature" as "submitting an invalid blockheader containing a valid public key signature while also invalidly setting the 'parent root' and 'state root' fields to a series of zeroes"). Notably, in resisting the motions to dismiss, the government pivoted to an "implicit misrepresentation" theory like in the spoofing cases premised on the violation of established rules of conduct. *See* 6/17/25 Hr'g Tr. 34 (arguing this case is analogous to spoofing because "there are specific rules and regulations at play here" and "relevant protocols at play here"). But none of the evidence or testimony that the government describes in its motions comes close to establishing any such rules. As explained below, should the government seek to portray online posts about how MEV-Boost was intended to function as "rules," the Court should preclude such misleading evidence and argument.

Whatever the legal validity of this implicit-misrepresentation theory (or whether the Indictment alleges it), the supposedly upset "expectations" and deviations from "standard operation" or "intended use" of software do not satisfy the elements of a charge based on false statements by the Peraire-Buenos concerning binding rules of conduct.

_Second_, the bulk of the government's motions concern evidence and argument it would offer to establish that, _after_ the alleged Exploit, the Peraire-Buenos believed they had committed a crime. Or, rather, that _other people_ believed the Peraire-Buenos may have done _something_ wrong, and that the Peraire-Buenos were aware of those opinions. The government apparently will seek to flood the trial with this type of evidence—news articles about the alleged Exploit where the authors used the words "hack," "theft," or "exploit;" a casual joke by an alleged co-conspirator; accusations of illegality by the alleged victims (and subsequent Google searches on legal topics); among other categories of evidence—that supposedly put the Peraire-Buenos on notice during the alleged money laundering conspiracy (the alleged fraud scheme having long concluded) that they had acted, in some vague sense, unlawfully. This evidence is inadmissible on multiple grounds. The unrepresentative views of a handful of absent journalists or online commentators in the articles, including their use of loaded terms like "hack," are irrelevant or obviously inadmissible under Federal Rule of Evidence 403, and loaded with hearsay. The supposed joke is hearsay without an exception. And the Google searches present a potpourri of evidentiary problems including by imposing an improper burden on the Peraire-Buenos' attorney-client privilege.

Aside from the individual shortcomings of each category of evidence, the sheer volume of this type of evidence the government apparently will seek to offer is notable. That is especially so when the evidence at trial—including through documents produced by the government and

through the likely testimony of its witnesses—will show that nobody involved thought they had broken the law. The mountain of irrelevant and unfairly prejudicial evidence the government would offer to resist that fact threatens to overwhelm the trial, sow confusion, and waste the jury's time.

_Third_, at the same time that it proposes to focus the trial on the after-the-fact reaction of third parties to the alleged Exploit, the government would seek to preclude legitimate evidence and arguments that would challenge what this evidence insinuates—_i.e._, that it is fraud to "exploit" a "vulnerability" in code and to "unbundle" a sandwich attack. The government would hide from the jury significant truths that would undermine that theory—truths about the alleged victims' trading strategy, the nature of the trading environment, and what the users of the relevant technologies thought about the bounds of acceptable behavior. In its place, the government would erect a faux-reality of its own making, where the MEV-Boost system worked to ensure that sandwich "trades" (not "attacks," which is the word everyone uses, including the government's witnesses) could obtain risk-free profits with no negative implications for other users, and where sandwich attackers were unaware that anything like the alleged Exploit could possibly occur because the technology guaranteed that it would not.

The actual evidence will demolish that story: the alleged victims were involved in risky, predatory trading strategies that engendered well-known attempts to disrupt them; the supposed "vulnerability" in the relay code was visible for everyone to see and build trading strategies around; the technological and protocol-based limitations on the ability to "bundle" transactions were well known; traders uniformly operated on the understanding that Ethereum's economic incentives would encourage or discourage behavior; and the alleged victims had no claim under any authority

(including the relevant protocols) to the order of transactions in a bundle. The jury must evaluate the alleged conduct in the context it actually occurred for the Peraire-Buenos to have a fair trial.

The Peraire-Buenos respond to each of the government's motions below, in the order presented in the government's omnibus brief.

## ARGUMENT

## I.    The Court Should Deny the Government's Motion for an Order Stating That Certain Categories of Evidence Are Not Hearsay.

The government's first motion *in limine* seeks unclear relief. Although the government claims in its preliminary statement that it seeks a "ruling[]" that "certain out-of-court statements are admissible," the motion appears to request a more limited ruling that the statements are "not barred by the rule against hearsay." ECF 125 at 11. Consistent with that more limited request, the government does not explain why most of the categories of evidence it "will seek to introduce for their truth" are relevant or attempt to overcome other likely evidentiary hurdles, like Federal Rule of Evidence 403. And the government does not attach or specifically describe virtually any of the subject evidence. For these reasons, the Court should deny the government's first motion *in limine* in substantial part as premature and unsupported.

With respect to certain categories, however, the government's arguments make plain that the evidence it may seek to admit at trial is either inadmissible under any circumstances or will require a more robust proffer than the government provides. The motions concerning these categories of evidence—(a) internet search histories, (b) a supposed joke by CC-3 to CC-1; (c) news articles, and (d) Flashbots online materials and posts—should be denied now on their merits.

The Peraire-Buenos address each category of evidence in the order raised by the government's motion.

A.    **Category 1: Defendants' Statements, Alleged Exploit Code, and Internet Search Histories**

1.    **Defendants' Statements**

The government states that it will seek to admit various documents, including text messages, emails, and Slack and Discord communications as statements of a party-opponent under Rule 801(d)(2)(A).  ECF 125 at 14.  It also will seek to admit the "statements of others within these communications" to "provide necessary context."  *Id.*

To the extent the government seeks a ruling in the abstract that statements of the Peraire-Buenos are non-hearsay, that request is unnecessary.  The Peraire-Buenos of course do not dispute that Rule 801(d)(2)(A) provides that party-opponent statements are non-hearsay.

Beyond the hearsay issue, the Court lacks sufficient information to evaluate the admissibility of these documents which will depend on the documents themselves and the context in which they are offered.   In these circumstances, courts routinely deny or defer similar government motions *in limine*.  *See, e.g.*, *United States v. Lingat*, 2024 WL 1051633, at *6 (S.D.N.Y. Mar. 11, 2024) (denying motion *in limine* to admit unspecified co-conspirator statements because "the Court cannot make blanket or 'categorical' rulings in advance of hearing the proffered evidence and any potential objection, or knowing the context in which the statement is offered").  Pursuant to the Court's Individual Trial Rules and Procedures, the Peraire-Buenos will object to specific government exhibits on all applicable grounds, including if appropriate, hearsay.

2.    **Alleged Exploit Code**

The Peraire-Buenos do not object to admitting the so-called "exploit code" as non-hearsay.  But the basis for its admission bears some clarification.  The code cannot be a party-opponent "statement" as the government suggests, because it is not a statement.  Like any other source code,

it is "a mathematical set of instructions that a computer converts into an executable program." *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 104 (2d Cir. 2002). The code is admissible primarily because instructions and commands are not hearsay. *See United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("commands are ordinarily not hearsay"); *United States v. Amirov*, 2025 WL 660197, at *12 (S.D.N.Y. Feb. 28, 2025) ("instructions . . . are not hearsay"); *accord Definitive Holdings, LLC v. Powerteq LLC*, 731 F. Supp. 3d 1243, 1254-55 (D. Utah 2024) (ruling that computer code is non-hearsay because it consists of "commands" and not "statements"). The Court should so rule and allow either party to introduce the code at trial.[1]

### 3.    Internet Search Histories

The Court should deny the government's motion with respect to the Peraire-Buenos' internet search histories. The government has cherry-picked a few dozen pages of searches (out of the *tens of thousands* of pages of internet search history produced by Google or found on devices), many of which are undated, from which it will apparently ask the jury to speculate about what the Peraire-Buenos were thinking when they typed words or phrases into the search bar. The government spills much ink arguing that the search queries are non-hearsay or are admissible under a hearsay exception. ECF 125 at 16-18 & n.7. But the problem with the search history is not hearsay; it is the irrelevance of, and unfair prejudice associated with, this evidence that makes it inadmissible. And because neither relevance nor unfair prejudice can be determined on a categorical basis, the Court should reserve ruling on the evidence's admissibility.

As the Peraire-Buenos noted in their motion *in limine* to exclude certain of these searches for seemingly legal topics, ECF 132 at 4-8, the government must establish that each search term

---

[1] To the extent the code might be construed as a statement, it would be admissible as a business record, *see* Fed. R. Evid. 803(6), as the Peraire-Buenos and their colleagues regularly recorded and stored computer code to carry out their trading business.

or result it seeks to introduce has a connection with this case.  *See* Fed. R. Evid. 104(b); *United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021).  Then, having made that preliminary showing, it must demonstrate why each search is probative of either of the Peraire-Buenos' states of mind with respect to the charged offenses.  *See* Fed. R. Evid. 401-402.  Finally, because the Peraire-Buenos object under Rule 403, the Court must find that the unfair prejudice, confusion, or undue delay that may result from admission of the searches does not substantially outweigh their probative value.  *See* Fed. R. Evid. 403.

This evidence will encounter challenges on each rung of that admissibility ladder.  Many of the searches have no apparent connection to this case.  Other searches on the government's exhibit list are transparently not about this case because they are about other high-profile prosecutions that are unrelated to the allegations here—*i.e.*, searches for "martin shrekeli sentence," "expected sam bankman-fried sentence," "elizabeth holmes prison," and "andrew tate prison," among other things.  *See* Ex. 1 at 5-6.[2]  As noted in the Peraire-Buenos' motion *in limine*, on inspection it is clear that at least one search that the government highlights in its motion concerns unrelated news events, even if that connection is not obvious from the search itself.  *See* ECF 125 at 10 (search for "charge by indictment vs. charge by complaint"); ECF 132 at 5-6 (explaining that this search was about the Bankman-Fried case).

Nor does the timing of the searches supply the preliminary relevance link.  *See Dawkins*, 999 F.3d at 789 (affirming exclusion of purportedly exculpatory conversation where the proffer

---

[2] These other cases obviously have nothing to do with the alleged charges here.  Only the Bankman-Fried case involved a cryptocurrency-adjacent business, and that is where the similarities end.  Anton Peraire-Bueno, like many people, apparently has at (uncertain) points queried the internet about news-making criminal justice issues.  The government's argument that this typical curiosity is evidence of consciousness of wrongdoing related to this case is pure speculation.

failed to provide more than approximate timing).  The searches concerning Shkreli, Bankman-Fried, and Holmes *do not even have dates* associated with them.  *See* Ex. 1 at 5-6.  This is true of many of the searches the government apparently would offer.  *See id.* at 6 (undated searches for "does house arrest count towards sentence" and "first time felony jail time").  Others occurred long after the alleged conduct.  The government cites a search for "is prison or jail worse," ECF 125 at 10, that occurred in May 2024—more than a year after the alleged Exploit.  *See* Ex. 1 at 2.

Even if the government could establish that a set of searches were related to this case, it is unclear what the searches would actually show.  The government sees no opportunity for nuance— asserting that the searches like "protonmail fake email" are "probative of the defendants' consciousness of guilt," ECF 125 at 16, without explaining why.  But that is far from the obvious, or even most likely, interpretation.  What does a search for "protonmail fake email" even mean, and why is it significant?  How would the government plausibly establish that meaning in the government's case-in-chief?  If the alleged conduct involved "fake" emails, and that fact was relevant, then the government should prove it.  It is unclear what the search adds.  Moreover, as the Peraire-Buenos explained in their motion *in limine*, even where the government's preferred inference is less obscure, the searches may just as easily establish the opposite inference and therefore lack any real probative value.  *See* ECF 132 at 6-7.

Serious Rule 403 concerns also accompany the searches.  At best, under Rule 403, admission of the searches is an invitation for the jury to speculate, and risks wasting the jury's time.  As the government's mistake regarding the "charge by indictment vs. charge by complaint" search shows, every ambiguous search risks a mini-trial concerning what events in the news or the Peraire-Buenos' lives provide an alternative explanation.  Others, like the undated searches

regarding Shkreli and other famous criminal defendants, seem cherry-picked for the purpose of arousing unfair and baseless comparisons between those unrelated cases and this one.

All these evidentiary problems are in addition to the risk of unfair prejudice stemming from the subset of searches for seemingly legal topics the Peraire-Buenos have moved *in limine* to exclude.  As the Peraire-Buenos have explained, these Google searches, *see* ECF 132-1 (App. A), like "money laundering statue [sic] of limitations" and "can you report tax losses on stolen property," among others, potentially implicate discussions with legal counsel and may unfairly pressure the Peraire-Buenos to waive the attorney-client privilege to explain why the government's speculative arguments about those searches are mistaken.  *See* ECF 132 at 8-10; *United States v. McKeon*, 738 F.2d 26, 31-32 (2d Cir. 1984).[3]

The cases the government cites do not come close to justifying its request.  Begin with *Atkins v. Clarke*, 2024 WL 4193821 (E.D. Va. Sept. 13, 2024), a habeas case that the government cites as "affirming admission of [internet history] extracted from a defendant's phone . . . as relevant to show his motive to commit the crimes for which he was charged."  ECF 125 at 17.  The court did no such thing.  It merely held that a state court had not unreasonably applied established law in denying an ineffectiveness of counsel claim premised on trial counsel's failure to object to the admission of a cell phone extraction report on hearsay and Confrontation Clause grounds. *Atkins*, 2024 WL 4193821, at *8.  The federal court explicitly did not address whether the search results were inadmissible hearsay, let alone whether they were relevant.  *See id.* at *9 & n.7.

---

[3] The foregoing considerations about relevance and unfair prejudice apply with equal force to the *results* of any search.  The Court must determine, on a case-by-case basis, whether either defendant's awareness of a search result is probative of any issue, whether there are additional hearsay problems with the webpage, and whether the webpage is not excludable under Rule 403.

In *Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775 (S.D.N.Y. Apr. 8, 2009), the court found Google searches appended to a declaration relevant to show what results the declarant observed—but only because a party had sought to strike the declaration for lack of personal knowledge. *Id.* at *9 n.6. The court did not make any further inference, like the government seeks to pursue here, about the declarant's state of mind.

Other cases involved specific, discrete, and obviously probative search terms, rather than the voluminous collection of vague words and phrases entered over several years that the government seeks to admit here. *See People v. Dunn*, 2020 WL 908476, at *1-2 (Mich. Ct. App. Feb. 25, 2020) (admitting search for "4 Ways to Cheat a Polygraph Test" conducted "less than two hours" after defendant's police interview); *United States v. Salah*, 2025 WL 689491, at *1, *9 (E.D. Cal. Mar. 4, 2025) (admitting searches in YouTube for videos depicting "infidels dying" and "ISIS killing people" and about the Boston Marathon bombing as evidence of defendant's "extremism" in case alleging religiously motivated terrorism).[4]

In sum, the government's motion as to the internet search history should be denied.

## B.    Category 2: Ledgers and Notes

The government also seeks to admit contemporaneous ledgers, notes, and spreadsheets created by CC-1, the Peraire-Buenos, and/or other alleged co-conspirators, claiming they are all admissible as co-conspirator statements under Rule 801(d)(2)(E) or statements of agents under

---

[4] In the government's remaining cases, the internet history at issue was also indisputably relevant. *See United States v. Abu-Jihaad*, 630 F.3d 102, 133-34 & n.29 (2d Cir. 2010) (affirming admission of videos defendant had purchased depicting "bloody bodies of *jihad* martyrs" as evidence of his motive and intent in transmitting classified information to supporters of *jihad*); *State v. French*, 2022 WL 17423735, at *19 (Wash. Ct. App. Dec. 6, 2022) (unpublished) (defendant himself admitted that the search history exhibits—which showed him "investigat[ing] his status post-shooting" and searching for "how to evade law enforcement"—were "very strong evidence of knowledge" of the shooting for which he was charged).

Rule 801(d)(2)(D).  This suffers from the same flaw as its request to admit statements by the Peraire-Buenos—namely, that the government fails to identify which statements it wishes to admit.

It is true that courts in the Second Circuit may admit evidence of co-conspirator statements on a conditional basis, subject to the government proving at trial that a conspiracy existed and that the statements were made during the course of and in furtherance of it.  *See generally United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969).  But such conditional admission only works when the government has identified the specific statements it wishes to admit, has made some proffer about who authored each one, and the Court has reviewed the documents and satisfied itself that they likely will meet the requirements of Rule 801(d)(2)(E) and are not otherwise inadmissible.[5]

The Court thus should deny the government's motion or reserve any decision on the admissibility of the foregoing categories of documents until trial.  *See supra* p. 6; *see also, e.g.*, *United States v. Chang*, 2024 WL 3303717, at *6 (E.D.N.Y. July 3, 2024) (conditionally admitting certain ledgers and spreadsheets as co-conspirator statements because they were "made or sent by co-defendant" and "appear to detail what the Government asserts are bribe payments," but declining to admit other ledger that "d[id] not identify the author").

## C.    Category 3: CC-3's Alleged Joke to CC-1

The Court should deny the government's motion with respect to evidence that CC-3 supposedly "joked" at a "work retreat" that "he hoped that the next time [the alleged co-conspirators] met would not be in jail."  ECF 125 at 22.  The alleged joke is irrelevant.  The

---

[5] The Court should also defer ruling on the government's arguments under Rule 801(d)(2)(D), as the *Geaney* protocol permits conditional admission only under Rule 801(d)(2)(E).  *Cf. United States v. Guo*, 2024 WL 3275265, at *3 (S.D.N.Y. July 1, 2024) ("The *Geaney* protocol is not an opportunity for the parties to relitigate other hearsay objections . . . including whether certain declarants were agents of the Defendant.").

government does not proffer that the Peraire-Buenos reacted to the joke in a way that would be probative of their intent. Nor does it proffer that the joke had any effect on any subsequent conduct.

Rather than explain the joke's relevance to the charges against the Peraire-Buenos, the government skips to arguing that it is not hearsay. These arguments fail.

First, in a single sentence without legal citation, the government claims that the joke is not a "statement" because it is a "forward-looking declaration of intent or desire (the hope that the Exploit Team would not be imprisoned)." ECF 125 at 22. That argument has no legal basis. Federal Rule of Evidence 801 defines a "statement" as "a person's oral assertion, . . . if the person intended it as an assertion," Fed. R. Evid. 801(a),[6] and out-of-court statements are inadmissible if offered for the truth of the matter asserted, *see* Fed. R. Evid. 801(c), 802. The joke meets this definition of hearsay under the government's proffered use: it was conveyed orally; it contained an assertion—*i.e.*, CC-3's "hope that the Exploit Team would not be imprisoned," ECF 125 at 22, and, implicitly, that CC-3 was concerned about that possibility; and the government would offer it for the truth of that assertion. The last point must be true because if CC-3 was not worried about potential criminal liability, then the joke *undermines* the government's intended use of the evidence. (The government cannot have it both ways by casting the statement as "just a joke" to evade the hearsay rules, but then offering it as meaningful evidence regarding the Peraire-Buenos' state of mind to explain its purported relevance.)

---

[6] Black's Law Dictionary defines "assertion" as "a declaration or allegation" or "a person's speaking . . . . [w]ith the intent of expressing a fact or opinion." ASSERTION, Black's Law Dictionary (12th ed. 2024). Accordingly, that the assertion contained a hope or opinion, or concerned a future possibility, is immaterial. Hearsay statements often concern a declarant's present hopes, views, or opinions about uncertain future events. *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 530 & n.1121 (S.D.N.Y. 2014) (statements expressing uncertainty about outcome of pending litigation inadmissible when offered to show that the declarant viewed the outcome as uncertain at the time), *aff'd*, 833 F.3d 74 (2d Cir. 2016).

Second, the joke is not admissible as a co-conspirator statement under Rule 801(d)(2)(E) because it was not "in furtherance" of the alleged money laundering conspiracy.[7] "The touchstone of the 'in furtherance' requirement is that the statement be designed to promote the accomplishment of the conspiracy's goals." *United States v. Saneaux*, 365 F. Supp. 2d 493, 500 (S.D.N.Y. 2005); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990) ("[T]he statements must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity."). The government claims, without elaboration, that the joke was meant to "provide reassurance" and to "facilitate and protect the conspiratorial activities." ECF 125 at 22 (citations and alterations omitted). How so? The joke cannot reasonably be construed as reassuring unless it conveyed CC-3's belief that the alleged Exploit was so clearly non-criminal that the mere suggestion was laughable, which is the opposite of the government's intended use. And it plainly did not protect or facilitate the alleged money laundering in any way.

Rather, the joke is quintessential "idle chatter" among alleged co-conspirators that the Second Circuit has long held inadmissible. *See, e.g.*, *United States v. Lieberman*, 637 F.2d 95, 103 (2d Cir. 1980); *see also, e.g.*, *Funk v. Belneftekhim*, 2018 WL 11169575, at *8 (E.D.N.Y. Nov. 30, 2018) (statement "is mere idle chatter" where it "does not inform [the listener] of the current status of [the] plan . . ., it does not promote that plan, or provide reassurance"). *United States v. Desena*, 260 F.3d 150 (2d Cir. 2001), cited by the government, held that similar "joking references to past events" made in a casual setting were "mere idle chatter" that "did not satisfy Rule 801(d)(2)(E)." *Id.* at 158. The same result should follow here.

---

[7] The government concedes that the joke could not have been in furtherance of the alleged fraud conspiracy because it allegedly occurred after that conspiracy was complete. *See* ECF 125 at 22 (arguing only that it was made "during and in furtherance of the money laundering conspiracy").

### D.      Category 4: News Articles

The Court should deny the government's motion with respect to "news stories and public documents" because these documents are inadmissible hearsay, are irrelevant, and would be unfairly prejudicial for the reasons set forth in the Peraire-Buenos' motion to exclude the same evidence.  *See* ECF 140.  None of the government's arguments in favor of admission has merit.

First, the news articles are irrelevant if offered for any of the purported non-hearsay uses. The government says the evidence would be offered for "its effect on the defendants," ECF 125 at 23, but never explains what that effect was or how it is relevant.  Alternatively, the government would offer the evidence "to demonstrate both the defendants' interest in their own criminal activity and their knowledge of how that activity was publicly perceived."  *Id.*  But a defendant's "interest" in his own conduct, whatever that means, is irrelevant.  Nor does it matter how a handful of journalists and online commentators who will not be witnesses "perceived" that conduct.

Alternatively, the government argues the articles supposedly provided the Peraire-Buenos with notice that the alleged Exploit was viewed by others as "criminal."  *See id.*  There are multiple, significant problems with this argument.

First, the government's claim that the "sources described the[] [alleged] conduct as criminal," *id.*, is inaccurate.  The Peraire-Buenos attached a compendium of all articles on the government's preliminary exhibit list to their motions *in limine*.  *See* ECF 143-4.  None of these articles suggests that others viewed the conduct as criminal.  *See id.*; ECF 140 at 5.[8]

Second, and even more critically, this argument wrongly assumes that the subjective views of absent journalists and internet commentators could provide notice relevant to the alleged money

---

[8] The government has since added more news articles to its exhibit list, including duplicates of articles that already appeared on the list several times.  The examples appended to the Peraire-Buenos' motion (ECF 143-4) provide the Court with the context necessary to resolve this motion.

laundering.[9]  That argument lacks any legal support.  The government's cited cases are either entirely inapposite—standing only for the proposition that notice is a potential non-hearsay purpose—or undermine its argument.  *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020); *United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004); and *United States v. Briguet*, 2020 WL 6945929 (E.D.N.Y. Nov. 25, 2020), all concerned evidence that provided the defendants with notice of *the facts* that made their conduct illegal.  *See Moseley*, 980 F.3d at 27 (customer complaints about lender's unfair terms in case charging fraudulent business practices); *Ansaldi*, 372 F.3d at 130 (scientific article about the chemical properties of a drug compound that defendants were alleged to have distributed); *Briguet*, 2020 WL 6945929, at *1 (article mentioning the existence of the tax form that the defendant was alleged to have later willfully failed to file).  None of these cases concerned notice for a money laundering charge, and none held that the views of third parties and journalists as to whether certain conduct was "illegal" was relevant to a defendant's intent.[10]  On their own terms, the cases are not helpful to the government because the Peraire-Buenos do not argue that they lacked notice of some fact about their alleged conduct that made it illegal; rather, they have argued, and the evidence will show, that the alleged conduct was not fraud and they never acted with any intent to defraud.

---

[9] The government does not argue that the articles, which post-date the alleged Exploit, are relevant to the Peraire-Buenos' intent with respect to the fraud counts.  *See* ECF 125 at 23 ("Yet, despite this notice, the defendants nonetheless proceeded to secretly launder the Crime Proceeds.").

[10] The government misstates the relevant holding of *United States v. Ayers*, 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024).  The court did not "admit[] news articles," ECF 125 at 24; it reserved on the issue because the government had "not specified the exact news articles it intends to enter" and observed that it "is likely that those articles contain information inadmissible for many reasons, including irrelevance, hearsay, and improper legal conclusions" and risked "that the jury would treat their contents as established facts, which is especially concerning to the extent the articles incorporate the author's opinions."  2024 WL 1158686, at *14.  And the articles were not offered show the defendants' notice of how others viewed the alleged crimes, but to explain how the articles motivated a later retaliatory killing by the gang members who read them.  *See id.*

The government's casual treatment of the Rule 403 concerns that the articles pose is deeply troubling. The government's relevance theory explicitly hinges on the fact that some journalists and online commentators referred to the Peraire-Buenos' conduct in loaded terms as "among other things, a 'theft,' 'hack,' 'exploit.'" ECF 125 at 23. But the loaded and imprecise nature of these views is what makes these articles unfairly prejudicial. *See generally* ECF 140. "Hack" and "exploit," in particular, are technical terms of art within the crypto community, and the government has disclosed no expert who would explain them to the jury. The terms do not equate to criminality and the government has no legitimate basis to waft them before the jury in the hopes that lay jurors will misunderstand them that way. The government's retort that the Peraire-Buenos' remedy to the "colloquial[]" use of these terms is through "cross-examination," ECF 125 at 23 n.8, is baffling when the articles' authors and quoted sources will not be called to testify. *See* ECF 140 at 1. Finally, the very premise that it is permissible to offer out-of-court statements in a fraud case that some journalist or online commentator unconnected to the case thought the funds at issue were "stolen" is outrageous.

Admission of this evidence would gravely prejudice the Peraire-Buenos' fair trial rights. The government has charged as fraud conduct that falls well outside the heartland of what has been understood to be fraud. Its burden at trial is to establish beyond a reasonable doubt that the alleged novel conduct was fraud. The government cannot bootstrap in the supposed opinions of absent journalists and online commentators about whether the alleged conduct was a "hack," an "exploit," or "theft"—all seemingly pejorative terms that, whatever their intended meaning, are not "fraud"—to lull the jury into excusing the factual and legal problems with its case.

If these disembodied opinions are admitted as evidence that supposedly put the Peraire-Buenos on notice that the alleged Exploit was "criminal" (in some vague and imprecise way, and

17

only after the alleged fraud was complete), then the Peraire-Buenos would be entitled to offer evidence of others' contrary views that the alleged Exploit was not criminal. As the government is aware, and as some of the articles on its exhibit list show, *see* ECF 140 at 5 (comment from prominent cryptocurrency investigator that the validators "did nothing wrong"), the government's cherry-picked quotes are not representative of the community's views as to the propriety of the alleged Exploit. Indeed, at the same time, the Peraire-Buenos were circulating, in the very same Slack channel from which the government cherry-picked its examples, articles that heralded the alleged Exploit as heroic and/or criticized mischaracterizations of the event as an exploit.

Criminal trials, however, are not referenda on how others viewed the conduct. When picking and instructing juries, courts and attorneys strive to keep that type of unfairly prejudicial noise from infecting the truth-seeking process. Admission of the articles on the government's exhibit list threatens to undo that careful work and, ultimately, would perpetrate a serious injustice. The Court should deny the government's motion with respect to this evidence and grant the Peraire-Buenos' motion to exclude it (ECF 140).

### E.    Category 5: Flashbots Documents

The Court should deny the government's motion with respect to the final two categories of evidence it may seek to admit as non-hearsay: (a) "online user guides and instructions" on Flashbots' website; and (b) "public announcements and postings" by Flashbots concerning the alleged Exploit (referred to in the government's brief as the "Post Mortem" and the "Flashbots Disclosure"). ECF 125 at 26. Neither category is admissible as previewed by the government.

#### 1.    Online User Guides and Instructions

The "online user guides and instructions" are either inadmissible hearsay or are irrelevant.

The government's primary intended use of the evidence is a hearsay one. According to the government, these documents about "MEV-Boost's use, design, functionality, and purpose" will

"establish how MEV-Boost was designed to operate and what MEV-Boost users . . . knew . . . about how MEV-Boost was designed to operate." *Id.* In other words, the government would use these documents about the functionality of MEV-Boost to establish the system's functionality.

The government alternatively claims that parts of the documents are non-hearsay because they are "instructions," *id.* at 27, but it does not specify which parts and does not attach the documents. The remainder of the non-instructional material, the government urges, can be admitted "to provide context for those instructions." *Id.* The Peraire-Buenos, however, attached the actual Flashbots exhibits concerning MEV-Boost to their motions *in limine.* *See* ECF 143-1.[11] Of these fifteen pages of online content, only two can be fairly characterized as instructions, and they have no obvious relevance as they are limited to instructions for how to download various components of the software and how to set up the relay, but not how to use the software in a way that is relevant. *See id.* at 11-12. The admission of those two irrelevant pages cannot justify the admission of the remaining thirteen pages for "context." The government cites no case for a broad "context" exception to the hearsay rules,[12] and the other webpages do not even provide any information that would contextualize the instructions.

Finally, the government argues that the materials are "admissible for their effect on MEV-Boost users," specifically to show users' "knowledge regarding the functionality, design, and

---

[11] The government subsequently added to its exhibit list screenshots of: (a) pages of the Ethereum website relating to the builder; (b) online documentation relating to the builder for the block involved in the alleged Exploit; and (c) portions of the Flashbots website relating to a separate product called Flashbots Auction. Because these new exhibits do not concern MEV-Boost, they appear to be outside the scope of the government's motion *in limine.*

[12] In *Powers v. Memorial Sloan Kettering Cancer Center*, 2023 WL 1927826 (S.D.N.Y. Feb. 10, 2023), the court admitted limited factual statements on the same page as the non-hearsay instructions for "context." *Id.* at *1. That holding does not support admitting other pages of a website for context. Such a loophole would swallow the rule against hearsay.

usage of MEV-Boost." ECF 125 at 27. But that is just an attempt to back-door the first hearsay use because it relies on the documents being accurate representations of the system's functionality.

In sum, the government's arguments to admit the Flashbots material fail. The government's arguments, however, betray two significant problems with its case that further warrant exclusion of this evidence.

First, the government apparently seeks to admit these documents to support its argument that Flashbots' public postings generated an expectation among users that sandwich bundles could or would not be unbundled. *See, e.g.*, *id.* at 52 n.21 (claiming that the Flashbots materials "made clear that the design and function of MEV-Boost was intended to prevent conduct like the Exploit"). As the Peraire-Buenos explained in their motion to exclude evidence of promises by third parties, evidence admitted to establish user expectations based on statements by someone other than the Peraire-Buenos is irrelevant because only a defendant's statements can support a wire fraud charge. *See generally* ECF 130. Evidence and argument suggesting otherwise is unfairly prejudicial because it risks a conviction on an invalid legal theory. *See id.* The Court should exclude these documents that the government seeks to admit principally to support this invalid theory and preclude any related arguments.

Second, the government's inaccurate characterization of the Flashbots documents as principally containing "instructions" suggests another improper use of the documents: as stand-ins for the supposed "rules" that govern MEV-Boost. In opposing the Peraire-Buenos' motions to dismiss, the government represented to the Court that the evidence would establish rules that bound MEV-Boost users akin to the professional rules and regulations that govern traders on commodities markets in spoofing cases. *See* 6/17/25 Hr'g Tr. 34 (arguing this case is analogous to spoofing because "there are specific rules and regulations at play here" and "relevant protocols at play

here"); *id.* at 38-39 (distinguishing *Eisenberg* because there was no "testimony about rules and protocols as you will see in this trial"); *see also id.* at 49-50 (analogizing MEV-Boost to "traffic rules" and arguing that MEV-Boost "provide[s] predictability through rules").

Since then, the government's descriptions of what the evidence will show—including in its preview of the case in its motions *in limine*—have signaled a retreat from that "rules"-based theory. *See, e.g.*, ECF 125 at 53 ("what matters in a fraud case is whether the scheme was deceptive, not whether it involved . . . breaking private contractual rules"). According to the government, the evidence will show only how MEV-Boost was "designed to function" and the conduct it was "intended to prevent," *e.g.*, *id.* at 52 n.21, and not rules governing its use. And the government's preview of the Flashbots Representative's testimony in its opposition to the Peraire-Buenos' motion to compel expert disclosures conspicuously did not include testimony about any "rules." *See* ECF 113 at 8-9. That is likely because, as the government knows and has known, there are no "rules" that govern MEV-Boost relevant to the alleged Exploit. To the extent the government will seek to admit these Flashbots documents in lieu of actual rules, that would be insufficient to prove the case it charged; a review of the documents shows that they are not rules nor do they suggest the existence of rules. Nor has the government disclosed an expert who could opine that they are rules. If the documents are admitted for any purpose, the Court should give a limiting instruction that they do not constitute rules of conduct that bind MEV-Boost users and should preclude any argument that would mislead the jury into viewing the documents that way.

### 2.    Flashbots "Post Mortem" and "Disclosure"

The Court should exclude the Post Mortem under Rules 802 and 403. The internet post purports to recount Flashbots' investigation of the alleged Exploit. *See* Ex. 2. The government has stated that the Flashbots Representative will testify to the same topics. ECF 111 at 6-7. This testimony is irrelevant and unfairly prejudicial. As the Peraire-Buenos have previously explained,

the "steps that Flashbots took," the "conclusions it reached," and "how Flashbots viewed the Exploit," ECF 125 at 27, are irrelevant because this not a case about defrauding Flashbots. *See* ECF 128 at 3-6. To the extent the government apparently intends to argue that Flashbots was a victim, evidence and argument admitted for this purpose risks a constructive amendment of the Indictment. *See id.* At a minimum, if the Flashbots Representative is permitted to testify to these topics, it is unclear what is gained by also admitting the hearsay statements in the Post Mortem.

The hearsay problem is significant because the Post Mortem contains technical descriptions of MEV-Boost and the mechanics of the alleged Exploit. To the extent that the government seeks to establish facts concerning MEV-Boost's functionality or the mechanics of the alleged Exploit, it must do so through testimony and evidence that is admissible for that purpose. It would be improper to offer a document on these topics purportedly for "notice" purposes as an end-run around the rules that may preclude the government from proving those facts like Rules 602, 701, and 702.

The only non-hearsay justification the government gives is that the Post Mortem will show that the Peraire-Buenos were aware of Flashbots' investigation and, specifically, knew the post included the word "exploit." ECF 125 at 27. But as discussed above, the government's intended use of the term "exploit" in online postings as supposedly bearing on the Peraire-Buenos' knowledge that the alleged Exploit was illegal is misleading and unfairly prejudicial. *See supra* p. 17. The Post Mortem's use of the term "exploit" poses the same risk of unfair prejudice.

The Flashbots Disclosure presents a different question. It is unclear why the government thinks this evidence assists its case, as the Disclosure describes how the Peraire-Buenos disclosed to Flashbots an additional way that the MEV-Boost protocol permitted validators to unbundle sandwich attacks. *See* Ex. 3. The Peraire-Buenos' voluntary disclosure allowed Flashbots to

modify the implementation of its own MEV-Boost relay and advise other relay operators. *See id.*; *see also* Ex. 4 (messages with Flashbots on this topic).[13]  Because it is unclear for what purpose the government seeks to admit the Disclosure, it is possible there is some relevant, non-hearsay use of the document.  The Court thus should defer ruling on its admission until trial.

## II.     The Court Should Deny the Government's Motion to Admit Certain Evidence Pursuant to Rule 404(b).

The government moves to admit three categories of evidence under Rule 404(b): (a) communications regarding other supposed hacks and exploits; (b) statements regarding Flashbots, MEV-Boost, privacy protocols, and bundled transactions; and (c) communications with Coinbase. The Court should deny the motion.

### A.     Communications Regarding Other Hacks and Exploits

The government seeks to admit the Peraire-Buenos' conversations with others in May 2021 and August 2022 "regarding *other* hacks and exploits." ECF 125 at 31-33 (emphasis added).  The government contends these communications show that the Peraire-Buenos "knew the difference between 'white hat' and 'black hat' conduct," which is direct evidence of their states of mind while committing the charged offenses, or, alternatively, relevant to "knowledge, preparation, absence of mistake, and lack of accident" under Rule 404(b)(2).  *Id*. at 32-33.  Both arguments fail.

The evidence is subject to Rule 404(b).  It implies that the Peraire-Buenos are in the business of "hacking" and invites the jury to conceive of the charged wire fraud as a black hat hack.  But these discussions occurred several months before the alleged wire fraud conspiracy began (December 2022, *see* ECF 70 ¶¶ 33, 36).  Uncharged activity, such as this, may be

---

[13] The government claims that, through these messages, the Peraire-Buenos "threatened" Flashbots.  ECF 125 at 7.  The messages themselves betray that absurd characterization, as do internal Flashbots messages produced to the Peraire-Buenos by the government on August 25.

considered direct evidence only if the conduct "arose out of the same transactions or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). The government does not argue that the conversations form part of the same transactions as the alleged Exploit or are inextricably intertwined with it. And it offers no reason why it cannot complete the story of the alleged Exploit without it.

Regardless of whether the evidence is barred by Rule 404(b), it still should be excluded as irrelevant and unduly prejudicial. *See* Fed. R. Evid. 401-403. It is irrelevant whether the Peraire-Buenos knew the difference between a "black hat" hack (in which the hacker keeps funds taken through a hack) and a "white hat" hack (in which he returns them) because this case does not involve hacking at all. The misleading insinuation to the contrary that the government would make through the admission of this evidence is unfairly prejudicial. The government has cast the Peraire-Buenos' trading strategy as a form of fraud, and it should be required to prove the elements of that crime alone. Nor is it relevant that the communications purportedly show the Peraire-Buenos' awareness that "stealing" is wrong. Everyone knows that, and that is not what the Peraire-Buenos allegedly did here. It is unclear, in any event, how the government intends to explain to the jury what "black hat" and "white hat" even mean, or how they could possibly relate to the charged offenses, without having noticed an expert on that subject. *See United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (lay testimony may not rest "in any way" on specialized knowledge).

The evidence is also likely to prejudice the Peraire-Buenos by associating their conduct with a vague sense of wrongdoing, confuse the jury, or result in mini-trials over what they meant in each of the proffered conversations. The government erroneously assumes that the Peraire-Buenos' alleged trading strategy that gives rise to the charges in this case is materially the same as

the other "hacks and exploits" that they previously discussed.  To establish that critical premise and make the proposed evidence even marginally relevant, the parties would need to engage in confusing mini-trials to prove what particular hack or exploit is being discussed and whether the underlying conduct is materially similar to the conduct alleged here.

### B.    Pre- and Post-2022 Statements Regarding Flashbots, MEV-Boost, Privacy Protocols, and Bundled Transactions

The Peraire-Buenos do not dispute, as a general matter, that "communications . . . reflecting their knowledge and understanding of Flashbots and how its MEV-Boost software worked" *potentially* may be relevant and admissible.  ECF 125 at 33-35.  However, since the government has not identified specific communications or statements in its motion, the Peraire-Buenos reserve the right to object to their admission and to ensure that any such statements are introduced in a complete form and with all necessary context.  The Peraire-Buenos vigorously dispute that any such evidence, properly understood, will support the government's suggested inference that their trading strategy employed any misrepresentation or violated Ethereum or MEV-Boost rules or protocols.[14]

### C.    Communications with Coinbase

The government contends that various communications between the Peraire-Buenos and Coinbase will demonstrate (a) their knowledge that Coinbase has robust compliance and "know your customer" policies; and (b) that the Peraire-Buenos failed to respond to information requests from Coinbase after the alleged Exploit, which it argues is probative of their "consciousness of guilt."  ECF 125 at 37.  Alternatively, the government contends that the evidence is admissible

---

[14] The government's argument that the evidence is relevant show that the Peraire-Buenos "understood that their scheme contravened the operation and expectations of the MEV-Boost system," ECF 125 at 24, fails because the "contravention" of the "operation and expectations" of a software "system" does not constitute fraud.  *See generally* ECF 130.

under Rule 404(b) to show the Peraire-Buenos' "motive, preparation and plan" to evade Coinbase monitoring. *Id*. at 38.

To be clear, the Peraire-Buenos vigorously dispute that they intended to evade Coinbase monitoring, and if the government is permitted to engage in this evidentiary sideshow, the evidence will show the opposite. The Peraire-Buenos *did* respond to Coinbase inquiries, both before and after the alleged Exploit, and they never provided any false or misleading information. Nor would such an effort make sense: as the government knows, the Peraire-Buenos and their alleged co-conspirators off-ramped the cryptocurrency from the alleged Exploit in Fall 2023 *in order to pay the estimated taxes owed on the alleged Exploit*—which they did, *before* the Indictment.

But in any event, the government has not identified specific communications it intends to introduce for these purported purposes. The government should be required to make a more detailed offer of proof, and the Peraire-Buenos should have an opportunity to respond. This information is necessary because it is unclear how Coinbase-related evidence is relevant under either theory the government floats.

## III. The Court Should Deny the Government's Motion to Elicit Testimony from Lay Witnesses Through Hypothetical Questions.

The Court should deny the government's motion to permit testimony in response to hypothetical questions from the witness for Nonparty-1 and the Flashbots Representative. ECF 125 at 38-42. Under *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), and Federal Rules of Evidence 602 and 701, lay witnesses may testify in response to hypothetical questions in limited circumstances that are not present here.

In *Cuti*, the government presented two accountant witnesses "with information that [the defendants] had withheld [from them], such as side letters to the transactions, and asked how the withheld information would have affected their accounting." *Id.* at 457. "In each instance, [the

accountants] replied that if they had been aware of the withheld information, they would not have recognized the full amount of the transaction proceeds as immediate revenue." *Id.* The court upheld the admission of this testimony as either lay fact testimony or lay opinion testimony.

*Cuti*'s fact-testimony holding was premised on three "limitations" to the testimony: (a) the "factual foundation" for the answers had been "laid in earlier admitted testimony and exhibits"; (b) the hypotheticals were "factual [in] nature"; and, critically, (c) the "witnesses' reasoning . . . was based on undisputed accounting rules." *Id.* at 458. On that last limitation, the court elaborated that the "undisputed accounting rules" had been "explained in detail" such that "the reasoning process that the witnesses employed in answering the hypotheticals was straightforward and transparent to the jurors, who could readily discern whether the responses given were reliable." *Id.*[15] The court also emphasized that the witnesses were "personally familiar with the accounting of the transactions at issue" because they had done the original accounting. *Id.* These "limitations" "left little room for the witnesses to engage in speculation." *Id.*

*Cuti*'s lay opinion-testimony holding was premised on similar limitations under the rubric of Rule 701's three sub-parts. Under Rule 701(a) and (b), the court held that the witnesses were not testifying to new facts outside their personal knowledge but merely "acknowledging that knowledge of . . . facts, already admitted into evidence, would have caused them to alter their accounting treatment," which was helpful to the jury. *Id.* at 459. Regarding Rule 701(c), the court held that the testimony was not expert because the accounting "rules or their interpretation were not in question in th[e] case," and, as a result, the testimony was "reduced to impact—whether a

---

[15] This limitation dooms the government's argument that it should be permitted to elicit this testimony before laying a foundation subject to later connection. *See* ECF 125 at 41 n.15. None of the cases the government cites involving co-conspirator statements supports conditional admission of this distinct type of testimony.

witness would have acted differently if he had been aware of additional information," which is a reasoning process understandable to lay jurors. *See id.* at 460.

The previewed testimony from the witness for Nonparty-1 and the Flashbots Representative defies these *Cuti* limitations and Rules 602 and 701 in three key respects: (1) it would establish new facts about disputed technology; (2) it is not based on the witnesses' personal knowledge; and (3) it would involve speculation that would not inform the materiality element.

First, unlike the accounting rules in *Cuti* that were "undisputed" and "not in question in th[e] case," *id.*, the functionality of the technology at issue is very much in dispute. The answers to the hypotheticals would convey new information about how, according to the government's witnesses, the disputed technology would have functioned in a different situation. The reasoning process required to answer these hypotheticals would not be "straightforward and transparent to the jurors," and, as a result, the jurors will not be able to "readily discern whether the responses given [are] reliable." *Id.* at 458. For the same reason, the testimony is not fairly characterized as having been "reduced to impact" and thus based on reasoning familiar to a lay jury. *Id.* at 460. In evaluating the answers to these technical questions, the jury necessarily will have to trust the expertise of the witnesses.[16]

---

[16] It is no answer that the government separately will seek to "lay the factual foundation" regarding the technology's functionality. ECF 125 at 40. The Peraire-Buenos dispute that this "foundational" testimony—including technical assertions that "the MEV-Boost system provided certainty that proposed bundles included within a block would be published to the chain either as originally ordered and structured or not at all," *id.* at 41—is "factual." That testimony is expert testimony conveying a witness's opinion as to how the disputed technology was designed to or did function, and the government has elected not to elicit expert testimony on these questions at trial. *See* ECF 136. The Peraire-Buenos therefore will object at trial to attempts to lay the "foundation" through opinion testimony that crosses the line between Rule 701 and 702. But even if the "foundational" testimony were factual, non-expert, and properly admitted, the answers to the hypothetical questions still would flout the *Cuti* limitations because they would establish new facts about how the disputed technology would have functioned in a different situation.

Second, neither witness has the personal knowledge necessary to answer the previewed hypothetical questions. *See* Fed. R. Evid. 602, 701(a); *Cuti*, 720 F.3d at 458. The accountants in *Cuti* had prepared the underlying financial records and were asked how they *personally* would have done things differently if they had known certain facts. This fact was core to both *Cuti* holdings because the reasoning process—if I had known X, I would have done Y differently—was deemed to be familiar to lay jurors. *See supra* pp. 27-28. Courts, including in a case cited by the government, have held that hypothetical "materiality" questions may *not* be posed to lay witnesses who were *not* the decisionmaker allegedly deceived. *See United States v. Hill*, 643 F.3d 807, 842 (11th Cir. 2011) (holding it was error to pose hypothetical questions to witnesses "who were not personally involved with the transactions at issue"); *Phillips v. Duane Morris, LLP*, 2015 WL 72336, at *2 (D. Colo. Jan. 5, 2015) (distinguishing *Cuti* where the witness "had no input into the specific decision" at issue). Here, the witness for Nonparty-1 did not make any "trading decisions" himself that would have been affected by any alleged misrepresentations. ECF 125 at 41. His pre-programmed MEV-Bot attempted to sandwich the so-called Lure Transactions without his input. Similarly, the relay, not the Flashbots Representative, was allegedly deceived by the so-called False Signature.

The Flashbots Representative is an additional step removed from the necessary personal knowledge because the relay supposedly deceived through the alleged Exploit was not operated by his employer, Flashbots. Rather, the relay belonged to a different entity called the Ultrasound Relay. The Flashbots Representative is not affiliated with Ultrasound Relay and had no role in administering its relay. The government has not included any witness from Ultrasound Relay on its witness list.

Third, the previewed hypothetical questions are not aimed at a narrow materiality inquiry like in *Cuti*.  Under *Cuti*, hypothetical questions must target whether a certain piece of allegedly misleading information (or the omission of specific information) would or would not have affected the decisionmaker.  Otherwise, the witness is free to "engage in speculation." 720 F.3d at 458.[17] And the speculative opinions would not be helpful to the jury.  *See* Fed. R. Evid. 701(b).  The hypothetical questions in the cases the government cites invariably follow this *Cuti* limitation.  For example, in *United States v. Orr*, 692 F.3d 1079 (10th Cir. 2012), the attorney asked a question that homed in on the impact of the allegedly misleading information on the witness: "What affect, [sic] if any, would it have had upon you if you had been told that all tests done on Mr. Orr's own fuel did not show the advantages disclosed in those documents?"  *Id.* at 1096.

The government's previewed questions do not fit this mold.  Rather than ask an appropriate witness (qualified under Rule 702) how the alleged misrepresentation that the MEV Bot encountered—*i.e.*, whatever false information the Lure Transaction supposedly conveyed—would have interacted with the MEV Bot's code, the government proposes to ask the witness for Nonparty-1 generally whether he "would have traded" if he had known that the alleged Exploit

---

[17] Courts regularly exclude speculative testimony about what a witness would have done, thought, or felt if the situation had been different under Rule 602 where this *Cuti* limitation is not present. *See, e.g.*, *Washington v. Dep't of Transp.*, 8 F.3d 296, 299-300 (5th Cir. 1993) (affirming exclusion of testimony from witness about what he "would have done had he seen the warning label" on allegedly defective product); *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1459 (10th Cir. 1990) (affirming exclusion of "speculative and self-serving statements to the effect that had a different warning been on the vehicle, she would not have allowed her six-year-old son to ride it"); *Evanston Bank v. Brink's, Inc.*, 853 F.2d 512, 515 (7th Cir. 1988) (affirming exclusion of testimony about what "the bank would have done under given circumstances" that would have required witness to speculate); *Athridge v. Iglesias*, 2004 WL 7345458, at *2 (D.D.C. Dec. 21, 2004) (excluding testimony about what witnesses "would have done, had they been home on the day of the accident rather than on an extended vacation" because "[s]peculative testimony, based on what a witness would have done had the situation been otherwise, cannot possibly be based on a witness' perception").

was possible. *See* ECF 125 at 41 ("[W]hether Victim-1 would have traded had Victim-1 known that the trades could be prematurely viewed by a validator, unbundled, and switched[.]"). As noted above, this question about what the witness for Nonparty-1 would have done is not even directed at the supposed decision-maker (to the extent bots can make decisions). In addition to that error, it fails to isolate and gauge the materiality of any alleged falsity by the Peraire-Buenos. Without that *Cuti* limitation, the question is an invitation to speculate about a hypothetical situation that is inadmissible under Rule 602. *See supra* n.17. Additionally, the question improperly suggests that the Peraire-Buenos had an obligation to disclose to the alleged victims the potential for unbundling. No such obligation has been alleged, none existed, and the government has not charged an omission-based theory of fraud. *See* ECF 112 at 17 n.4 ("[T]he Government has confirmed that it is proceeding only on a theory of material misrepresentations" and not an "omission theory").

The questions to the Flashbots Representative are similarly improper. First, like with the witness for Nonparty-1, the Flashbots Representative was not the supposed decisionmaker. Second, the questions focus on the effect of the "False Signature" generally rather than isolating and asking about the effect of what was allegedly false about it. *See* ECF 125 at 42 (whether "absent the False Signature, the relay would have submitted a proposed block, which included the Victim Traders' proposed bundled transactions, in a manner that would have been accepted by other Ethereum users"). This testimony would not assist the jury in evaluating whether any alleged falsity within the signature was material because, as formulated, the question is asking something different—*i.e.*, whether the alleged False Signature was causally significant to the alleged Exploit's success. Something can be integral (and, in a colloquial sense, "material") to a strategy without being materially misleading under the wire fraud statute. The government's hypotheticals relate only to the former concept. Third, the questions would require the Flashbots Representative

31

to speculate about the actions of third parties—*i.e.*, the validators who would attest to the hypothetical block. *See* ECF 125 at 42 (opinion on what "would have been accepted by *other* Ethereum users" (emphasis added)). The Flashbots Representative is not a mouthpiece for "other Ethereum users," and opinions about what other users would have done in hypothetical situations is expert testimony far outside the bounds set by *Cuti*.

There is a likely reason why the government may seek to ask the Flashbots Representative the imprecise questions previewed in its motion: it has previously admitted that the relay "did not check" the fields in the signed blockheader that were allegedly "invalid," "including the parent root or the state root." ECF 111 at 8. In other words, any alleged falsity (or "invalidity," in the government's new framing) in the False Signature could not have been material because it was not something the relay ever considered. It is unclear how the government can plausibly argue the False Signature is a material misrepresentation in these circumstances. The improper hypothetical questions it previews suggest it instead will seek to confuse the jury by asking inapposite questions that, although they sound in "materiality" in a colloquial sense, do not actually bear on the materiality element of the charged offenses.

In sum, while lay witnesses properly may answer hypothetical "materiality" questions in certain circumstances, none of those circumstances is present here. The Court should preclude testimony through hypotheticals from the witness for Nonparty-1 and the Flashbots Representative.

## IV.    The Court Should Deny the Government's Motion to Preclude Evidence and Argument That Are Supposedly Irrelevant and Unfairly Prejudicial.

The government moves to exclude several categories of evidence and argument that it claims are irrelevant and/or unfairly prejudicial. None of these categories of evidence or argument

is irrelevant or unfairly prejudicial. Rather, the government's overbroad arguments seek to exclude evidence essential to the Peraire-Buenos' defense. The Court should deny the motion.

### A.    Evidence and Argument Concerning the Alleged Victim Traders' Trading Strategies

The Court should deny the government's motion to preclude evidence or argument that the alleged victims "engaged in inappropriate trading strategies." ECF 125 at 43. The government does not specify what it means by inappropriate trading strategies. Instead, the government hypothesizes about several potential arguments that the Peraire-Buenos have not made and do not intend to advance at trial. For this reason, the motion is largely moot. But, for the reasons explained below, the motion also appears to sweep too broadly and to improperly target highly probative evidence and legitimate arguments, and thus, it should be denied. The parties and the Court can address at trial any issues with respect to arguments the Peraire-Buenos do pursue.

Start with the arguments that the Peraire-Buenos will not make. The Peraire-Buenos do not intend to argue that Nonparty-1's trading strategy was unlawful, criminal, or that the jury should acquit them because Nonparty-1 was engaged in wrongdoing. Nor will they argue that their conduct was lawful because "everyone [was] doing it," ECF 125 at 44-45 (citing *United States v. Connolly*, 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019))—that is, other users of the Ethereum Network or MEV-Boost were also thwarting sandwich attacks. As explained below, that fact is relevant to the intent inquiry but of course does not alone preclude a fraud conviction.

Similarly, the Peraire-Buenos will not argue that they should be given a pass by the jury because, like Robin Hood, they "robb[ed] the rich to help the poor." ECF 125 at 44 (citing *United States v. Gatto*, 986 F.3d 104, 133 (2d Cir. 2021) (Lynch, J., concurring)). The Peraire-Buenos did not commit fraud, and at trial, they will not present any nullification defense. A "Robin Hood"

defense, *id.* at 44, would not even make sense here: the Peraire-Buenos are not alleged to have taken from sandwich attackers to compensate the traders victimized by sandwich attacks.

Finally, the Peraire-Buenos will not argue that they should be acquitted because the alleged victims were negligent, careless, or gullible. *Id.* at 44-46 (citing *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004); *United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021)). That is not their defense. Far from "people of below-average judgment or intelligence," *United States v. Coffman*, 94 F.3d 330, 334 (7th Cir. 1996) (cited in *Thomas*), the sandwich attackers were highly sophisticated parties who had complete access to all of the same Ethereum and MEV-Boost code and whose bots presumably could simulate the potential outcomes of their various trading strategies. The Peraire-Buenos never lied to the alleged victims (or any other users), and it was not fraud to prevent sandwich attacks.

All that said, evidence concerning sandwich attacks is obviously relevant to the case and will be admitted at trial. Indeed, the mechanics of sandwich attacks are central to the Indictment's allegations. *See* ECF 70 ¶¶ 13, 24, 26. In its brief, the government says that the witness for Nonparty-1 "will explain how these trades take place in bundles of transactions" that placed "a potentially profitable trade identified in the mempool" between Nonparty-1's front- and back-run trades. ECF 125 at 43. In other words, he will explain how a sandwich attack works. The government's description of that testimony attempts to use the most neutral terminology possible to describe the trades, including by omitting the word "attack" or "sandwich," calling the sandwich attack victim a "mempool transaction," and avoiding the logical and undisputed conclusion that the "profit" the MEV Bots earn comes at the expense of the sandwiched trader.

This artificial attempt to sanitize the evidence should be rejected, for several reasons. First, as a practical matter, it is unsustainable because it does not reflect how people, including Nonparty-

1, the Flashbots Representative, or CC-1, actually talked about these trades. Nonparty-1's own documents refer to the middle trade in the sandwich as its "victim." The words "sandwich attack" are all over the government's exhibits.

More fundamentally, the government's approach distorts in meaningful ways the reality of the trading environment in which the alleged fraud occurred. The jury will need to understand that environment, not some Potemkin version of it, to evaluate the government's case. Evidence about the reality of sandwich attacks, their mechanics, and their place in the Ethereum ecosystem are critical to the Peraire-Buenos' defense in at least the following ways, none of which implicates the inappropriate arguments that the government purportedly fears.

First, the evidence will inform the meaning (or lack thereof) of the alleged Lure Transactions. The only supposed meaning that the government has argued the Lure Transactions conveyed to the MEV Bots was that, as trades pending in the public mempool, they implicitly conveyed a promise to be sandwiched. *See* ECF 61 at 16. Evidence that Nonparty-1 (accurately) refers to the middle trade as its "victim," and that the middle trader is left worse off, defeats this argument because it is implausible that someone would knowingly agree to be a victim of a sandwich attack.[18] If the jury is instead presented with the government's sanitized version, where the MEV Bots trade around the middle trade without affecting that trade's economics at all, the government's inaccurate argument would be misleadingly strengthened.

---

[18] Here is one of the many points of divergence between this case and the spoofing cases. In a spoofing case, the implicit message conveyed by placing an order for the purchase of commodities—*i.e.*, that there is authentic demand for the commodities as reflected in the commensurate increase in their price—is a straightforward axiom of economics. It is hard to conceive of a less comparable, or more preposterous, implicit meaning for a trade placed on the Ethereum Network to supposedly convey than a promise to be victimized by a sandwich bot.

Second, the evidence will inform whether the alleged victims' cryptocurrency was "stolen," as the government alleges, or speculatively traded away. The evidence will show that each of the alleged Victim Traders' MEV Bots sustained losses on the first trade, which was executed as the bots had programmed. The alleged Victim Traders hoped to recoup that expected, intentional loss through the backrun trade and reap a profit. The evidence will show that neither MEV-Boost, the underlying blockchain technology, nor any other authority guaranteed that the MEV-Bots' sandwich strategy would ultimately succeed. (That makes sense because sandwich attacks are an undesirable, predatory trading strategy.) And the evidence will not show any misrepresentation by the Peraire-Buenos on this or any other topic. To evaluate whether the failure of such a contingent, adversarial trading strategy was the result of fraud, the jury needs to understand how the strategy worked, how its pieces fit together (or did not), and how it could fail.

Third, the evidence will defeat any claim that the alleged scheme deprived the Victim Traders of a traditional property interest. Evidence that the middle trade was placed by some other user that the MEV Bots sought to victimize will demonstrate the absurdity of any claim of right to the precise order of transactions that includes that "victim" trade. Recall that only that middle, "victim" trade—which never belonged to the alleged Victim Traders—is alleged to have been changed before being added to the blockchain. The sandwich victim's trade was not "property" that belonged to the sandwich attackers (or their MEV Bots) that could be taken by the Peraire-Buenos (or their validator) through fraud.

Fourth, the role that sandwich attackers play in the adversarial trading environment informs the alleged Victim Traders' expectations and the Peraire-Buenos' alleged intent to defraud. The sandwich attackers' MEV Bots were engaged in an aggressive trading strategy that, while not prohibited under the relevant protocols, was viewed negatively as a form of "attack." Other users

attempted to thwart those attacks, occasionally succeeded, and openly boasted about those efforts online. In this context, it is incredible to claim, as the witness for Nonparty-1 apparently will, that the sandwich attack strategy was considered risk-free and that efforts to unbundle a sandwich attack would be unexpected. In this context, by contrast, it is reasonable for an individual who attempted to thwart a sandwich attack and beat the MEV Bots at their own game to believe he is doing nothing wrong. A jury blinded to the real context in which these trades occurred cannot fairly evaluate either side's states of mind.

Fifth, the facts that sandwich attacks require vast investments of money, are done by a few sophisticated entities, and are a controversial form of adversarial trading provide necessary context to the Peraire-Buenos' response to the alleged Victim Traders' anonymous demands and threats for the profits from the alleged Exploit. In the circumstances as they truly existed, the Peraire-Buenos' request that the entities first identify themselves—so that the Peraire-Buenos could assure themselves the sandwich attackers were not affiliated with sanctioned entities or international criminals—is entirely reasonable. (It will be undisputed that those entities did not identify themselves in response to these requests.) In the government's artificial context, where the jury is misled into believing that sandwich attacks are a normal form of arbitrage trading that occurs on Ethereum, that request seems less reasonable.

The above evidence and argument are relevant and essential to rebutting the case the government has alleged. None of it is improper or unfairly prejudicial. The Court should deny the motion.

**B.    Evidence and Argument Concerning Lack of Cryptocurrency Regulation or the Government's Charging Decisions**

The government asks the Court to "exclude evidence and argument that cryptocurrency is unregulated or that the government's charging decisions were improper." ECF 125 at 47-50. The

Court should deny the motion because it apparently seeks to exclude relevant evidence and arguments.

As an initial matter, the Peraire-Buenos do not intend to impugn the government's charging decisions or motives, to suggest that they are being subjected to unfair "selective prosecution," or to argue that the lack of regulation in cryptocurrency markets means "anything goes," such that otherwise criminal conduct is somehow immunized. *See also infra* pp. 39-43 (discussing the government's motion to preclude a so-called "code is law" defense).

However, evidence that the Ethereum Network is "decentralized and 'trustless' by design," ECF 125 at 47, and that neither the government nor the Ethereum Network (or MEV Boost) imposed express rules prohibiting the Peraire-Buenos' trading strategy, is plainly relevant to whether any alleged representations were false, whether any misrepresentations were material, and whether the Peraire-Buenos acted with required specific intent to defraud. Indeed, the absence of regulations and rules was essential to Judge Subramanian's Rule 29 decision in *Eisenberg*. *See United States v. Eisenberg*, --- F. Supp. 3d ---, 2025 WL 1489248, at *23 (S.D.N.Y. May 23, 2025) (finding no material misrepresentation because the service at issue "had no terms and conditions, policies, or rules regarding either manipulation or the borrowing of funds").

This evidence is also relevant to the Peraire-Buenos' alleged intent to defraud or engage in money laundering. The government's motions *in limine* seek to admit multiple categories of evidence like internet search histories and news articles that it claims reflect or inform the Peraire-Buenos' knowledge and belief that they had committed a crime. The mere fact that alleged crime occurred on an unregulated exchange—one that was purposefully designed to operate without the intervention of a central authority—makes that flimsy "consciousness of guilt" evidence even less probative. At a minimum, the government cannot have it both ways by excluding this evidence

about the context in which the alleged crimes occurred while flooding the trial with supposed consciousness of guilt evidence to show that the Peraire-Buenos knew or should have known that their alleged conduct—which the then-U.S. Attorney boasted "was novel and has never before been charged"—was illegal.[19]

In short, the apparent scope of evidence the government seeks to exclude is far too broad. Evidence of basic *facts* concerning the existence or non-existence of regulations, rules, and protocols in the Ethereum network is both relevant and admissible.

### C.    What the Government Calls a "Code Is Law" Argument

The Court should deny the government's motion to preclude what it characterizes as a "code is law" argument.  The government's motion attacks a strawman, and by sweeping too broadly, ensnares valid arguments.

As an initial matter, the government's motion targets an argument that the Peraire-Buenos never suggested they will make—*i.e.*, "that because the MEV-Boost code did not prevent the defendants' Exploit, their conduct was legal."  ECF 125 at 50.  The government purports to read that argument into a sentence clipped from the brief in support of the Peraire-Buenos' motions to dismiss.  *See id.*  The government fundamentally misunderstands the Peraire-Buenos' argument. In the relevant part of their brief, the Peraire-Buenos argued that the fraud allegations were surprising

> where the underlying code that permitted the alleged 'Exploit' was as visible to the alleged victims' MEV-Bots as to the Peraire-Buenos ***and where the Peraire-Buenos are not alleged to have made any representations (let alone misrepresentations) to the alleged victims either directly or indirectly*.  *Under this factual scenario, if fraud is to occur it must be due to the violation of some other***

_____

[19] *Two Brothers Arrested For Attacking The Ethereum Blockchain And Stealing $25 Million In Cryptocurrency*, U.S. Attorney's Office, Southern District of New York, https://www.justice.gov/usao-sdny/pr/two-brothers-arrested-attacking-ethereum-blockchain-and-stealing-25-million (last accessed Sept. 7, 2025).

> *obligation imposed on Ethereum validators—but the Indictment does not allege any such obligation.*  At a minimum, where everyone on the exchange has access to the same information on which to base their adversarial trading strategies, it cannot be said that it was reasonably clear at the relevant time that the alleged conduct permitted by the relevant code could be considered fraudulent.

ECF 49 at 13-14 (emphasis added) (citations and alterations omitted).  The Peraire-Buenos also clarified that this argument was not a "code is law" defense.  *See id.* at 14 n.8 ("Actions permitted by the code of a cryptocurrency exchange potentially could be illegal in various ways.").  The government's quotation ignores the footnoted language and leaves out the bolded text emphasizing that the government apparently sought to pursue a novel theory whereby Ethereum validators can commit fraud without making material misrepresentations and without violating any duties.  The government has never disputed that such a theory would be novel; rather, it disavowed that theory at the motion to dismiss stage by arguing that the Indictment alleged two material misrepresentations and that the evidence at trial would establish rules that were supposedly broken. *See* 6/17/25 Hr'g Tr. 34, 38-39, 49-50.

Apart from attacking a strawman, the government is wrong that the public nature of the relay code and the fact that the code did not prohibit the alleged Exploit is only relevant to a "code is law" defense.  This evidence undermines the government's fraud theories in several respects that do not equate to a facile argument that "if the code allows it, it is legal."

First, the evidence undermines the anticipated testimony of the witness for Nonparty-1 and the Flashbots Representative and related arguments regarding the supposedly unexpected nature of the alleged Exploit.  The government's superficial labeling of the alleged conduct as an "exploit" of a "vulnerability" in the relay code obscures what it is really alleging.  The government does not dispute that on April 2, 2023 neither the MEV-Boost software nor the relay code prevented the unbundling of a sandwich attack.  That is indisputable because the unbundling happened on April 2, 2023.  Instead, the government will seek to elicit testimony from the Flashbots Representative

and to admit documents about how MEV-Boost was "intended to" prevent unbundling but how its code, in fact, did not do so. *See, e.g.*, ECF 125 at 20, 26, 34, 42, 52 nn.20 & 21. And the government will seek to elicit testimony that the witness for Nonparty-1 understood (incorrectly) that MEV-Boost provided "certainty" against unbundling. *Id.* at 41. The implication of this testimony and evidence is that the events of April 2, 2023, were unexpected. Although the Peraire-Buenos maintain that whether something is unexpected is irrelevant to whether it is fraudulent (to establish that proposition, the government will need to prove that the Peraire-Buenos made a material misrepresentation setting those expectations, among other things, *see* ECF 130), they are entitled to contest the premise at trial if the government is allowed to suggest this.

That the MEV-Boost code did not prevent unbundling, and that this aspect of the system's design was visible to anyone who cared to look, fatally undermines this likely government argument. The Flashbots Representative's testimony about what the MEV-Boost system was "intended" to do will be undermined by evidence about how the system was, in fact, not designed to implement those supposed intentions. The evidence also will show that the potential for unbundling was well-known to Flashbots and its users. Similarly, the witness for Nonparty-1's self-serving testimony about the "certainty" MEV-Boost supposedly provided is undermined by the public nature of the supposed vulnerability. Flashbots materials publicly available at the time informed its users that the only thing that discouraged unbundling was the Ethereum protocol's slashing penalty. *See* ECF 143 at 15. The public code confirmed the same thing. Precluding arguments about the public nature of the code and its limitations to guaranteeing the success of sandwich attack trades would deprive the jury of context necessary to evaluate these witnesses' testimony.

Second, the evidence and argument about the public nature of the code also bears directly on the meaning and materiality of the alleged misrepresentations.  It is unclear what allegedly false information the government ultimately will say that the Lure Transactions or False Signature supposedly conveyed to the inanimate computer programs they allegedly deceived.  But the government has floated some theories: that the Lure Transactions were a promise to be sandwiched, *see* ECF 61 at 16; and that the False Signature was a promise "that [the validator] would publish the block as is," 6/17/25 Hr'g Tr. 38.  The fact that the public code did not prevent unbundling is powerful evidence that neither alleged misrepresentation conveyed the implicit meaning the government claims.  Why would it be reasonable to interpret a transaction pending in the mempool as a promise to be sandwiched when the MEV-Boost system's architecture publicly did not guarantee that sandwich trades would remain intact?  And why would the MEV-Boost protocol include a step where a validator promises to do something that the code did not bother to prevent the validator from doing?  The government's misrepresentation theory makes no sense. The jury should not be deprived of the information necessary to evaluate these weaknesses.

In this context, the government's invocation of the spoofing cases is curious.  The government claims that the courts there affirmed convictions without "requiring any proof that 'spoofing' was technologically or contractually prohibited on the platforms the defendants used." ECF 125 at 52-53.  That's not true.  In those cases, the implicit falsehood regarding the traders' intent—*i.e.*, the false meaning their pending trades supposedly conveyed to other traders in the market—was premised on the existence of binding rules that prohibited spoofing.  *See, e.g.*, *United States v. Chanu*, 40 F.4th 528, 533 (7th Cir. 2022) ("[T]raders are prohibited from placing orders that they intend to cancel before execution[.]"); *see also Eisenberg*, 2025 WL 1489248, at *24 (distinguishing *Chanu* on these grounds).  Whether those rules are characterized as "contractual"

(whatever that means), or professional, or regulatory, they were binding on the spoofing defendants and this context was essential to the misrepresentation theory. This stands in stark contrast to the "trustless" design of the Ethereum Network and its reliance on economic incentives, not rules, to shape behavior.

Finally, the government's quip that "[o]ne is not allowed to rob a bank because the door to the bank was left unlocked," ECF 125 at 53, similarly misses the point. While that is true, it also does not make it *fraudulent* for someone to notice that bank door was unlocked and take the money. *See, e.g.*, *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) ("Theft not accomplished by deception (e.g., physically taking and carrying away another's property) is not fraud absent a fiduciary duty." (citation omitted)).[20]

### D.    Argument and Evidence About the Involvement of Counsel

As the government notes, ECF 125 at 55, the government filed its motions *in limine* before the deadline for the Peraire-Buenos to disclose an intent to pursue an advice-of-counsel defense at trial. The Peraire-Buenos, however, do not intend to assert such a defense.

But the government is wrong to suggest that the Peraire-Buenos have agreed not "to adduce evidence or make arguments regarding the presence or involvement of attorneys . . . to suggest that the defendants lacked criminal intent," or that such "evidence or argument would be improper and should be precluded." *Id.* As explained below, the government misstates the law, which permits evidence involving the presence of counsel as relevant to intent and other issues, and ignores that whether such evidence is necessary here depends on the contours of its case.

---

[20] To be clear, the Peraire-Buenos do not accept that the bank-robbery analogy is apt in any way and deny that there was any theft here.

As an initial matter, there is a difference between an advice of counsel defense and evidence that attorneys were involved or present. *See United States v. White*, 887 F.2d 267 (D.C. Cir. 1989). In *White*, then-Judge Ginsburg explained that "acknowledgement that one's attorney was present during a conversation is not equivalent to affirmative reliance on his advice that one's action is legal." *Id.* at 270; *see id.* (explaining advice of counsel is "an assertion more positive and specific than a general denial of criminal intent" because it requires "evidence of communications to and from [an attorney]"). Courts routinely admit evidence about the presence or involvement of counsel, even when no advice of counsel is at issue. *See In re Customs & Tax Admin. of the Kingdom of Denmark (Skat) Tax Refund Litig.*, 2024 WL 4696085, at *5 (S.D.N.Y. Nov. 6, 2024) (ruling that "defendants are not necessarily precluded from introducing evidence or argument concerning the impact of the advice of counsel or involvement of counsel on their good faith simply because they do not satisfy each of the . . . factors required of the so-called advice-of-counsel defense" and "such evidence remains subject to Rules 401 and 403"); *Ap-Fonden v. GE*, 2024 WL 4246159, at *1 (S.D.N.Y. Sept. 18, 2024) (declining to exclude "all references to counsel's involvement in disclosure decisions"); *see also United States v. Weinstein*, 2025 WL 438344, at *10 (D.N.J. Feb. 9, 2025) (ruling "the presence of an attorney could be probative of [the defendant]'s state of mind without becoming a 'back-door' advice of counsel defense").

None of the government's cases holds otherwise. In *United States v. Bankman-Fried*, the court ruled that such evidence may be admissible "depend[ing] on the circumstances." 2023 WL 6392718, at *3 (S.D.N.Y. Oct. 1, 2023) ("So whether and to what extent the defendant should be permitted to argue or adduce evidence regarding the presence or involvement of lawyers will depend on the circumstances."); *see also United States v. Bankman-Fried*, 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024) ("Although evidence of the presence of attorneys can be probative of a

defendant's state of mind, it on occasion can pose a substantial risk of misleading the jury.").  On that basis, and as the trial proceeded, the court admitted certain defense evidence (*e.g.*, testimony that "lawyers sanctioned the data retention policies"), but excluded other evidence.  *See id.*  And neither *SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013), nor *SEC v. LEK Securities Corp.*, 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019), which were civil cases that *Bankman-Fried* discussed, reached a different conclusion.[21]

Because the Peraire-Buenos do not intend to disclose any confidential legal communications or to argue (or imply) that they relied in good faith on such advice, there is no risk that the jury may mistakenly conclude an attorney "blessed" the implementation of their trading strategy or the handling of their trading profits.  But the jury may well learn, through the government's own evidence, that attorneys were present during relevant events and involved with them.  And the Peraire-Buenos may need to explain those facts to the jury and to put them in context in response to misleading government arguments.

For example, the government may offer corporate documents for Pine Needle, Inc., and try to argue that it was a "shell company registered in Wyoming" that the Peraire-Buenos used to commit fraud and launder funds.  ECF 125 at 10.[22]  Of course, there is nothing unlawful about

---

[21] *United States v. Gillier*, No. 11-cr-409 (PAE) (S.D.N.Y. July 5, 2022), Pretrial Hr'g Tr. 15-16, which pre-dates *Bankman-Fried*, also discusses *Tourre* and *LEK Securities* and ultimately takes the same "it depends" approach.  There, the government sought to offer evidence that the defendant had fled from the United States to Canada.  He sought to introduce evidence that he met with a lawyer in New York beforehand.  The court ruled that the defendant could not offer that evidence because it risked suggesting—falsely—that the lawyer had "blessed" the trip *and* it had "no non-speculative probative value" to counterbalance that risk.  *Id.* at 17.  The court did not hold that invoking the presence of counsel outside the context of a formal advice of counsel defense is forbidden.  For the reasons explained below, the presence of counsel may be relevant here in ways having nothing to do with advice they may have given.

[22] The government should be precluded from suggesting that Pine Needle was a "shell company" without expert testimony as to what that means, which it has not disclosed.  *See* ECF 136.

forming a corporation to engage in a business venture, and there is no basis to suggest that Pine Needle was merely a shell company. *See United States v. Motovich*, 2024 WL 3303723, at *3 (E.D.N.Y. July 2, 2024) (permitting government's use of term only if foundation was properly laid that company met accepted definition of shell company). In fact, the corporate documents were drafted and filed with the assistance of reputable corporate counsel. If the government is nevertheless permitted to argue that Pine Needle is a shell company or that the nature of its formation, structure, or place of incorporation is evidence of their intent to defraud or intent to conceal the proceeds of fraud, the Peraire-Buenos may want to introduce evidence of counsel's involvement to rebut that baseless assertion. *See Bankman-Fried*, 2023 WL 6392718, at *3 (acknowledging circumstances where a lawyer's presence has "a real bearing on whether [the defendant] acted with or without fraudulent intent").

Moreover, depending on this Court's ruling on the Peraire-Buenos' motion to exclude evidence or argument about their post-Exploit Google searches, ECF 132, the Peraire-Buenos may also need to refute the completely baseless but highly prejudicial notion that their after-the-fact internet searches reflect their consciousness of guilt. ECF 125 at 16 (arguing "[Defendants'] search histories before and after the Exploit are relevant to their knowledge and intent"). As the Peraire-Buenos have explained to the Court and the government, and substantiated with their disclosures in a privilege log, ECF 132 at 9-10; ECF 143-08, their Google searches temporally correlated with meetings and discussions with counsel, whom the Peraire-Buenos consulted after the alleged victims, who stubbornly refused to identify themselves, accused the Peraire-Buenos of theft and threatened them. Whether these searches are admitted, how the government intends to use them, and what evidence of counsel's involvement may be appropriate to rebut them, is presently unknown.

### E.    Evidence of Defendants' Personal Circumstances and Potential Punishment

The Court should deny the government's motion to exclude evidence of the Peraire-Buenos' personal circumstances and potential punishment.  The motion is both premature and overbroad.

The Peraire-Buenos have no intention of arguing that the jury should take pity on them or consider their potential punishment when it assesses whether the government has met its burden.  But certain aspects of the Peraire-Buenos' backgrounds will obviously be relevant to establishing the context in which the alleged Exploit occurred—including their education at the Massachusetts Institute of Technology, and when and how they entered the cryptocurrency trading business.  *See* ECF 70 ¶ 1 (alleging that the Peraire-Buenos "studied mathematics and computer science at one of the most prestigious universities in the country").  That the government's motion, if taken at face value, could preclude these relevant facts demonstrates its serious overbreadth.

Additionally, the Peraire-Buenos may put forward evidence that they are otherwise law-abiding citizens, if they so choose.  *See* Fed. R. Evid. 404(a)(2)(A); *United States v. Miller*, 2012 WL 3264516, at *1 (D. Vt. Aug. 10, 2012) ("Under Federal Rule of Evidence 404(a), evidence of an accused's character for integrity and for being a law-abiding citizen is admissible.").  That is true especially in this case, where the Peraire-Buenos' specific intent to defraud and knowledge that the Exploit proceeds were unlawfully derived will be vigorously contested.  And this evidence may be necessary to rebut the government's insinuation that ambiguous internet search queries and the contents of news articles are evidence of the Peraire-Buenos' asserted knowledge that they acted unlawfully (if the government is permitted to make those claims).

Should the government object on this basis to any argument or evidence presented by the Peraire-Buenos at trial, it can do so at the appropriate time.  The Court need not issue a ruling at this juncture.  *See, e.g.*, *United States v. Ayers*, 2024 WL 1158686, at *15 (E.D.N.Y. Mar. 18,

2024) (denying request to preclude defendant from eliciting juror sympathy as "premature" because "defense counsel in this case are all highly experienced, and they know what they are not allowed to do and the consequences of violating the basic rules of trial conduct," and the Court "does not expect to be tested with the kind of matters to which the Government has alluded").

## V.    The Court Should Deny the Government's Motion to Preclude Cross-Examination on Certain Topics.

The Constitution enshrines a criminal defendant's right to confront his accusers through cross-examination.  *See* U.S. Const., amend. VI (Confrontation Clause).  Cross-examination is "the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis v. Alaska*, 415 U.S. 308, 316 (1974), and it has been recognized as the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 J. Wigmore, Evidence, § 1367 (3d ed. 1940)).  Accordingly, "[a] district court should afford 'wide latitude to a defendant in a criminal case to cross-examinate government witnesses,'" *United States v. Mallay*, 712 F.3d 79, 103 (2d Cir. 2013) (citation omitted), because "the Confrontation Clause gives a defendant the right not only to cross-examination, but to effective cross-examination," *id.*; *see United States v. Kohan*, 806 F.2d 18, 23 (2d Cir. 1986) (holding trial court abused its discretion in limiting cross-examination of government's witnesses).

The government's motion to preclude entire topics of cross-examination is both premature and improper.  Most of the government's arguments regarding potential areas of questioning are speculative and rest on faulty premises.  None has merit.  The Court should deny the motion.

### A.    Cross-Examination of the Witness for Nonparty-1 Regarding "Market Manipulation"

The Court should deny the government's motion to preclude cross-examination of the witness for Nonparty-1 regarding "market manipulation."  As discussed above, the Peraire-Buenos do not intend to argue that sandwich attacks are unlawful market manipulation.  *See supra* p. 33.

Accordingly, to the extent the government is worried that Victim-1 will be asked, "are you a market manipulator?" or "did your MEV Bot engage in market manipulation?" the Peraire-Buenos will not ask those questions. Nor will they ask Victim-1 if he is a "criminal" or engaged in conduct that was "unlawful." Rather, as explained above, evidence about the mechanics of the alleged victims' sandwich attacks (some of it perhaps unflattering) is directly relevant to the charges about the Peraire-Buenos' competing trading strategy. *See supra* pp. 35-37.[23] Cross-examination on the topics discussed above therefore is entirely proper.

Such an examination would not come close, much less cross, the line into inappropriate "harassment" or undue "embarrassment." This is not a case in which the defendants plan to challenge the government's witness by introducing evidence about prior criminal convictions, asking inflammatory questions about sexual misconduct. Thus, it bears no resemblance to the cases on which the government relies in its motion involving cross-examination on these topics. ECF 125 at 57-60 (citing *United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003); *United States v. Schlussel*, 2009 WL 536066, at *3 (S.D.N.Y. Feb. 27, 2008); *United States v. Devery*, 935 F. Supp. 393, 407-08 (S.D.N.Y. 1996)). Notably, in some of those cases, the courts ruled that such evidence would be relevant, even highly relevant, but that the risk of undue prejudice and wasted time outweighed the probative value. *See, e.g.*, *Crowley*, 318 F.3d at 417 (holding "alleged instances of false accusation were certainly relevant to the witness's credibility," but nevertheless, trial judge had not abused his discretion in disallowing them). This case involves no such salacious conduct, and so this Court need not undertake a similar calculus.

---

[23] This Court's prior decision to quash (in part) a Rule 17 subpoena to Nonparty-1 under the restrictive *Nixon* standard does not mean that cross-examination at trial should be limited. Further, if the witness for Nonparty-1 gives false or incomplete testimony about these topics as the government's witness, the Peraire-Buenos must be allowed to confront him, by exposing any inaccuracies and challenging his credibility.

The cases on which the government relies concerning unproven allegations against government witnesses are similarly distinguishable.  *See* ECF 125 at 59 (citing *Motovich*, 2024 WL 3303723, at *18 (cross-examination regarding civil lawsuit against IRS agent); *United States v. Novaton*, 271 F.3d 968, 1004-07 (11th Cir. 2001) (cross-examination regarding unrelated internal investigation of DEA agent and investigation of police detective that occurred six years earlier and led to no criminal charges and only minor reprimand); *United States v. Stoecker*, 215 F.3d 788, 789-90 (7th Cir. 2000) (cross-examination regarding administrative complaint against government witness that was made more than fifteen years earlier and resulted in no adverse findings)).  The Peraire-Buenos will not ask the witness for Nonparty-1, or introduce extrinsic evidence, about any similar criminal, civil, or administrative proceedings against that witness.[24]

That being said, "aggressive cross-examination that could incidentally bring out embarrassing facts . . . is simply a function of litigation, in which both sides get to present their case before a decision is made."  *Sherman v. Fivesky, LLC*, 2020 WL 5105164, at *6 (S.D.N.Y. Aug. 31, 2020); *see also United States v. Paredes*, 2001 WL 1478810, at *2 (S.D.N.Y. Nov. 20, 2001) (holding defendants were entitled to cross-examine witness, even though testimony may be "embarrassing," because the jury must be able to "assess[] her credibility" and she would be "one of only three witnesses the government [would] call").  That is why, in *Davis v. Alaska*, one of the leading cases on the constitutional right of cross-examination, the Supreme Court held that "the State's desire that [its witness] fulfill his public duty to testify free from embarrassment and with

---

[24] Based on the current discovery from the government, the Peraire-Buenos are not aware of any such allegations against the witness for Nonparty-1 or any other government witness.  Should the government produce such evidence, however, the Peraire-Buenos reserve their rights to modify and supplement their response to the government's motion *in limine*.

his reputation unblemished must fall before the right of [the defendant] to seek out the truth in the process of defending himself." 415 U.S. at 320.[25]

In this case, the Peraire-Buenos will confront their accuser, by challenging any false or misleading testimony he may provide and his credibility as an alleged victim who has both a significant financial interest in the outcome of the case and an axe to grind. The jury should disbelieve Victim 1's testimony not because he is a "crook" or "villain," but because he has powerful personal, reputational, and financial interests in falsely portraying any losses that his MEV Bots may have suffered as the result of a fraud scheme. The Peraire-Buenos are entitled to expose those biases and to argue the jury should not credit his self-serving testimony.[26]

## B.    Cross-Examination of Records Custodians and Witnesses Called for Limited Purposes

The government next seeks to limit cross-examination of certain records custodians and witnesses it intends to call at trial who will authenticate documents and testify to certain discrete topics. The motion should be denied.

As an initial matter, the Peraire-Buenos do not intend to cross-examine records custodians for financial institutions and electronic communications providers on matters beyond the scope of authenticating and maintaining records. Nor do they intend to cross-examine the witnesses from the U.S. Attorney's Office about matters unrelated to the materials they extracted and reviewed or the scope of their review. But a ruling to this effect would be premature until the witnesses have

---

[25] Rule 611(a) permits a court to limit cross-examination to prevent "undue embarrassment," meaning excessive or unjustified embarrassment, *cf. Educ. Credit Mgmt. Corp. v. Frushour*, 433 F.3d 393, 399 (4th Cir. 2005) ("'Undue' generally means 'unwarranted' or 'excessive.'"), not to minimize any possible unpleasantness associated with testifying as a government witness in a criminal prosecution.

[26] The Peraire-Buenos also anticipate cross-examining the witness on other topics.

testified and the true scope of the direct is known. *See, e.g.*, *United States v. Wagner*, 2022 WL 19179, at *4 (S.D.N.Y. Jan. 3, 2022) (denying motion to limit scope of defendant's cross-examination as "premature"); *United States v. Sampson*, 2015 WL 2066073, at *15 (E.D.N.Y. May 4, 2015) (denying similar motion and noting that the government "may renew their objection" at trial). The government adduces no reason why a ruling on these subjects is necessary at this stage or why the Peraire-Buenos should be forced to preview their cross-examination questions.[27] The government can object at trial to whatever questions it perceives to be improper.

As to the witnesses who will testify on discrete topics, it is unclear what exactly the government is proposing the Court should preclude the Peraire-Buenos from asking on cross-examination. That parties are expected to comply with Rule 611(b) hardly requires pre-trial confirmation from the Court.

The only specific example the government does provide involves factually inaccurate direct testimony that should not be elicited from any witness. The government represents that it will call a witness to testify that "after the Exploit, the defendants never contacted TRM Labs, Inc., a blockchain intelligence firm that identifies and labels cryptocurrency addresses, to request any changes to the labeling of the defendants' cryptocurrency addresses." ECF 125 at 61. And it asks the Court to preclude cross-examination about "the methods that TRM uses to identify and label cryptocurrency addresses, or that Coinbase uses to detect and flag potentially fraudulent accounts or transactions." *Id.* As an initial matter, it is not apparent that this questioning would be

---

[27] The government cites *United States v. Londonio*, No. 17-cr-89 (CS), Dkt. 857 (S.D.N.Y. 2019), as having granted a similar request to limit the scope of cross. In fact, this docket entry is a letter motion by the government bringing the issue of the need to limit cross-examination of NYPD detectives to the court's attention but acknowledging that the court would "not likely be able to rule on this issue until it sees the scope of the Government's direct examination." *Id.* at 1. It was not an order by the court. It is unclear from the public docket whether this motion was ever granted.

inappropriate in any way or outside of the scope of the government's proffered direct. But this cross won't be necessary because, the Peraire-Buenos *did* contact TRM on October 4, 2023, to challenge the basis for listing their address as "being involved in illicit activity." *See* Ex. 5. They received no response and followed up on October 9. Ex. 6. As a result, the Peraire-Buenos do not anticipate that the government will elicit false testimony to the contrary from the TRM custodian.

## VI. The Government's Motion to Permit Authentication of Certain Records Under Rules 902(11), (13), and (14) Is Moot.

The Peraire-Buenos do not oppose the government's request to permit authentication of certain records, without prejudice to their right to object to the admission of the evidence on other grounds. The parties have agreed to stipulate to the authenticity of the three categories of records the government identified in its motion.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motions *in limine*.


Date: September 8, 2025                              Respectfully submitted,

By: */s/ Katherine Trefz*                              By: */s/ Daniel N. Marx*

Katherine Trefz (*pro hac vice*)                    Daniel N. Marx
Daniel Shanahan (*pro hac vice*)                  William W. Fick (*pro hac vice*)
Patrick J. Looby (*pro hac vice*)                   Fick & Marx LLP
Williams & Connolly LLP                              24 Federal Street, 4th Floor
680 Maine Avenue SW                                 Boston, MA 02110
Washington, DC 20024                                Tel: 857-321-8360
Tel: (202) 434-5000                                      dmarx@fickmarx.com
ktrefz@wc.com                                            wfick@fickmarx.com
dshanahan@wc.com
plooby@wc.com                                           *Counsel for Defendant*
                                                                *Anton Peraire-Bueno*
Jonathan P. Bach
Shapiro Arato Bach
1140 Avenue of the Americas
17th Floor
New York, NY 10036

Tel: 212-257-4897
jbach@shapiroarato.com

*Counsel for Defendant*
*James Peraire-Bueno*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2025, I electronically filed the foregoing document

with the Clerk of Court using the CM/ECF system which will send notification of such filing to

all counsel of record in this matter who are on the CM/ECF system.


*/s/ Katherine Trefz*
Katherine Trefz