UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA                        :
:
   - v. -                                                   :        S1 24 Cr. 293 (JGLC)
:
ANTON PERAIRE-BUENO, and                        :
JAMES PERAIRE-BUENO,                            :
:
                Defendants.          :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' MOTIONS *IN LIMINE***

JAY CLAYTON
United States Attorney

Jerry Fang
Danielle Kudla
Benjamin Levander
Assistant United States Attorneys
- Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT .................................................................................................................. 1

I.     The Court Should Deny the Defendants' Motion to Exclude Purported Uncharged
       Theories of Fraud ................................................................................................ 1

       A.     Factual Background ................................................................................ 2

       B.     Applicable Law ....................................................................................... 3

       C.     Discussion ............................................................................................... 4

II.    The Court Should Permit the Government to Introduce Evidence Regarding MEV-
       Boost's Purpose, Design, Functionality, and Intended Use ................................ 9

       A.     Factual Background .............................................................................. 10

       B.     Discussion ............................................................................................. 11

III.   Evidence of the Defendants' Post-Exploit Google Search Histories Is Admissible ........ 14

IV.    The Government Should Be Permitted to Elicit Testimony from Victim-1 Regarding
       Victim-1's MEV Bots .......................................................................................... 25

       A.     Factual Background .............................................................................. 26

       B.     Discussion ............................................................................................. 30

V.     The Defendants' Motion to Preclude Undisclosed Expert Testimony Should Be Denied 32

       A.     Factual Background .............................................................................. 33

       B.     Discussion ............................................................................................. 34

              1.     Law Enforcement Witnesses ....................................................... 34

              2.     The Government's Expert Witness .............................................. 35

              3.     The Government's Percipient Witnesses ..................................... 37

VI.    The Government Should Be Permitted To Adduce Evidence Regarding the
       Circumstances of the Tether Seizure ................................................................. 38

       A.     Factual Background .............................................................................. 38

       B.     Discussion ............................................................................................. 40

VII.   The Post-Exploit News Articles and "False Signature" Screenshot Are Admissible ....... 44

       A.     Factual Background .............................................................................. 45

       B.     Discussion ............................................................................................. 47

1.      The Blockheader Screenshot Is Admissible ............................................. 47

2.      The News Articles Are Admissible ......................................................... 49

CONCLUSION..................................................................................................................... 53

iii

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                     **Page(s)**

*A. Terzi Prods., Inc. v. Theatrical Protective Union,*
2 F. Supp. 2d 485 (S.D.N.Y. 1998) ................................................................... 7

*Arizona v. Youngblood,*
488 U.S. 51 (1988) ............................................................................................ 30

*Brennan Ctr. for Justice v. DOJ,*
697 F.3d 184 (2d Cir. 2012) ............................................................................. 22

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) .......................................................................................... 15

*Elliott v. Cartagena,*
84 F.4th 481 (2d Cir. 2023) .......................................................................... 31, 32

*George v. Celotex Corp.,*
914 F.2d 26 (2d Cir.1990) ................................................................................. 20

*HDI Glob. Ins. Co. v. Kuehne + Nagel, Inc.,*
23 Civ. 6351 (LJL), 2024 WL 5247216 (S.D.N.Y. Dec. 30, 2024) ................. 17

*Jones v. Jasper Wyman & Son,*
639 F. Supp. 3d 192 (D. Me. 2022) .................................................................. 43

*Sioson v. Knights of Columbus,*
303 F.3d 458 (2d Cir. 2002) ............................................................................. 37

*United States v. Abu-Jihaad,*
630 F.3d 102 (2d Cir. 2010) ............................................................................. 48

*United States v. Agrawal,*
726 F.3d 235 (2d Cir. 2013) ........................................................................... 5, 6

*United States v. Alexandre,*
No. 22 Cr. 326 (JPC), 2023 WL 416405 (S.D.N.Y. Jan. 26, 2023) ................. 21

*United States v. Al-Moayad,*
545 F.3d 139 (2d Cir. 2008) ........................................................................ 19, 47

*United States v. Arrington,*
876 F.2d 122 (2d Cir. 1989) ............................................................................. 23

*United States v. Berry,*
318 F. App'x 569 (9th Cir. 2009) ..................................................................... 34

*United States v. Brandon,*
50 F.3d 464 (7th Cir. 1995) .............................................................................. 22

*United States v. Certified Environmental Servs., Inc.,*
753 F.3d 72 (2d Cir. 2014) ............................................................................... 49

*United States v. Chang,*
No. 18 Cr. 681 (NGG), 2024 WL 4766371 (E.D.N.Y. Nov. 13, 2024) ........... 17

*United States v. Colasuonno,*
697 F.3d 164 (2d Cir. 2012) ............................................................................. 24

*United States v. Connolly,*
No. 16 Cr. 370 (CM), 2018 WL 2411760 (S.D.N.Y. May 15, 2018) ................. 4

*United States v. Connolly*,
    24 F.4th 821 (2d Cir. 2022) ....................................................................................... 6, 11

*United States v. D'Amelio*,
    683 F.3d 412 (2d Cir. 2012)........................................................................................ 4, 6

*United States v. D'Amico*,
    734 F. Supp. 2d 321 (S.D.N.Y. 2010)............................................................................ 4

*United States v. Dawkins*,
    999 F.3d 767 (2d Cir. 2021)......................................................................................... 19

*United States v. Dove*,
    884 F.3d 138 (2d Cir. 2018)............................................................................................ 3

*United States v. Downing*,
    297 F.3d 52 (2d Cir. 2002)........................................................................................... 21

*United States v. Doyle*,
    No. 16 Cr. 506 (ALC), 2018 WL 1902506 (S.D.N.Y. April 19, 2018)........................... 22, 23

*United States v. Dupre*,
    462 F.3d 131 (2d Cir. 2006)............................................................................................ 5

*United States v. Dupree*,
    706 F.3d 131 (2d Cir. 2013)......................................................................................... 50

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008)......................................................................................... 12

*United States v. Forney*,
    No. 24 Cr. 146 (KAM), 2025 WL 2208298 (E.D.N.Y. Aug. 4, 2025)............................ 52

*United States v. Gillier*,
    No. 11 Cr. 409 (PAE), (S.D.N.Y. Jan. 19, 2022)......................................................... 51

*United States v. Gonzalez*,
    110 F.3d 936 (2d Cir. 1997).......................................................................................... 52

*United States v. Greenberg*,
    835 F.3d 295 (2d Cir. 2016)............................................................................................ 8

*United States v. Hild*,
    147 F.4th 103 (2d Cir. 2025) ......................................................................................... 7

*United States v. Hild*,
    644 F. Supp. 3d 7 (S.D.N.Y. 2022) ............................................................................... 6

*United States v. Jacobs*,
    735 F. App'x 739 (2d Cir. 2018) ................................................................................. 13

*United States v. Javice*,
    No. 23 Cr. 251 (AKH), 2025 WL 2254601 (S.D.N.Y. Aug. 7, 2025)........................... 35

*United States v. Khalupsky*,
    5 F.4th 279 (2d Cir. 2021) ......................................................................................... 3, 4

*United States v. Lemay*,
    No. 24-2328-cr, 2025 WL 1873404 (2d Cir. July 8, 2025) ............................................ 3

*United States v. Lockhart*,
    No. 17 Cr. 02, 2017 WL 3471430 (E.D. Va. Aug. 11, 2017).......................................... 23

*United States v. Malka*,
    602 F. Supp. 3d 510 (S.D.N.Y. 2022)........................................................................... 38

ii

*United States v. Marsh,*
   568 F. App'x 15 (2d Cir. 2014) ................................................................ 34
*United States v. McElroy,*
   910 F.2d 1016 (2d Cir. 1990)............................................................. 43, 44
*United States v. McKeon,*
   738 F.2d 26 (2d Cir. 1984)................................................................. 23, 24
*United States v. Mejia,*
   655 F.3d 126 (2d Cir. 2011)............................................................... 22, 25
*United States v. Mercado,*
   573 F.3d 138 (2d Cir.2009)........................................................................ 53
*United States v. Monsalvatge,*
   850 F.3d 483 (2d Cir. 2017).............................................................. 51, 52
*United States v. Mostafa,*
   16 F. Supp. 3d 236 (S.D.N.Y. 2014).......................................................... 52
*United States v. Nixon,*
   418 U.S. 683 (1974).................................................................................... 30
*United States v. O'Connor,*
   650 F.3d 839 (2d Cir. 2011)....................................................................... 31
*United States v. Paulino,*
   445 F.3d 211 (2d Cir. 2006)....................................................................... 21
*United States v. Perez,*
   387 F.3d 201 (2d Cir. 2004)....................................................................... 15
*United States v. Puzzo,*
   928 F.2d 1356 (2d Cir. 1991)..................................................................... 50
*United States v. Quattrone,*
   441 F.3d 153 (2d Cir. 2006)....................................................................... 41
*United States v. Rosemond,*
   958 F.3d 111 (2d Cir. 2020)....................................................................... 52
*United States v. Salemeh,*
   152 F.3d 88 (2d Cir. 1998)......................................................................... 50
*United States v. Salmonese,*
   352 F.3d 608 (2d Cir. 2003)......................................................................... 3
*United States v. Schultz,*
   333 F.3d 393 (2d Cir. 2003)....................................................................... 48
*United States v. Shively,*
   715 F.2d 260 (7th Cir. 1983)..................................................................... 22
*United States v. Simpson,*
   227 F. App'x 41 (2d Cir. 2007) ............................................................ 5, 6
*United States v. Stefan,*
   784 F.2d 1093 (11th Cir. 1986) ................................................................ 44
*United States v. Trapilo,*
   130 F.3d 547 (2d Cir. 1997)......................................................................... 7
*United States v. Vallee,*
   304 F. App'x 916 (2d Cir. 2008) ................................................. 20, 41, 42

*United States v. Weber,*
    437 F.2d 327 (3d Cir. 1970)............................................................................22
*United States v. Whittingham,*
    346 F. App'x 683 (2d Cir. 2009) ..................................................................31
*United States v. Zemke,*
    457 F.2d 110 (7th Cir. 1972) ........................................................................22
*Upjohn Co. v. United States,*
    449 U.S. 383 (1981)......................................................................................25
*Williams v. Florida,*
    399 U.S. 78 (1970)........................................................................................22

**Statutes and Rules**

18 U.S.C. § 1956...........................................................................................40, 42
Fed. R. Evid. 401 ..........................................................................................14, 41
Fed. R. Evid. 403 ........................................................................................*passim*
Fed. R. Evid. 901 ...............................................................................................47
Fed. R. Evid. 1002 ......................................................................................30, 31
Fed. R. Evid. 1004 .............................................................................................31

**Other Authorities**

6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence,
    § 1004.02, ed. 2009....................................................................................31, 32

## PRELIMINARY STATEMENT

The Government respectfully submits this brief in opposition to the motions *in limine* filed by defendants Anton Peraire-Bueno and James Peraire-Bueno. The defendants seek pretrial rulings (i) precluding the Government from adducing evidence or argument concerning purported uncharged theories of fraud; (ii) precluding the Government from adducing evidence or argument concerning promises by third-parties other than the defendants; (iii) excluding evidence of certain of the defendants' Internet searches following the Exploit; (iv) precluding the Government from adducing evidence or argument regarding Victim-1's views, expectations, and analyses regarding the "bait" transactions; (v) precluding the Government from offering undisclosed expert testimony during its case-in-chief; (vi) precluding the Government from adducing evidence or argument that Tether froze certain cryptocurrency constituting Crime Proceeds at the request of Israeli law enforcement; (vii) excluding certain news articles saved to or reflected in the browsing history in the defendants' electronic devices or accounts; and (viii) excluding a screenshot of the False Signature.[1] These motions should be denied.

## ARGUMENT

## I.     The Court Should Deny the Defendants' Motion to Exclude Purported Uncharged Theories of Fraud

The defendants seek to preclude the Government from adducing evidence and argument that they defrauded the victim cryptocurrency traders (the "Victim Traders") based on an omission theory or based on a theory that individuals or entities other than the Victim Traders were

---

[1] Capitalized terms not defined herein have the same meaning set forth in the Government's motions *in limine*. (*See* Dkt. 125). This opposition memorandum addresses the defendants' motions *in limine* (vii), concerning the news articles, and (viii), concerning the screenshot, in a single section as they both pertain to material located on the defendants' electronic devices and accounts.

defrauded, arguing that such evidence or argument would constructively amend the indictment. (*See* Dkt. 128 (the "Fraud Theory Mot.")). The defendants' constructive amendment arguments are procedurally flawed, however, because the extent to which the trial evidence differs from the Indictment can only be determined after evidence has been presented at trial. In any event, the defendants' arguments are meritless, and the motion should be denied in its entirety.

### A.    Factual Background

On March 12, 2025, a grand jury sitting in this District returned Superseding Indictment S1 24 Cr. 293. (Dkt. 70 (the "Indictment")). The Indictment describes in fourteen pages of speaking allegations how the defendants meticulously planned the Exploit months in advance, how the defendants executed the Exploit, and the steps that the defendants took to conceal the Exploit proceeds in the ensuing months.

As relevant here, the Indictment alleges how the defendants (i) learned the trading behaviors of the Victim Traders whom they eventually defrauded (*see, e.g.*, *id.* ¶¶ 2, 17, 22); (ii) identified and exploited a coding vulnerability in the MEV-Boost relay code that enabled them to prematurely receive the Victim Traders' private transaction data (*see, e.g.*, *id.* ¶¶ 17, 20); (iii) submitted certain "bait" transactions to publish to the block that they knew would induce the Victim Traders to propose certain trading bundles, even though the defendants also knew that they actually planned to remove the transactions from the block and replace these transactions with other "dump" transactions (*see, e.g.*, *id.* ¶¶ 24-26); (iv) transmitted the False Signature, which included falsely populated data that the defendants knew would invalidate the block and misrepresented the defendants' commitment to propose a valid block as ordered (*see, e.g.*, *id.* ¶ 26); and (v) removed and replaced the "bait" transactions with the "dump" transactions, enabling the defendants to steal approximately $25 million of cryptocurrency from the Victim Traders (*see, e.g.*, *id.* ¶¶ 25-27).

The Indictment charged the defendants with conspiring to commit wire fraud and committing wire fraud. (*Id.* ¶¶ 33-36). The wire fraud counts included statutory allegations that tracked the language of the relevant statutes, as well as to-wit clauses alleging that the defendants agreed to engage and engaged in a "scheme to defraud the Victim Traders, by making material representations, including among other things, the Lure Transactions and the False Signature,[2] in order to fraudulently obtain cryptocurrency." (*Id.* ¶¶ 34, 36).

### B.    Applicable Law

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018). "Not every alteration of an indictment, however, rises to the level of a constructive amendment." *Id.* For a defendant to prevail on such a claim, he "must demonstrate that either the proof at trial or the trial court's jury instructions so altered an *essential element of the charge* that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (emphasis added). "An indictment is not constructively amended, however, where a portion of the indictment that is unnecessary for a conviction of the crime charged is removed or altered." *Dove*, 884 F.3d at 146.

The Second Circuit "undertake[s] this inquiry mindful that courts have constantly permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *United States v. Lemay*, No. 24-2328-cr, 2025 WL 1873404, at *5 (2d Cir. July 8, 2025) (quoting *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir.

---

[2] The transactions referred to herein as the "bait" transactions are what the Indictment refers to as the "Lure Transactions."

2021) (internal quotation marks and citation omitted)). "The core of criminality of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." *Khalupsky,* 5 F.4th at 293 (citation omitted).

### C.    Discussion

The defendants' motion suffers from multiple procedural and substantive flaws. As an initial matter, the defendants' constructive amendment argument is premature because it "only ripen[s] when the Government has actually put in its case." *United States v. Connolly*, 16 Cr. 370 (CM), 2018 WL 2411760, at *7 (S.D.N.Y. May 15, 2018). As explained above, a successful constructive amendment claim requires the defendant to demonstrate that "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (emphasis in original). That presupposes the existence of trial evidence and jury instructions, which is not the case here.

The prematurity of the defendants' motion is sufficient reason alone to deny it. But the defendants' constructive amendment argument also founders on the merits. In particular, the defendants seize on specific language from the to-wit clauses of the fraud counts that alleges a scheme to defraud the Victim Traders through material misrepresentations.[3] (*See* Fraud Theory

---

[3] Even a more charitable characterization of the defendants' argument—*i.e.*, that the Government should be judicially estopped from presenting a legal theory that purportedly differs from the allegations in the Indictment—suffers from fatal infirmities. Judicial estoppel—to the extent it even applies in criminal cases—precludes the Government "from raising an argument at a criminal trial because it took a factually incompatible position in pursuing a conviction against another defendant at another trial." *United States v. D'Amico*, 734 F. Supp. 2d 321, 351-52 (S.D.N.Y. 2010) (surveying the split among the federal courts of appeals). These factual circumstances are plainly not present here.

Mot. at 1 (citing Indictment ¶¶ 34, 36)). The defendants claim that this language binds the Government to a misrepresentation fraud theory that targets the Victim Traders, such that *any* evidence or argument regarding omissions or the impact of the Exploit on other parties (such as Flashbots) falls outside the scope of the indictment. Not so, for a few reasons.

*First*, constructive amendment principles do not limit the Government to the allegations in a to-wit clause, so long as the defendant has "fair notice" of the "core of criminality" proven at trial. *See United States v. Simpson*, 227 F. App'x 41, 43-44 (2d Cir. 2007) (holding that "indictment was not constructively amended by the district court's invitation to the jury to consider the full range of the government's proof at trial" because the defendant "was provided with fair notice of the 'core of criminality' that was proven at trial"). Indeed, the Government is not even *required* to prove the allegations in a to-wit clause. *United States v. Dupre*, 462 F.3d 131, 140-41 (2d Cir. 2006) (finding no constructive amendment where trial evidence and indictment concerned the "same elaborate scheme to defraud," even though "the specific wire transfer mentioned in the 'to wit' clause of the indictment was not proven at trial"). This is because a to-wit clause is merely "illustrative"—it is not "definitional of the core of criminality charged by the grand jury." *See United States v. Agrawal*, 726 F.3d 235, 260-61 (2d Cir. 2013).

These principles dispose of the defendants' constructive amendment argument. There is simply no constructive amendment issue because the speaking Indictment outlines the same elaborate fraud scheme that the Government expects to prove at trial—that is, the defendants' exploit of a MEV-Boost code vulnerability using the False Signature, and their use of the "bait" transactions, to steal the Victim Traders' money. Indeed, the Second Circuit has rejected precisely the same argument that the defendants advance—namely, that the to-wit clause cabins essential elements of the crime such that evidence of *other* uncharged means or particulars would constitute

a constructive amendment. *See Agrawal*, 726 F.3d at 260 (noting that, in *D'Amelio*, "[t]he defendant argued that where the indictment thus cabined an element of the crime, it was a constructive amendment, or at least a prejudicial variance, for the prosecution to argue, and for the district court to instruct, that the jurisdictional element could be satisfied by evidence of other, uncharged means—specifically, the use of a telephone" and that the Circuit rejected that argument) (citing *D'Amelio*, 683 F.3d at 413-14)).

In other words, the fact that the Exploit may have impacted parties *other* than the Victim Traders—such as Flashbots—does not somehow transform the core of criminality that the Government intends to prove at trial.[4] *See Simpson*, 227 F. App'x at 43-44 (noting that the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial" (cleaned up)); *D'Amelio*, 683 F.3d at 414 (explaining that "core of criminality" is the "essence of a crime, in general terms," and that "the particulars of how a defendant effected the crime falls outside that purview"). The Court should reject the defendants' efforts to preclude the Government from adducing evidence and argument of any means or particulars of the fraud scheme not alleged in the to-wit clauses.[5] *See*

---

[4] To the extent that the defendants suggest that the core of criminality for the wire fraud counts is limited to false statements, the Court should reject that argument. As the Second Circuit has recognized, to obtain a wire fraud conviction based on a scheme to defraud, "the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception, such as a half-truth, *i.e.*, a 'representation stating the truth so far as it goes' but is nonetheless misleading because of the 'failure to state additional or qualifying matter.'" *United States v. Connolly*, 24 F.4th 821, 833-34 (2d Cir. 2022).

[5] Evidence that "characterizes Flashbots as a 'victim'" appears to be the only category of evidence mentioned in the defendants' motion. (*See* Fraud Theory Mot. at 4). The Government does not intend to argue or present evidence that the defendants sought to obtain money or property from Flashbots. But evidence regarding the impact of the Exploit on Flashbots and the steps that Flashbots took to investigate the Exploit is relevant and admissible because it is probative of the falsity of the defendants' representations and because it has the tendency, among other things, to rebut the anticipated defense argument that the defendants' Exploit was merely a "trading strategy" analogous to the trading strategy that the Victim Traders employed.

*United States v. Hild*, 644 F. Supp. 3d 7, 53 (S.D.N.Y. 2022) (explaining that the "precise combination of misrepresentations and omissions that [the defendant] deployed to carry out this fraud are immaterial to the essence of a crime, and instead make up the particulars of how the defendant effected the crime," discrepancies in which "do not constructively amend the indictment" (citations and quotation marks omitted)).

*Second*, the defendants assert that a "deceptive course of conduct" cannot serve as a basis for a wire fraud charge in the absence of misrepresentations. (*See* Fraud Theory Mot. at 3-4). Although the Government does intend to prove misrepresentations by the defendants at trial, the law does not preclude the Government from advancing a "deceptive course of conduct" theory of wire fraud. The law of this Circuit has long been that a scheme to defraud may exist "although no misrepresentation of fact is made." *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997); *accord A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 501 (S.D.N.Y. 1998) (Sotomayor, J.) (reading *Trapilo* as "underscoring the accepted notion that a defendant, by his conduct alone, can intend to deceive another and engage in a scheme to defraud, even though the defendant's statements themselves contain no misrepresentations," where such conduct involves "a dishonest and deceptive act").

The Second Circuit recently affirmed this principle in another precedential, binding decision, citing to *Trapilo*'s statement that "[t]he scheme exists although no misrepresentation of fact is made." *United States v. Hild*, 147 F.4th 103, 111 (2d Cir. 2025) (affirming fraud convictions, including on wire fraud count, in which defendant deceived lenders by negotiating loan agreements based on understanding that third-party would provide market price of bonds, while feeding inflated bond market prices to third-party).

The defendants also contend that the Government may not proceed on a "deceptive course of conduct" theory because the Indictment does not use that specific language. (*See* Fraud Theory Mot. at 4). This argument is also meritless. As explained above, the statutory allegations in the Indictment simply track the expansive language of the wire fraud statute, so the Indictment's failure to specifically use the words "deceptive course of conduct" cannot preclude the Government from pursuing that wire fraud theory at trial.

*Third*, the defendants cherry-pick isolated snippets from the Government's opposition to their Rule 12 motions that describe the defendants' use of certain misrepresentations to obtain cryptocurrency from the Victim Traders. They suggest that these descriptive statements made in the Government's legal filings preclude the Government from presenting evidence or argument regarding any omissions by the defendants or the impact of the defendants' fraud scheme on parties other than the Victim Traders. In doing so, they misunderstand the nature of the wire fraud charged in the Indictment, which alleges that the defendants used misrepresentations (*i.e.*, the "bait" transactions, in conjunction with the False Signature, which misrepresented the defendants' commitment to publish the block as structured) as part of a unified fraud scheme to obtain money or property from the Victim Traders. To be clear, the Government does not intend to argue or present evidence that the defendants' fraud scheme had the object of obtaining the money or property of individuals or entities other than the Victim Traders, and that is not what is charged in the Indictment. But it is entirely proper for the Government to offer evidence regarding misrepresentations that the defendants made to individuals or entities other than the Victim Traders because the wire fraud statute "does not require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme." *United States v. Greenberg*, 835 F.3d 295, 306-07 (2d Cir. 2016) (affirming conviction for wire fraud scheme involving

"misrepresentations [that] were directed at acquiring banks and others," but where "the credit card holders were the intended victims of the scheme"). And it is likewise proper for the Government to present evidence and argument regarding qualifying or additional facts that the defendants' failed to disclose that rendered their representations misleading, including their plans to use their validator to obtain the Victim Traders' private transaction data, unbundle the block that their validator committed to proposing as structured, and submit a replacement block that switched their "bait" transactions for the "dump" transactions.  Accordingly, the Court should deny the defendants' motion.

## II.    The Court Should Permit the Government to Introduce Evidence Regarding MEV-Boost's Purpose, Design, Functionality, and Intended Use

The defendants seek to exclude evidence of promises and statements by other parties that the Victim Traders' proposed transaction bundles would be executed as ordered or not at all, as well as argument that the subversion of expectations engendered by third-party representations constitutes fraud. (*See* Dkt. 130 (the "Third-Party Promises Mot.")). Contrary to the defendants' contentions, however, evidence regarding MEV-Boost's purpose, design, functionality, and intended use—including publicly available guides and instructions for using MEV-Boost contained on Flashbots' online repositories—is directly relevant and, indeed, crucial, to establishing essential elements of the charged wire fraud scheme, including the materiality of the defendants' misrepresentations and the defendants' intent to defraud.[6] The Court should deny the defendants' motion and permit the Government to offer such evidence at trial.

---

[6] For the reasons set forth in the Government's motions *in limine*, these Flashbots materials are not precluded by the hearsay bar. (*See* Dkt. 125, at 26-28). Separately, evidence regarding the ordering of transactions in the bundles that Victim-1 submitted, which were subsequently unbundled as part of the Exploit, is admissible for the reasons set forth in Section IV, *infra*.

### A.    Factual Background

As set forth above, the Indictment alleges that the defendant perpetrated the Exploit through material misrepresentations, including the submission of "bait" transactions that misrepresented the defendants' intent to remove the transactions from the block and replace them with other transactions (*see, e.g.*, Indictment ¶¶ 24-26), as well as the transmission of the False Signature, which falsely populated certain blockheader fields and misrepresented the defendants' commitment to propose a valid block as ordered, while knowing that the blockheader contained altered fields that would invalidate the block and that the defendants intended to reconstitute and propose a separate block (*see, e.g.*, *id.* ¶ 26).

As previewed in the Government's prior *in limine* and motion to compel briefing, the Government intends to offer evidence of how MEV-Boost operated and was designed to operate (including the roles of builders, relays, and validators), and how Flashbots publicly disseminated instructions regarding the design and operation of MEV-Boost to users. The Government expects to present this evidence through testimony (including from the Flashbots Representative, Victim-1, and CC-1), documents (including instructions and guides accessible on Flashbots' public websites and repositories, some of which were saved to the defendants' electronic devices and accounts or reflected in their online search history), and the defendants' electronic communications reflecting their knowledge of MEV-Boost's operation and design. The Government anticipates that this evidence will show, in relevant part, that (i) Victim-1 used the MEV-Boost system precisely so he could submit the transaction bundles relating to the Exploit to the blockbuilder with coded conditions that they be executed as ordered or not at all; (ii) the MEV-Boost system and its transaction privacy features were designed to prevent validators from tampering with the transactions in the proposed block; and (iii) under the MEV-Boost system, validators commit to publishing a block as structured by digitally signing the blockheader that is sent to the relay.

B.      Discussion

The Court should deny the defendants' motion to categorically preclude the Government from offering evidence regarding representations by third-parties that Victim-1's (or any other MEV-Boost user's) transaction bundles would be proposed in a block as ordered or not at all. To start, the defendants' arguments for preclusion attack the straw man that the Government improperly seeks to convict the defendants solely based on statements by third-parties other than the defendants. To be clear, the Government's fraud theory is not based on the defendants "upsetting the expectations" engendered by third-parties. (*See* Third-Party Promises Mot. at 1). It is based on the defendants' own misrepresentations—namely, the defendants' "bait" transactions and the False Signature, which were misrepresentations that are actionable under the wire fraud statute. *See Connolly*, 24 F.4th at 833-34 ("To convict an accused of a wire fraud 'scheme to defraud,' however, the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception, such as a half-truth, *i.e.*, a 'representation stating the truth as far as it goes' but is nonetheless misleading because of the 'failure to state additional or qualifying matter'").

The evidence that the defendants seek to exclude—*i.e.*, testimony and records that establish that the MEV-Boost system was designed to assure that a proposed block would be published as structured by the validator—is highly probative because it explains why the defendants' misrepresentations were false, misleading, and material. To be clear, the wire fraud counts are not premised on representations made by parties other than the defendants, but on the defendants' own

misrepresentations regarding their commitment to propose a valid block as ordered.[7] For example, the public MEV-Boost guides and instructions (some of which were saved in the defendants' electronic accounts and devices, reflected in their browsing history, or referenced in communications among the defendants and their co-conspirators) are directly probative of the defendants' intent to defraud and corroborate other indicia of fraudulent intent reflected in the defendants' electronic communications—*i.e.*, if the defendants knew from Flashbots guides and instructions that MEV-Boost was designed to prevent validators from tampering with transaction blocks by keeping block contents private until it was too late for validators to make use of the transaction data, a jury can reasonably infer the defendants' intent to defraud from the defendants' use of the "bait" transactions and the False Signature to circumvent MEV-Boost's design.[8]

Moreover, Victim-1's understanding that his transaction bundles would be executed as ordered or not at all (whether based on Flashbots' informational materials or not) is also relevant to the materiality of the defendants' misrepresentations. Indeed, the Government expects that Victim-1 will explain that the reason that he used MEV-Boost was because the ordering of bundles

---

[7] The Second Circuit's decision in *United States v. Finnerty*, discussed at length in the defendants' motion, is thus inapplicable because in *Finnerty*, the defendant's "arbitrage of the gap between customers' orders to buy and sell stock" was more akin to "garden variety conversion" that featured no deceptive conduct and conveyed no misleading impression, aside from violating certain NYSE rules. *United States v. Finnerty*, 533 F.3d 143, 145, 149-50 (2d Cir. 2008). By contrast, the defendants here are not charged with violating MEV-Boost's rules and protocols, but in connection with the *defendants' own misrepresentations* that induced the Victim Traders into parting with their money and subsequently enabled the defendants to obtain the Victim Traders' money by circumventing MEV-Boost's rules and protocols.

[8] Curiously, the defendants now seek to preclude the very evidence they previously argued that the Government needed to identify as relevant to their *mens rea* at the time of the Exploit.  At the June 17, 2025 hearing, defense counsel argued that "the MEV-Boost protocol, like the Ethereum protocol, doesn't have a rule against reordering.  The government has not identified one in the indictment.  It has not identified one in its pleadings. And so that would still be an unprecedented application of the wire fraud statute[.]"  (Dkt. 100, Tr. at 11).  Yet, now that the Government is seeking to admit these materials as relevant to the defendants' *mens rea*, the defendants are seeking their preclusion.

was important to him, that he understood that the design of MEV-Boost facilitated the submission of transaction bundles to be included on the blockchain as ordered or not at all, and that had he known that his transaction bundles would be intentionally unbundled and proposed not as ordered, he would not have submitted those bundles. In other words, it does not follow that statements by other individuals regarding MEV-Boost's purpose, design, functionality, and intended use are categorically irrelevant simply because the wire fraud statute requires the Government to prove false or fraudulent pretenses, representations, or promises by the defendants. To the contrary, such statements are necessary to understand the defendants' intent and to prove an element of the crime—materiality.

Finally, there is no basis to preclude evidence regarding MEV-Boost's purpose, design, functionality, and intended use under Rule 403. The defendants do not articulate any Rule 403 concern aside from the risk of jury confusion.[9] It is difficult to imagine how the evidence subject to the defendants' motion—essentially, guides and instructions for software that was used by the Victim Traders and defendants themselves in connection with the Exploit—would confuse the jury to such a degree that it would "substantially outweigh" its direct relevance to the very conduct at issue in this case and the elements that the Government has the burden of proving at trial. *Cf. United States v. Jacobs*, 735 F. App'x 739, 742 (2d Cir. 2018) (affirming, in case charging false tax return preparation, district court's preclusion of Treasury Regulation that defendant never relied on as "irrelevant" and "substantially outweighed by the risk of confusing the jury"). Indeed, the thrust of the Government's case-in-chief would be confusing to the jury *without* such evidence. The defendants' motion to exclude should be denied.

---

[9] The defendants claim that such evidence risks conviction on a legally invalid theory is also meritless. Again, the Indictment's wire fraud charges are not premised on the defendants' violations of MEV-Boost's rules, norms, or protocols, but on their own misrepresentations.

13

III.    **Evidence of the Defendants' Post-Exploit Google Search Histories Is Admissible**

The defendants argue that the defendants' post-Exploit Google search histories should be precluded on the grounds that (i) their Internet searches, which are indicative of the defendants' consciousness of guilt regarding the Exploit and probative as to their criminal intent *during* the money laundering conspiracy, are irrelevant and unduly prejudicial, and (ii) their admission at trial places them in "an unfair position" of needing to waive attorney-client privilege in order to provide an "innocent explanation" (*i.e.*, the *non-privileged* fact that they met with counsel prior to certain searches, which purportedly prompted the defendants to independently search for terms relevant to their criminal liability while they continued to launder the Crime Proceeds) to counter an "inflammatory and speculative narrative" (*i.e.*, the highly relevant searches linked both temporally and factually to the crimes charged). (Dkt. 132 (the "Google Mot.")). These arguments are without merit.

*First*, the defendants argue their "context-less Google" searches are irrelevant because there is "no factual link [between the searches] to the alleged." (Google Mot. at 4-5). The Internet searches, however, the Government seeks to admit are, on their face, sufficient to permit the inference that they are related to the crimes charged. *See* Fed. R. Evid. 401 (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). For example, between April 11, 2023 and April 26, 2023, Anton searched, among other things, "flashbots terms and conditions," "https://docs.flashbots.net/policies/termsofservice," "tether blacklist," "wire fraud," "wire fraud statute of limitations," "fraudulent ethereum addresses database," "how many trials are jury," and "money laundering statute of limitations." Between October 5, 2023 and October 25, 2023, James searched, among other things, "money laundering," "exploit," "computer fraud and abuse act," and "prosecuting computer crimes – department of justice." From these

14

searches alone, the jury could draw inferences that the defendants were concerned about violations of federal law, interested in how their crime was publicly perceived, knew that at least one major issuer of cryptocurrency had blacklisted a portion of the Crime Proceeds shortly after the Exploit, and knew not only how to find documentation concerning Flashbots' rules and protocols, but visited the publicly available website (facts further confirmed by their pre-Exploit searches and communications)—all facts directly relevant to their knowledge and identity in the Exploit, their consciousness of guilt regarding the Exploit, and their criminal intent as they proceeded to launder the Crime Proceeds. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993) (finding that Rule 401's relevancy standard "is a liberal one"); *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) ("Evidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt.").

However, there is more than that here. The post-Exploit Internet search history will be placed in context of the defendants' actions through anticipated witness testimony, cryptocurrency tracing evidence, and contemporaneous communications, which include the defendants' own statements. For example, between June 2023 and October 2023, the defendants searched for, among other things: "mofa [sic] inquiry letter," "coinbase chainalysis,"[10] "what does coinbase use for on chain security checks trm labs," "Ethereum Staking Privacy Concerns and Exposed IP Addresses," "low carb crusader," "552061 validator," "0x3c98d617db017f51C6A73a13E80E1FE14cD1D8Eb," "AUSA," "irs-ci," "DHS," "0x687A9414B0225092d4a8B859Fe813F1f637d3383," "Does Coinbase freeze accounts?," and

---

[10] Evidence at trial will establish that Chainalysis and TRM are private blockchain intelligence companies that, among other things, conduct blockchain transaction analytics, provide tracing analytics for, among others, entities like Coinbase, and flag digital wallets suspected of fraudulent activity.

"money laundering." Many of these searches pertain to (i) Victim-1's requests for the defendants to voluntarily return the Crime Proceeds, including through counsel at Morrison Foerster ("MoFo"), (ii) the identity of the validator that was operated by the defendants and responsible for stealing the Victim Traders' money, (iii) various cryptocurrency wallet addresses used by the defendants to receive and conceal portions of the Crime Proceeds during the off-ramping process, and (iv) account freezing concerns related to the Coinbase account used to off-ramp the Crime Proceeds (the "Pine Needle Coinbase Account"). For example, on September 27, 2023, Anton searched, "AUSA" and "IRS-CI," the law enforcement agency that investigated this case based upon a victim referral. On September 28, 2023, James messaged Anton and the other co-conspirators, "seems like Coinbase won't freeze access to our funds without a request from law enforcement, which **we're pretty certain doesn't exist yet**." (emphasis added). Thereafter, between October 16, 2023 and November 20, 2023, the defendants off-ramped approximately $20.5 million worth of cryptocurrency over the course of more than a dozen staggered transactions varying in date and amount. On October 23, 2023, less than two weeks after James searched and visited websites concerning "money laundering," Anton replied to Mercury Bank's inquiries regarding the source of approximately $20.5 million transferred from the Pine Needle Coinbase Account to Anton's Mercury Bank account, falsely claiming that there was "no one trade" he could identify to account for the "entire sum"—despite his clear knowledge that these were proceeds from the April 2, 2023 Exploit.

Even the defendants' claim that a few cherry-picked searches on October 10, 2023 are irrelevant because they pertain to the defendants' interest in the Samuel Bankman-Fried ("SBF") cryptocurrency fraud and money laundering trial, rather than their own cryptocurrency fraud scheme or subsequent money laundering, is without merit. (Google Mot. at 5-6). *Prior* to the

Exploit, in February 2023, while developing the Bait Transactions and referring to them as such, the defendants privately texted each other stating that they "should avoid using terms like 'bait' imo [in my opinion] to avoid any wirefraud-like situations (sbf reference)[.]" It is hardly surprising that the defendants admit that following the Exploit, they closely monitored the Bankman-Fried trial. This is particularly true where Caroline Ellison—like the defendants—committed crimes with her co-workers and testified against her boss pursuant to a cooperation agreement, supporting the inference that this fact prompted James to search for "5k letter" and "proffer agreement vs cooperation agreement," *HDI Glob. Ins. Co. v. Kuehne + Nagel, Inc.,* 23 Civ. 6351 (LJL), 2024 WL 5247216, at *1 (S.D.N.Y. Dec. 30, 2024) ("So long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." (cleaned up)). The defendants are free to make arguments to the jury that these searches—which pertain to the defendants' interest in a widely publicized cryptocurrency fraud and money laundering trial where corporate insiders testified against the defendant—are irrelevant to their own *mens rea* or were done for innocent reasons, and the jury is free to reject or accept them. Arguments as to whether one inference is more plausible than another are not arguments against the admissibility of evidence, but rather present a question of fact for the jury to decide. *Cf. United States v. Chang*, No. 18 Cr. 681 (NGG), 2024 WL 4766371, at *16 (E.D.N.Y. Nov. 13, 2024) (noting that it's the jury's task, not the court's, to "choos[e] among permissible competing inferences").

The defendants' post-Exploit Internet searches, including searches on their electronic devices seized at the time of their arrests, further show that their interest was not confined to the Bankman-Fried trial, but extended to criminal arrests and convictions around the world involving similar decentralized finance crimes and the prison sentences for notable white collar criminals,

17

including "elizabeth holmes," "do kwon," and Martin "[S]hkreli[.]" During the period of the money laundering conspiracy, on September 11, 2023, less than one week after the defendants were directed to contact the Israeli cyber police concerning the Crime Proceeds, Anton accessed online news articles titled, "Teenage Suspect in $16M DeFi Hack Wanted for Arrest in Canada," and "Young Waterloo crypto fugitive remains in hiding, one year after arrest warrant issued." On October 25, 2023, approximately one week after the defendants transferred more than $20 million worth of the Crime Proceeds into the Pine Needle Coinbase Account and continued to launder that money in the subsequent weeks, James viewed a YouTube video of remarks by the United States Attorney for the Southern District of New York announcing the "first criminal charges ever brought involving an attack on a smart contract on a decentralized cryptocurrency exchange." (Video Tr. attached hereto as Ex. A).[11] The U.S. Attorney noted in the video that the defendant allegedly "laundered the stolen funds through a series of complex transfers on the blockchain, where he swapped cryptocurrencies, hopped across different crypto blockchains, and used overseas crypto exchanges"—all actions that mirrored the defendants' own actions—and warned that, "[i]t doesn't matter whether someone steals money from a bank or defrauds, a decentralized crypto exchange, it's all fraud, plain and simple SDNY is watching[.]" (Ex. A). Thereafter, in the weeks that followed, the defendants continued to move a portion of the Crime Proceeds off-chain, and prior to the end of the year, paid their co-conspirators their respective share of the Exploit profits with the successfully off-ramped Crime Proceeds. On December 1, 2023, as the defendants themselves note, (Google Mot. at 6 n.3), James searched for "french court dismisses charges against platypus hackers," concerning yet another decentralized finance hack where the attackers intended to return the stolen funds and claim a reward. Contrary to the defendants' assertions, the

---

[11] The Government will seek to admit the video for its effect on the listener.

jury can infer, from these searches, along with cryptocurrency tracing evidence and anticipated percipient witness testimony, that the defendants were acutely attuned to violations of federal law, criminal arrests and convictions for those who committed similar crimes, and the criminal sentences of those who committed fraud crimes as they laundered their own Crime Proceeds. *See United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) (noting that the "very low standard for relevance" and affirming the district court's admission of records that were "at least marginally relevant to the allegations").

The defendants' reliance on *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021), in support of the contention that the defendants' post-Exploit Internet searches are irrelevant, (Google Mot. at 4-6), is misplaced. In *Dawkins*, the defendant was charged with bribery based on a scheme to pay bribes to college basketball coaches in exchange for steering student athletes to the defendant's sports management company. *Id.* at 777. The Second Circuit found that the district court did not abuse its discretion when it precluded two defense witnesses based on a "meager proffer" of relevance. *Id.* at 789. In particular, the defendant proffered witnesses who claimed to have overheard the defendant on the phone saying: "Do not accept money from these people." *Id.* The proffered testimony, however, was "hazy about [the] timing" of the alleged calls and the witnesses were unable to testify about "who was on the other end of the phone calls," both facts necessary to establish a relevant link to the bribe charges. *Id.* Here, by contrast, the defendants' post-Exploit Internet searches are tightly linked both temporally and factually to the charged crimes based on the anticipated witness testimony and evidence outlined above.

*Second,* the defendants' assertion that these post-Exploit Internet searches, which are clearly interwoven in the anticipated trial evidence and highly probative of the defendants' *mens rea*, will somehow "encourage[] rank speculation and thus pose[] unfair prejudice" warranting

their exclusion, is baseless. The defendants' search histories pertaining to the Flashbots terms of service, Tether's blacklisting, public articles describing the "Exploit," and the criminal statutes for which they are charged, are not only highly probative of their consciousness of guilt and criminal intent, but are also evidence of facilitating *ongoing* criminal activity as they continued to search for ways to conceal evidence linking them to the Exploit and obscure the origins of the Crime Proceeds. For example, on June 23, 2023, the Anton searched "validator hide ip ethereum," "how can validators in a PoS network efficiently hide their IP addresses," "Ethereum Staking Privacy Concerns and Exposed IP Addresses," which were followed weeks later by on-chain transactions to transfer the Exploit validator's "staked" cryptocurrency to the defendants' Pine Needle Coinbase Account.  This is far from "rank speculation," but rather yet another example of how the post-Exploit Internet search history is intrinsically tied to the evidence of the charged crimes that will be presented at trial.

Notably, the fact that the defendants' post-Exploit Internet search histories are highly probative of the crimes charged do not make them "unduly" prejudicial under Rule 403. *See United States v. Vallee*, 304 F. App'x 916, 920 (2d Cir. 2008) (noting that unfair prejudice "does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means"). Since Rule 403 governs the exclusion of relevant, probative evidence, prohibiting the use of evidence on this basis "is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990) (citation omitted). As outlined above, the defendants' post-Exploit Internet search histories adhere tightly to facts highly relevant to the defendants' knowledge and intent. The defendants are free to argue that their searches, the websites they visited, and the videos they accessed, were not prompted by their participation in

the fraud scheme and desire to off-ramp the Crime Proceeds without detection. *Cf. United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *14 (S.D.N.Y. Jan. 26, 2023) ("While Defendant might reasonably argue that EminiFX's transfers of investor funds to CoinPayments were in fact investments, the Government also reasonably argues that these transfers were merely *deposits* rather than true investments . . . . [T]hose arguments are more appropriate for the jury.").

As the Government noted in its *omnibus* motions *in limine*, it is amenable to a limiting instruction regarding the purpose for which the evidence is offered (*i.e.,* the effect on the listener, as opposed to the truth of the matter asserted in the websites visited or videos accessed). *See United States v. Paulino,* 445 F.3d 211, 223 (2d Cir. 2006) ("[T]o the extent there was any risk of unfair prejudice, the district court satisfactorily reduced that possibility with a thorough and carefully worded limiting instruction."); *see also United States v. Downing,* 297 F.3d 52, 59 (2d Cir. 2002) (reiterating presumption that "juries understand and abide by a district court's limiting instructions," "[a]bsent evidence to the contrary").

*Third,* the defendants argue that the "evidence puts the Peraire-Buenos in the unfair position of potentially needing to waive attorney-client privilege and work product in order to counter an inflammatory and speculative narrative." (Google Mot. at 8). In the face of these clearly relevant and highly probative facts, the defendants have a choice to make, but it is not an untenable or unfair one. They can make a strategic choice to testify (or call their counsel to testify) to the non-privileged fact that, on days that preceded several of their Internet searches, they met with legal counsel, which may necessitate waiving the privilege, or they can assert a formal "advice-of-counsel" defense by waiving privilege and making arguments concerning the advice they received to explain why their Internet searches are not indicative of their wrongful criminal intent, or they can choose not to pursue those options. But they cannot wield the attorney-client

21

privilege as both a sword and shield to prevent the Government from introducing highly probative evidence.

There is nothing unfair about a defendant, who has no burden of proof and the absolute right not to testify, nonetheless choosing to testify to explain away relevant evidence[12] by revealing the non-privileged fact that the defendant met with legal counsel. *Cf. United States v. Doyle*, No. 16 Cr. 506 (ALC), 2018 WL 1902506, at *12 (S.D.N.Y. April 19, 2018) ("[T[he Fifth Amendment is not implicated simply because the Defendant feels she has to put on a defense to respond to the prosecutor's evidence[.]") (*citing United States v. Brandon*, 50 F.3d 464, 469 (7th Cir. 1995) (holding that admission of statement by attorney in response to subpoena to the effect that defendant had no responsive records "did not force [the defendant] to take the stand" and therefore did not "impair[ ] his privilege against self-incrimination"); *United States v. Shively*, 715 F.2d 260, 268 (7th Cir. 1983) ("Circumstances—a cogent prosecution witness, or a codefendant who is trying to exculpate himself at the defendant's expense—often force a defendant to take the stand in his own defense; yet there is no infringement of the Fifth Amendment."); *United States v. Weber*, 437 F.2d 327, 335 (3d Cir. 1970) ("That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been though[t] an invasion of the privilege against compelled self-incrimination.") (quoting *Williams v. Florida*, 399 U.S. 78, 83-84 (1970)); *United States v. Zemke*, 457 F.2d 110, 115 (7th Cir. 1972) (holding that the prosecution's

---

[12] The defendants do not appear to be claiming, nor could they, that their Google searches—which are not a communication between a lawyer and a client, and for which, the defendants queried the world's largest public search engine—are privileged. *See Brennan Ctr. for Justice v. DOJ*, 697 F.3d 184, 207 (2d Cir. 2012) ("[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance."); *see also United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (finding that the attorney-client privilege does not extend to situations where there "could be no reasonable expectation of confidentiality").

presentation of strong evidence of guilt does not "compel" the defendant to testify in violation of the Fifth Amendment); *United States v. Lockhart*, No. 17 Cr. 02, 2017 WL 3471430, at *3 (E.D. Va. Aug. 11, 2017) (concluding that former defense lawyer's testimony regarding allegedly obstructive communications by defendant did not impact Defendant's right to remain silent at his trial because "[t]estimony by a defendant's lawyer would not 'compel' the defendant to do anything and certainly would not compel him to be a 'witness' against himself.")).

The defendants' reliance on *United States v. Doyle*, No. 16 Cr. 506 (ALC), 2018 WL 1902506 (S.D.N.Y. Apr. 19, 2018), and *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), for the assertion that such a strategic choice is somehow unduly prejudicial under Rule 403 is misplaced.  (*See* Google Mot. at 8-9). First off, the issue in *Doyle* and *McKeon* was whether certain statements made by an *attorney*, acting on behalf of a defendant, could be used against a defendant at a subsequent criminal proceeding, pursuant to Rule 801(d)(2), without impermissibly infringing upon a defendant's Fifth Amendment right against self-incrimination. *Doyle*, 2018 WL 1902506, at *9-10; *McKeon*, 738 F.2d at 29. This is far afield from the situation before this Court, which concerns the *defendants*' non-privileged statements made to a public search engine, which are clearly relevant to the issues in dispute. In *McKeon*, the Second Circuit announced a five-part balancing test, when considering the admission of defense counsel's prior jury arguments at a subsequent trial. 738 F.2d at 32-33. First, the Second Circuit has since limited *McKeon*'s balancing test to only consideration of a defense attorney's prior jury argument, not all statements made by counsel—neither of which applies here in the context of the defendants' own statements. *See United States v. Arrington*, 867 F.2d 122, 127-28 (2d Cir. 1989) (limiting *McKeon* to a defense attorney's prior jury argument). However, even setting this limitation aside, the single factor of the five-part test that the defendants reference, (Google Mot. at 8)—being forced to "waive[] . . .

attorney-client privilege" or risk the "introduction of a prior criminal record for impeachment purposes" where an innocent explanation may be had for seemingly inconsistent statements in a prior trial opening, *McKeon*, 738 F.2d at 32—is simply not present. The Government is not seeking to admit defense counsel's statements, but rather the defendants'. Nor is the Government seeking to admit evidence of a prior criminal prosecution, but rather the defendants' public Internet searches, which are directly relevant to the facts of the alleged crime, probative of their *mens rea*, and no more inflammatory than the details of the alleged crimes themselves.  There is simply no basis to exclude this evidence.

The defendants have chosen not to pursue an advice of counsel defense.[13]  Indeed, to benefit from an "advice of counsel" defense the defendants must waive privilege and show that they "(1) 'honestly and in good faith' sought the advice of counsel; (2) 'fully and honestly laid all the facts before his counsel'; and (3) 'in good faith and honestly follow[ed]' counsel's advice, believing it to be correct and intending that [their] acts be lawful." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012). This, however, would have been a challenging feat considering that their motion *in limine* is based on the premise that following their legal consultations during the course of the money laundering conspiracy, the defendants searched the Internet for the very criminal statutes for which they are charged (*e.g.* "wire fraud statute," "wire fraud statute of limitations," "money laundering," and "money laundering statute of limitations") while they took actions that amount to money laundering—*i.e.*, transferring the Crime Proceeds in a manner designed to obscure their source.  *See Colasuonno*, 697 F.3d at 181. Now, not willing to disclose the "full and frank communications" between themselves and their counsel, which, if a valid

---

[13] On September 8, 2025, the defendants advised the Government that neither defendant intends to assert an advice of counsel defense.

defense, gave them confidence that their actions (prior to taking them) were lawful, they, instead, seek to prevent the jury from hearing highly relevant, non-privileged evidence. Permitting them to do so under these circumstances would distort the very purpose of the attorney-client privilege, which is designed to promote the observance of the law. *Cf. Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (noting that the purpose of the attorney-client privilege is "to encourage full and frank communications" between "attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice"); *Mejia*, 655 F.3d at 132 (noting that "courts apply the [attorney-client] privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable").

For the foregoing reasons, the defendants' motion *in limine* to exclude the defendants' post-Exploit Google search history should be denied.

## IV. The Government Should Be Permitted to Elicit Testimony from Victim-1 Regarding Victim-1's MEV Bots

The defendants seek to exclude testimony from Victim-1 about the views, expectations, and analyses of Victim-1's MEV Bot, such as "how or why the MEV Bot constructed specific transactions or bundles" and "any expectations [Victim-1] had that resulted from the specific logic coded into [Victim-1's] MEV Bot." (Dkt. 134 (the "Victim Preclusion Mot.") at 3). The defendants argue that such testimony from Victim-1 about the operation and conduct of Victim-1's MEV Bot would violate both "due process where the Peraire-Buenos have been denied the opportunity to obtain the MEV Bot's source code" and the best evidence rule. (Victim Preclusion Mot. at 4-5). The Court should allow testimony from Victim-1, and related argument, regarding

the operation and conduct of Victim-1's MEV Bot, including in reaction to the defendants' bait transactions.[14]

### A.    Factual Background

As described in detail in the Government's motions *in limine*, the Government expects that, at trial, Victim-1—from whom the defendants took more than $13 million of cryptocurrency in the Exploit—will testify that, prior to the Exploit, Victim-1's MEV Bots were engaged in a particular trading strategy whose profitability depends on the execution of bundled transactions in a precise order, and that Victim-1 chose to use the MEV-Boost system to effectuate this trading strategy based on the understanding that MEV-Boost provided certainty that the proposed bundles would be published to the chain as originally ordered and structured, or not at all. In the days that followed the Exploit, Victim-1 observed, based on publicly recorded blockchain information, that during the Exploit his MEV Bots proposed a bundle of transactions that included the defendants' bait transactions, the proposed bundled transaction was subsequently unbundled, and the bait transactions were then switched with transactions that, in effect, stole Victim-1's cryptocurrency. Victim-1 further discovered that particular Ethereum user(s) appeared to have spent the months leading up to the Exploit learning how to bait Victim-1's MEV Bots into trading. (*See* Dkt. 125 at 7-8, 43-44). The Government further expects that at trial, CC-1 will confirm that he and the defendants in fact did spend the months leading up to the Exploit testing the MEV Bots' trading

---

[14] The defendants have also moved to preclude testimony and argument about the "views and expectations" of *other* victims' MEV Bots, "including by making inferential leaps based on [Victim-1's] testimony." (Victim Preclusion Mot. at 6). The Government does not presently intend to call any other victims at trial or otherwise to introduce evidence of other victims' subjective expectations or the design of their MEV bots. Rather, the Government's evidence and argument as to other victims will be focused on objective evidence, such as those victims' trades actually published to the blockchain, the defendants' and their co-conspirators' own discussions of those victims' trades and trading patterns, and the evidence of the defendants' intent to defraud those victims as well. There is no basis to preclude such clearly admissible evidence and argument.

parameters and in fact did switch out their bait transactions for "dump" transactions as part of the Exploit. (*See generally* Dkt. 125 at 3-5 (discussing CC-1's testimony and related evidence)).

On March 27, 2025, the defendants filed a motion for issuance of a Rule 17(c) subpoena on Victim-1, which sought production of nine categories of documents, including the source code for Victim-1's MEV Bots ("Request 1") and for the smart contracts for Victim-1's April 2, 2023 transactions. The defendants also sought "communications with and transmissions to and from the builders regarding the proposed bundles for the April 2, 2023 transactions" ("Request 3"). (Dkt. 74-1, at 8).

In response to the subpoena, Victim-1 explained in a sworn declaration that the source code for the MEV Bots "contains tens of thousands of lines spread across hundreds of files in multiple repositories," much of which is irrelevant to the issue in this case, reflecting "thousands of hours of work performed by highly qualified and experienced software engineers and algorithm developers," and that the confidentiality of the source code is "zealously protect[ed]." (Dkt. 93-1 ¶¶ 3-4). Victim-1 further explained that reconstructing "a version of the source code for the MEV Bot that was active on April 2, 2023," would not merely be extremely "time-consuming," but would carry "a significant risk that [Victim-1] would not be able [to] correctly identify all the relevant branch/commits, which would mean the produced code would not be 100% identical to what was running on April 2, 2023." (Dkt. 93-1 ¶ 5). Moreover, even if the code as of April 2, 2023, could be recreated, "the actions taken [by the] MEV BOT using the source code active on that date depended on numerous market inputs at the time, which cannot be recreated." (Dkt. 93-1 ¶ 5). And as to the code for the smart contracts, Victim-1 explained that the "bytecode" for the smart contracts is publicly available, but that Victim-1 lacked a record "of all the configurations and settings required to recreate the [exact] on-chain bytecode on April 2, 2023." (Dkt. 93-1 ¶ 5).

On July 8, 2025, counsel for Victim-1 informed defense counsel that Victim-1 has no documents responsive to Request 3. (Dkt. 143-2). On July 23, 2025, the Court granted Victim-1's request to quash as to Requests 1 and 2, finding that the source code for the MEV Bots and smart contracts "lack relevance." (Dkt. 112 at 34).

With regard to Request 3, Victim-1 has since informed the Government that every day the MEV Bots send hundreds, thousands, or even tens of thousands of proposed bundles to builders, and no record is kept of the exact coded conditions sent in each proposed bundle.[15] Accordingly, Victim-1's firm has never had records of the exact coded conditions communicated by the MEV Bots to the builder on April 2, 2023. However, Victim-1 *has* produced records—both from Victim-1's firm and from the builder itself—reflecting that Victim-1's April 2, 2023 transactions were, in fact, bundles meant to be executed in order or not at all. For example, Victim-1 has produced the victimized MEV Bots' logs for the transactions unbundled in the defendants' Exploit, which—while they do not contain coded conditions or a list of the transactions in the proposed bundle—contain metadata that can be used to determine the actual transactions in each MEV Bot's proposed bundle.

Additionally, while Victim-1's MEV Bots did not keep records of the actual proposed bundles, the *builder* did. Victim-1 has produced November 2023 chats between Victim-1 and the builder, in which the builder explains that, while it does not retain the "block content" of the block it sent to the relay, the builder does "keep decoded raw bundles . . . [s]o if you share a transaction hash I can check if it was part of any bundle." (Ex. B at 4). Victim-1 responded with a list of the

---

[15] According to Victim-1, such voluminous logs would create a significant security risk—as a hacker could attempt to obtain the log information in real time and front-run Victim-1's proposed bundle, causing Victim-1 losses in a manner similar to the defendants' Exploit. Additionally, according to Victim-1, because such logs are not needed to debug the MEV Bots' code, there is no business need to maintain these voluminous records.

bait transactions' hashes, and the builder provided a list of proposed bundles containing one of those bait transactions. (*Id.* at 4-5). The builder also confirmed that its logs contained "all the eth_sendBundle fields," including "revertingTxHashes." (*Id.* at 5). According to the builder's website, as captured by the Wayback Machine in March 2023, eth_sendBundle is code that can be used to "send transaction bundles to our builder." (Ex. C). If a searcher, such as Victim-1, uses the eth_sendBundle code to provide a "list of signed transactions" and a "block number," then, by default, the builder will "execute [the transactions] in an atomic bundle"—*i.e.*, an indivisible bundle. (*See id.*).[16] However, a searcher also has the option to include "revertingTxHashes"—or a list of transactions "that are allowed to 'fail' or be discarded"—if the searcher would allow the bundle to be executed even if the specified transactions within the bundle failed.

Victim-1 later obtained from the builder and produced in discovery the builder's actual log containing information about bundles that were proposed for the block involved in the defendant's Exploit. The builder's log has columns listing the transactions included in each proposed bundle, and, for bundles in which the searcher would have allowed the bundle to execute non-atomically, the "revertingTxHashes" for the proposed bundle. (Ex. D). Notably, *none* of Victim-1's MEV Bots' proposed bundles for the Exploit block—which are highlighted in Exhibit D—included any data in the "revertingTxHashes" columns. (*Id.*). Put differently, according to the builder's logs, each of Victim-1's MEV Bots' proposed bundles was intended to be executed all together or not at all.

---

[16]    *See also* Atom, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/atom (providing alternative definition of "atom" as referring to "indivisible particles").

### B.    Discussion

The Court should allow testimony from Victim-1 regarding the operation and actions of Victim-1's MEV Bot, including in reaction to the defendants' bait transactions. That is true notwithstanding that the MEV Bots' source code as of April 2, 2023, and the exact coded conditions submitted by the MEV Bots to the builder on April 2, 2023, no longer exist, cannot be reproduced, and were not provided to the defendants in response to their Rule 17 subpoena.

To begin, as this Court previously found, the underlying source code of the MEV Bots and smart contracts is irrelevant. (Dkt. 112 at 33-34). The defendants' inability to obtain irrelevant evidence plainly does not implicate the Due Process Clause. *See United States v. Nixon*, 418 U.S. 683, 699, 711 (1974) (explaining the Fifth Amendment's guarantee of "due process of law" and holding that defendant seeking documents pursuant to Rule 17(c) subpoena must demonstrate, among other things, "that the documents [sought] are evidentiary and *relevant*"). Nor does the fact that Victim-1 kept no record of the coded conditions submitted by his MEV Bots to builders for each bundled trade. Indeed, even a failure by *law enforcement* to preserve potentially useful evidence is not a denial of due process "unless a criminal defendant can show bad faith." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Here, the defendants cannot show bad faith on the part of Victim-1 or the Government. Victim-1's MEV Bots retained no log of the coded conditions sent to the builder, and Victim-1 has not only produced the "metadata" records that were retained but also has obtained and produced relevant records from the builder that *do* reflect the bundles proposed by the MEV Bots.

The defendants' argument that testimony about the MEV Bots' expectations, operation, and actions would violate the best evidence rule is similarly without basis. Under Federal Rule of Evidence 1002, often referred to as the "best evidence" rule, an "original writing, recording, or photograph is required in order to prove its content unless [the Federal Rules of Evidence] or a

federal statute provides otherwise." One exception to this rule is laid out in Rule 1004, which states that "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if . . . all the originals are lost and destroyed, and not by the proponent acting in bad faith." Fed. R. Evid. 1004(a). When evidence is admitted under Rule 1004, this "other evidence," "rather than being interchangeable with the original, may be probative of the contents of the missing document, to a greater or lesser degree, depending on its persuasive power." *Elliott v. Cartagena*, 84 F.4th 481, 491 (2d Cir. 2023). Accordingly, the opposing party "may attack the secondary evidence's sufficiency," but this attack "*goes not to the evidence's admissibility but to its weight* and is a matter for the trier of fact to resolve." 6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 1004.02, ed. 2009 (emphasis added).

Victim-1's testimony regarding the operation of the MEV Bots—including their bundling of transactions upon finding apparently profitable transactions, like the bait transactions, in the mempool—is plainly admissible pursuant to Rule 1004(a) in the absence of the original coded conditions provided by the MEV Bot to the builder on April 2, 2023. *See, e.g.*, *United States v. O'Connor*, 650 F.3d 839, 862 (2d Cir. 2011) (affirming admission pursuant to Rule 1004 of witness testimony regarding the contents of a note written "in [the victim's] handwriting" where "the note itself had since been misplaced or thrown out"); *United States v. Whittingham*, 346 F. App'x 683, 685 (2d Cir. 2009) (affirming admission pursuant to Rule 1004 of "still images printed from surveillance videos," in place of the original surveillance videos, in bank fraud case because "it was the [victim bank], not the government, who lost the videotapes"). The defendants summarily address Rule 1004 in a single footnote, asserting without citation that "[n]o exception under Rule 1004 should be deemed to apply," because, as relevant to Rule 1004(a), "[Victim-1] has not said that the code does not exist, just that it would be difficult to assemble and proprietary."

(Victim Preclusion Mot. at 5 n.4.). But, as set forth above, Victim-1 *has* said that the coded conditions no longer exist in any form (because they were never retained by the MEV Bots once sent to the builder). And Victim-1 *has* said that the source code—which, again, lacks relevance— no longer exists in the form it was in as of April 2, 2023, and cannot be recreated.

To be sure, the defendants are free to cross-examine Victim-1 about the absence of records reflecting the coded conditions submitted to the builder. But that inquiry "goes not to the . . . admissibility [of Victim-1's testimony] but to its weight and is a matter for the trier of fact to resolve." 6 Weinstein's Federal Evidence, § 1004.02, *see Elliott*, 84 F.4th at 491. Accordingly, the Government respectfully submits that the Court should allow testimony and argument concerning Victim-1's MEV Bots.

## V.    The Defendants' Motion to Preclude Undisclosed Expert Testimony Should Be Denied

The defendants seek to preclude the Government from offering testimony on certain topics from law enforcement witnesses, the Government's expert witness, and percipient witnesses the Government intends to call—namely, Victim-1, CC-1, and the Flashbots Representative. (*See* Dkt. 136 (the "Expert Mot.")). As discussed below, the Government does not intend to elicit expert testimony from its law enforcement witnesses. As to the Government's expert witness, the Government has either disclosed or does not intend to elicit the opinions listed in the defendants' motion. (*See* Expert Mot. at 4). Finally, for the reasons set forth in the Government's opposition to the defendants' motion to compel expert disclosures, and as this Court already ruled, the anticipated testimony of Victim-1, CC-1, and the Flashbots Representative does not constitute expert testimony. (*See* Dkts. 111, 119). The defendants' motion should be denied.

A.    **Factual Background**

On June 27, 2025, the Government timely disclosed the expert opinions it intended to elicit from Chris Hoffmeister, a cryptocurrency and financial crimes specialist at TRM Labs, Inc., regarding cryptocurrency tracing analyses. As relevant here, the Government also disclosed its intent to offer percipient testimony from Victim-1, CC-1, and the Flashbots Representative, outlining broad categories of facts that these witnesses would explain based on their personal knowledge, experience, and perception as Ethereum Network participants, MEV-Boost software users, and/or MEV-Boost software developers. For all of these witnesses, the Government reserved its right to supplement its disclosures.

On July 2, 2025, the defendants moved to compel the Government to provide expert disclosures for Victim-1, CC-1, and the Flashbots Representative pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, arguing that the anticipated testimony by these witnesses constituted expert testimony subject to the strictures of Rule 702 of the Federal Rules of Evidence. (*See* Dkts. 102-104). As the Government explained in its opposition brief, the percipient witnesses would offer testimony well within their personal knowledge and rationally based on their own perceptions as a victim of the fraud, a cooperating witness, and a witness from the company whose software vulnerability was exploited by the defendants. (*See* Dkt. 111). In its briefing, the Government also included summaries of the anticipated contours of the percipient witnesses' testimony, which articulated the basis for those witnesses' personal knowledge.[17] (Dkt. 111 at 3-9). On August 6, 2025, this Court denied the defendants' motion to compel after reviewing the parties'

---

[17] The Government also noted that the summaries did not purport to be a complete recitation of the testimony, that the Government may not necessarily elicit all of the testimony summarized in its brief, and that the Government reserves the right to elicit testimony about additional topics covered by Rules 602 and 701—that is, testimony within their personal knowledge and rationally based on their own perceptions—as it continues its trial preparation.

full briefing, ruling that "[t]o the extent the anticipated testimony" remains "based on [the] witness's personal knowledge, rationally based on that witness's perception, and not rooted exclusively in that witness's expertise," there is "no basis to require expert disclosures for any of the witnesses at issue." (Dkt. 119).

### B.    Discussion

### 1.    Law Enforcement Witnesses

As an initial matter, the Government does not intend to elicit testimony in its case-in-chief from law enforcement agents that relies on specialized law enforcement training, experience, or expertise. As the Government disclosed to the defendants in pre-motion discussions and in its motions *in limine*, the Government may call law enforcement agents to offer limited testimony (i) regarding the search of Anton's residence and law enforcement's recovery of the defendants' electronic devices, absent a factual stipulation between the parties; (ii) regarding the seizure and extraction of evidence recovered from those devices, absent a factual stipulation between the parties; and (iii) as summary witnesses to summarize the contents of voluminous financial records, communications, and other electronic evidence. (*See* Dkt. 125 at 62).

None of these topics would require these witnesses to render expert testimony, and so that branch of the defendants' motion should be denied as moot. Any testimony regarding what devices were found during the law enforcement search and where they were found would be entirely based on the witness's perception from conducting the search. *Cf. United States v. Berry*, 318 F. App'x 569, 569 (9th Cir. 2009) (agent's testimony not expert testimony where he "simply testified to what he found on the [defendant's] hard drive . . . , without expressing an opinion that required specialized knowledge or offering insight beyond common understanding"). Nor is testimony regarding the extraction of electronic data from these devices expert testimony under the law of this Circuit. *See United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) (finding no error

in allowing lay, non-expert testimony regarding extraction of data from electronic device where witness simply "explained his training," "described" his search, and "testified to the contents of the messages received from the phone"). Finally, testimony by law enforcement witnesses who will merely summarize evidence that is already in the record is properly admitted as that of a summary witness, not as an expert witness. *See, e.g.*, *United States v. Javice*, 2025 WL 2254601, at *6 (S.D.N.Y. Aug. 7, 2025) (testimony by witness called to "summarize other evidence in the record" and "summarizing the data contained within [large Excel spreadsheets]" was "properly admitted as that of a summary witness").

Accordingly, the defendants' motion to exclude purported expert testimony by law enforcement witnesses should be denied as moot.

### 2.    The Government's Expert Witness

The defendants' motion to preclude Mr. Hoffmeister from opining on certain topics should also be denied. (*See* Expert Mot. at 4). At the outset, the Government does not intend to elicit any opinions from Mr. Hoffmeister regarding (i) the extent to which the defendants' conduct "violated the purported rules, norms, or expectations" on the Ethereum Network or among MEV-Boost users; or (ii) what effect, if any, the defendants' conduct had on the Ethereum Network or MEV-Boost. As such, the defendants' request to preclude Mr. Hoffmeister from opining on these topics should be denied as moot.

While the Government does not anticipate that Mr. Hoffmeister will offer any specific opinion as to whether the defendants' exploitation of a coding vulnerability was "like 'hacking' or

other crimes occurring on cryptocurrency networks" (*see id.*),[18] the Government expects that Mr. Hoffmeister will explain the defendants' cryptocurrency transactions prior to the Exploit (*e.g.*, the staking of validators, including by transferring cryptocurrency through passthrough accounts and the Aztec Network), as well as the defendants' cryptocurrency transactions after the Exploit (*e.g.*, the withdrawal of the validator stakes, including through passthrough accounts, as well as the movement of the Exploit proceeds through multiple cryptocurrency swaps and cryptocurrency addresses). As set forth in Mr. Hoffmeister's expert notice, he is further expected to opine that these actions had the effect of obscuring the source and ownership of the cryptocurrency and making the flow of those funds more difficult to trace or detect. (*See, e.g.*, Dkt. 111-1 (Hoffmeister Disclosure), ¶ 3 n.6 (discussing passthrough accounts), ¶¶ 4 n.9 & 5 n.11 (discussing Aztec Network), ¶ 15 n.24 (discussing cryptocurrency swaps)). Finally, there is no basis to preclude Mr. Hoffmeister from opining that certain of the defendants' actions are consistent with criminal activity that he has previously observed. Indeed, as disclosed in Mr. Hoffmeister's expert notice (*see id.* ¶ 3 n.6), he is expected to explain what passthrough accounts are—*i.e.*, accounts with little to no account activity other than to receive funds that are then quickly transferred to another destination. It is entirely proper (and necessary) for Mr. Hoffmeister to explain that his knowledge of and experience with passthrough accounts comes from encountering them frequently in

---

[18] The Government disclosed in Mr. Hoffmeister's expert notice that he is expected to testify regarding his understanding of liquidity pools and the price effects of certain transactions in liquidity pools based on his experience investigating decentralized exchange exploits involving liquidity pools—again, without opining on whether the defendants' conduct constituted a hack or exploit. It is entirely proper for the Government to elicit such testimony from Mr. Hoffmeister to provide the bases for his opinions and to assist the jury in evaluating the weight of Mr. Hoffmeister's testimony. As set forth in his expert disclosure, Mr. Hoffmeister is also expected to explain, based on his review of public blockchain information, how the cryptocurrency wallet that the defendants used to receive the Exploit proceeds was publicly labeled over time, including being flagged as having been involved in an "exploit."

connection with money laundering investigations, and the jury is entitled to consider that experience in evaluating the defendants' conduct.

Accordingly, the Court should deny defendants' request to preclude Mr. Hoffmeister from offering these opinions on grounds that these opinions were purportedly not disclosed.

### 3.    The Government's Percipient Witnesses

Finally, although the defendants apparently seek to relitigate whether the anticipated testimony by the Government's percipient witnesses—*i.e.*, Victim-1, CC-1, and the Flashbots Representative—constitutes fact testimony or expert testimony, there is no basis to revisit the Court's appropriate denial of the defendants' motion to compel expert disclosures from those witnesses. Though the defendants rehash their argument that the testimony identified in their motion-to-compel briefing "falls on the expert side of the line," (*see* Expert Mot. at 5 (citing Dkt. 113, at 18-19)), this Court has already considered and rejected the defendants' arguments based on the Government's representation that the anticipated testimony of Victim-1, CC-1, and the Flashbots Representative is "based on that witness's personal knowledge, rationally based on that witness's perception, and not rooted exclusively in that witness's expertise," (*see* Dkt. 119).

Moreover, the defendants merely assert in conclusory fashion that "much of the testimony identified there would plainly reach beyond the witness' personal knowledge, experiences, and observations" and restate the uncontroversial principle that a proper foundation must be laid for lay opinion testimony, without making any effort to identify the testimony at issue, the witnesses who purportedly lack percipient knowledge, or why those witnesses lack percipient knowledge. (*See* Expert Mot. at 5). These arguments fall well short of establishing that the Government should be precluded from eliciting testimony regarding a laundry list of broad topics. *See Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) (declining to consider "a doctrinal recapitulation" that "references only case-law authorities, and never the requisite combination of

authorities and putative facts"); *see also United States v. Malka*, 602 F. Supp. 3d 510, 529 (S.D.N.Y. 2022) (motions "made in passing and accompanied by any effort at developed argumentation" are waived).

The motion should be denied.

## VI.    The Government Should Be Permitted To Adduce Evidence Regarding the Circumstances of the Tether Seizure

The defendants seek to exclude, pursuant to Rules 401, 402, and 403, evidence and argument indicating the blockchain platform Tether froze certain cryptocurrency in the defendants' cryptocurrency wallet at the request of a foreign government. (*See* Dkt. 138 (the "Tether Mot.")). The defendants concede that "the fact that Tether froze the USDT will come up in the trial," but nonetheless seek to preclude that Tether froze the cryptocurrency "at the behest of foreign law enforcement." (Tether Mot. at 2). The Government should be permitted to introduce this evidence, which is highly relevant evidence of the defendants' state of mind and will not create a risk of *unfair* prejudice or a mini-trial on issues of Israeli law.

### A.    Factual Background

On April 10, 2023, Tether blacklisted a cryptocurrency wallet into which the defendants had deposited proceeds from the Exploit, effectively freezing approximately $3 million worth of USDT (*i.e.*, a cryptocurrency stablecoin) that the defendants had obtained from the Exploit. On September 6, 2023, in response to an inquiry from the defendants' anonymous "Low Carb Crusader" proton email address regarding why the wallet had been frozen, Tether directed the "Low Carb Crusader" (*i.e.*, the defendants) that "[f]or more information" on the frozen wallet, "we kindly ask that [you] contact the Cyber division, Israel police." (Ex. E).

Anticipated evidence at trial in the form of anticipated witness testimony and cryptocurrency tracing evidence will show that the defendants engaged in numerous transactions

to conceal and move the Exploit proceeds following the Exploit. Crucially here, even after the defendants were put on notice on September 6, 2023 that a foreign law enforcement agency had been involved in the freezing of their Tether cryptocurrency, the defendants took numerous steps to conceal, swap, and transfer the remaining approximately $20 million in cryptocurrency that had not yet been frozen. For example, *after* learning that a foreign law enforcement agency had initiated the Tether freeze, the defendants nonetheless proceeded to: (i) move more than $13 million of Exploit proceeds that had been swapped for DAI cryptocurrency tokens to a deposit address with MakerDAO—a decentralized protocol that enables users to swap DAI—in two separate transactions on October 18 and October 26, 2023, having previously moved more than $7 million in Exploit proceeds that had also been swapped for DAI to the same address; (ii) withdraw, in 16 separate transactions from the MakerDAO protocol to another cryptocurrency wallet that the defendants funded on October 16, 2023, the approximately $20 million worth of DAI constituting the unfrozen Exploit proceeds, converting the DAI into USDC (*i.e.*, another cryptocurrency stablecoin) in the process; (iii) transfer the approximately $20 million of USDC to their Pine Needle Coinbase Account in 15 separate transactions; and (iv) transfer the approximately $20 million in Exploit proceeds from their Pine Needle Coinbase Account to their fiat bank account at Mercury Bank in 21 separate transactions beginning in October 2023. Also in October 2023— again, *after* learning that a foreign law enforcement agency was involved in freezing approximately $3 million of the Exploit proceeds—in response to a direct inquiry from Mercury Bank about the specific "crypto transactions that resulted in the" proceeds being transferred into the defendants' Pine Needle Coinbase Account, Anton falsely told Mercury Bank the proceeds "were accumulated through many on-chain actions" and that there was "no one trade I can point to," when, in fact, the money consisted of the proceeds from a single set of transactions—the

Exploit. During the same time period, the defendants also failed to provide information to Coinbase's compliance team in response to similar inquiries.

On November 21, 2023, while the defendants were still in the process of concealing and moving the Exploit proceeds, James searched on Google for "Israeli head of cyber division crypto" and "Israel-united states extradition," and visited a webpage titled "The head of the snake: Israel police bust international crypto fraud ring."

### B.    Discussion

The defendants' knowledge that a foreign law enforcement agency, specifically the Israeli police's cyber division, was involved in Tether's freeze of $3 million of the Exploit proceeds is highly probative evidence (i) that the defendants conspired to launder the Exploit proceeds with the requisite intent and knowledge; and (ii) providing necessary context for the defendants' Google searches, which are powerful evidence of the defendants' consciousness of guilt. The defendants will not suffer any *unfair* prejudice from the admission of this highly probative evidence. Further, no "mini-trial" will be required, as the evidence can be admitted for solely for its impact on the defendants and to explain the defendants' subsequent search history, not for the truth of whether the Exploit violated Israeli law, and the Court can instruct the jury accordingly.

At trial, the jury will be asked to determine whether the defendants conspired to engage in money laundering by conducting or attempting to conduct financial transactions "knowing that the transaction[s] [were] designed in whole or in part" to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" of the defendants' Exploit, 18 U.S.C. § 1956(a)(1)(B)(i), and "knowing that the property involved in [the transactions] represents the proceeds of some form of unlawful activity," *id.* § 1956(a)(1). The defendants' knowledge that Tether not only had frozen $3 million of the Exploit proceeds just one week after the Exploit, but also that Tether had done so at the behest of a foreign law enforcement agency is highly probative

evidence that the defendants' subsequent complex and circuitous movement of the Exploit proceeds "off-chain"—first into the MakerDAO protocol, then into a second cryptocurrency wallet, then into a Coinbase account, and finally into a Mercury Bank account—was done "in whole or in part to conceal or disguise" the Exploit proceeds to avoid further freezes or law enforcement detection. Indeed, this Court has already acknowledged the relevance of the fact "that foreign law enforcement and Ethereum Network users indicated that a crime may have occurred." (Dkt. 112 at 31).

Further, the Government will seek to offer into evidence, among other search history, James's November 21, 2023, Google searches for "Israeli head of cyber division crypto" and "Israel-united states extradition," as well as his visit to a webpage titled "The head of the snake: Israel police bust international crypto fraud ring." The defendants' knowledge that the Israeli police's cyber division had caused Tether to freeze $3 million of the Exploit proceeds is highly relevant to understanding how these searches relate to the Exploit—and bear directly on James's consciousness of his guilt. *See* Fed. R. Evid. 401; *United States v. Quattrone,* 441 F.3d 153, 188 (2d Cir. 2006).

The Second Circuit's decision in *United States v. Vallee* is instructive. In that case, the defendant, like the defendants here, challenged "as irrelevant and unduly prejudicial the admission of testimony by a Canadian prosecutor that she told [the defendant's] trial counsel that [the victim] was the sole witness against [the defendant] in a Canadian drug prosecution," which testimony was "offered to prove [the defendant's] motive to murder [the victim]." *Vallee*, 304 F. App'x at 919. The Circuit, in a panel presided over by then-Judge Sotomayor, rejected the defendant's argument, explaining that the "evidence was relevant because it had a tendency to make the existence of a fact—whether [the defendant] knew that [the victim] was an important witness

against him—'more probable or less probable than it would be without the evidence.'" *Id.* (quoting Fed. R. Evid. 401). Further, with regard to the defendant's unfair prejudice argument, the Circuit explained that "[u]nfair prejudice 'does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.'" *Id.* at 920. Thus, "[a]lthough the Canadian prosecutor's testimony was damaging to [the defendant's] defense insofar as it suggested a motive for the alleged crimes, its probative value depended upon a reasonable inference . . . instead of upon an 'illegitimate emotional appeal.'" *Id.* (citations omitted).[19]

So too here. The defendants' knowledge that a foreign law enforcement agency had catalyzed Tether's freezing of $3 million of the Exploit proceeds is plainly relevant to, among other things, the defendants' motive and intent to "conceal or disguise the nature, the location, the source, the ownership, or the control of the [Exploit] proceeds," 18 U.S.C. § 1956(a)(1)(B)(i), as well as understanding their incriminating Google search history. And while that evidence is damaging to the defendant's case, its probative value is based on appropriate and reasonable inferences, not "an illegitimate emotional appeal." *Vallee*, 304 F. App'x at 920 (quotation marks omitted). Moreover, as in *Vallee*, there is no concern with a mini-trial on issues of foreign law here. The evidence of a Canadian prosecutor's statement about Canadian drug charges against the defendant in *Vallee* did not render appropriate, much less necessitate, testimony or argument about the elements of Canadian drug crimes, the nature of Canadian authorities' investigation, or the

---

[19] The Circuit further explained that the testimony "was not hearsay because it was not admitted for the truth of the matter asserted, but rather as evidence of [the defendant's] state of mind." *Vallee*, 304 F. App'x at 919. Although the defendants here have not challenged the Tether/Israel statements as hearsay, the same is true here.

particular Canadian statutes claimed to be violated. The jury in *Vallee* did not need to know the finer points of Canadian law to understand the impact of a Canadian case on the defendant's motive, and the jury here need not be burdened with a mini-trial on Israeli law to understand the impact of an Israeli law enforcement action on the defendants' motive and intent to launder the proceeds of the Exploit.

The District of Maine case cited by the defendants is not to the contrary. In that case, the plaintiff sought to exclude, at a civil trial against his former employer for discrimination and breach of contract claims, evidence that the plaintiff had filed a separate state court lawsuit against the same former employer for overtime wages. *Jones v. Jasper Wyman & Son*, 639 F. Supp. 3d 192, 194-95 (D. Me. 2022). The defendants sought to introduce the separate state court lawsuit, in which discovery had not yet begun, as impeachment evidence. *Id.* at 197. The court disagreed, finding the separate state court lawsuit "marginally relevant," and "not admissible for the purposes of showing [the plaintiff's] litigiousness or depicting him as a perpetual litigant," which would create "a high risk of prejudice against [the plaintiff] if the jury were to be told of [the separate state court] action." *Id.* at 199-200. The court concluded that "it will enhance the jury's consideration of the issues in this lawsuit if the parties concentrate on the claims and defenses here, rather than the claims and defenses of a pending but stayed state lawsuit." *Id.* at 200. The concerns posed by the District of Maine case are not present here. Evidence that the defendants knew that Israeli law enforcement was involved in Tether's freezing of the Exploit proceeds is highly relevant to their states of mind *in this case*, and in no way requires an assessment of "the claims and defenses" that might have existed in a hypothetical Israeli criminal case.

The sole in-Circuit authority cited by the defendants proves this point. The defendants cite *United States v. McElroy* for the proposition that "references to violations of other laws is improper

'if their purpose or effect were to suggest to the jury that it could find the defendant guilty simply by reason of his violation of the regulation.'" (Tether Mot. at 4 (quoting *United States v. McElroy*, 910 F.2d 1016, 1023 (2d Cir. 1990))). But the defendants leave out the rest of the quoted sentence: "[but] that was neither the purpose nor the suggestion here." *McElroy*, 910 F.2d at 1024. Indeed, the Circuit in *McElroy*, *upheld* the admission of witnesses' testimony explaining a bank's rejection of the defendant's loan application by reference to the regulation because such testimony served to explain the basis for the bank's rejection of the application, and the court "took care to instruct the jury that a violation of [the regulation alone] would 'not amount to criminal conduct under federal law.'" *Id.*[20] Here, too, if requested by the defendants, the Court can instruct the jury to the effect that the evidence is being admitted solely to show the defendants' awareness that a foreign law enforcement agency was involved in Tether's freezing of Exploit proceeds, and that the involvement of a foreign law enforcement agency does not bear on whether the Exploit itself constituted a violation of the U.S. wire fraud statutes.

## VII.    The Post-Exploit News Articles and "False Signature" Screenshot Are Admissible

In separate motions, the defendants seek to preclude two categories of evidence found on electronic accounts belonging to the defendants: (i) a particular screenshot of a blockheader message that contains a series of zeros in the parent and state root fields (the "Blockheader

---

[20] The Eleventh Circuit's opinion in *United States v. Stefan*, 784 F.2d 1093 (11th Cir. 1986), cited approvingly in the Second Circuit's *McElroy* opinion, is even more on point. In that case, the Eleventh Circuit upheld the admission of evidence that the defendant had violated civil banking statutes because "the government did not base its prosecution for misapplication of bank funds on [the defendant's] alleged violations of [the] civil statute," but rather "sought to show that [the defendant] violated the [criminal] misapplication statute by making loans to straw borrowers for the [at-issue] project knowing that the borrowers lacked the capacity to repay the loans" and "that one reason [the defendant] dealt with straw borrowers was to avoid the limitation of [the civil banking statute]." *Stefan*, 784 F.2d at 1098. As in *Stefan*, "[p]ertinent evidence would be lost in this and other cases," *id.*, if the defendants' requested prohibition on evidence of foreign law enforcement action were to be adopted.

Screenshot"); and (ii) news articles (the "News Articles"). (Dkt. 142 (the "Screenshot Mot."); Dkt. Dkt. 140 (the "News Article Mot.")). The defendants' challenges to both categories of evidence—authentication, hearsay, and unfair prejudice—are baseless. As outlined below, the contested evidence is not hearsay, as the articles are not being offered for the truth of the matters asserted therein, but rather the defendants' own interest in the topics of the articles and knowledge gleaned from the articles. These articles were found in the defendants' own electronic accounts, making their authentication straightforward.

### A.    Factual Background

As part of the Government's investigation, it obtained judicially authorized search warrants to seize various electronic accounts belonging to the defendants. Among these accounts were an iCloud account belonging to Anton (the "Anton iCloud Account") and six Google accounts belonging to Anton and James (the "Google Accounts"). The News Articles and Blockheader Screenshot were found in one or more of these electronic accounts. In particular, the News Articles, which are attached to the defendants' motions *in limine* (*see* Dkt. 143-4),[21] were found in the Anton iCloud Account or searched for in either the Anton or James Google Accounts during the course of the fraud scheme and money laundering conspiracy as follows:

| Article | Location |
|---|---|
| "'Sandwich the Ripper' MEV Exploiter Joins Tether's Graveyard of Blacklisted Addresses," *Decrypt*, April 11, 2023 | Anton's iCloud<br>Anton's Google search history – 4/11/23 |
| "A New Crypto Mixer Promises to Be Tornado Cash Without the Crime," *Wired*, March 3, 2023 | Anton's Google search history – 4/11/23 |

---

[21] The article "U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash," *U.S. Dep't of the Treasury*, August 8, 2022, was referenced in a Discord chat group that, upon further review, did not include either defendant. The Government does not presently intend to introduce this article at trial.

|  |  |
|---|---|
| "How Did A Malicious Validator Steal $20 Million From MEV Bots by Attacking Ethereum MEV Boost Relay," *EigenPhi*, April 3, 2023 | Anton's Google search history – 9/23/23 |
| "Former Security Engineer For International Technology Company Arrested For Defrauding Decentralized Cryptocurrency Exchange," *DOJ Press Release*, July 11, 2023 | James's Google search history – 10/25/23 |
| "Ethereum Bot Gets Attacked for $20M as Validator Strikes Back," *CoinDesk*, April 3, 2023 | Anton's iCloud |
| "Explained: The MEV Bots Hack (April 2023)," *Halborn Blog*, April 12, 2023 | Anton's iCloud |
| "Exploiter Front Runs $25M From MEV Bots Using Ethereum Validator," *Blockhead*, April 4, 2023 | Anton's iCloud |
| "Flashbots Loses Around $20M in Innovative Cyber Attack: Insider Information Exploited by Hacker," *BitNewsBot*, April 4, 2023 | Anton's iCloud |
| "Rogue Validator Exploits MEV Bots on Ethereum, Resulting in $25.3M in Crypto Losses," *Bitcoin.com*, April 4, 2023 | Anton's iCloud |
| "Sandwich trading bots lose bread and butter in $25M exploit," *Cointelegraph*, April 3, 2023 | Anton's iCloud |
| "Tether Blacklists 'Sandwich the Ripper': Insights into MEV and the Future of Blockchain Security," *Daniel Aharonoff* | Anton's iCloud |
| "$25M MEV Exploit Teaches a Valuable Lesson About Relay Providers," *Blockworks*, April 13, 2023 | Anton's iCloud |

As relevant to this Opposition, the Blockheader Screenshot, which is attached to the defendants' motion *in limine* (*see* Dkt. 143-5), was saved to James's Google Account on or about

June 7, 2023. The Blockheader Screenshot shows computer code for a blockheader where the "parent_root" and "state_root" fields are filled with zeros.

### B.    Discussion

#### 1.    The Blockheader Screenshot Is Admissible

The Government is seeking to admit the Blockheader Screenshot found on the James Google Account.[22] As such, its authentication is straightforward under Rule 901. The defendants' contentions that the Government must "authenticate [the Blockheader Screenshot] as the alleged False Signature" conflate authentication with argument. (Screenshot Mot. at 3). There is no dispute that the Blockheader Screenshot is an authentic document saved to the James's Google Account. There is therefore sufficient proof that the document is what the Government offers it to be—a document obtained from the defendant's Google account. *See* Fed. R. Evid. 901 (providing that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is"); *Al-Moayad*, 545 F.3d at 172 ("'[T]he bar for authentication of evidence is not particularly high,' and proof of authentication may be direct or circumstantial." (citation omitted)). The Government does not need to *prove* that the Blockheader Screenshot is the False Signature in order for it to be authenticated. (*See* Screenshot Mot. at 3). To the extent the defendants seek to argue that the Government has not sufficiently proven that the screenshot captures the False Signature (or any other proper argument related to this screenshot), they are free

---

[22] The Government will not seek to admit the image identified in the Screenshot Motion as GX 4017, which was not saved to James's electronic accounts.

to argue that the jury.  It is a question of competing inferences for the factfinder, not an issue of admissibility.

In any event, with respect to the Blockheader Screenshot, the Government does not intend to argue that the Blockheader Screenshot is, in fact, the False Signature that was sent on April 2, 2023, thereby eliminating any argument, regardless of its merit, pursuant to Federal Rule of Evidence 1002. The fact, however, that James *saved* the Blockheader Screenshot, which shows a blockheader with the parent and state root fields set to zero, to his Google Account is relevant to the defendant's knowledge of the Exploit and the materiality of the False Signature. The Government anticipates that evidence at trial in the form of witness testimony and documentary evidence, including the defendants' computer code and Slack communications, will establish that the success of the Exploit on April 2, 2023 relied upon the exploitation of a MEV-Boost relay coding vulnerability that involved setting a blockheader's parent and state roots to zero. The Government also expects that evidence at trial, including programmer notes for the defendants' computer code, will show that James was responsible for drafting the blockheader section of the code. As a result, the fact that—out of all the items one could save to a computer—James chose to save a screenshot of a blockheader with the parent and state roots set to zero is relevant to his knowledge of and participation in the Exploit, which are material issues that the defendants intend to contest at trial. *See United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) ("To be relevant, evidence need not be  sufficient  by  itself  to prove a fact in  issue,  much  less to prove it beyond a reasonable doubt."); *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("Evidence need not be conclusive in order to be relevant.").  Nor is the admission of the Blockheader Screenshot unfairly prejudicial pursuant to Rule 403 where there will be substantial

48

evidence at trial regarding use of zeros in the parent and state root fields and its effect on the MEV-Boost relay.

### 2.    The News Articles Are Admissible

The defendants argue that the News Articles should be precluded as hearsay and as unfairly prejudicial under Rule 403. The News Articles are not hearsay or unfairly prejudicial and should be admitted.

The News Articles are not hearsay because the Government is not offering them to prove the truth of the matters asserted therein, but rather as relevant to the defendants' intent and knowledge. As the Government outlined in its omnibus motions *in limine*, (Dkt. 125 at 23-25), the Government intends to offer the News Articles,[23] which include references to "theft," "hack," "exploit," and "frozen Tether," along with reports of other computer crime arrests, not for their truth, but for their effect on the defendants, who either downloaded them or searched them, to demonstrate the defendants' interest in their own criminal activity and their knowledge of how that activity was publicly perceived, as well as the criminal activity of others engaging in similar crimes. *See United States v. Certified Environmental Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014). ("An out-of-court statement offered for some other purpose [than to prove the truth of a fact asserted], such as . . . to demonstrate the statement's effect on the listener, or to show the circumstances under which subsequent events occurred, is not hearsay." (citations omitted)).

Among other things, the defendants seeking out, accessing, or saving news articles that describe their wire fraud conduct (or similar conduct) as criminal supports an inference that the

---

[23] Since its initial production of trial exhibits on August 8, 2025, the Government has made a second exhibit production on August 29, 2025, which removed a number of the News Articles from its revised exhibit list. The Government reserves the right to supplement, edit, and revise its exhibit list as it prepares for trial, and in response to the defendants' proposed exhibits.

defendants (i) were aware that their conduct was criminal or wrongful, but had hoped to maintain some plausible deniability that the conduct was appropriate (*i.e.*, to make the exact arguments they are advancing now); and (ii) as a result, were particularly concerned that their conduct was being publicly perceived as criminal. This is a completely fair inference to argue to the jury, and it does not matter that their accessing of the News Articles post-date the Exploit because a defendant's conduct *after* a crime can shed light on a defendant's intent to commit the crime and consciousness of guilt.

The defendants also fail to fully grapple with the plain and obvious relevance of the News Articles to the *ongoing* criminal activity—that is, their money laundering. The defendants simply say, "Nor are [the News Articles] relevant to the Peraire-Buenos' intent with respect to the alleged money laundering because they do not establish that the alleged Exploit was a crime." (News Article Mot. at 4-5).

*First*, for the reasons discussed above, the News Articles *are* relevant to the defendants' knowledge that the Exploit was wrongful. *Second*, the News Articles are independently probative of money laundering because they support the inference that the defendants took additional steps to conceal the source of the Exploit proceeds when they realized that the public or news media was seeing the Exploit for what it was—a crime. *Cf. United States v. Dupree,* 706 F.3d 131, 137-38 (2d Cir. 2013) (finding district court erred by not admitting a temporary restraining order, which was not offered for the truth of the matter asserted, but rather to show that the defendant had knowledge of his legal obligations and intended to evade them). The News Articles are therefore probative of a key issue that will be contested at trial and are thus not hearsay. *United States v. Salemeh*, 152 F.3d 88, 112 (2d Cir. 1998) ("Where, as here, the statement is offered as circumstantial evidence of [a defendant's] state of mind, it does not fall within the definition given

by Rule 801(c); because it was not offered to prove the truth of the matter asserted." (alteration in *Salameh*, citation omitted)); *United States v. Puzzo*, 928 F.2d 1356, 1365 (2d Cir. 1991) (testimony not hearsay where its contents "formed the basis of [the listener's] knowledge at the time which provided the motive for his actions; and was evidence of [his] probable state of mind").

As noted in the Government's motions *in limine*, the Government would have no objection to a limiting instruction that none of the News Articles are offered to establish the truth of their contents, but solely for their effect on the defendants' state of mind. *See United States v. Monsalvatge*, 850 F.3d 483, 496-97 (2d Cir. 2017) (movie clips properly admitted as probative of intent, with similar limiting instructions). In an analogous situation, Judge Engelmayer permitted the Government to introduce a civil attachment order (and civil petition accusing the defendant of fraud), which were provided to the defendant two days before he left the United States for Canada, as evidence of his consciousness of guilt and to explain the defendant's ensuing conduct. (*See* Ex. F,[24] *United States v. Gillier*, 11 Cr. 409 (PAE), FPTC Tr. at 14 ("First, there is a potential hearsay problem posed by receiving the content of the civil attachment order in evidence, as such effectively accuses Gillier of the crime for which he will stand trial in this court. To cure that problem, the government states that it will not offer the content of Honeywell's attachment papers for their truth. That is the right solution. On a request from the defense, I stand at the ready to give the jury a limiting instruction that the content of the civil attachment order and associated papers is admissible to show only the effect of that order on Gillier's knowledge and intent and to explain his ensuing conduct.")).

---

[24] Exhibit F is an excerpt of the final pre-trial conference transcript from *Gillier*, which was also cited in the Government's opening motions *in limine*.  (*See* Dkt. 125 at 55).

That these articles will make it difficult for the defendants to deny that they knew (or were aware of the high probability) that what they were doing was illegal, particularly when they were taking actions to launder the Crime Proceeds, does not make the articles *unfairly* prejudicial—it only makes them especially probative. *See Monsalvatge*, 850 F.3d at 495-96 (affirming district court's admission of robbery movie clips where there was evidence that the defendants were aware of the movie and the movie helped show *modus operandi*, and rejecting the notion that the clips were unfairly prejudicial where the clips did not elicit a "strong emotional or inflammatory impact," that would risk the jury "would act irrationally in reaching a verdict").

The defendants' contention that the News Articles are unfairly prejudicial because they were published after the Exploit and do not establish the Exploit was a crime misses the mark. (*See* News Article Mot. at 4-5). "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Here, it is clearly relevant that the defendants were aware that many public reports characterized their conduct in terms associated with criminal activity and that others had been arrested and criminally charged for similar conduct. Moreover, the News Articles, which merely discuss the charged offenses that will be detailed at length during trial are logically no more sensational or disturbing than the charged offenses. *United States v. Forney*, 24 Cr. 146 (KAM), 2025 WL 2208298, at *9 (E.D.N.Y. Aug. 4, 2025) ("[I]t is well settled in the Second Circuit that relevant evidence will not be precluded by Rule 403 where 'the conduct is not any more sensational or disturbing than the charged crime.'" (quoting *United States v. Rosemond*, 958 F.3d 111, 125 (2d Cir. 2020))). To the extent that there is any risk of unfair prejudice, it can be appropriately mitigated with a limiting instruction. *Cf. United States v. Mostafa*, 16 F. Supp. 3d 236, 254 (S.D.N.Y. 2014) (admitting

other-acts evidence, with appropriate limiting instructions, that was probative of a defendant's state of mind regarding the charged crimes even where portions of that evidence occurred before and after the charged crimes); *United States v. Mercado,* 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where the challenged evidence was "not especially worse or shocking than the transactions charged" and where the district court instructed the jury as to what inferences could properly be drawn from such evidence)).

Based on the foregoing, the defendants' motions to exclude the Blockheader Screenshot and the News Articles found on the defendants' electronic accounts and devices should be denied.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendants' motions *in limine*.

Dated: New York, New York
September 8, 2025

                                      Respectfully submitted,

                                      JAY CLAYTON
                                      United States Attorney

By:     s/ _____
                  Jerry Fang / Danielle Kudla / Benjamin Levander
                  Assistant United States Attorneys
                  26 Federal Plaza, 37th Floor
                  New York, New York 10278
                  Tel: (212) 637-2584 / -2308 / (914) 993-1930