**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ANTON PERAIRE-BUENO, and JAMES
PERAIRE-BUENO,

      Defendants.

Case No.:  1:24-cr-00293-JGLC

**DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTIONS TO EXCLUDE
<u>DEFENSE EXPERT TESTIMONY</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 4

    A.    The Government's Allegations Place the Disputed Function of Blockchain Technology and the Trading Environment at the Center of This Case.................... 5

    B.    The Government's Allegations Rest on a Fundamental Misunderstanding of the Blockchain Technology and a Distorted View of the Trading Environment........................................................................................................ 8

    C.    The Potential Defense Expert Testimony Is Essential to Defending Against the Government's Flawed Allegations .................................................. 11

        1.    Professors Falk and Weinberg ................................................. 11

        2.    Mr. Madura ............................................................................... 13

        3.    Professor Eisfeldt....................................................................... 13

LEGAL STANDARD......................................................................................... 13

ARGUMENT ..................................................................................................... 15

I.     THE DEFENSE EXPERTS ARE HIGHLY QUALIFIED TO OFFER THE DISCLOSED TESTIMONY. ................................................................... 15

    A.    Expertise in "MEV-Boost" Is Not Required.......................................... 16

    B.    The Experts Are Qualified to Offer Their Opinions................................ 19

II.    THE DEFENSE EXPERT TESTIMONY SHOULD NOT BE PRECLUDED ON THE BASIS THAT GOVERNMENT WITNESSES WILL TESTIFY ON SIMILAR TOPICS. .................................................................................. 22

III.    THE DEFENSE EXPERT TESTIMONY DOES NOT USURP THE JURY'S OR THE COURT'S ROLE. .................................................................... 24

    A.    The Expert Testimony Does Not Approach an Impermissible Legal Opinion. ...................................................................................................... 24

    B.    The Expert Testimony Does Not Include Opinions on the Peraire-Buenos' Mental State or That of Other Witnesses.............................................. 32

IV.     THE DEFENSE EXPERT TESTIMONY IS RELIABLE AND HELPFUL. ....................35

V.     THE DEFENSE EXPERT TESTIMONY IS NOT IRRELEVANT OR UNFAIRLY PREJUDICIAL. ...........................................................................................39

VI.    THE DEFENSE EXPERT DISCLOSURES ARE ADEQUATE AND EXCLUSION IS NOT THE PROPER REMEDY FOR THE SUPPOSED DEFICIENCIES...................................................................................................................43

CONCLUSION...........................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ....................................15

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003)...............18

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..................................................14, 17

*Diaz v. United States*, 602 U.S. 526 (2024) ...........................................................................33, 35

*DiBella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) .........................................................................43

*Ellis v. YMCA Camp Mohawk, Inc.*, 615 F. App'x 697 (2d Cir. 2015) ........................................18

*Highland Cap. Mgmt. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005)................................34

*Highland Cap. Mgmt. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008)...........................34, 38

*In re Blech Sec. Litig.*, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) .........................................36

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009)...................................34

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................22, 26, 38, 43

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ................34

*Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302 (S.D.N.Y. 2022) .....................14, 15

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ..................................................38

*Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505 (2d Cir. 1977) ..............................................24, 25

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ........................................................17

*Nike, Inc. v. StockX LLC*, 2024 WL 3361411 (S.D.N.Y. July 10, 2024)................................36, 39

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)........................................................14, 18

*Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016)................................................................18

*Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420 (2d Cir. 1998)............26

*SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384 (S.D.N.Y. 2019) ....................................................18

*SEC v. Lyon*, 2009 WL 6325519 (S.D.N.Y. Mar. 18, 2009) ........................................................43

*SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013)....................................................18, 26, 34, 35

*SEC v. U.S. Env't, Inc.*, 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ...........................25, 28, 36

*SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486 (S.D.N.Y. 2018) .......................................17

*TC Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171 (N.D.N.Y. 2002) ..............18, 21

*United States v. Amirov*, 2025 WL 636088 (S.D.N.Y. Feb. 27, 2025)..........................................44

*United States v. Asare*, 2019 WL 5693477 (S.D.N.Y. Nov. 4, 2019) ..........................................18

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)................................................24, 25, 26

*United States v. Brown*, 776 F.2d 397 (2d Cir.1985)................................................................15, 18

*United States v. Chaffo*, 452 F. App'x 154 (3d Cir. 2011) ...........................................................25

*United States v. Chastain*, 2023 WL 2966643 (S.D.N.Y. Apr. 17, 2023)...............................36, 43

*United States v. Crater*, 93 F.4th 581 (1st Cir. 2024)...................................................................36

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ..............................................................41

*United States v. DiDomenico*, 985 F.2d 1159 (2d Cir. 1993).......................................................33

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994).............................................................26, 30

*United States v. Gentile*, 2024 WL 3251702 (E.D.N.Y. June 20, 2024) ......................................44

*United States v. Guo*, 2024 WL 2262706 (S.D.N.Y. May 17, 2024) ...........................................39

*United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013) ................................................................33

*United States v. Kaufman*, 2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021)................................38, 43

*United States v. Kwok*, 2024 WL 1773143 (S.D.N.Y. Apr. 24, 2024) ....................................43, 44

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ....................................................4, 14, 22, 31

*United States v. Mandell*, 752 F.3d 544 (2d Cir. 2014).................................................................25

*United States v. Mendlowitz*, 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ...............................23

*United States v. Menendez*, 2025 WL 547794 (S.D.N.Y. Feb. 19, 2025) .....................................18

*United States v. Mrabet*, 703 F. Supp. 3d 442 (S.D.N.Y. 2023)...................................................44

*United States v. Newkirk*, 684 F. App'x 95 (2d Cir. 2017)...........................................................23

iv

*United States v. Pacilio*, 85 F.4th 450 (7th Cir. 2023)....................................................41

*United States v. Romano*, 794 F.3d 317 (2d Cir. 2015) ................................................36

*United States v. Russo*, 74 F.3d 1383 (2d Cir. 1996) ...................................................25

*United States v. Sanders*, 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) ....................23

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988)........................................24, 25, 34

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015)...........................15

## RULES

Fed. R. Crim. P. 16 ............................................................................... *passim*

Fed. R. Evid. 401 .........................................................................................25, 42

Fed. R. Evid. 403 .................................................................................22, 23, 27

Fed. R. Evid. 404(b)............................................................................................7

Fed. R. Evid. 702 ................................................................................. *passim*

Fed. R. Evid. 704(b)................................................................................33, 34, 35

Defendants James and Anton Peraire-Bueno respectfully submit this opposition to the government's motion to exclude defense expert witnesses (ECF 148).

## INTRODUCTION

If they choose to put on a defense case, the Peraire-Buenos may elicit expert testimony to assist the jury in evaluating this highly technical case. The Peraire-Buenos have provided the government with notice of four experts—Brett Falk, Ph.D.; S. Matthew Weinberg, Ph.D.; Mr. Kevin Madura; and Andrea Eisfeldt, Ph.D.—to offer opinions based on their academic, professional, and experience-based expertise. Professors Falk and Weinberg, who study and teach blockchain technology and protocol design at two of the nation's most prestigious universities, will explain the key features of the Ethereum blockchain and its protocol, the role of validators, the properties of digital signatures, and the function of MEV-Boost, among other topics. Mr. Madura, an expert on blockchain technology and computer programming who is regularly qualified to testify about blockchains and related computer code, will testify about the so-called Exploit code and how it was programmed to interact with the blockchain. And Professor Eisfeldt, an expert in financial markets and the forces that influence them, will testify about the key features of decentralized exchanges like those that exist on Ethereum and the protocol-based incentives that drive behavior there.

The government's motion takes a shotgun approach to this testimony, seeking to exclude *all testimony* from *all four noticed defense experts* on virtually *every available ground*. The government's indiscriminate arguments fail in every regard. The four defense experts are highly qualified to offer their opinions which draw directly from their expertise. The government offers a series of objections based on broad maxims—*i.e.*, that experts may not give impermissible legal opinions, may not comment on a defendant's mental state, may not simply narrate non-technical facts, and so on—that have no purchase here when assessed against the disclosures. Indeed, the

1

government's doomed effort to fit a square peg into the round hole of these well-worn Rule 702 objections is betrayed by the amount of space it devotes to arguments that have nothing to do with Rule 702.  The government retreads arguments from its motions *in limine* that concern purportedly improper arguments it claims the Peraire-Buenos may make based on the expert testimony.  The government's purported fears of "victim-blaming" or "code is law" arguments (whatever their merits, and there are none) are no basis to exclude the disclosed expert testimony, which does not blame the victims, does not assert that "code is law," and makes no "arguments" at all.  The government's assertions to the contrary rely on out-of-context snippets of language from the disclosures or outright mischaracterizations of the opinions.

While each argument fails on its own merits, several conceptual flaws undermine the motion generally.

First, regarding both the experts' qualifications and the relevance of their testimony, the government takes an artificially narrow view of the technological questions this case raises.  The government's brief assumes that only MEV-Boost matters, that the Ethereum protocol is irrelevant, and that MEV-Boost is a closed system with its own rules that bind users.  The government has never disclosed an expert opinion to support that theory (it disclosed no experts for its case-in-chief and none for its rebuttal case).  As the Peraire-Buenos' expert disclosures show, the government's views on this and other questions of technology are wrong.  MEV-Boost is not a "system" but rather computer code that can be used within Ethereum to facilitate the interaction with other computer code.  The alleged conduct here did not take place "in" MEV-Boost.  The alleged Lure Transactions were submitted through the Ethereum protocol and were pending in the Ethereum mempool.  And a validator's role derives from the Ethereum protocol alone, not MEV-Boost.  The government's overly narrow view of MEV-Boost's role in the case

blinds it to the obvious relevance and helpfulness of the defense expert testimony about the structure and function of both the Ethereum protocol and the MEV-Boost software and how they interact.

Second, the government's arguments reveal a serious failure to grapple with the technical nature of its case and the scope of expert testimony appropriate to rebut it. The government alleges that fraud occurred on a decentralized blockchain, supposedly through messages conveyed through computer code between a series of bots, and which involved the purported "exploitation" of code. It has stated its intention to elicit testimony from purported lay witnesses about how the relevant computer programs functioned. It will seek to have its witnesses say that transactions pending in the Ethereum mempool convey implicit meanings and an Ethereum validator's cryptographic signature on a "blockheader" is a promise to propagate a certain block, among other technical opinions. The government will also seek to elicit testimony from these witnesses about what a "vulnerability" in code is, and what it means to "exploit" it. These propositions, among others implicated by the government's charges, concern the functionality of complicated and evolving technology that the jury will need expert testimony to navigate and understand. And yet the government incredibly seeks to exclude *all expert testimony on these very topics*.

The government's galling position effectively seeks a ruling precluding the Peraire-Buenos from presenting a defense. The government would present in its case-in-chief technical testimony about the meaning and function of the alleged False Signature, while seeking to preclude testimony in a defense case explaining why that alleged function is wrong because, according to the government, that testimony would "usurp" the jury's role. And it would seek to elicit testimony that the Peraire-Buenos violated "rules" or "protocols" of MEV-Boost (which evidence the government says bears on the Peraire-Buenos' alleged intent to defraud and the materiality of the

3

alleged misrepresentations), while seeking to exclude defense expert testimony explaining what those protocols are and that the Peraire-Buenos, in fact, *did not violate them*. According to the government, testimony on these topics—which is directly responsive to the very testimony the government says it will elicit and the arguments it says it will make—must be excluded to prevent the Peraire-Buenos from twisting these facts into an impermissible jury nullification argument. The government goes so far as to argue that the defense experts' testimony is unhelpful or unnecessary because its witnesses will cover the same topics. That argument is confounding in this posture, where the government has refused to disclose those witnesses' testimony. But, in any event, a criminal defendant is not required to accept the government's witnesses' views as true.

The government's arguments invite error. *See United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015). In *Litvak*, after introducing testimony on materiality from victims in its case-in-chief, the government defended the exclusion of the defendant's expert on similar grounds raised here— *i.e.*, that the topic was legal and/or an ultimate issue for the jury to decide. *Id.* at 183-84. The Second Circuit reversed. *Id.* The court noted the fundamental unfairness (and legal unsoundness) of an argument that would put a defendant in the "an untenable position" where he is "left only with the 'victims' of his conduct as sources of potential testimony on" the critical issue of materiality. *Id.* The government's arguments here pose the same threat on materiality and several other disputed elements and topics. The Court should deny the motion.

## BACKGROUND

The government's arguments ignore the technical nature of its charges and misconstrue the defense arguments that may be appropriate to rebut them. If there is a defense case, the Peraire-Buenos may offer the noticed expert testimony, all of which bears directly on the technical questions that the government's case presents.

### A.    The Government's Allegations Place the Disputed Function of Blockchain Technology and the Trading Environment at the Center of This Case.

The government's allegations depend on its view of how the Ethereum and MEV-Boost protocols, and different pieces of software interacting with those protocols, functioned.  They also depend on the context in which the Peraire-Buenos and the alleged Victim Traders encountered and used that technology—*i.e.*, what the relevant actors understood about the software's functionality, and what they reasonably expected to occur (or did not expect) based on their experience and publicly available information.  The government has said so repeatedly.

First, the government will argue that the so-called Lure Transactions and False Signature were material misrepresentations—*i.e.*, that each conveyed some false meaning.[1]  The government will argue that the meaning of these alleged misrepresentations and their materiality depends on the functionality of the MEV-Boost software.  *See* ECF 146 at 11 (arguing that evidence of MEV-Boost's functionality "is highly probative because it explains why the defendants' misrepresentations were false, misleading, and material").

Second, the government will argue that the alleged conduct was not a legitimate MEV strategy but an "exploit" and involved "taking advantage of a coding vulnerability."  ECF 61 at 1.[2]

---

[1] *See* ECF 61 at 1 (Lure Transactions were "deceitful trades"); *id.* at 16 n.4 ("Like in the spoofing cases, the defendants signaled particular trading intentions by submitting the Lure Transactions to the mempool[.]"); *id.* at 50 ("The Lure Transactions . . . were not *bona fide* trades."); ECF 111 at 8 (relay was "tricked" "because the relay only checked to confirm that the validator that signed the blockheader was the validator that was selected to propose the next block").

[2] *See* ECF 111 at 5-6 ("CW-1 will further explain . . . that the defendants identified a coding vulnerability in the MEV-Boost software"); *id.* at 14 ("The Flashbots Representative is expected to describe how the MEV-Boost software was exploited by the perpetrators of the Exploit[.]"); *see also* ECF 125 at 32 (arguing that the Peraire-Buenos' supposed failure to "report[] to Flashbots the MEV-Boost vulnerability that they eventually exploited" is relevant to their intent).

Third, the government will argue the alleged conduct was contrary to the protocols and/or supposed rules of the MEV-Boost "software" or "system." *See* ECF 61 at 4 (alleging "manipulation of the process and protocols by which cryptocurrency transactions are validated"); ECF 111 at 6 (conduct was "contrary to the way that Flashbots had designed the MEV-Boost software"); ECF 125 at 8 (conduct was "contrary to the standard operation of the MEV-Boost system"); ECF 146 at 12 n.7 (defendants "circumvent[ed] MEV-Boost's rules and protocols"). It will argue that, in connection with MEV-Boost, "[a] validator commits to publishing the block as structured by digitally signing the blockheader that is sent to the relay." ECF 111 at 8.

Fourth, the government will argue that the alleged Exploit was fraud based on the witness for Nonparty-1's claimed understanding of MEV-Boost's particular features.[3] This "understanding" of the witness for Nonparty-1, according to the government, is "relevant to the materiality of the defendants' misrepresentations." ECF 146 at 12.

Fifth, the government will argue that the Peraire-Buenos' knowledge of the technology's functionality before the alleged Exploit is evidence of their alleged intent to defraud.[4]

---

[3] *See* ECF 61 at 28-29 ("[T]he Victim Traders expected that their frontrun trades would only be executed if the Lure Transactions were executed immediately thereafter[.]"); *id.* at 29 n.9 ("defendants' fraud scheme successfully counteracted the Victim Traders' coding conditions"); ECF 111 at 3-4 ("Victim-1 chose to use the MEV-Boost trading system . . . based on Victim-1's understanding that the MEV-Boost system provided certainty" regarding bundles and "Victim-1 will explain that he did not believe that such an alteration to his proposed bundle could happen because he was using the MEV-Boost system and relying on its specific features.").

[4] *See* ECF 111 at 5 (CC-1's notes would be offered to show the Peraire-Buenos' "understanding of how the MEV-Boost system is supposed to work" and "that the Victim Traders and Flashbots would be upset with their actions"); ECF 61 at 30-31 (arguing that the Peraire-Buenos, being "highly educated in mathematics and computer science and experienced in cryptocurrency trading," "plainly understood . . . the fraudulent nature of their conduct"); ECF 146 at 12 (documentation regarding MEV Boost's design and functionality is "directly probative of the defendants' intent to defraud"); *see also* ECF 125 at 33-34 (arguing that the Peraire-Buenos' "knowledge and understanding of Flashbots and how its MEV-Boost software worked" is "directly relevant to the defendants' knowledge and intent").

In support of these arguments, the government would seek to offer an array of testimony and documentary evidence concerning the technology's functionality and the related expectations of its users.[5]  CC-1, the witness for Nonparty-1, and the Flashbots Representative would discuss Ethereum, MEV-Boost, MEV extraction, sandwich attacks, the process by which blocks are added to the Ethereum blockchain, and the ways in which the alleged Exploit was supposedly contrary to protocols.  *See, e.g.*, ECF 111 at 3-9.  The witness for Nonparty-1 also would testify "regarding the operation and actions of [Nonparty-1's] MEV Bot, including in reaction to the defendants' bait transaction," and the mechanisms by which a sandwich attacker can attempt to keep bundles intact including through "revertingTxHashes."  ECF 146 at 29-30.  The government "also intends to offer portions of the Exploit code."  ECF 125 at 15.  It will seek to admit CC-1's technical notes. *See* ECF 111 at 4-5.  Its cryptocurrency tracing expert purportedly would "testify regarding his understanding of liquidity pools and the price effects of certain transactions in liquidity pools." ECF 146 at 36 n.18.  It would seek to offer "public MEV-Boost guides and instructions" that it claims establish MEV-Boost's functionality and "design[]."  ECF 146 at 12.  It even may seek to admit evidence from long before the alleged Exploit under Rule 404(b) about "black hat" and "white hat" hacking that it claims would establish the that the Peraire-Buenos "*knew*, at a minimum, that exploiting a coding vulnerability and keeping the money was wrongful."  ECF 125 at 33.

To be clear, the Peraire-Buenos disagree with virtually everything the government says about the technology and what constitutes an "exploit" in this trading environment.  The Peraire-Buenos have moved to exclude certain of the above evidence and argument through their motions

---

[5] The Peraire-Buenos may object to substantial portions of this evidence and testimony.

*in limine*.  But whatever the Court's ruling on those motions, this trial will be about complex blockchain technology, how it functioned, and the broader context in which it was used.

### B.    The Government's Allegations Rest on a Fundamental Misunderstanding of the Blockchain Technology and a Distorted View of the Trading Environment.

At trial, the Peraire-Buenos will vigorously dispute all the above ways in which the government claims the technology's functionality assists its case.  Although the Peraire-Buenos have no obligation to disclose their defenses in this way, the Peraire-Buenos make the following points about what the evidence (in both the government's case-in-chief or, if they choose, a defense case) is likely to show, and potential defense arguments from that evidence, to aid in the Court's evaluation of the government's motion.[6]

First, the evidence will not prove that the two alleged misrepresentations were capable of, or did, convey the supposedly false meanings the government may ascribe to them.  Understanding why requires an explanation of Ethereum and its protocol.  The so-called Lure Transactions, for example, were not submitted through MEV-Boost; rather, they were submitted through the Ethereum protocol to other Ethereum nodes and were pending in Ethereum's mempool.  Evidence about the Ethereum protocol, the mempool, and the role of validators under the protocol as the ultimate decision-makers on the order of transactions in a block will demonstrate that a mempool transaction could not convey a promise to be included (in effect, victimized) in a sandwich.

Regarding the alleged False Signature, the evidence will show that there was nothing false about it.  Digital signatures on Ethereum do not convey a promise or any other type of commitment.  There is nothing in their cryptographic properties that inherently would convey the meaning that the government alleges, and there is nothing in the relevant protocols that would supply that

---

[6] These arguments of course are tentative and based on what the Peraire-Buenos view as the likely contours of the government's case-in-chief.

meaning, either.  The evidence will further show that the supposedly false information on the blockheader to which the signature as affixed—the parent and state root fields—were not even populated by the Peraire-Buenos' validator.  And that default information—a series of zeros— conveyed no meaning and was not something the Ultrasound relay (the bot supposedly deceived) even checked.  Understanding why the government's view of the False Signature is wrong thus requires an explanation of the properties of cryptographic signatures, the functionality of the alleged Exploit code, the functionality of the relay code, and the purpose and functionality of the blockheader and its various fields, among other technical topics.

Second, the evidence will show that what the government calls a "vulnerability" in computer code was, in fact, a relay operating as indicated by its publicly available code.  Which fields of the blockheader this relay, and other relays, checked or did not check was no secret.  This fact bears on whether any alleged deception occurred.

Third, contrary to the government's arguments, the evidence will not show that the alleged Exploit violated the Ethereum or MEV-Boost protocols.  The government takes the incorrect view that certain "read me" documents and blog posts constitute the "MEV-Boost protocol."  *See, e.g.*, ECF 125 at 52 nn.20, 21.  A protocol is something different.  It is the processes and procedures which permit computer programs to interact.  It is not a code of conduct or a rulebook.

Fourth, in various ways the evidence will undermine the witness for Nonparty-1's claimed belief in the guarantee of risk-free success to its sandwich attack strategy that MEV-Boost supposedly provided.  The evidence will show that MEV-Boost is not a closed system that exists separately and apart from Ethereum.  Rather, it is software that different users may use when interacting on the Ethereum Network.  The underlying technological and protocol-based constraints and the incentives of the Ethereum protocol always remain operative even when users

interact with aspects of MEV-Boost (indeed MEV-Boost sits on top of, and relies on, the Ethereum protocol and its economic incentives). The Ethereum protocol awards the validator the ultimate authority over block ordering and publication, and because MEV-Boost cannot revoke that power, it relies on the same constraints (*i.e.*, slashing penalties) to shape validator behavior. The evidence also will show that the supposed coded conditions that assertedly functioned to keep a sandwich bundle intact weren't coded conditions. They were expressions of a preference of transaction order that the MEV Bots conveyed to the builder. Evidence will show that the MEV Bots' sandwich trading strategy was highly controversial (at a minimum), and that attempts to thwart sandwich attacks (including through unbundling) were publicly discussed and even actively encouraged.

Fifth, the evidence will show that, contrary to the government's allegations that the Peraire-Buenos "stole" the alleged victims' cryptocurrency, the true nature of the alleged property loss puts this case outside the scope of the wire fraud statute. This is not a case in which the alleged victim of fraud handed over money to the defendant after receiving a misrepresentation. Rather, the alleged victims' MEV Bots were pre-programmed to engage in a speculative series of trades with other entities that, as a matter of technological fact and protocol design, could not be guaranteed to appear as an "atomic" bundle. The MEV Bots' initial, front-run trade was with the liquidity pool. It was a trade that was designed to, and did, swap valuable amounts of cryptocurrency for currency worth much less. This trade, which was not with the Peraire-Buenos, caused a sizable loss. That self-inflicted loss only made sense because the MEV Bot was programmed to attempt to swap the money back in the later, back-run transaction. The bundle of transactions submitted to the builder in this contingent, multi-trade play included at its center someone else's trade that did not belong to the MEV Bots—a trade which Nonparty-1 referred to as its "victim." The only thing that the Peraire-Buenos are alleged to have altered (or swapped

out) from that bundle was the middle transaction that never belonged to the alleged Victim Traders. The evidence will show that the alleged Victim Traders did not have any guarantee to the middle trade's placement in their bundle, and that the Peraire-Buenos made no representation regarding the bundles. Simply put, the unrealized value from the back-run trade was not "stolen" because it did not belong to the alleged victims. Understanding why this is so requires a technical explanation of sandwich attack mechanics and the process of block construction under Ethereum's protocol and with respect to MEV-Boost.

### C. The Potential Defense Expert Testimony Is Essential to Defending Against the Government's Flawed Allegations.

Should the Peraire-Buenos put on a defense case, they may seek to elicit expert testimony on the above topics. The disclosures set forth the content of the potential testimony, and its bases and reasons, in detail. The Peraire-Buenos thus only briefly summarize that testimony[7] here as relevant to the government's arguments.

#### 1.    Professors Falk and Weinberg

The Peraire-Buenos may call one or both of Professors Falk and Weinberg to testify to the topics in their disclosures.[8]

Professors Falk and Weinberg will testify about several technical matters informing the anticipated defense arguments discussed above. In brief, and as relevant here, they will testify to:

---

[7] The experts' qualifications and bases and reasons for their opinions are discussed as relevant in response to government arguments regarding those issues.

[8] The Peraire-Buenos will not elicit redundant testimony at trial and may choose to elicit all, part, or none of the disclosed expert testimony from either witness (if there is even a defense case). Pursuant to Rule 16, the Peraire-Buenos have disclosed the opinions that they may seek to elicit from these potential expert witnesses.

*Key features of the Ethereum blockchain and its protocol*.  ECF 148-2 ¶¶ 3-26; ECF 148-3 at 2-3.  The experts will explain the incentives for validators under the protocol and their significance to the process of adding blocks to the Ethereum blockchain.  The experts also will explain what a protocol is, what it means to operate through a protocol, and how a protocol does not function like prescriptive rules of conduct for Ethereum users.

*The role of validator under the Ethereum protocol*.  ECF 148-2 ¶¶ 9-13; ECF 148-3 at 3-5.  The experts will explain the validator's role in the process of adding blocks to the Ethereum blockchain, and the economic incentives under the protocol such as MEV and slashing.

*The MEV-Boost software and its protocol*.  ECF 148-2 ¶¶ 27-50; ECF 148-3 at 5-8.  The experts will also explain how the above principles of the Ethereum protocol are relevant to the block-building process even when the MEV-Boost software is involved.

*The properties and function of digital signatures in Ethereum and MEV-Boost*.  ECF 148-2 ¶¶ 69-72; ECF 148-3 at 8.  The experts will explain the properties and functions of digital signatures generally, under the Ethereum protocol, and in connection with MEV-Boost—specifically that, as relevant here, the signature's sole function is to identify the validator who signs a block.

*How the alleged Exploit interacted with the protocols*.  ECF 148-2 ¶¶ 51-80; ECF 148-3 at 8-10.  The experts will explain how the alleged "Exploit" was akin to an equivocation, *i.e.*, the act of signing two blocks during the same time slot, and how the protocol addresses that conduct through slashing.

*The adversarial nature of the trading environment*.  ECF 148-2 ¶¶ 45-50; ECF 148-3 at 3-5.  The experts will explain that many interactions on Ethereum, including those between participants of MEV-Boost, are adversarial and governed by economic incentives.

### 2.    Mr. Madura

Mr. Madura's testimony is based on his expertise and study of the so-called "Exploit code" (referred to in the disclosure as "the Program") and the protocols it interacted with—*i.e.*, Ethereum and MEV-Boost.  The government has stated that it will seek to introduce the Program at trial, and it will elicit testimony from CC-1 about how the Program functioned.  Mr. Madura studied that same code (as he has done in many cases) and, based on that study and his expertise, would testify about the code's functionality and interaction with the relevant protocols.

### 3.    Professor Eisfeldt

As an expert in a variety of financial markets, Professor Eisfeldt will testify about the economic incentives that exist on Ethereum and the ways in which the unique features of decentralized markets like Ethereum shape trading behavior.  She will explain what a decentralized market is, and how it can function without centralized authority or government regulation.  She will explain the importance of economic incentives and transparent code to the functioning of such markets.  She will educate the jury about the incentives that exist to engage in profit-seeking behavior on a decentralized exchange like those on Ethereum such as arbitrage, and how (contrary to the government's contention) sandwich trading is not a form of price convergence arbitrage.  She will explain the mechanics of a sandwich trade and how it works to extract a trading profit.  Professor Eisfeldt will also explain how, like in any market, the opportunity for profit on Ethereum encourages competition, and how sandwich attacks have spawned predictable counterstrategies.  And she will opine that Ethereum is an evolving system that changes through an iterative process.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Before admitting such testimony, the court conducts "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).

The Second Circuit has made clear, however, that "expert testimony does not have to rest on traditional scientific methods"; it can be grounded in "general truths derived from specialized experience." *Litvak*, 808 F.3d at 180 n.25 (cleaned up). Thus, "district courts must be mindful that the *Daubert* factors do not all necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert." *Id.* (cleaned up).

That inquiry is relatively undemanding. *See Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) ("Rule 702 embodies a liberal standard of admissibility for expert opinions"); *accord* Fed. R. Evid. 702, advisory committee notes to 2000 amendment ("[T]he rejection of expert testimony is the exception rather than the rule."). A court may exclude expert testimony only when it finds "serious flaws in reasoning or methodology." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 330 (S.D.N.Y. 2022) (citation omitted). If the testimony "falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court." *Lickteig*, 589 F. Supp. 3d at 330 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). And any defects in the testimony are appropriately addressed through the "tools" of the "adversary system," including "[v]igorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303

F.3d 256, 267 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 596).

**ARGUMENT**

## I.    THE DEFENSE EXPERTS ARE HIGHLY QUALIFIED TO OFFER THE DISCLOSED TESTIMONY.

"[C]ourts in the Second Circuit liberally construe expert-qualification requirements in

consideration of the thrust of the Federal Rules and their general relaxation of traditional barriers

to opinion testimony." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015)

(cleaned up); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) ("The words

'qualified as an expert by knowledge, skill, experience, training, or education' must be read in

light of the liberalizing purpose of the Rule." (quoting Fed. R. Evid. 702)).  An expert, therefore,

is not "required to satisfy an overly narrow test of his own qualifications." *Washington*, 105 F.

Supp. 3d at 305 (citation omitted).  Rather, "the court's focus should be on 'whether the expert's

knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the

truth.'" *Lickteig*, 589 F. Supp. 3d at 329 (citation omitted).  It is often sufficient for the expert to

have "educational and experiential qualifications in a general field closely related to the subject

matter in question," even if the witness "lacks expertise in the specialized areas that are directly

pertinent." *Washington*, 105 F. Supp. 3d at 305 (citation omitted).

The government's arguments relating to the qualifications of the four experts are premised

on an erroneous view that the relevant area of expertise concerns MEV-Boost alone (which the

government incorrectly claims the experts lack), and not blockchain technology, Ethereum,

coding, cryptography, decentralized markets, and protocol/market design (on which the experts

are variously, and indisputably, qualified to opine).  Because the government's focus is too narrow,

15

and because the experts' qualifications on the subject matters on which they opine are beyond dispute, the Court should deny the government's motion on these grounds.

### A.    Expertise in "MEV-Boost" Is Not Required.

The government faults the experts for purportedly having insufficient expertise in the "MEV-Boost system." *See* ECF 148 at 10 (arguing that Professor Eisfeldt "fails to identify any prior education, experience, or training . . . relating to the MEV-Boost system"); *id.* at 22 ("[N]either Professor Falk nor Professor Weinberg has disclosed sufficient expertise in . . . the MEV-Boost system"); *id.* at 35 (asserting that Mr. Madura's CV "makes no reference to MEV-Boost"). The government further claims that the "MEV-Boost system" is "the actual system at issue here." *Id.* at 23. This argument is flawed in several respects.

First, it is based on a misunderstanding of the relevant technologies at issue. As Professors Falk and Weinberg explain, MEV-Boost is not a standalone "system"; it is a "sidecar" software that is not part of the Ethereum protocol but rather sits on top of and relies upon the Ethereum protocol's features and economic incentives to function. *See* ECF 148-2 ¶¶ 36-37 ("Although MEV-Boost relies on the economic incentives that are part of the Ethereum protocol, i.e., slashing, it is not itself part of the Ethereum protocol."); *accord* ECF 148-3 at 5. MEV-Boost is not a closed system a validator opts into. For example, there is no up-front agreement required to use MEV-Boost, and a validator that interacts with the relay code always "retains the ability to use its own execution client to order transactions and propose a block." ECF 148-3 at 6-7; *accord* ECF 148-2 ¶ 75. It therefore is illogical as a technological matter to talk about MEV-Boost as separate from the Ethereum blockchain on which it operates.

The government's allegations show this to be true. The alleged Lure Transactions were not placed "in" MEV-Boost; they were sent through the Ethereum protocol. The alleged victims' MEV Bots encountered those transactions in the Ethereum mempool. *See, e.g.*, ECF 148-2 ¶ 29.

The slashing penalty that the government cites as purported evidence of the Peraire-Buenos' fraudulent intent is not part of MEV-Boost; it is a feature of the Ethereum protocol alone.  *See* ECF 148-3 at 7 ("[T]he MEV-Boost program relies exclusively on the slashing penalties in the Ethereum protocol to discourage . . . behavior by validators.").  The liquidity pools with which the MEV Bots placed their front-run trades were not "in" or even related to MEV-Boost; they are applications, in the form of smart contracts, on Ethereum.  *See* ECF 148-2 ¶¶ 19-23.  And the government's theory of falsity for the alleged False Signature relies on the "invalidity" of the block the Peraire-Buenos' validator signed under the Ethereum protocol, not MEV-Boost.  *See* ECF 148-2 ¶ 71.

In this context, it is nonsensical to fault the experts for not having published a paper on MEV-Boost, when that is just one piece of software running on the Ethereum Network and is not the only (or even primary) technology at issue.  MEV-Boost is a commercial product that has been operational on the Ethereum blockchain since September 2022.  It would be unusual, to say the least, for an academic to teach a class on a single piece of commercial software, to publish a paper on it, or to organize a conference around it.  The government's argument is the equivalent of faulting a cardiologist expert for having a CV that does not mention a particular brand of stent used in a surgery.  *Cf. McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (argument that medical expert had to be a "specialist" in environmental medicine to provide expert testimony was an "unwarranted expansion of the gatekeeper role announced in *Daubert*").

In any event, even if this were a case solely about MEV-Boost (which it is not), the experts would still be qualified to give their opinions because the law does not require the government's claimed level specificity in expertise.  *See supra* p. 15; *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 508 (S.D.N.Y. 2018) ("An expert is not unqualified merely because he or she does

not possess experience tailored to the precise product or process that is the subject matter of the dispute." (cleaned up)); *see also Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (rejecting argument that a lack of experience with the "day-to-day operations of a small fuel distributor" disqualified an expert who was "clearly not new to the world of petroleum distribution" and whose "area of expertise certainly enable[d] him to provide an opinion that would assist a jury in understanding the issues relevant in the instant case"); *TC Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 174-75 (N.D.N.Y. 2002) ("While O'Donnell's curriculum vitae does not demonstrate any practical experience concerning compensation for use of public rights-of-way or the telecommunications industry, O'Donnell does have a doctorate in economics and has taught courses in antitrust and regulation as well as urban and regional planning."); *cf. Brown*, 776 F.2d at 400 ("While Grimball was scarcely a Chief Superintendent Maigret, he knew a good deal more about street narcotics deals in Harlem than did the jurors, who would consequently be 'assisted' by his description of the terms and practices generally used in such sales.").  As numerous courts have explained, the government's arguments that the experts "lack[] certain educational or other experiential background go to the weight, not the admissibility, of the testimony."  *United States v. Asare*, 2019 WL 5693477, at *5 (S.D.N.Y. Nov. 4, 2019) (cleaned up).[9]

---

[9] The government's cited cases are not to the contrary.  Rather, they are the rare examples where a witness had so little relevant experience, knowledge, or education on a topic that it would render their opinion speculative.  *See, e.g.*, *Ellis v. YMCA Camp Mohawk, Inc.*, 615 F. App'x 697, 699 (2d Cir. 2015) (exert had "practically no knowledge or experience relating to horsemanship"); *Nimely*, 414 F.3d at 399 n.13 ("no indication whatever that Dawson qualified as an expert on human perception or cognitive function"); *United States v. Menendez*, 2025 WL 547794, at *2-3 (S.D.N.Y. Feb. 19, 2025) (similar for purported expert on gift-giving in Middle East); *SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 408 (S.D.N.Y. 2019) (similar for purported expert on market manipulation); *see also Querub v. Hong Kong*, 649 F. App'x 55, 57 (2d Cir. 2016) (expert had no experience with relevant auditing standard); *SEC v. Tourre*, 950 F. Supp. 2d 666, 677 (S.D.N.Y. 2013) (purported expert "has no experience in the CDO industry apart from acting as an expert

B.    **The Experts Are Qualified to Offer Their Opinions.**

When viewed at just one level of generality up from the government's overly narrow focus on the supposed "MEV-Boost system," the government's qualification arguments disintegrate.  As discussed above, *see supra* pp. 5-11, this case implicates technical issues of blockchain technology, the block building process on Ethereum, the Ethereum protocol, cryptography, the function of digital signatures on Ethereum, the operation of computer code, protocol design and incentives, and decentralized markets.  The defense experts are eminently qualified to opine on these topics.

Start with Professors Falk and Weinberg, who teach about blockchains at two of the nation's premier research universities.  Professor Falk is the "Research Assistant Professor in the Department of Computer and Information Science at the University of Pennsylvania," who "teaches a popular course on blockchains," and whose research and teaching "focuses on blockchains and cryptocurrencies."  ECF 148-2 ¶ 1.  Professor Weinberg "is an associate professor of computer science at Princeton University," where he is the "co-director of Princeton University's Center on the Decentralization of Power through Blockchain Technology (DeCenter)."  ECF 148-3 at 1; *see also id.* at 13 (CV listing course on "Advanced Topics in Computer Science: Algorithmic Mechanism Design for Cryptocurrencies and DeFi").

Professor Falk is the author of a forthcoming paper that models trading and arbitrage activity on decentralized exchanges like Uniswap.  As part of his research, he has scraped and analyzed millions of transactions on Uniswap v2 (*i.e.*, the exchange at issue here).  His class covers MEV and MEV extraction, and financial incentives on the Ethereum blockchain, and he regularly teaches the "Flash Boys 2.0" paper that defined and conceptualized MEV.  His research includes

---

witness, yet he intends to opine about what information would and would not matter to CDO investors.").

scraping the Ethereum blockchain for data to analyze MEV strategies, including sandwich attacks, and running his own Ethereum nodes to analyze mempool transactions.  As an academic in this space, he was familiar with MEV-Boost and Flashbots long before this litigation.[10]

Professor Weinberg's 2016 paper "On the Instability of Bitcoin without the Block Reward," ECF 148-3 at 26, has been credited as an early conceptualization of MEV rewards on blockchains and MEV's theoretical impact on consensus mechanisms.  His research has been funded by grants from the Ethereum Foundation, and he regularly speaks at Ethereum Foundation conferences—most recently on the topic of Transaction Fee Mechanism Design.  His course on Algorithmic Mechanism Design has included lectures on the same Uniswap liquidity pools at issue in this case.  And he has served as the General Chair and co-Program Committee Chair for Advances in Financial Technologies, the top conference for blockchain research.  *See id.* at 1-2.

Mr. Madura "is an expert on blockchain technology and computer programming." ECF 148-4 ¶ 2.  "Mr. Madura is a Director at AlixPartners, LLP and specializes in cryptocurrency technology, software development processes and computer programming.  He holds a Bachelor of Science in Computer Science from the University of Maryland and a Master's in Technology Management from Georgetown University."  *Id.* ¶ 5.  He has given expert testimony in cases involving blockchain technology, and "regularly assists clients with technical investigations, regulatory matters pertaining to technology products, forensic analyses, and other issues that require expertise in cryptocurrencies and relevant technology, such as computer algorithms and code."  *Id.* ¶¶ 6-7.  This work "regularly requires him to study and examine transaction activity on

---

[10] The government attaches a portion of an arbitration award in a case where Professor Falk testified in which the arbitrator relied on his testimony on similar topics as disclosed here.  *See*, *e.g.*, ECF 148-10 at 5 n.3 (testimony about digital signatures on Ethereum).  The arbitrator merely declined to rely on Professor Falk's answers regarding whether public statements were confusing to a consumer, *id.* at 17, something not at issue here.

the blockchain, which has led him to become familiar with the Ethereum protocol and how blocks are added to the blockchain." ECF 148-6 at 3. As particularly relevant here, Mr. Madura's "work regularly includes writing and reading source code in many different programming languages." ECF 148-4 ¶ 8. Mr. Madura's potential testimony here is based on that experience and his review of the so-called Exploit code and the Ethereum and MEV-Boost protocols. *See* ECF 148-6 at 2-3. The government does not meaningfully dispute Mr. Madura's qualifications to interpret either set of computer code. Mr. Madura's testimony about how the Program interacted with Ethereum is based on his study of that protocol. *See id.*

Andrea Eisfeldt is "the Laurence and Lori Fink Endowed Chair in Finance and Professor of Finance at the Anderson School of Management at the University of California, Los Angeles, where she has been on the faculty since 2010. Prior to that, she was a tenured professor at the Kellogg School of Management at Northwestern University, where she was on the faculty for ten years after receiving her Ph.D. in Economics from the University of Chicago in 2000." ECF 148-1 ¶ 1. Professor Eisfeldt is an expert in financial markets, including decentralized exchanges like those on Ethereum. Professor Eisfeldt has taught courses covering "blockchain technology, cryptocurrency protocols and trading, crypto market dynamics and liquidity, and applications of cryptofinance, such as stablecoins, to payment systems." *Id.* ¶ 2. Her MBA class has included classes on MEV. As an expert in a variety of financial markets, Professor Eisfeldt is qualified to testify to the structure, incentives, and trading environment that exists on the decentralized market at issue here. *See, e.g.*, *TC Systems*, 213 F. Supp. 2d at 175 (Ph.D. economist qualified to testify to "economic principles and market forces" relevant to a given industry).

In sum, the defense experts are highly qualified to offer the disclosed opinions, which derive from their academic and professional experience as well as their study of the technological and economic concepts at issue in this case.

## II.    THE DEFENSE EXPERT TESTIMONY SHOULD NOT BE PRECLUDED ON THE BASIS THAT GOVERNMENT WITNESSES WILL TESTIFY ON SIMILAR TOPICS.

Before addressing the government's remaining arguments under Rules 702 and 403, the Peraire-Buenos respond to the government's argument that the defense expert testimony is not necessary, and thus inadmissible, because the government purportedly will cover these topics with *its witnesses* in *its case-in-chief*. *See* ECF 148 at 19 n.7 (regarding Professor Eisfeldt); *id.* at 32 (regarding Professors Falk and Weinberg); *id.* at 41-42 (regarding Mr. Madura).

The Court should reject this preposterous argument. The Peraire-Buenos, as defendants in a criminal case, have a constitutional right to offer testimony that contradicts and rebuts the government's proof. Exclusion of expert testimony bearing on a defendant's core defenses has been held to be reversible error. *See Litvak*, 808 F.3d at 183-84 (reversing conviction where preclusion of defense experts led to "untenable position" where defendant was "left only with the 'victims' of his conduct as sources of potential testimony on" a critical issue). The government's argument, if accepted, would effectively prevent the Peraire-Buenos from mounting a defense.

In any event, the argument is also factually unsubstantiated and premature because the government has refused to disclose the potential testimony of its technical witnesses with any specificity and they have not yet testified.[11] Based on the government's arguments before the

---

[11] This fact alone distinguishes this case from the civil case the government cites for separate propositions where certain redundant testimony was stricken as cumulative based on a developed record that included robust disclosures under the Federal Rules of Civil Procedure and depositions. *See generally In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004).

Court and in its briefing—*e.g.*, that a digital signature on a blockheader is a "commitment" to publish a certain block, that protocols are "rules" and were broken here, etc.—there are likely to be many technical topics that the Peraire-Buenos may seek to rebut and contextualize through expert testimony in a defense case (if they choose to offer one).

None of the government's cases remotely support its argument.  In *United States v. Sanders*, 2013 WL 1421487, at *1 (S.D.N.Y. Mar. 27, 2013), the court granted a mid-trial motion to preclude expert testimony noticed for the first time "over two weeks after the trial began," principally because the testimony was irrelevant (or "beside the point") and not helpful given that multiple witnesses had testified to the same non-technical matters and thus the expert "d[id] not propose to testify to anything that the average juror is not capable of understanding on his or her own." *Id.* (cleaned up).  In *United States v. Mendlowitz*, 2019 WL 6977120, at *6 (S.D.N.Y. Dec. 20, 2019), the court denied a motion for a new trial premised in part on the exclusion of a defense expert whose testimony the court found was inadmissible on multiple grounds including relevance and Rule 403.  *See id.* at *5-7.  In finding no prejudice, the court observed that the testimony was non-technical and had been covered by many other witnesses at trial.  *Id.*  And in *United States v. Newkirk*, 684 F. App'x 95, 97 (2d Cir. 2017), the court affirmed a conviction despite the exclusion of a defense expert whose testimony did not relate to his primary defense at trial, was not probative of his theory on appeal, and would have covered the same non-technical ground as several other lay witnesses to whose testimony "Newkirk [had] voiced no objection."  *Id.*  Here, the expert testimony concerns highly technical matters that go to the core factual disputes in this highly technical case.  There is no basis in the cited cases for excluding that testimony.

Because exclusion on this ground would violate the Peraire-Buenos' constitutional right to defend against the government's charges, the Court should deny the motion on this ground.

III.    **THE DEFENSE EXPERT TESTIMONY DOES NOT USURP THE JURY'S OR THE COURT'S ROLE.**

The government argues that each of the four experts' testimony in various ways would "usurp" the role of the Court or jury. Its arguments boil down to two points: that an expert may not opine on (a) legal matters or (b) a defendant's (or other witness's) mental state. Neither principle—properly construed—applies to any of the disclosed testimony.

### A.    The Expert Testimony Does Not Approach an Impermissible Legal Opinion.

The government urges the Court to exclude broad swaths of the defense expert testimony as stating an impermissible legal conclusion. The government's cited cases confirm that the expert testimony here does not come close to violating this rule, which prohibits bare legal conclusions regarding a party's liability (or lack thereof) for the very *claim or charge at issue in a case*. *See United States v. Scop*, 846 F.2d 135, 138, 140 (2d Cir. 1988) (error, in a fraud case, for witness to opine "as to whether there was a scheme to defraud investors"); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 506-10 (2d Cir. 1977) (error, in case where "[t]he court ultimately submitted to the jury whether Diners breached its contractual obligation to use its best efforts to register the plaintiffs' stock," for an expert to "construe[] the contract[] as a matter of law," including by defining "best efforts," and to offer "his opinion that [certain contract] defenses . . . were unacceptable as a matter of law"); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). In *Bilzerian*, also cited by the government, the court discussed the narrowness of *Marx* and *Scop*'s holdings, affirming the admission of testimony from an expert who "did not give his opinion as to whether Bilzerian's actions violated the securities laws." *Id.* In contrast, the court affirmed the exclusion of defense expert testimony on the definition of "personal funds" in a regulatory submission where that definition was something the court would instruct the jury on as

a matter of law.  *See id.* at 1295 ("Defense counsel was informed that it would have an opportunity to submit proposed jury instructions regarding the scope of 'personal funds'").

These cases therefore do not stand for the proposition that opinions merely bearing on questions the jury must answer are not the proper subject of expert testimony.  Indeed, that connection is necessary for the opinions to be relevant and helpful under Rules 401 and 702.  In *Scop*, for example, the court observed that the expert could have explained how "controlled buying and selling of the kind alleged here can create artificial price levels to lure outside investors," as long as he did not opine that the same conduct constituted market manipulation which was charged offense.  846 F.2d at 140.  And in *Marx*, the court observed that the expert "may tell the jury whether he thinks the method of trading was normal" under industry standards, just "not . . . whether it amounted to illegal manipulation under Section 9 of the Securities Exchange Act of 1934."  550 F.2d at 512.[12]  The court in *Scop* cited the Advisory Committee's note as stating the subtle line between testimony containing "ultimate factual conclusions that are dispositive of particular issues if believed, e.g., medical causation," which are permissible, and "inadequately explored legal criteria," which are not.  846 F.3d at 142 (quoting Fed. R. Evid. 704, advisory

---

[12] *See also, e.g.*, *United States v. Chaffo*, 452 F. App'x 154, 158-59 (3d Cir. 2011) (distinguishing *Scop* and holding that a mortgage industry expert's identification of a statement as a "misrepresentation" was proper because, "though reminiscent of statutory language, was not couched in it, and therefore falls far short of usurping the jury's role"); *United States v. Russo*, 74 F.3d 1383, 1395 (2d Cir. 1996) (citing *Scop* and holding that expert testimony was proper where it "gave no opinion as to whether the appellants had violated the securities laws" but "simply described certain stock transactions and his opinion of their effect on the market"); *SEC v. U.S. Env't, Inc.*, 2002 WL 31323832, at *5 (S.D.N.Y. Oct. 16, 2002) (citing *Scop* when rejecting motion to exclude expert whose report gave "no indication that he intends to testify that [the defendants] committed a 'fraud' or a 'manipulation' in violation of any of the regulations at issue in this case," but "merely states his opinion that the alleged 'prearranged' buying and selling of the USE common stock artificially increased the price of the USE common stock"); *cf. United States v. Mandell*, 752 F.3d 544, 551 (2d Cir. 2014) ("As we have explained, following *Scop*, the mere fact that a witness opines that a defendant's activity was 'illegal' does not necessarily mean that a district court would commit error by allowing such testimony.").

committee's note); *accord Bilzerian*, 926 F.2d at 1294; *see also United States v. Duncan*, 42 F.3d 97, 103 (2d Cir. 1994) ("[T]he Agent did not comment as to whether Duncan was guilty of . . . the crimes with which Duncan was charged.  He merely posited factual conclusions which are not prohibited even if they embrace an ultimate issue to be decided by the jury." (cleaned up)).[13]

Assessed against the correct standard, none of the expert testimony comes close to the line.  The testimony does not cover the same ground as the Court's potential instructions, does not contradict anything the Court will instruct on as a matter of law, is not couched in terms of the charged statutes, and does not state the conclusion that the conduct did or did not constitute fraud.  Rather, the testimony conveys information significant for the jury's evaluation of whether fraud occurred as the government alleges, including whether the alleged misrepresentations conveyed the alleged meanings, whether they were materially deceptive, and whether the Peraire-Buenos acted with intent to defraud—without impermissibly encroaching on that evaluation.

*Professor Eisfeldt*.  The government cites snippets of Professor Eisfeldt's testimony that it claims usurp either the Court's or the jury's role apparently because they include a few vaguely "legal" terms.  *See* ECF 148 at 12-13.  For example, the government homes in on the phrases "legal provisions" and "central authority" in a paragraph contrasting traditional financial markets and decentralized crypto markets.  ECF 148-1 ¶ 12.  That paragraph explains the important principle that, unlike in "traditional financial markets" where "regulators enforce trading rules, such as those

---

[13] The government's other cases also demonstrate that this rule precludes a narrow category of expert testimony.  *See, e.g.*, *In re Rezulin*, 309 F. Supp. 2d at 547 (testimony that conduct was "negligence"); *Tourre*, 950 F. Supp. 2d at 682 (admonishing expert to avoid "all characterizations of the marketing materials as 'misleading,'" but permitting testimony on "what a CDO market participant would have reasonably expected in terms of the role of a short investor in the selection process").  Other citations are far afield, concerning expert testimony on the meaning of ambiguous contract terms in cases that required the court to construe those same terms.  *See, e.g.*, *Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 424 (2d Cir. 1998).

that prohibit front-running," decentralized markets are "facilitated by economic incentives, code to implement those incentives, and transparency so those incentives can be understood." *Id.* That specialized opinion, like Professor Eisfeldt's overall testimony, is helpful to the jury's evaluation of the trading environment and the function of the protocols that the Peraire-Buenos supposedly violated (which the government claims is key to its materiality and intent arguments).[14] The testimony does not tell the jury about the meaning of wire fraud or whether the Peraire-Buenos' alleged conduct was fraud.

The same goes for testimony that "[b]y design, crypto markets operate under transparent code," which "allows certain market participants to invest in utilizing that code and developing strategies to profit from any nuances in their design or implementation," *id.* ¶ 13, and testimony about how Ethereum's slashing penalty works (or does not work) to deter validators from equivocating—*i.e.*, signing more than one block per slot, *see id.* ¶ 39, or testimony about the ways in which dynamic systems like Ethereum evolve over time and through experimentation, *see id.* ¶¶ 45-46. It is unclear how this testimony about economic incentives on Ethereum and the evolution of financial systems even relates to the government's "legal opinion" argument.[15]

Finally, the government focuses on the word "manipulation" to describe sandwich attacks. To be clear, Professor Eisfeldt will not opine that sandwich attackers engage in illegal "market

_____

[14] The government has requested that the Court instruct the jury that a supposed violation of a protocol may be relevant to the Peraire-Buenos' intent to defraud. *See* ECF 154 at 39. Testimony about the content and function of the relevant protocols, and the context in which they operate, is necessary and appropriate to explain why the government's arguments are wrong.

[15] Tellingly, with respect to this testimony, the government quickly pivots to the argument that the Peraire-Buenos may seek to use it to advance what it calls an improper "code is law" argument. ECF 148 at 14. But Professor Eisfeldt does not offer any such "code is law" opinions. The government's argument therefore is better understood as an (incorrect) objection under Rule 403 about permissible argumentation based on Professor Eisfeldt's testimony, which is addressed in subsequent sections.

manipulation" or other illegal conduct, as the Peraire-Buenos have informed the government. *See* ECF 148-6 at 7-8. (Such testimony would be contrary to other parts of her disclosure, which explains that conduct like frontrunning that is prohibited by rules in traditional finance is not prohibited in this space. *See* ECF 148-1 ¶¶ 5-14.) For that reason alone, the government's purported concern is misplaced. But the argument under Rule 702 fails in any event because experts *can* opine that conduct manipulated (or "artificially inflated," or whatever turn of phrase is most accurate in context) prices in the market—even in cases where the defendant is charged with market manipulation and the testimony concerns the charged conduct. *See, e.g., U.S. Env't, Inc.*, 2002 WL 31323832, at *5.[16] Here, the government's argument fails for the basic reasons that the testimony concerns the alleged victims' conduct (not the Peraire-Buenos'), and there is no charge of market manipulation against anyone. Accordingly, there is no risk that the testimony would impermissibly intrude upon the ultimate questions for the jury—because the jury is not tasked with deciding whether sandwiching is or is not manipulation—even if that testimony provides helpful information for the jury to evaluate the government's fraud allegations.

*Professors Falk and Weinberg*. The government's arguments with respect to these experts suffer the same deficiencies. The out-of-context snippets of language in the government's brief and mischaracterizations of the disclosures, even on their own misleading terms, do not remotely suggest improper legal testimony, let alone "unfettered attempts to instruct the jury on the law." ECF 148 at 28. The government identifies four pieces of testimony concerning (a) slashing; (b) sandwich trading; (c) the content of the alleged Lure Transactions and False Signature; and (d) the

---

[16] The government's argument is hard to credit for the additional reason that there can be no serious dispute as a matter of economics that sandwich attacks "manipulate" prices. Indeed, that is their entire purpose. Its own witnesses will apparently testify to this fact when describing the sandwich attack strategy, even if they are coached to avoid calling the practice what it is.

power of the validator under the relevant protocols to equivocate, as supposedly containing impermissible legal opinion. *Id.* None is improper.

Start with slashing. There will be evidence at trial about Ethereum's slashing penalty. The government wants to argue that the fact that slashing occurred is relevant to the Peraire-Buenos' intent, even if it does not automatically show an intent to defraud. *See* ECF 154 at 39 (proposed jury instruction). Professors Falk and Weinberg will explain what slashing is, why it is not evidence of a "rule" violation like the government argues, and explain its actual function as an economic incentive in the Ethereum protocol. *See, e.g.*, ECF 148-2 ¶ 10 (Ethereum protocol "is agnostic to the ordering of transactions, and there is no attempt by the protocol to describe a 'fair' ordering of transactions"); ECF 148-3 at 4-5 ("Nothing in the protocol prevents or prohibits . . . equivocating from occurring. Rather, the foreseeable consequence of such action is application of the slashing penalty."). What slashing is, and what information the jury should take from it, is not an element of the offense nor is it something the Court will instruct on as a matter of law. There is no risk of usurping the jury's role. Moreover, it cannot be the case that the government can introduce evidence of slashing and why it is supposedly probative of an alleged intent to defraud but preclude the Peraire-Buenos from offering testimony that, by providing the proper context, deflates those misleading arguments. Far from usurping the jury's role, the defense expert testimony will empower the jury to place this evidence in the proper context.

The government's argument that the experts should be precluded from testifying about the content, function, and supposed falsity of the two alleged misrepresentations is galling. The government apparently will seek to introduce testimony that the Lure Transactions conveyed some meaning about the Peraire-Buenos' future intent that was misleading. *See, e.g.*, ECF 61 at 16. The experts will explain what a cryptocurrency trade is and how it proceeds from a proposed trade to

29

an executed trade under the protocol.  ECF 148-2 ¶¶ 3-9, 41-44; ECF 148-3 at 2-3.  They will

explain the mempool, which is where the allegedly deceived MEV Bots encountered the Lure

Transactions.  ECF 148-2 ¶ 29; ECF 148-3 at 5-6.  They will provide their opinion that, under the

relevant protocols and in the context of the Ethereum blockchain technology, there is no implicit

meaning that trades (including this one) could have conveyed to other Ethereum users.  ECF 148-

2 ¶¶ 66-68; ECF 148-3 at 9.  Regarding the alleged False Signature (which the government now

concedes was not false but was a valid signature on a blockheader for a block that was eventually

rejected as invalid under the Ethereum protocol by attesting validators, *see* ECF 125 at 5), the

experts will explain the function and role of digital signatures on Ethereum and in relation to MEV-

Boost.  ECF 148-2 ¶¶ 69-72; ECF 148-3 at 8.  This testimony will inform the jury that, as a matter

of cryptography, blockchain technology, and protocol design, a signature does not convey a

promise or commitment by the validator to propagate a certain block.  The experts will explain

why the features of the technology, and the context of the protocols and the Ethereum Network

generally, make that claim implausible at best.

This testimony does not come close to violating the rule against legal opinions.  The experts

will not opine that the alleged conduct was not wire fraud.  Nor will they contradict anything that

the Court will instruct on as a matter of law.  The Court will not be instructing the jury on what

meaning a "Lure Transaction" could or did convey.  And it won't instruct the jury on the role or

function of digital signatures, or what meaning they conveyed here.  These are core factual disputes

(not legal ones) that the jury must consider when deciding whether the government has met its

burden.  The law allows expert testimony on "factual conclusions . . . even if they embrace an

ultimate issue to be decided by the jury."  *Duncan*, 42 F.3d at 103 (cleaned up).  The government

should not be heard to argue otherwise when it will seek to offer testimony on the very same

subjects—*i.e.*, testimony that the Lure Transactions conveyed a message, that the False Signature is a "commitment," etc.  To accept the argument that the government's witnesses may properly opine on these topics without usurping the jury's role, but that defense experts cannot, would essentially preclude the Peraire-Buenos from contesting the material misrepresentation element altogether.  *See Litvak*, 808 F.3d at 183-84 (reversing conviction for this error).

Finally, the testimony about the role of the validator under the protocol—and the validator's ability to reorder transactions when publishing a block—is not a legal conclusion but an opinion about the facts of the relevant protocol design.  The government has argued that the alleged Exploit violated the MEV-Boost protocol and apparently will seek to admit testimony to that effect as purportedly bearing on the Peraire-Buenos' intent.  *See supra* p. 6.  The defense experts will explain that the protocol was not violated as the government alleges.  This testimony does not usurp the jury's role because the ways in which the alleged conduct interacted with the relevant protocols is not even the "ultimate" question (though it is relevant to it), and the opinions are not framed in the language of the statute.[17]

*Mr. Madura*.    The government's argument that Mr. Madura's testimony contains impermissible legal opinions is fundamentally unsound.  It collects "nine main sets of opinions" that is says violates the rule, *see* ECF 148 at 38-39, but that claim does not withstand scrutiny.  The government asserts that testimony that, under the Ethereum and MEV-Boost protocols, "valid transactions can be freely mixed with other transactions," that validators "are free to order transactions in blocks," how the so-called exploit code populated the fields of the blockheader, and other related testimony are "thinly veiled" legal opinions.  *Id.*  Not so.  These are opinions

---

[17] The market "manipulation" objection with respect to these experts' testimony fails for the same reason as discussed above with respect to Professor Eisfeldt.  *See supra* p. 28.

grounded in facts and based on the computer code and protocols for the relevant technology. The government does not explain how these opinions are "legal," but rather argues they are incorrect. *See* ECF 148 at 39-40.

In any event, although beside the point, the government's critiques are mistaken. The government claims, without citing his disclosure, that Mr. Madura will opine that there are "no MEV-Boost rules or protocols concerning the conduct of validators, like the defendants, who *chose to use* the MEV-Boost software." *Id.* Mr. Madura will not say that, but it would be true. The protocols are not "rules" in the sense that the government claims. And the conduct did not violate the relevant protocols in the way the government claims, as Professors Falk and/or Weinberg will opine. *See supra* p. 12. The government also argues that Mr. Madura will testify that the alleged Lure Transactions (and Tampered Transactions) were "*bona fide*." ECF 148 at 40. That word does not appear in Mr. Madura's disclosure, and it is unclear what the government thinks it means here. The government also puts words in the expert's mouth when it claims Mr. Madura will say that the alleged Exploit "did not cause the MEV-Boost relay to act in an unintended manner," *id.*, something that appears nowhere in his disclosure. The testimony the government purports to paraphrase this way—which actually concerns which blockheader fields the Program populated— is admissible because it would show that the information that was supposedly false in the blockheader was supplied by an open-source programming library. *See* ECF 148-4 ¶¶ 64-65. The fact that this aspect of Mr. Madura's testimony, among others, undermines the government's case doesn't make it improper, much less an impermissible legal opinion.

### B. The Expert Testimony Does Not Include Opinions on the Peraire-Buenos' Mental State or That of Other Witnesses.

The government's argument that an expert may not testify about a defendant's or another witness's mental state is overbroad and misplaced. The government interchangeably cites cases

decided under Federal Rule of Evidence 704(b), ECF 148 at 6 (citing *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993)), or cases stating that an expert may not comment on the credibility of witnesses or another person's state of mind, *see id.* at 6-7 (citing *Scop*, 846 F.2d at 142; *Highland Cap. Mgmt. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005); and *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012)); *see also id.* at 16 (citing additional cases for the same propositions), but neither group of cases is relevant here.

First, Rule 704(b) prohibits an exceedingly narrow category of testimony—*i.e.*, testimony from an expert "expressly stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime." *DiDomenico*, 985 F.2d at 1164 (cleaned up).  The rule "[c]learly . . . does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state." *Id.* at 1165.  "The plain language of the rule . . . means that the expert cannot expressly 'state the inference,' but must leave the inference, however obvious, for the jury to draw." *Id.*; *see also, e.g.*, *United States v. Haynes*, 729 F.3d 178, 196 (2d Cir. 2013) (error for government witness to testify as to the moment a defendant "'realized' there were drugs in the car").  The rule thus has nothing to say about testimony that stops short of explicitly attributing a mental state to a defendant.  *See Diaz v. United States*, 602 U.S. 526, 534 (2024).  In *Diaz*, for example, the Supreme Court held that an expert may opine as to the mental state and knowledge of typical members of a group that includes the defendant without running afoul of the rule.  *See* 602 U.S. at 534.

Putting aside Rule 704(b), the more generic prohibition on expert testimony concerning the credibility or mental states of other witnesses likewise applies to a narrow set of testimony not implicated here.  The government's cases demonstrate the limits of this rule and its irrelevance.

In *Highland*, the court precluded direct commentary on the credibility *of other trial witnesses*. *See Highland Cap. Mgmt. v. Schneider*, 551 F. Supp. 2d 173, 180 (S.D.N.Y. 2008). And *Scop* concerned an expert who testified that he based his opinions on "his positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses," which he gleaned from his review of "the testimony and documentary evidence introduced at" that very trial. *Scop*, 846 F.2d at 138, 142. In *Tourre*, 950 F. Supp. 2d 666, the court excluded a narrow slice of speculative expert testimony about a company's "objective" when it was "choosing reference assets," but permitted testimony about what market participants "would have reasonably expected in terms of the role of a short investor in the selection process." *Id.* at 681-82.[18]

The government is unclear about what testimony it claims violates these rules. For some of the experts, it is the same testimony that it claims is an improper legal opinion. For Mr. Madura, for example, after misleadingly paraphrasing four topics of testimony that it claims is an improper legal opinion, the government shifts to arguing the same testimony is "a transparent effort to put the weight of Mr. Madura's opinions on key *mens rea* issues in this case." ECF 148 at 40. It is unclear what the government means by "put[ting] the weight" of an opinion on "an issue," but it certainly does not state the legal standard. And there is nothing in Mr. Madura's testimony that comes close to opining that the Peraire-Buenos lacked an intent to defraud in violation of Rule

---

[18] The government's remaining cases are too devoid of factual elaboration to be helpful and/or are plainly irrelevant. In *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009), the court granted a motion to exclude the testimony of an FDA Medical Officer to the extent it would concern "the knowledge, motivations, intent, state of mind, or purposes of Merck, its employees, the FDA, or FDA officials," but did not specify the offending testimony. The court in *LaSalle Bank* excluded testimony for the inapposite reasons that the letter outlining his anticipated testimony did not say whose expectations he was describing, was potentially irrelevant, and was not fully disclosed in his report. *See* 2012 WL 466785, at *7 ("Mr. Cohen does not identify who has an expectation concerning the B-buyer's awareness or what his basis is for opining as to that party's state of mind.").

704(b).  He simply will testify to the relevant protocols and how the alleged Exploit code would have interacted with them.  That testimony will show that the conduct was not deceptive as the government alleges, and eliciting expert conclusions *relevant to* that question is entirely proper.

The government's arguments for the remaining experts fare no better.  The government claims that Professor Eisfeldt's testimony about the economic incentives that drive trading on Ethereum is an attempt to explain "the defendants' reasoning and motivation for the Exploit."  ECF 148 at 16.  But Professor Eisfeldt's disclosure contains no opinions about the Peraire-Buenos' reasoning that could possibly violate Rule 704(b).  The government baldly asserts that aspects of Professors Falk's and Weinberg's disclosures about the expectations of users of Ethereum and MEV-Boost "is obviously a vehicle to argue that the defendants lacked the requisite state of mind."  ECF 148 at 29-30.  That claim has nothing to do with the actual opinions disclosed, and, in any event, is incorrect as a matter of law.  Experts in the government's own cases testified as to the expectations and norms in certain industries.  *See, e.g.*, *Tourre*, 950 F. Supp. 2d at 682 (permitting testimony on "what a CDO market participant would have reasonably expected in terms of the role of a short investor in the selection process").  That this testimony may be relevant to the mental state of either the Peraire-Buenos, the alleged victims, or both, is entirely proper (indeed, it is what makes the evidence probative and admissible.)  *Cf. Diaz*, 602 U.S. at 534 (testimony about the knowledge that "most" people in a group, which allegedly included the defendant, have is proper expert testimony).

## IV.    THE DEFENSE EXPERT TESTIMONY IS RELIABLE AND HELPFUL.

The government offers a grab-bag of other arguments under Rule 702 relating to the reliability and helpfulness of the potential testimony of Professors Falk and Weinberg and Mr. Madura that should be rejected.  These arguments fall into two buckets.  First, the government argues that the testimony is not reliable and/or not the product of an adequate methodology.

Second, the government argues the testimony is mere "narration." Although presented as discrete objections, the arguments collapse on one another and fail for similar reasons.

First, the disclosed testimony is reliable. Where, as here, an expert testifies based on their academic study, professional experience, and/or technological expertise, the Rule 702 standard is "evaluated by reference to other standard principles attendant to the particular area of expertise," and "grounded in an accepted body of learning or experience in the expert's field." Fed. R. Evid. 702, advisory committee's note to 2000 amendments. And "Rule 702 itself provides that the court may admit evidence that will assist the jury based on the witness's specialized knowledge," without the need for scientific evidence. *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015).[19]

Accordingly, experts are routinely qualified in cases to opine on blockchain technology based on their study of, and experience with, the public blockchain and its code. *See, e.g.*, *Nike, Inc. v. StockX LLC*, 2024 WL 3361411, at *15 (S.D.N.Y. July 10, 2024) (observing that the "technology underlying [non-fungible tokens] is plainly beyond the ken of the average juror, and is, therefore, an appropriate subject matter for expert testimony," and admitting testimony on about features of NFTs based on expert's "extensive experience" and "specialized knowledge"); *United States v. Chastain*, 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023) (admitting "general testimony about" cryptocurrency and "common practices with respect to such technologies"); *see also United States v. Crater*, 93 F.4th 581, 585, 591 (1st Cir. 2024) (affirming admission of

---

[19] *Cf. In re Blech Sec. Litig.*, 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (admitting securities industry expert's testimony "as to what ordinary broker activity entails and as to the customs and practices of the industry"); *SEC v. U.S. Envt'l., Inc.*, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (admitting expert's testimony that "certain trading patterns would raise 'red flags'" based on expert's "knowledge of typical trading activity and the types of trading patterns that an experienced trader would recognize as irregular").

"blockchain analysis" that included explanation of how "cryptocurrencies like Bitcoin use cryptography to validate and secure transactions that are digitally recorded on a distributed ledger known as a blockchain" and rejecting "vague methodological objections" (internal quotation marks omitted)).

The government does not specify what it claims is lacking as to the reliability of any of the testimony. Regarding Professors Falk and Weinberg, the government only argues that there is no "methodology." ECF 148 at 25. And regarding Mr. Madura, although the section header states that his opinion lacks a "reliable methodology," *id.* at 35, the argument does not mention that objection. (Regarding Professor Eisfeldt, the "argument," so to speak, is relegated to a single, undeveloped footnote. *See id.* at 17 n.6). These arguments fail because the disclosures explain the bases and reasons for the opinions and their connection to the materials reviewed and the experts' education, training, and specialized knowledge. *See generally* ECF 148-1, -2, -3, -4. The argument is perplexing where Professors Falk and Weinberg and Mr. Madura reviewed and opine about the Ethereum and MEV-Boost protocols—*i.e.*, the very technology at issue. And Mr. Madura's testimony is based on his review of those protocols *and* the alleged "Exploit" code. It is unclear on what other basis an expert could properly opine on the matters of protocol design and function. And that is the same source on which the government's lay witnesses would purportedly premise their own experience-based opinions that the defense experts would rebut. *See supra* pp. 5-7.

The government is thus left to complain that the disclosures cite websites like Github and purportedly non-scholarly articles about the technology, or legal filings in this case. With respect to the former two, the government cites no authority for the argument that these citations are problematic for experts in this industry. Information about this novel technology, including its

protocols and its code, exists natively online.  And the experts here reviewed hearing transcripts, pleadings, and correspondence in this matter because those were the only sources where the government had disclosed its theories about the technology the experts' testimony is meant to rebut.  In the absence of government Rule 16(a)(1)(G) disclosures, it is unclear what other source the experts could properly have considered for that information.[20]

Second, none of the potential testimony is mere "narration."  The cases the government cites excluded purported expert testimony on non-technical factual matters that did not require expertise to understand.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47, 549-51, 553 (S.D.N.Y. 2004) (excluding portions of expert opinions that described "lay matters which a jury is capable of understanding and deciding without the expert's help," including the opinion that "Warner–Lambert 'buried' certain lab results in an Appendix to the Rezulin NDA" and the narrative "history" of a drug's development); *Highland*, 551 F. Supp. 2d at 180 ("factual narrative of events giving rise to th[e] action" was something "that the jury is capable of understanding and deciding without [expert's] testimony"); *United States v. Kaufman*, 2021 WL 4084523, at *21 (S.D.N.Y. Sept. 8, 2021) (purpose of proffered expert testimony "would have been simply to narrate loan data – largely already in evidence").  In these cases, the experts did "not bring their expertise to bear in any . . . way."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (affirming exclusion, in copyright case, of "history" experts whose reports merely collected "hearsay statements" "concerning [the defendant's] general practices towards its artists during the relevant time period").

---

[20] To be clear, while the citation to these sources is not problematic, the experts' opinions are not based solely on these sources but rather are rooted in the Ethereum and MEV-Boost protocols and the experts' own research, experience, and expertise.

Here, none of the experts will narrate non-technical factual matters that the jury would be capable of understanding on its own. *See, e.g.*, *Nike*, 2024 WL 3361411, at *15 ("The technology underlying NFTs is plainly beyond the ken of the average juror, and is, therefore, an appropriate subject matter for expert testimony."); *cf. United States v. Guo*, 2024 WL 2262706, at *3 (S.D.N.Y. May 17, 2024) ("At trial, the jury will be presented with a complicated set of facts as to two purported cryptocurrencies, and the average juror does not possess the specialized knowledge to analyze the market capitalization for cryptocurrencies or their level of ownership concentration."). After explaining the fundamentals of blockchain technology and the functionality of the relevant protocols, Professors Falk and Weinberg will testify about the alleged Exploit and how it interacted with that technology and those protocols. That testimony is not narration of historical fact within the ken of a lay juror; rather, it is expert testimony concerning the functioning of complicated technology. Likewise, Mr. Madura will testify about the so-called Exploit code, and how it was designed to and did function, but that is not a narration of non-technical facts. Rather, his testimony conveys his interpretation of computer code based on his expertise.

## V.  THE DEFENSE EXPERT TESTIMONY IS NOT IRRELEVANT OR UNFAIRLY PREJUDICIAL.

The remainder of the government's arguments transparently have nothing to do with Rule 702. Rather, they are retread arguments from its motions *in limine* that seek to preclude large amounts of relevant evidence out of a purported fear of jury nullification arguments like "code is law" or a "Robin Hood" defense. *See* ECF 145 at 32-39 (defense opposition explaining why the Court should deny the government's motions on these issues). The Peraire-Buenos reincorporate their arguments from their motion *in limine* opposition here and add the following.

First, the expert disclosures do not advance a "code is law" defense. The Peraire-Buenos will not argue that anything is legal so long as the code allows it, nor will their experts so opine.

That the government is overreaching is apparent from its brief, which can only make this point by putting words in the experts' mouths. *See, e.g.*, ECF 148 at 29. With respect to Professors Falk and Weinberg, in a sentence spanning nearly a page, the government paraphrases or selectively quotes from the expert disclosures and then couples those out-of-context snippets with parentheticals straw-manning argumentative claims found nowhere in the disclosures. For example, the government takes the statements that "the MEV-Boost code is publicly available and 'it would be understood in the community of Ethereum users, . . . that other users would try to take advantage of the code," and transforms them into "(i.e., that 'code is law' and both the defendants and their victims knew that was the case)." *Id.* (citation omitted). The language in the government's parenthetical is not in the experts' disclosures. As previously explained, the fact that the code was public is relevant not because "code is law" but because it undermines government arguments about the supposed unexpected nature of the alleged Exploit, and because it makes the purported meaning Nonparty-1 supposedly read into the Lure Transactions and that the government ascribes to the False Signature less plausible. *See* ECF 145 at 40-43.

The government repeats this approach across the experts. For Professor Eisfeldt, it claims that her testimony about the importance of transparent code in shaping the profit-seeking strategies of traders in decentralized financial markets like Ethereum is "[a]t its heart," an "argument that 'code is law' and anything permitted by 'transparent' computer code in decentralized crypto markets is therefore legal." ECF 148 at 14. Not so. Professor Eisfeldt does not hold that opinion and her disclosure does not contain it. The testimony, rather, is relevant for unrelated reasons to explain the nature of the trading environment where sophisticated entities like the alleged Victim Traders and others compete for profits by designing algorithms and bots that interact with the protocols to out-compete rival traders. That environment and its incentives is appropriate context

40

for the jury's evaluation of whether the alleged Exploit was fraud, and whether someone who would design their own bots to compete with sandwich attackers for profits would consider that "theft" or competition.  The government can argue that the conduct here crossed the line into fraud (as it has alleged), and its burden at trial is to prove every element of that offense.  Testimony concerning the trading environment as it existed will assist the jury in evaluating the evidence.

The government also argues that any mention of the lack of regulation in the cryptocurrency space is a "code is law" or nullification argument in disguise.  *See, e.g.*, ECF 148 at 18.  This is inaccurate.  In the quoted portion of Professor Eisfeldt's opinion, the lack of regulation is merely a background fact supporting her opinion about the importance of transparent code and protocols in shaping trading behavior and competition in lieu of regulation.  In any event, the fact that there were no regulations in this space is obviously relevant.  If there were regulations or codes of conduct at play, as in spoofing and other cases, the government would no doubt seek to introduce violations of them as evidence bearing on intent.  *See, e.g.*, *United States v. Pacilio*, 85 F.4th 450, 465 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1033 (2024); *United States v. Dawkins*, 999 F.3d 767, 787 (2d Cir. 2021).  That common relevance theory is a two-way street.  The fact that there were no express rules prohibiting "unbundling" is relevant to (albeit not dispositive of) the Peraire-Buenos' intent.[21]

The government's argument that the expert opinions engage in "victim-blaming" is similarly off base.  *See* ECF 148 at 17-18.  The supposedly offending testimony includes Professor

---

[21] The government, of course, claims that the conduct *did* violate "rules."  *See supra* p. 6.  The Peraire-Buenos disagree.  But the mere fact that the government will seek to prove the violation of supposed rules defeats its argument that the Peraire-Buenos cannot elicit even the background fact that there were no such rules or to dispute their content and significance.

Eisfeldt's discussion of the economics of sandwich trading. *See id.*[22] That the government would seek to preclude any mention of sandwich trading shows the overbreadth of its motion *in limine*, which should be denied for the reasons explained in the Peraire-Buenos' opposition. *See* ECF 145 at 33-37.

In other instances, the government is simply wrong that the jury argument that the Peraire-Buenos may make based on the defense expert testimony is even improper. The government cites the experts' discussion of the Salmonella strategy, objecting to its introduction as a basis for the Peraire-Buenos to argue that "the defendants and their victims would have thought the exploit was fair game due to the existence of a prior attack on sandwich traders." ECF 148 at 29. There is nothing improper about that as a basis for a jury argument. The fact that attempts to thwart sandwich attacks were publicly discussed (and lauded) in the community undermines the potential testimony from the witness for Nonparty-1 that the alleged Exploit was unexpected (and thus more likely to have been achieved through deception). The same fact makes it more likely that the Peraire-Buenos did not believe that their alleged conduct was wrongful. There is nothing improper about that argument.

Finally, the government argues that Professor Eisfeldt's opinion is irrelevant under Rule 401 or lacks the necessary "fit" under Rule 702. But Professor Eisfeldt's testimony concerns the features of the very market where the alleged fraud occurred, the economic incentives that guide market participants like the Peraire-Buenos and the alleged Victim Traders, and other obviously relevant topics. That relevant testimony is entirely unlike the excluded testimony in the

---

[22] This is the only specific piece of testimony the government identifies. With respect to Professors Falk and Weinberg, it states only in conclusory terms that their testimony "goes to inappropriate topics," including that "the victims are the real bad guys." ECF 148 at 31. The disclosures themselves defeat this inflammatory characterization.

government's cases.  In *Kaufman*, 2021 WL 4084523, at *19, the court denied a motion for a new trial after a conviction premised on the exclusion of an expert's opinion about the "similarities and differences" between certain types of loans because it would have been cumulative of "extensive[]" testimony "about the same issues."  And in *Chastain*, 2023 WL 2966643, at *9, the court excluded expert testimony about concepts that had "limited or no bearing on the issues in th[e] case."[23]

## VI.    THE DEFENSE EXPERT DISCLOSURES ARE ADEQUATE AND EXCLUSION IS NOT THE PROPER REMEDY FOR THE SUPPOSED DEFICIENCIES.

At various points in its brief, the government claims that the expert disclosures are inadequate under Federal Rule of Criminal Procedure 16.  The argument is baseless, and, in any event, is no reason to exclude any of the proffered testimony.

Rule 16 requires the disclosure of, among other things, "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief," and "the bases and reasons for them."  Fed. R. Crim. P. 16(b)(1)(C)(iii).  The purpose of the disclosure is "to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed."  *United States v. Kwok*, 2024 WL 1773143, at *1 (S.D.N.Y. Apr. 24, 2024) (quoting Fed. R. Crim. P. 16, advisory committee notes to 2022 amendment).  The requesting party is not entitled, however, "to a verbatim recitation of the testimony the expert will give at trial."  Fed. R. Crim. P. 16, advisory committee notes to 2022 amendment.

---

[23] *See also DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) (affirming exclusion of testimony that solicitation of a bribe was unethical in a libel case where the disputed issue was whether the payment was a bribe); *In re Rezulin*, 309 F. Supp. 2d at 544-45 (excluding testimony that the defendant "acted in an unethical manner" in a products liability case that did not concern ethics). *SEC v. Lyon*, 2009 WL 6325519 (S.D.N.Y. Mar. 18, 2009), also cited by the government, is a five-sentence order that does not describe the subject testimony.

The Peraire-Buenos' disclosures easily clear that bar.  Professors Falk's and Weinberg's disclosures span 26 pages and 10 pages, respectively.  Mr. Madura's is 24 pages, and Professor Eisfeldt's is 16.  The disclosures do not merely list topics but elaborate at length on the substance of each expert's potential opinions.  Each disclosure was accompanied by the witness's curriculum vitae and an appendix of materials consulted—including dozens of online blockchain transaction records involving the alleged Exploit, academic literature, articles and web pages concerning the at-issue technology, and the relevant protocols.  This information was sufficient for the government to file a 43-page motion in which it expresses no doubt about the content of the opinions.  And it opted not to retain rebuttal expert witnesses.

The kinds of disclosures that courts have deemed inadequate do not contain nearly this level of detail or substantiation.  *See, e.g.*, *United States v. Mrabet*, 703 F. Supp. 3d 442, 444 (S.D.N.Y. 2023) (disclosure consisting of essentially three paragraphs stating "that [expert] will testify, 'based on his training and experience,' regarding seven broadly and briefly described categories," and then "only very lightly" expanding on those descriptions); *United States v. Amirov*, 2025 WL 636088, at *2 (S.D.N.Y. Feb. 27, 2025) (disclosure "[l]isting the subjects on which a witness might testify," without disclosing the witness's opinion).  The Peraire-Buenos have gone above and beyond what Rule 16 requires.

To the extent the government has questions concerning an expert's anticipated testimony or the bases and reasons for them, the appropriate remedy is to seek supplemental disclosures from the defense.  *See, e.g.*, *Kwok*, 2024 WL 1773143, at *3 (ordering defendant to supplement expert disclosures).  Or the government can address these issues on cross-examination.  Preclusion of any expert testimony on this basis is an "extreme remedy" and entirely unwarranted in this case. *United States v. Gentile*, 2024 WL 3251702, at *4 (E.D.N.Y. June 20, 2024).

**CONCLUSION**

For the foregoing reasons, the Court should deny the government's motion to preclude the entirety of the noticed defense expert testimony.  The Peraire-Buenos respectfully submit that a *Daubert* hearing is not necessary to deny the government's motion but will make their experts available should the Court order one.  Alternatively, if the Court or the government has outstanding questions regarding the experts' qualifications or potential testimony, those topics could be explored through *voir dire* at trial should there be a defense case.

Date: September 19, 2025

By: */s/ Katherine Trefz*

Katherine Trefz (*pro hac vice*)
Daniel Shanahan (*pro hac vice*)
Patrick J. Looby (*pro hac vice*)
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
ktrefz@wc.com
dshanahan@wc.com
plooby@wc.com

Jonathan P. Bach
Shapiro Arato Bach
1140 Avenue of the Americas
17th Floor
New York, NY 10036
Tel: 212-257-4897
jbach@shapiroarato.com

*Counsel for Defendant*
*James Peraire-Bueno*

Respectfully submitted,

By: */s/ Daniel N. Marx*

Daniel N. Marx
William W. Fick (*pro hac vice*)
Fick & Marx LLP
24 Federal Street, 4th Floor
Boston, MA 02110
Tel: 857-321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

*Counsel for Defendant*
*Anton Peraire-Bueno*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter who are on the CM/ECF system.

*/s/ Katherine Trefz*
Katherine Trefz