

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 22, 2025

**BY ECF**
The Honorable Jessica G. L. Clarke
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re: *United States v. Anton Peraire-Bueno, et al.*, 24 Cr. 293 (JGLC)

Dear Judge Clarke:

      The Government writes respectfully to supplement its motion *in limine*, (Dkt. 125 at 55), to preclude the defendants from relying at trial on the presence of counsel to suggest they lacked criminal intent. Absent a formal advice of counsel defense—which the defendants have elected not to make—arguments invoking the specter, but not reality, of legal counsel are not relevant and, even if they were relevant, pose of a profound risk of misleading the jury. Accordingly, the Court should preclude such arguments.

      If these arguments are not precluded at this time, the Government respectfully requests that the Court promptly address pressing attorney-client privilege issues implicated by the defendants' anticipated use of such evidence, which may require the production of extensive additional attorney-client and attorney work product materials, further motion practice, and one or more hearings pre-trial, or in the middle of trial.

      **A.  Background**

      The Court imposed a September 8, 2025 deadline for defendants to provide "notice to the Government about [an] advice of counsel defense." (Dkt. 46). In accordance with the Court's Individual Rules, the parties met and conferred on August 20, 2025 regarding the parties' anticipated motions *in limine*. As noted in the Government's omnibus brief on August 22, 2025, the defendants represented to the Government at the August 20, 2025 meeting that "if they do not assert a formal advice-of-counsel defense[,] they do not intend to adduce evidence or make arguments regarding the presence or involvement of attorneys at certain meetings or on certain emails or documents to suggest that the defendants lacked criminal intent." (Dkt. 125 at 55). Accordingly, although the Government moved to preclude such evidence in its omnibus brief in an abundance of caution, the Government did not further detail its position.

The defendants did not affirmatively move the Court before the motions deadline to make any "presence of counsel" arguments. Prior to the filing of their opposition to the Government's motions *in limine*, on September 8th, the defendants at no time contacted the Government to make any revised representation regarding their anticipated arguments nor raised any issue with the Government's account as to what occurred at the August 20, 2025 meeting. Consistent with their representation at the earlier meet-and-confer, on September 8, 2025, the defendants wrote to the Government "that neither Anton Peraire-Bueno nor James Peraire-Bueno intend to rely on an advice-of-counsel defense."

Later that evening, in their opposition to the Government's motions *in limine*, dated September 8, 2025, the defendants changed position, arguing that they should be permitted to make arguments "involving the presence of counsel as relevant to intent and other issues." (Dkt. 145 at 43).

On September 12, 2025, the Government sent a letter to the defendants requesting additional information regarding those arguments, requesting a list of the topics on which defendants intend to claim attorney presence at trial, the specific evidence of attorney involvement that the defendants expect to adduce, and additional documents (including otherwise privileged documents) that would support or impeach or undermine such arguments.[1] The Government requested a response to that letter by September 17, 2025. The defendants responded on September 19, 2025, declining to provide any additional disclosures.[2]

**B. Applicable Law**

Pursuant to Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and pursuant to Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

---

[1] The Government also requested privilege logs for Slack chat communications that were not previously provided in an August 11, 2025 production by the defendants, which had included a list of hundreds of fully withheld or partially redacted documents over which the defendants claimed privilege, but without providing any explanation as to the participants in the communications or why they may be privileged. The Government also requested retainer agreements in order to determine whether any of the defendants' associates may properly claim representation by the same counsel.

[2] The defendants did not respond to the Government's request for retainer agreements. After the Government again requested them, the defendants provided a limited summary of the scope of the relevant representation—without addressing the representation of the defendants' associates or other apparent third-parties, including the defendants' father—while again declining to providing copies of the complete retainer agreements.

presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689–90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667–68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416–17 (1980)).

"[T]he attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Thus, "[a] party . . . can waive privilege by placing privileged communications 'at issue' in the litigation[.]" *In re Lifetrade Litig.*, No. 17 Civ. 02987 (JPO), 2022 WL 3644357, at *2 (S.D.N.Y. Aug. 24, 2022). With respect to the scope of the waiver, voluntary disclosure by or on behalf of a party during judicial proceedings may waive the privilege as to the disclosed information, as well as all the otherwise privileged information relating to the same subject matter of the disclosed information. *See In re von Bulow*, 828 F.2d 94, 101–02 (2d Cir. 1987). Subject-matter waiver applies where considerations of fairness should allow the "attacking party to reach all privileged conversations regarding a particular subject once one privileged conversation on that topic has been disclosed," *id.* at 102–03, in order to avoid prejudice to the adversary party and "distortion of the judicial process" that may result from selective disclosure. *Id.* at 101; *see also McGrath v. Nassau Cnty. Health Care Corp.*, 204 F.R.D. 240, 243 (E.D.N.Y. 2001) ("the scope of any waiver is defined by the context of the waiver and the prejudice to the other party that limiting the waiver would cause").

Where a defendant has not put forward a formal defense of reliance on advice of counsel, courts in this District have limited the admission of evidence about the involvement of attorneys on relevancy grounds pursuant to Rules 401 and 402, and pursuant to Rule 403. For example, the decision in *S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013), illustrates the limited relevance of evidence of attorney involvement absent a showing of each of the elements of advice of counsel. In that case, the defendant disclaimed any advice of counsel defense, but sought to introduce evidence that in-house counsel had reviewed various documents, reviewed disclosure language, was copied on communications, and in some instances assisted in drafting documents. *Id.* at 682–83. The court, however, held that Rules 401 and 403 precluded evidence of—and references in arguments to—counsel, explaining:

> a lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction. Likewise, the fact that lawyers saw and commented on disclosure language could be understood as 'blessing' the sufficiency of that disclosure. This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense.

*Id.* at 684. Accordingly, in *Tourre*, the court precluded as irrelevant and prejudicial (1) evidence used solely to show lawyers attended or set up meetings, (2) evidence that lawyers approved of certain documents or disclosures, and (3) the placing by the defendant of undue focus on the fact that a lawyer was present at meetings or reviewed documents or disclosures. *Id.* at 685. Although the defendant was allowed to present evidence of the attendees of meetings and to include professional descriptions for those participants, defense counsel was not permitted to mention the presence of lawyers in their opening statements or arguments. The court emphasized that this was not an inclusive list of inadmissible references to counsel and that other references may similarly be inadmissible. *Id.*

Similarly, in *S.E.C. v. Stoker*, a civil securities fraud action in which the defendant did not intend to assert an advice of counsel defense, but rather sought to elicit testimony about whether lawyers had reviewed certain transactions, Judge Rakoff took issue with defense counsel's efforts to highlight, through questioning, the fact that attorneys had reviewed certain offering materials. *See* No. 11 Civ. 7388 (S.D.N.Y. July 23, 2012), Trial Tr. at 895–96. The court recognized that "absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, at least from outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] totally irrelevant." *Id.* And, although the defendant proffered an alternative reason for the questioning, the court recognized that counsel's tactic was a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the dangers of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981. Similarly, in *S.E.C. v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019), Judge Cote precluded "references to counsel's communications" because, among other things, they were "not relevant in the absence of an advice-of-counsel defense." The court explained that "any probative value of such references is substantially outweighed" by, among other things, "the risk that such references will sow confusion and mislead the jury by suggesting that counsel . . . fully informed . . . approved" a transaction. *Id.*

In some cases, involving the *absence* of attorney advice, some courts have allowed defendants to offer limited evidence of lawyers' involvement in allegedly inculpatory decisions or conversations to support an argument that the defendant lacked intent to defraud. *See, e.g.*, *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. June 24, 2014), Trial Tr. at 84–85 ("the defendant may argue that attorneys who drafted or reviewed documents related to the charged transactions did not inform him of the illegality . . . and that the defendant took comfort in the attorney silence"). Importantly, however, even those courts that have permitted such evidence have required extensive pre-trial disclosures and have carefully policed references to counsel in testimony and argument to ensure that the defendant does not unfairly hide behind the attorney-client privilege or attempt to mount a disguised reliance argument, given the concerns of relevance and prejudice. *See id.* (noting that the defendant needed to produce documents to the government, particularly in light of his untimely waiver decision); *United States v. Hild*, No. 19 Cr. 602 (RA) (S.D.N.Y. Apr. 15, 2021), Trial Tr. at 215 (noting risk that presence of counsel arguments in the absence of a waiver risks "misleading the jury" by suggesting that "counsel was there for the entirety of the time looking at the relevant issue, which suggests that they gave their blessing without knowing what information they were provided").

Thus, where a defendant seeks to admit evidence of the involvement of attorneys, whether as a formal advice of counsel defense, or something less, courts in this District often require that the Government with sufficient notice and disclosures ahead of trial. *See, e.g.*, *United States v. Schulte*, No. 17 Cr. 548 (PAC), 2020 WL 133620, at *6 (S.D.N.Y. Jan. 13, 2020) (requiring advanced advice of counsel disclosure); *United States v. Sfcali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018) (defendant should have made pertinent disclosures in advance of trial); *United States v. Rubin/Chambers, Dunhill*, 828 F. Supp. 2d 698, 711 (S.D.N.Y. 2011) (requiring notification to the Government of advice of counsel defense sufficiently before pre-trial conference to permit litigation over disputes). Such pretrial notice and disclosures are necessary not only to litigate privilege disputes, but also to assess the relevance and admissibility of evidence and determine the permissibility of arguments in order to prevent confusing or unfairly prejudicial arguments from being presented to the jury.

### C. Discussion

The Court should preclude evidence and arguments at trial, including in opening statements, regarding the "presence" of the defendants' defense counsel. Such arguments are not relevant because the bare fact that the defendants *had* lawyers—but did not actually rely on their advice—does not make any disputed fact at trial more or less probable. Because the defendants have elected not to assert an advice of counsel defense, any purportedly lesser invocations of the mere "presence" of counsel wound end-run the well-settled law that has developed to carefully police such arguments. That end-run would pose a serious risk of tempting the jury to speculate that the defendants may, indeed, have relied on the advice of their lawyers—even as the defendants evade the obligations that would otherwise apply to show what that advice might have been, making any such argument impossible for the Government to further investigate or rebut.

Although a defendant may elect to argue before the jury that their actions were taken upon the advice of counsel, a defendant is "entitled to an advice-of-counsel instruction only if there are sufficient facts in the record to support the defense . . . such that a reasonable juror could find that the defendant honestly and in good faith sought the advice of counsel, fully and honestly laid all the facts before his counsel, and in good faith and honestly followed counsel's advice." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (discussing the so-called *Williamson* factors). Accordingly, advice of counsel defenses generally require extensive discovery of documents supporting as well as impeaching or undermining the defense, pre-trial hearings during which the counsel involved may be called to testify, and privilege waivers from the holders of the privilege(s), including potential third-party privilege holders which may give rise to still further, collateral litigation. These practical complications are so well understood that courts in this District routinely impose notice deadlines well in advance of trial to prevent advice of counsel issues from being litigated mid-trial. *See, e.g.*, *United States v. Javice*, 23 Cr. 251 (AKH) (ordering defendants to provide notice of any advice of counsel defense approximately six weeks in advance of trial date, to include (1) identification of attorneys purportedly relied on, (2) the timing and substance of the alleged advice, and (3) all documents in the defendants' possession, custody or control "that support or might impeach or undermine any such defense"); *United States v. Schulte*, No. S2 17 Cr. 548 (PAC), 2020 WL 133620, at *6 (S.D.N.Y. Jan. 13, 2020) (requiring advanced advice of counsel disclosure); *United States v. Sharma*, 18 Cr. 340 (LGS) (July 1, 2019) (Dkt. No. 140) (ordering defendants to "provide discovery relating to any advice of counsel defense they

intend to advance at trial" about three months before the scheduled trial date). The Court entered just such an order in this case, (Dkt. 46), and defense counsel indicated to the Government that no advice of counsel defense would be made.

Recently, however, the Government learned for the first time that the defendants intend instead to mount a so-called "presence of counsel" defense on the apparent theory that such presence suggests that the defendants lacked criminal intent. (Dkt. 145 at 43 (defendants proposing to introduce "evidence involving the presence of counsel as relevant to intent")). That, however, is precisely what the actual advice of counsel defense is meant to negate. *See United States v. Denkberg*, 139 F.4th 147, 156–57 (2d Cir. 2025) ("[A]n advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true. Instead, the evidence introduced regarding a defendant's good faith reliance on the advice of counsel, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an unlawful intent."). Moreover, use of "presence of counsel" *as relevant to intent* is precisely the sort of misleading end-run around the requirements of a true advice of counsel defense that has prompted other courts in this District to preclude or strictly limit evidence and argument of mere "presence of counsel."

The Court should reject the defendants' maneuver, which leaves the Court, the Government, and the jury to guess at whether certain of the defendants' actions were really undertaken at the direction of counsel or, instead, on the defendants' own initiative. If the former, the defendants have not proffered—as they must—any facts regarding what advice they sought, what information they disclosed to counsel, whether that information was complete, what advice was given, whether they approved of any particular conduct, whether the advice was reasonable, or what actions the defendants took to follow legal advice in good faith. Nor have the defendants even fully disclosed which attorney(s) were consulted, or when, or whom the attorneys actually represented.[3] If, on the other hand, the defendants' actions were not undertaken at the direction of counsel, and lawyers were only incidentally present, the bare contextual fact of an attorney's involvement would have almost no probative value—and that value would be easily outweighed by the risk of unfair prejudice.

Where courts have sometimes made a distinction between an advice of counsel defense and more limited invocations of the "presence" of counsel, such references have been highly fact-specific and severely limited in scope. Even the cases cited by the defendants, (Dkt. 145 at 44), indicate as much. For example, although in *In re Customs & Tax Admin. of Kingdom of Denmark (SKAT) Tax Refund Litig.*, Judge Kaplan held open the theoretical possibility that "presence" of counsel evidence could be admissible, the court rejected (on Rule 401 or Rule 403 grounds) or otherwise declined to rule on each of the proposed uses, and held that the court's analysis must still "incorporate[] the *Williamson* factors [evaluating a traditional advice of counsel defense] into

---

[3] In its September 12, 2025, letter to defense counsel, the Government requested copies of retainer agreements to properly identify the parties represented by counsel (whether the defendants individually, their corporate entities, other of their companies' employees, or some combination) and the scope of that representation. As noted above, (n.2), the defendants have still not provided those agreements despite the Government's repeated requests.

its Rules 401 and 403 analyses of the defendant's proffered testimony" regarding "presence" of counsel. No. 18 Md. 2865 (LAK), 2024 WL 4696085, at *4 (S.D.N.Y. Nov. 6, 2024). Similarly, in *Sjunde AP-Fonden v. Gen. Elec. Co.*, Judge Furman permitted limited "presence" evidence but refused to permit defendants to imply that counsel "blessed" their actions or "include references to the presence and involvement of lawyers in their opening statement." No. 17 Cv. 8457 (JMF), 2024 WL 4246159, at *1 (S.D.N.Y. Sept. 18, 2024). And although the court in *United States v. Bankman-Fried* permitted a testimonial reference to the fact that "company counsel was involved in drafting and implementing FTX's document retention policies," the court did so only because those policies were only "collaterally related to the charged conduct." No. 22 Cr. 0673 (LAK), 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024). In other words: the references had little to do with the defendant's intent anyway, because the testimony involved other subjects that did not "tend to suggest that the defendant believed that other, *charged conduct* had been lawful." *Id*. (emphasis added).

Here, by contrast, the defendants appear poised to go much further, introducing evidence directly related to the charged conduct such that the "practical effect is indistinguishable from a presence-of-counsel defense." *United States v. Rangott*, No. 23 Cr. 004 (JHR), 2024 WL 3488038, at *3 (S.D.N.Y. July 19, 2024). Rather than seeking the Court's approval to make fleeting, incidental references to the fact that, *e.g.*, an attorney may have been present along with others at a particular meeting, the defendants seek to introduce such evidence as relevant to the defendants' criminal intent as to the charged conduct—breezily contending that, "[b]ecause [they] do not intend to disclose any confidential legal communications or to argue (or imply) that they relied in good faith on such advice, there is no risk that the jury may mistakenly conclude an attorney 'blessed' the implementation of their trading strategy or the handling of their trading profits." (Dkt. 145 at 45). That turns the case law in this area on its head. The risk of the proposed evidence is that the jury will be misled (either through the introduction of particular evidence or through argument) that an attorney blessed the conduct in question. Any assurance that the defendants will not pursue an actual advice of counsel defense does not eliminate the risk of jury confusion. It underscores it: the jury may infer that the defendants relied on counsel without understanding that they in fact did not. The defendants elide the problem by claiming that "the jury may well learn, through the government's own evidence, that attorneys were present during relevant events and involved with them." (*Id.*). But that is a far cry from how the defendants propose to use such evidence: not to acknowledge the fact of an attorney's presence, but to argue that such presence is "relevant to intent." (*Id.* at 43).

Two examples of the defendants' proposal are provided in their opposition brief. The first concerns the defendants' use of shell companies to launder their proceeds of the Exploit. (Dkt. 145 at 45–46). Specifically, the defendants propose to introduce evidence that "corporate documents were drafted and filed with the assistance of reputable corporate counsel" in order to that show that entities were not evidence of the defendants' "intent to conceal the proceeds of fraud." (*Id.* at 46). First, that argument is expressly a contention that counsel "blessed" the corporate structures used and, implicitly, approved the conduct that underlies the money laundering charge—precisely what the Second Circuit and courts in this District have repeatedly forbidden. Second, the involvement of counsel in this scenario does not in fact rebut the idea the company is a "shell," and indeed highlights the risk of this type of evidence and argument. Creating a corporate entity for a client is a routine and ministerial task for a lawyer. In order for

the involvement of the lawyer to be relevant to whether the defendants intended the company to be a "shell," the jury would have to understand what, if anything, the defendants *told* the lawyer about the company and vice versa. And that is exactly the information that the defendants seek to withhold from the Government and the jury. This evidence therefore invites the jury to speculate that the lawyer—simply by incorporating a company used to dispose of the fraud proceeds—must have blessed the movement of the funds, all without allowing the Government to, for example, call the lawyer to testify that in fact he or she set up the company without providing any other guidance or advice, and without knowledge of how it was to be used (or worse, that the defendants had lied to the lawyer about the purpose of the company). In other words, the defendants seek to introduce evidence regarding such meetings with lawyers while continuing to otherwise make blanket assertions of attorney-client privilege regarding what those meetings actually involved. They may not do so. *See, e.g.*, *United States v. Doe (In re Grand Jury Proceedings)*, 219 F.3d 175, 182 (2d Cir. 2000) ("A party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.").

A second example contends that the defendants' Google search queries—devastating evidence of the defendants' consciousness of guilt and their plans to cover up their crimes—came shortly after their meetings with lawyers. (*See* Dkt. 145 at 46). To the extent that the defendants claim the searches were conducted in an attempt to follow legal advice, such an argument could be permissible as a traditional advice of counsel defense, for which the defendants would be required to disclose other records revealing what, in fact, was discussed at the meetings, thereby permitting the jury to decide whether to credit the defendants' explanation. But the defendants have refused to provide such evidence, declining to waive privilege to the degree necessary to fairly mount that defense. Rather, the defendants argue instead that the searches were merely *prompted by* the meetings with lawyers. (*Id.*). But as even one precedent the defendants themselves cite held, even the fact of a meeting with counsel may be precluded because it so obviously suggests, with little countervailing "non-speculative probative value," that a defendant's conduct was taken as a result of advice received at the meeting. (*See id.* at 45 (citing *United States v. Gillier*, No. 11 Cr. 409 (PAE) (S.D.N.Y. July 5, 2022)). Once more, the Government and the Court are left accepting at face value that the Google searches were plausibly prompted by a meeting with counsel, without any clue as to what actually happened or was discussed at those meetings. The Government is left unable to fairly confront this defense.

Despite the notice requirements that would ordinarily attend such arguments and the Government's repeated inquiries to defense counsel, the defendants have not explained further what evidence they intend to adduce. But other possible examples in this case are legion given the numerous lawyers retained by the defendants over a number of years and the voluminous privilege claims that the defendants have already asserted.[4] A third possible manifestation of the

---

[4] Defendants in this case withheld a substantial amount of material regarding the actions they took after carrying out the Exploit. According to defendants' privilege logs, at least 1,244 such potentially privileged documents were withheld, as well as an additional 172 fully withheld and 144 partially redacted documents containing or related to Slack messages—creating a substantial likelihood that, within such an extensive cache of otherwise discoverable material, there may exist evidence that would undermine the defendants' arguments.

defendants' apparent strategy at trial could be, for example, this: on cross-examination of a cooperating witness ("CW-1") who worked for the defendants, the defendants may attempt to elicit testimony that this witness took comfort in the fact that the defendants had retained legal counsel following the Exploit and had been under the impression—based on the defendants' hearsay communications with legal counsel—that the Exploit and subsequent transfers of the Exploit funds was legal. Such testimony, without more, would be deeply misleading to the jury. To begin, evidence suggests that the defendants did not accurately inform CW-1 what legal advice they had received from counsel in meetings at which the witness was not present.[5] For example, in a Slack chat on or about April 15, 2023, *i.e.*, about two weeks after the Exploit, the defendants privately debated which law firm to retain, with one defendant noting that Williams & Connolly would be a better choice than another firm because "[w]e may be paying for a criminal case . . . and pretty sure I'd even more want to be with these guys if it's criminal." (FT_USAO_00000155–00000161 ("Ex. A")). The other defendant responded that "we need to give [CW-1] a heads up," misleadingly explaining that they could "say that wc seems good and in the interest of saving time since conflict will take a while to resolve . . . we're just going to go with them." (*Id.* at FT_USAO_00000161). In another Slack chat sent to CW-1 the month after the Exploit, on May 25, 2023, one of the defendants portrayed the legal advice the defendants had received as involving only civil claims and claimed that the lawyers had "largely already examined [the issues and that the lawyers] have very strong counterarguments for why they don't apply to us." (USAO_SLACK_00210966–00210967 at USAO_SLACK_00210967 ("Ex. B")). Although CW-1 suggested seeking further legal guidance, the defendant responded that there was "not much else to do here," and said that the company could consider its own affirmative "class action" against the Exploit's victims. (*Id.*) All the while, in the weeks prior, the defendants had already begun Googling "statute of limitations," "wire fraud statute," "wire fraud statute of limitations," "how

---

[5] Communications between the defendants and their employee regarding legal advice, in any event, likely constitute a forfeiture of attorney-client privilege as to those communications even if the defendants' company—rather than the defendants individually—was holder of the privilege. *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) ("subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege"); *see also, e.g.*, *Baptiste v. Cushman & Wakefield, Inc.*, No. 03 Cv. 2102, 2004 WL 330235, at *2 (S.D.N.Y. Feb. 20, 2004) ("communications which reflect advice given by counsel to a corporation do not lose their privileged status when shared among corporate employees *who share responsibility for the subject matter of the communication*") (citing cases) (emphasis added). There are numerous indications, which the Government will not more fully brief at this stage, both that (a) the defendants well understood which of their communications regarding attorney advice would remain confidential and which would not, and (b) that CW-1 in any event did not share decision-making responsibility regarding the matters upon which advice was received. The defendants have nonetheless claimed privilege over dozens of such group communications with the employee and other even more distantly related individuals—assertions that the Government has not yet litigated and which may require, for example, future *in camera* review by the Court of potentially privileged documents. It is the defendants' burden to establish privilege. *See United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) ("The party asserting the privilege . . . bears the burden of establishing its essential elements.").

many trials are jury," and "money laundering statute of limitations," and discussed privately between each other the likelihood that they would face criminal liability, including by discussing what information technology companies would provide in response to search warrants. Without more fully disclosing the legal advice the defendants actually received, it will be impossible for the jury to evaluate whether CW-1's limited awareness of the "presence" of counsel could possibly bear on the defendants' intent. CW-1 could, on one hand, have taken "comfort in the [apparent] attorney silence," *Tagliaferri*, No. 13 Cr. 115 at Trial Tr. at 84–85, or, on the other hand, have been unwittingly misled by the defendants regarding their own true awareness of the illegality of their conduct. The jury will have no way to know one way or the other, because the defendants' privilege claims make it impossible for the jury to evaluate the reasonableness or accuracy of the witness's perception—even as the defendants may simultaneously propose to elicit evidence of what CW-1 believed about the perceived legality of the Exploit. Such testimony inescapably carries the implication that the defendants received and relied on legal advice, a defense they formally claim they will not make.

Further still, the Government recently learned in an interview with the same witness that the witness was told by the defendants that the defendants' legal counsel did *not* in fact advise the defendants regarding their disposition of the proceeds of the Exploit, the subject of the Government's money laundering allegation in Count Three.[6] If the witness were permitted to testify to the fact that the witness understood lawyers had been involved in advising the company on the Exploit, the witness must necessarily be permitted to testify to the fact that the witness also understood that lawyers had *not* been involved in advising the company on the series of financial transactions in its aftermath.[7] Eliciting and then rebutting such testimony without an advance and complete disclosure of the facts and a waiver of attorney-client privilege that may otherwise apply—even if expertly performed by counsel for both sides—risks CW-1 testifying to purportedly privileged communications, potentially giving rise to a motion by the defendants for a mistrial. At very least, the unpredictable direction of such testimony may require the Court to find that

---

[6] Out an abundance of caution, in order to protect the defendants' potential attorney-client privilege, the Government did not inquire further, and the witness did not specify whether counsel declined to advise on the subject generally or, instead, affirmatively advised against the defendants' scheme to conceal the proceeds of the Exploit and "off-ramp" the funds to their personal checking accounts. As noted above, the defendants have refused to provide their retainer agreement, which would, at a minimum, determine the scope, if any, of the attorney-client privilege at issue.

Consistent with CW-1's understanding, the defendants acknowledged in a September 20, 2025 letter that Williams & Connolly's representation of the defendants related only to the Exploit itself, and that the firm's representation "did not extend to opinions concerning or review of business or cryptocurrency transactions" that they contemplated later undertaking—*i.e.*, the defendants' later attempt to "off-ramp" the proceeds to their personal accounts.

[7] Indeed, as noted above, such evidence would be permissible not only for completeness, but also because—to the extent that "presence of counsel" arguments are cognizable at all—the *absence* of legal advice carries less potential prejudice than evidence concerning its existence. *See Tagliaferri*, No. 13 Cr. 115, Trial Tr. at 84–85.

additional implied subject-matter waivers of privilege, requiring potential mid-trial adjournments and additional discovery in proportion to the scope of such additional waivers.

Here, the defendants' apparent strategy is made still more concerning given the unusual fact that the defendants' trial counsel are the very same lawyers who appear to have advised the defendants for more than two years pre-trial. Accordingly, in order to appropriately determine the contours of the advice the defendants actually received, the Court may need to call as fact witnesses one or more Williams & Connolly attorneys at a pre-, or even mid-, trial hearing—putting defense counsel in the untenable position of, essentially, examining themselves. It appears that none of the few cases the defendants cite in support of their so-called "presence of counsel" argument entailed this distinguishing circumstance.[8]

---

[8] At a future date, the Court may also be called upon to resolve whether the crime fraud exception applies to vitiate altogether the defendants' claims to attorney-client privilege as related to the Exploit and the defendants' attempt to launder the proceeds thereof. For the crime-fraud exception to apply, the Government need only show that there is probable cause to believe that (1) a fraud or crime has been attempted or committed, and (2) the attorney-client communication or attorney work product in question was intended in some way to facilitate or to conceal the fraud or crime. *See In re Grand Jury Subpoena*, 731 F.2d at 1038. The exception applies to communications and documents in furtherance of a crime or fraud even if the attorney involved in such communications is unaware that he is being used in furtherance of a crime or fraud. *See id.* ("Such communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose.").

Although the Government makes no such motion at this stage, the Government has identified numerous abuses of the attorney-client relationship by the defendants, who appear to have deliberately sought legal counsel in order to provide a fig leaf for their conduct when, in fact, they did not intend to honestly follow their lawyers' advice. Rather, they appear to have sought to wield their lawyers' credibility to intimidate victims and persuade cryptocurrency exchanges to permit them to unfreeze and "off-ramp"—*i.e.*, transfer to conventional fiat currency-based, U.S. bank accounts—the proceeds of the Exploit, even as they intended all the while to disregard their lawyers' advice regarding how to do so legally.

Here, for example, before seeking counsel, the defendants (1) discussed sending intimidating messages to victims, claiming that they had consulted with legal counsel when, in fact, they had not done so (*see, e.g.*, USAO_SLACK_ 00185786–00185790 ("Ex. C")); and (2) then agreed between each other that, if a lawyer would not approve of their conduct, they would simply disregard the advice, (*see, e.g.*, USAO_SLACK_00453467 ("Ex. D") (James Peraire-Bueno asking, "what do we do if law firm X says 'you guys should return [the Exploit proceeds],'" and Anton Peraire-Bueno responding, "We don't[.] We're their clients."); USAO_SLACK_00444816 ("Ex. E") (Anton Peraire-Bueno appearing to explain that he was "getting push back [from] w&c," "should not have asked," and that "at the end of the day[,] if we say something it goes")). Later, after retaining legal counsel, the defendants (1) proceeded to repeatedly label their own Slack chats as "attorney-client privileged" even though they were not (*see, e.g.*, USAO_SLACK_00453758–00453759 ("Ex. F") (claiming attorney-client privilege over a threatening message sent to victims before legal counsel appears to have been engaged)), and (2) strategically claimed advice of

For all of these reasons, the Court should preclude evidence of the presence of counsel under Rule 401 because, without some indication that the defendants received or acted on legal advice, the mere fact of attorneys' involvement lacks relevance to any issue in dispute at trial. Moreover, even if the defendants could articulate some conceivably relevant purpose for such evidence, the Court should nonetheless preclude it under Rule 403 given the overwhelming likelihood that such arguments would confuse the jury and cause unfair prejudice, substantially outweighing any purported relevance. At a minimum, were the Court to permit such arguments, the Government respectfully submits that, in order to avoid a delay in the trial date, it should (1) promptly order the defendants to produce a complete list of the topics on which defendants intend to claim attorney presence at trial, identifying the specific evidence and arguments that the defendants expect to adduce (whether in response to Government evidence or arguments or in the defendants' case-in-chief); (2) find that the defendants have effectuated a subject-matter waiver of privilege with respect to each such topic; and (3) order the defendants to produce additional discovery of all documents (including attorney-client and attorney work product documents) that would support or impeach or undermine any such evidence. The Government respectfully requests that the Court set a deadline of September 26, 2025, for the production of such materials sufficiently in advance of trial for the Government to review the materials and take related investigative steps, and for any additional necessary motion practice that may be necessary.

---

counsel even when they in fact never received such advice. In September 2023, for example, the defendants discussed among themselves sending messages to a cryptocurrency exchange in advance of seeking to withdraw the Exploit proceeds. In those messages, the defendants proposed to inquire about the likelihood the funds would be frozen, drafting a message in which they would ask how the exchange used "compliance software" and noting that, "[w]e've checked with our legal counsel and do not believe there there [sic] should be any problems on that front." (USAO_SLACK_00221957–00221961 ("Ex. G") at USAO_SLACK_00221959). In fact, the defendants had expressly *not* received approval to transfer the funds from their legal counsel. In response to a defendant's draft message, an unindicted co-conspirator ("CC-1") responded, "Yeah I like the phrasing of saying we've checked with our legal counsel, makes it less suspicious." (*Id.*).

In sum, the defendants ask the Court to contravene the Second Circuit's well-settled law and let them have it both ways: decline to play by the ordinary advice of counsel defense rules, but let the jury speculate anyway that their actions may have been the result of advice of counsel. *See Bilzerian*, 926 F.2d at 1292 ("the attorney-client privilege cannot at once be used as a shield and a sword"). Permitting this gambit would not only risk unfair prejudice to the Government, but also permit misleading arguments that would confuse the jury and portray the defendants' actions in a potentially profoundly false light. Any ruling short of outright preclusion on these questions—in which the Court, as the defendants casually suggest, can simply decide the issues later, "depend[ing] on the contours of [the] case," (Dkt. 145 at 43)—is virtually certain to give rise to extensive and intensely disputed litigation in the middle of trial. If the defendants relied on the advice of their lawyers, the appropriate means to advance that claim before the jury is by adhering to the long-established rules for doing so, by making the required disclosures, and by providing the notice the Court has ordered. Because the defendants have chosen not to do so, the Court should preclude them from now making the same arguments through the backdoor.

                    Respectfully submitted,

                    JAY CLAYTON
                    United States Attorney

by: /s/ _____

                    Jerry Fang
                    Danielle Kudla
                    Benjamin L. Levander
                    Ryan T. Nees
                    Assistant United States Attorneys
                    (212) 637-2584 / 2304 / 1930 / 1595

Cc:    Defense Counsel (by ECF)