

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 29, 2025

**BY ECF**
The Honorable Jessica G. L. Clarke
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re: *United States v. Peraire-Bueno,* **S1 24 Cr. 293 (JGLC)**

Dear Judge Clarke:

The Government respectfully submits this letter in response to the defendants' October 21, 2025 letter attaching a supplemental expert disclosure for Professor Brett Falk. (*See* Dkts. 187, 187-1 (the "Supplemental Disclosure")). The Court should preclude the defendants from offering the new opinions set forth in Professor Falk's mid-trial supplemental disclosure, which is substantively defective and procedurally improper. At their core, Professor Falk's new opinions—which address the Government's opening and the Government's questioning of a witness, parrot defense arguments to the jury, interpret the defendants' conduct, purport to reflect Professor Falk's knowledge about the understanding of others about what code was intended to do, and tell the jury what conclusions to draw from the evidence—are not proper expert testimony. They will not help the jury understand the evidence or determine a fact in issue. To the contrary, they usurp the jury's role and are likely to confuse the jury by, for example, having a witness (whose testimony is evidence) comment on the statements of a party (which are not evidence). Professor Falk's new opinions are also plagued by a lack of discernable basis or methodological rigor, as is made most evident by his willingness to opine on something he does "not exactly understand." And Professor Falk's new opinions improperly propose to tell the jury how to weigh the evidence before it and how to apply the law to the facts. That is emphatically not the appropriate role of an expert witness. At a minimum, before allowing Professor Falk to testify regarding these new opinions before the jury, the Court should hold a brief *Daubert* hearing to ensure that they are based on an adequate foundation.

## I.    Professor Falk's Supplemental Disclosure Fails the *Daubert* Standard

The defendants have failed to meet their burden of demonstrating that the standards for the admissibility of Professor Falk's new opinions have been met. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The Court should therefore preclude him from testifying to these opinions, including the following:

- Professor Falk proposes to opine that "[i]n their opening statement, Government's Counsel said that the alleged lure transactions 'looked like one thing from the outside, but was secretly something else.' Although I do not exactly understand what they mean, this statement does not accurately characterize the alleged lure transactions . . . ." (Supp. Disc. ¶ 6) (footnote omitted).

Testimony that purports to tell the jury that something an expert does "not exactly understand" is nonetheless an inaccurate characterization cannot possibly be "the product of reliable principles and methods." Fed. R. Evid. 702(c). Nor does it help the jury "to understand the evidence or to determine a fact in issue" to hear that something a witness does not exactly understand nonetheless strikes him as wrong. *Id.* Moreover, nothing in the rules or the law contemplates that an expert will serve as a second attorney, addressing arguments made by counsel and explaining why he is unpersuaded by them. *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) ("[N]o expert may supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." (cleaned up)); *accord LinkCo, Inc. v. Fujitsu Ltd.*, 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (rejecting expert report that "does no more than counsel for plaintiff will do in argument, i.e., propound a particular interpretation of defendant's conduct" (cleaned up)). Juries are instructed that the arguments of counsel are not evidence and that they should base their decisions on the evidence they hear from the witness stand. *See, e.g.*, *United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004). Having a witness comment on an argument made by counsel will not help the jury "to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a). To the contrary, it will confuse the issues and mislead the jury, asking it to consider testimony (which is evidence) that comments on argument (which is not). *See* Fed. R. Evid. 403. This opinion should not be allowed, nor any opinion that addresses the arguments of counsel or position of a party.

- Similarly, Professor Falk proposes to testify that "[i]n the direct exam of Robert Miller, the Government elicited testimony that certain information in the block header for one of the blocks at issue was 'not correct.' To the extent that the government means that it was somehow contrary to the Ethereum protocol, this is a misconception . . . ." (Supp. Discl. ¶ 13) (footnote omitted).

The answer of a witness to the Government's question is not something "the government means." Rather, it is testimony. Again, Professor Falk proposes to guess at what the Government means based on a question it asked (which the jury will be instructed is not evidence) and to respond to what he thinks the Government could argue. For the same reasons just described above, this kind of argument of counsel masquerading as "expert" opinion should be precluded.

- Professor Falk also proposes to opine that "[i]n this context, the cryptographic term 'honesty' or 'honest behavior' does not have anything to do with 'truthfulness' or telling the truth," that "[u]sers of Ethereum and MEV-Boost are not obligated or expected to make any promises that they will behave as 'honest' users of the system, and indeed there is no mechanism for ensuring that they do so." (Supp. Discl. ¶ 4).

This opinion is inappropriate on multiple grounds. To start, Professor Falk articulates no reliable basis to reach these conclusions. In essence, he is opining about what particular terms mean to general body of users of Ethereum and MEV-Boost (some of whom have testified to their

understanding).  But he cites only how "[a]cademic literature often models protocol validators" (and even that citation says nothing about the terms "honesty" or "honest behavior"). (Supp. Discl. ¶ 2 n.3).  He has done no study to support his claim.  Professor Falk provides nothing that establishes how ***the users*** of Ethereum and MEV-Boost use these terms.  That failing is especially acute where, as here, the Court has observed that "none [of the defendants' experts] have experience in MEV-Boost in particular."  (10/9/2025 Tr. at 30).

Moreover, Professor Falk's opinion not only fails the *Daubert* standard, it also usurps the Court's and the jury's role by functionally instructing the jury about how they should understand evidence adduced at trial about acting "honestly"—a term that is used both in Flashbots documents and by the defendants and their co-conspirators.  The Court will instruct the jury with respect to what constitutes fraud and what constitutes false or fraudulent conduct.  It is not the appropriate role of an expert to exclude from that instruction conduct that the expert believes was "honest." *See Scott,* 315 F.R.D. at 48*; LinkCo, Inc.*, 2002 WL 1585551, at *2.  It is hardly beyond the ken of the jury to evaluate whether the defendants' conduct constituted fraud or did not meet that definition because it was "honest" based on the facts in evidence; an expert's testimony on such grounds adds no technical expertise to aid the jury's task. *See United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir.1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) ("Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own.").

Even if this were appropriate expert testimony, Professor Falk's opinions about what constitutes "honest" behavior should also be precluded under Rule 403.  These opinions will almost certainly cause the jury confusion when it is instructed on what constitutes fraud and false and fraudulent representations and statements, instructions that do not use the terms "honest," "honesty," or "honest behavior." *See Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024) (because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," the "judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses").  Finally, Professor Falk's opinion that MEV-Boost users make no promises also fails the *Daubert* test.  As noted above, Professor Falk has not used MEV-Boost.  Moreover, this is simply another flavor of the "'anything goes' in cryptocurrency markets" argument that the defendants disclaimed and which the Court precluded. *United States v. Peraire-Bueno*, 24 Cr. 293, 2025 WL 2753560, at *5 (S.D.N.Y. Sept. 29, 2025).

- Professor Falk proposes to testify that the incorrect parent and state root values "[were] not contrary to the Ethereum protocol and [did] not make the block or block header 'false.'"  (Supp. Discl. ¶ 14).

Here, too, Professor Falk usurps the role of the Court and the jury.  Citing nothing for the proposition, Professor Falk simply asserts that a block that he concedes is "invalid" nonetheless is not "false."  (Supp. Discl. ¶ 14).  But the Court will tell the jury what constitutes a false or fraudulent representation, and the jury will decide whether the defendants' creation of an invalid block in these circumstances is a false or fraudulent representation, or constitutes deception that is not premised upon spoken or written words alone.  Professor Falk's opinion that an invalid block

is nonetheless not "false" improperly tells the jury what conclusion to reach (*i.e.*, that an invalid block, despite its invalidity and the surrounding circumstances, is not "false"); and embodies a legal conclusion that the jury is being asked to decide (*i.e.*, whether there have been false or fraudulent pretenses, representations, or promises). *United States v. Scop*, 846 F.2d 135, 139-40 (2d Cir. 1988) (expert may not "merely tell the jury what result to reach" or "offer opinions embodying legal conclusions"). *See Scott*, 315 F.R.D. at 48; *accord LinkCo, Inc.*, 2002 WL 1585551, at *2; *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (district court must exclude expert testimony that "expresses a legal conclusion"); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it"); *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987) (district court must be vigilant to prevent an expert from coming "dangerously close to usurping the jury's function"). As with his other opinions, Professor Falk's opinion also fails Rule 403 balancing: it carries a significant risk of misleading the jury and confusing the issues by opining, with the imprimatur of expertise, on an issue the jury will be asked to decide pursuant to instructions given by the Court.

Finally, this opinion, by asserting that something is "not contrary to the Ehtereum protocol" is not "'false,'" (Supp. Discl. ¶ 14), invites the jury to do precisely what the Court has forbidden: to conclude that just because the defendants' actions were not contrary to the Ethereum protocol, their actions were not unlawful. *Peraire-Bueno*, 2025 WL 2753560, at *5.

- Professor Falk also proposes to testify, in response to Robert Miller's testimony regarding the intended purpose and design of the MEV-Boost system, that the relay at issue did not "behave[] inconsistently with its intended purpose as described by public Flashbots documentation," that the "code appears to correctly implement its stated behavior," and that "[a]ll of these facts . . . would inform a reasonable MEV-Boost user's understanding of what the code was intended to do." (Supp. Discl. ¶¶ 16-17).

As an initial matter, Professor Falk has not established that he is remotely qualified to opine on the purpose and design of MEV-Boost: he has never used it, he does not appear to have published any academic studies regarding MEV-Boost, and defendants make only a cryptic reference to his "familiar[ity] with MEV-Boost and Flashbots long before this litigation" as an "academic" in "this space." (Dkt. 156 at 20). Moreover, as is the case with his other new opinions, Professor Falk has not disclosed **what** specific Flashbots documentation or code he was referring to or what other documentation he looked at but may have rejected.

In addition, Professor Falk's opinion suggesting what a "reasonable MEV-Boost user" would understand about MEV-Boost[1] is improper: (i) Professor Falk cites no survey or other data

---

[1] The opinion is framed as what facts "would inform" a reasonable MEV-Boost user's understanding of what the code was intended to do, (Supp. Discl. ¶ 17), but this will almost certainly be heard by the jury as what a reasonable MEV-Boost user's understanding will, or should, be.

that demonstrates how MEV-Boost users actually understand what the code was intended to so;[2] (ii) he usurps the Court's and jury's function by adopting terminology the Court may define (*compare* "a reasonable MEV-Boost user," *with* "reasonable person") and purporting to tell the jury what such a reasonable person will understand; and (iii) Professor Falk goes beyond what an expert can opine about by purporting to know the state of mind of a "reasonable MEV-Boost user." *See Scott*, 315 F.R.D. at 46; *see also SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (rejecting as inadmissible expert opinion on "whether the specific information at issue in a case" was "economically material").

- Professor Falk also purports to opine on Robert Miller's testimony regarding "commit-reveal" schemes, opining that a validator's "digital signature" is "not a cryptographic commitment in the technical sense" of a "Commit-Reveal scheme," and that the "MEV-Boost Relay does not follow the pattern of a typical Commit-Reveal scheme." (Supp. Discl. ¶ 20).

Professor Falk's opinion provides no discernable bases or reasons for his new opinion, which proceeds from his assertion that commit-reveal schemes "have a specific technical meaning," but then cites only an article from more than 40 years ago and a definition of a "commit-reveal scheme" from an unsourced third-party blog post. *See United States v. Phillips*, 22 Cr. 138 (LJL), 2023 WL 6620146, at *12 (S.D.N.Y. Oct. 10, 2023) (experts cannot "merely parrot the views of other experts" or "read secondary sources to the jury"). He also fails to identify why a "typical Commit-Reveal scheme," in his parlance, would matter. Indeed, if, as Professor Falk claims, the "MEV-Boost Relay does not follow the pattern of a typical Commit-Reveal scheme," (*id.*), then his opinions regarding what a "typical" commit-reveal scheme means in the "technical" sense are completely irrelevant. *See Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 418 (S.D.N.Y. 2017) ("Where an expert opinion is based on assumptions that are not present in the case, the opinion 'cannot be said to assist the trier of fact as Rule 702 requires.'" (citation omitted)). Instead, Professor Falk opines that to the extent that MEV-Boost is "sometimes colloquially referred to as a commit-reveal scheme," the "signature on a blockheader" would only "represent a 'commitment' to being slashed if you propose another block," but not a commitment "to *not* propose another block." (Supp. Disc. ¶ 20). There are several infirmities with these new opinions as well. To start, they are completely unsourced. Professor Falk discloses no bases at all for his new conclusions regarding what a signed blockheader does or does not mean. Moreover, they are inadmissible because they merely purport to interpret the meaning of a signed blockheader *for* the jury, with no reasoning or explanation other than it being what Professor Falk thinks. *See Scott*, 315 F.R.D. at 48. Finally, this testimony should be precluded under Rule 403, because it invites the jury to simply substitute Professor Falk's interpretation of the import of a signed blockheader

---

[2] Similarly, Professor Falk opines about what is the "expected" behavior of a validator in Ethereum. (Supp. Discl. ¶ 1). The cited basis for this assertion is his initial disclosure, which in turn cites a magazine article that itself does not discuss the "expected" behavior of validators or include any cognizable methodology. (Dkt. 148-2, ¶ 46 & n.32). But Professor Falk nowhere explains by whom this behavior is expected or what work he has done to determine how widely shared this "expectation" is. There is no citation to, for example, a survey of the users of Ethereum or MEV-Boost to determine what their expectations are, or any field interviews with Ethereum or MEV-Boost users.

for their own evaluation of the evidence. *Bustamante*, 100 F.4th at 427 (cautioning that a district court must police Rule 403 because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it").

- Professor Falk also opines on the purpose of a validator registering with a MEV-Boost Relay, claiming that the "point of registration is to ensure that the validator can get paid by block builders," that it "in no way binds the validator to any future actions," and that it "would be completely acceptable to register and never call getHeader." (Supp. Discl. ¶ 23).

Here again, Professor Falk has not sufficiently established why he is qualified to opine on the purpose and function of specific aspects of software that he did not design or develop and does not appear to have used, written about, or studied in any meaningful respect. Professor Falk discloses only a single public Flashbots document for this new opinion, which does not support his opinion. (*See* Supp. Discl. ¶ 23 nn.29 & 30). It shows merely that a validator sets its payment preferences at the registration stage, which is evident from the face of the document and the testimony at trial already, and calling Professor Falk to read a Flashbots document to the jury would be unhelpful, cumulative, and an unnecessary waste of time. Professor Falk makes no effort to articulate the bases, reasons, or methodology of his opinion as to what registration does or does not mean, why it would be "completely acceptable" to register and never request a block, much less what he would define as "completely acceptable," in what context, and by whom. Professor Falk's opinions are also inadmissible under Rule 403 because any limited probative value of Professor Falk's unsupported opinions is substantially outweighed by the risk of misleading the jury into conflating what is "completely acceptable" with what is lawful. And finally, Professor Falk's categorical opinion regarding what is "completely acceptable" is the flipside of the "code is law" argument and evidence that the Court has ruled to be inadmissible. *Peraire-Bueno*, 2025 WL 2753560, at *5.

\* \* \*

The examples set forth above merely illustrate the significant deficiencies that permeate Professor Falk's new opinions, which should be precluded in their entirety. His boilerplate incantation of his "academic work and experience" are an insufficient basis for these opinions and quintessential "*ipse dixit.*"    (*See* Supp. Discl., ¶¶ 5, 9, 12, 15, 18, 21, 24). Professor Falk's occasional reference to unspecified "academic literature," "industry publications," "public articles on Ethereum," and "public documentation on MEV-Boost" does not save his opinions and fails to explain how he is applying any "rigorous analytical connection" to his review of any such materials. *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005); *see United States v. Gentile*, 21 Cr. 54 (RPK), 2024 WL 3251702, at *3 (E.D.N.Y. June 20, 2024) (finding "single-sentence explanation" that the expert's "opinions are founded in 'his education, knowledge, and experience in the fund industry'" to be "an '*ipse dixit* of the expert from experience' statement that is inadequate to satisfy the Rule 16 standard"). These generic bases and reasons are plainly insufficient to "identify the objective bases for the opinion" with enough specificity for the Court to "assess the opinion in the first instance." *United States v. Ulbricht*, 14 Cr. 68 (KBF), 2015 WL 413318, at *7 (S.D.N.Y. Feb. 1, 2025); *see, e.g.*, *United States Ferguson*, 06 Cr. 137 (CFD), 2007 WL 4539646, at *2 (D. Conn. Dec. 14, 2007) (finding list of "numerous broad-based sources" that

"did not specify which sources the expert used to reach the different opinions identified" to be insufficient).

Further, district courts routinely exclude expert testimony that purports to be based merely on the "experience" of an expert, or something found in singular documents they may have read which fails to reflect any synthesis of data and study in their particular field. *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 471 (S.D.N.Y. 2023) (excluding proposed testimony based on "training and experience," "the usual economic and general understanding," and "long literature"). Indeed, it is well-established that an expert "may not . . . simply transmit . . . hearsay to the jury," whether in the form of statements by others or "printed and online materials." *Mejia*, 545 F.3d at 197. Nor are "[o]pinions that assume a conclusion and 'reverse-engineer[] a theory' to fit that conclusion" admissible. *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018). At bottom, an expert opinion based on insufficient facts, unsupported suppositions, or unreliable methodology is neither acceptable nor admissible. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (expert testimony should be excluded if it is "speculative or conjectural" or "conclusory").

These concerns are magnified where, as here, Professor Falk's new opinions reflect no studies, surveys, interviews, or any other methodology—indeed, it appears he has never published his supplemental opinions in any setting, let alone a peer-reviewed setting. Instead, Professor Falk's new opinions appear on their face to be a mouthpiece for defendants' legal arguments in response to the Government's opening statement, witness testimony, and letter describing certain means of the fraud scheme, which the Court requested for its jury instructions on the law. Indeed, Professor Falk's supplemental disclosure is itself styled as a point-by-point rebuttal to the Government's descriptions set forth in its jury instructions letter. (*Compare* Dkt. 182 (letter describing seven examples of the defendants' misrepresentations and deceptive conduct), *with* Supp. Discl., Dkt. 187-1 (purporting to rebut those precise seven examples). Professor Falk's commentary on witness testimony further exposes his explicit "tailoring" of his opinions. *See, e.g., United States v. Sindone*, 01 Cr. 517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002) (noting "the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented."). Finally, the fact that Professor Falk cites to no other academic pieces regarding MEV-Boost to support his views is particularly telling—it suggests that he lacks independent familiarity with the relevant academic literature (and thus is unqualified), that his litigation-tailored opinions find no support in the academic literature (and thus his methodology is unreliable), or both.[3]

---

[3] The prejudice to the Government is exacerbated by the lack of Rule 26.2 material provided to the Government since the defendants' initial production on September 17, 2025, which itself only consists principally of Professor Falk's engagement letter, expert notice, and scheduling communications, without any substantive communications or notes. The defendants have only recently agreed in principle to disclose a list of legal filings (including transcripts) that have been provided to their noticed experts, but that alone does not cure the deficiencies with Professor Falk's new opinions. The defendants have also disclosed no Rule 26.2 material in connection with the supplemental disclosure.

## II.     Professor Falk's Mid-Trial Disclosure Violates Rule 16's Notice Requirements

Professor Falk's new opinions should also be precluded on another, independent basis: they are being disclosed far too late to comply with Rule 16 and provide the Government with adequate opportunity to respond. And contrary to the defendants' suggestions, they were fully apprised of the Government's allegations long before it filed its letter on October 16, 2025 setting forth the alleged misrepresentations and deceptive conduct.

Rule 16 expressly provides that the court "must set a time for the defendant to make the defendant's disclosures," which "***must be sufficiently before trial*** to provide a fair opportunity for the government to meet the defendant's evidence." Fed. R. Crim P. 16(b)(1)(C)(ii) (emphasis added); *see United States v. Amirov*, 22 Cr. 438 (CM), 2025 WL 636088, at *3 (S.D.N.Y. Feb. 27, 2025) (Rule 16 requires that disclosure "must be made, not during the trial, but 'sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence'"). These disclosures must also contain "***a complete statement of all opinions*** that the defendant will elicit from the witness in the defendant's case-in-chief" and their "***bases and reasons***." Fed. R. Crim. P. 16(b)(1)(C)(ii) (emphases added). The defendants cannot circumvent Rule 16 "by asserting that [they] would only offer its expert evidence 'in rebuttal' if certain proof comes in on the Government's case," because Rule 16 "is perfectly clear that . . . the defense expert's opinion must be proffered in advance of the trial." *Amirov*, 2025 WL 636088, at *4; *see also United States v. Rajaratnam*, 09 Cr. 1184 (RJH), 2011 WL 723530, at *5 (S.D.N.Y. Feb. 25, 2011) (explaining that defendants' Rule 16 obligations are not dependent "on the government's laying open its entire case [to] the defendant's satisfaction"). Professor Falk's new opinions appeared nowhere in the defendants' initial disclosures and should not be permitted now. *See Ulbricht*, 2015 WL 413318, at *5 (collecting cases in which various courts precluded expert testimony disclosed on the eighth day of trial, on the Friday before Monday start of trial, three days before jury selection, on the day before trial, and less than one week before trial).

Not only does this late disclosure impair the Government's ability to meet this evidence—for example, by making it impossible for the Government to timely retain a rebuttal expert—but it also reveals the impropriety of the opinions themselves. Rule 16 does not contemplate that a defense expert would watch the events of a trial, review the Government's litigation submissions, and then purport to offer his own, unsupported opinions on the validity of the Government's arguments and the meaning of the evidence for the jury, *see Scott*, 315 F.R.D. at 48*; LinkCo, Inc.*, 2002 WL 1585551, at *2; *accord Amirov*, 2025 WL 636088, at *3-4; *Rajaratnam*, 2011 WL 723530, at *5. And for good reason: as set forth above, that is not the proper province of an expert witness, and it implicates the very same testimony-tailoring concerns that explain why the Government is not required to preview its case-in-chief before trial and why witnesses must be sequestered at a party's request. *See Sindone*, 2002 WL 48604, at *1; *Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 762 (2d Cir. 1998) (explaining that Rule 615 "seeks to prevent the 'tailoring' of a witness's testimony to that evidence given earlier in the trial"). Rule 16 requires disclosure "sufficiently before trial," plain and simple. Fed. R. Crim. P. 16(b)(1)(C)(ii). Professor Falk's "supplemental" opinions can be excluded on that basis alone.

Lastly, the defense has had ample notice for months that the evidence at trial would include the "new" topics upon which Professor Falk now purports to opine. *See Ulbricht*, 2015 WL

413318, at *1 (precluding defense expert testimony disclosed mid-trial where the "evidence on which the Government has based its case-in-chief was long ago disclosed to the defense"). In contrast to the Court, which relied on the legal filings of the parties, the defense received far greater detail about the Government's case through its extensive Rule 16 productions, Section 3500 productions, and exhibit productions—which were further contextualized by the speaking Indictment, search warrant affidavits, oral argument presentations, and numerous pretrial filings. [4] These disclosures made the factual underpinnings of the Government's case-in-chief available to the defendants well before trial, as illustrated by the examples below:

- **GX 3442**: Slack messages in "omakase" channel discussing whether to run another validator in parallel to "behave[] as an honest validator should," which was produced in November 2024 and identified as an exhibit on August 29, 2025.

- **3506-005**: Government interview with Robert Miller in June 2025 discussing "honest" and "malicious" validators, as well as the "commit and reveal" interaction between the validator and the relay, which was produced on September 16, 2025.

- **GX 3406**: Slack messages in "omakase-unblinding" channel discussing the functionality of the getHeader function, which was produced in November 2024 and identified as an exhibit on August 29, 2025.

- **GX 3446**: Slack messages in "omakase-unblinding" channel describing the "unblinding [as] basically two calls, get_header + unblind," which was produced in November 2024 and identified as an exhibit on August 29, 2025.

- **GX 3682**: Saved Google document outlining four-step Omakase plan, which states "[n]eed to set up an mev-boost validator that has the relay unblind the block to us" as part of "Unblinding the Block," which was cross-produced in July 2025 and identified as an exhibit on August 8, 2025.

The defendants attempt to frame Professor Falk's supplemental disclosure as responding to "topics and theories" to which the Government has purportedly "recently pivoted." (Dkt. 187, at 1). The

---

[4] For example, the Indictment alleges a "unified scheme to defraud" that involved the use of "multiple misrepresentations (including implied misrepresentations) to accomplish its object," including (i) posing as an honest MEV-Boost validator; and (ii) misleadingly requesting a block from the relay. (*See* Dkt. 188, at 2-3 (citing Indictment's allegations)). The Government also explained during the June 17, 2025 argument that, based on information provided by Robert Miller, (i) "[t]he moment the validator sends a digital signature to a relay, as they did in this case, 'I promise to publish this block as structured by the block header,' and they do not do that, that is a lie, that is a misstatement, and that goes to the wire fraud"; and (ii) "[u]sing the MEV-Boost software, the validator was not supposed to reorder the transactions at all." (Dkt. 100, at 52, 55-56, 58). Likewise, the Government explained in its July 17, 2025 opposition to defendants' motion to compel that under the MEV-Boost system, the "validator asks the relay for the highest-value blockheader" and "commits to publishing the block as structured by digitally signing the blockheader that is sent to the relay" without seeing its transaction contents. (Dkt. 111, at 7).

defendants are wrong.[5]  As a result, the delay by the defense has nothing to do with any lack of notice regarding the scope of the Government's proof, and there is no credible reason why Professor Falk could not have disclosed his "supplemental" opinions on these topics earlier.  *Cf. Sandata Techs., Inc. v. Infocrossing, Inc.*, 05 Civ. 9546 (LMM) (THK), 06 Civ. 1896 (LMM) (THK), 2007 WL 4157163, at *6 (S.D.N.Y. Nov. 16, 2007) (explaining in civil context that "experts are not free to continually bolster, strengthen, or improve their efforts by endlessly researching the issues they already opined on, or to continually supplement their opinions").  Instead, Professor Falk's delay served one purpose: to allow a scientific expert to "opine" to the jury that the Government and the Government's fact witnesses are wrong, rather than rely on defense cross-examination and arguments by defense attorneys to the jury.

### III.  Conclusion

For the foregoing reasons, the Court should preclude Professor Falk's supplemental opinions in their entirety.  In the alternative, the Government requests that the Court order a brief *Daubert* hearing before the defendants' case-in-chief to explore the bases, reasoning, and methodology for Professor Falk's new opinions.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: /s/
Jerry J. Fang / Danielle M. Kudla
Benjamin L. Levander / Ryan T. Nees
Assistant United States Attorneys
(212) 637-2584 / 2304 / 1930 / 1595

Cc:    Defense Counsel (by ECF)

---

[5] Professor Falk's supplemental opinions are not somehow made proper based on the lack of analogous expert disclosures by the Government.  The Court already denied defendants' motion to compel expert disclosures from the Government's percipient witnesses.  (Dkt. 119).  What Rule 16 "requires [is] reciprocity; it makes no provision for a holistic comparison of what each side has or has not disclosed."  *Rajaratnam*, 2011 WL 723530, at *5.   The Government complied with its obligations in this case—the fact that the law does not require it to provide a roadmap of its case-in-chief or trial strategy, disclose the precise manner in which the crime was committed, or specify its legal theories in advance of trial does not justify Professor Falk's supplemental opinions.  *See, e.g.*, *United States v. Kogan*, 283 F. Supp. 3d 127, 132 (S.D.N.Y. 2017) (collecting cases); *United States v. Taormina*, 97 Cr. 1120 (MBM), 1998 WL 702341, at *4 (S.D.N.Y. Oct. 8, 1998) (collecting cases); *see also United States v. Zhang*, 833 F. Supp. 1010, 1020 (S.D.N.Y. 1993) (holding, in customs fraud case, that there "is no requirement that the Government reveal its precise legal theory of the fraudulent statements by identifying which components of [facts disclosed to the defense] are false").