UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>ANTON PERAIRE-BUENO, and<br>JAMES PERAIRE-BUENO,<br><br>　　　　Defendants. | Case No. 1:24-cr-00293-JGLC |

BRIEF OF AMICUS CURIAE COIN CENTER
IN SUPPORT OF DEFENDANTS' OBJECTIONS TO "HONEST VALIDATOR"
THEORY OF FRAUD

Tami Stark
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
tami.stark@whitecase.com

OF COUNSEL
Peter Van Valkenburgh
Coin Center
700 K Street NW
Washington, DC 20001
peter@coincenter.org

Pratin Vallabhaneni
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
prat.vallabhaneni@whitecase.com

Rachel Rodman
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
rachel.rodman@whitecase.com

**INTEREST OF AMICUS CURIAE**

Coin Center is a Washington, DC-based non-profit research and advocacy center focused on the public policy issues facing cryptocurrency and decentralized computing technologies such as Bitcoin and Ethereum. Coin Center's mission is to defend the rights of individuals to build and use free and open cryptocurrency networks. These rights include: (1) the right to write and publish code—to read and to run it; (2) the right to assemble into peer-to-peer networks; and (3) the right to do all this privately. Coin Center, when necessary, engages in litigation to defend its mission from regulatory overreach.[1]

**ARGUMENT**

The claims of the prosecution in this case—in particular regarding "honest validation"—are wildly divergent from longstanding practice in the communities that design and maintain open blockchain systems like Ethereum. Based on Coin Center's expertise in the technology and the facts of this case as it understands them, Coin Center's position is: (1) that "honest validation" in cryptocurrency communities is a mathematical check rather than a legal or normative judgment, and Defendants appear to have contravened none of the clear rules or controls found within the Ethereum protocol in a manner deserving outside interference or enforcement; (2) that there are many reasons and an inherent logic as to why Ethereum's protocol rules have been designed to allow for Defendants' conduct, and (3) that the prosecution is asking the Court to impose a novel and alien code of conduct on top of those protocol rules,

---

[1] *See, e.g., Harper v. Werfel*, No. 23-1565 (1st Cir.) (filed Oct. 20, 2023); *Grayscale Investments, LLC v. Sec. & Exch. Comm'n*, No. 22-1142 (D.C. Cir.) (filed Oct. 18, 2022); *United States v. Storm*, No. 23-cr-430, at ECF 42 (S.D.N.Y.) (filed April 5, 2024); *Beba LLC et al. v. Sec. & Exch. Comm'n*, No. 6:24-cv-00153, at ECF 32 (W.D. Tx.) (filed Oct. 22, 2024).

not only without justification, but in a manner that would be detrimental for the government to do through criminal prosecution.

Indeed, it would massively chill public participation in these innovative systems. To join the Ethereum network as a validator, one would no longer need only to understand the deterministic and verifiable rules of the software protocol, but also to wonder what the "emergent" codes of conduct in the ecosystem may be and whether those wooly norms will be seized upon by government prosecutors to hold one responsible for alleged violations that carry profound consequences.

Ethereum is a global technology and ecosystem. It is novel, rapidly changing,[2] and unregulated,[3] but for its own internal economic incentives, cryptographic controls, and the fierce competition among its validators—including Defendants and the alleged victims—as described below. Ethereum's open source software establishes the rules and controls for that competition thanks to the voluntary software contributions of thousands of individual and brilliant developers working transparently and cooperatively.[4] To think that the judgement of a handful of

---

[2] The novelty of the proof of stake transition relative to the alleged criminal conduct is a matter of months not years, with no time for there to be inherently obvious emergent community norms and standards around appropriate participation beyond adherence to bare protocol requirements.

[3] Many activities persons may perform using Ethereum are regulated, for example, helping someone transmit money, or issuing securities. Ethereum, the network itself, is not regulated by outside authorities as none of the core activities that enable its functioning—writing software validating blocks—fit within existing definitions of regulated conduct. The network, instead, self-regulates using in-built economic and cryptographic incentives and controls. In this regard Ethereum is similar to Bitcoin, the original open blockchain network. *See, e.g.*, Jerry Brito, *Is Bitcoin Regulated?*, COIN CENTER (Jan. 13, 2015), https://www.coincenter.org/education/blockchain-101/is-bitcoin-regulated/.

[4] A conservative estimate might place the number of contributing software developers in the range of 3,000 to 10,000 individuals. Ethereum.org, operated by the Ethereum Foundation, estimates 12,000 contributors. *See Contributing*, ETHEREUM (March 18, 2025), https://ethereum.org/contributing. According to a longitudinal study of ten major Ethereum

prosecutors could lead to the imposition of specific alternative technical standards for what qualifies as lawful participation in that technology and to think that those standards would manifestly contradict many of the established rules in that open source software is, in a word, radical. Coin Center cares deeply about the continued organic emergence of new and innovative tools for financial freedom, privacy, and autonomy, and is deeply concerned about use of the criminal law to stymie or redirect that innovation in a direction preferred by a small number of unelected federal prosecutors with limited technical expertise.

To assist the Court, we will begin with a description of the technical role of validators in the Ethereum ecosystem and explain how competition amongst validators is encouraged. Within the Ethereum ecosystem, "honest" validation simply means obeying the specified rules of consensus articulated in the protocol software. Next, we show that adoption of the prosecution's "honest validator" theory of fraud would be alien to widespread industry practice and contravene longstanding legal principles of due process.

**I. Aggressive Block Validator Competition is Encouraged Within "Honest" Participation**

For clarity of discussion, we distinguish among three related but technically distinct roles in cryptocurrency block creation. In Bitcoin, a **miner** is the participant who expends computational power to create blocks under the proof-of-work consensus rules. In Ethereum's proof-of-stake system, that role is performed by a **validator**—an on-chain participant recognized by the consensus protocol who proposes and attests to blocks and may be *slashed* for certain

---

software repositories between 2014 and 2024, there were "17829 unique comment authors, with 2774 (15%) contributing to more than one repository." *See* M. Vaccargiu *et al.*, *Mining a Decade of Event Impacts on Contributor Dynamics in Ethereum: A Longitudinal Study*," 22D INT'L CONF. ON MINING SOFTWARE REPOSITORIES (Apr. 28-29 2025), https://smartbridgelab.co.uk/wp-content/uploads/2025/02/msr2025_preprint.pdf?utm (last visited Oct. 31, 2025).

protocol violations such as producing conflicting blocks.[5] Ethereum also has an open-source middleware layer, **MEV-Boost**, that enables block creation alongside "maximum extractable value" (MEV). Under Ethereum's MEV-Boost architecture, a **block builder**—which may be the validator itself or an external actor—assembles candidate blocks off-chain and submits them for proposal to increase the potential profits that validators and builders can capture. In this brief, we use **"miner"** when referring to Bitcoin's proof-of-work participants, **"validator"** when referring to Ethereum's on-chain consensus actors, and **"block builder"** only when discussing the off-chain assembly process.

Bitcoin, the original permissionless blockchain technology, was designed by its pseudonymous inventor to leverage miner competition over computing power in order to promote an "honest" chain. As the inventor's original white paper describes:

> If a majority of CPU power is controlled by honest nodes, the honest chain will grow the fastest and outpace any competing chains.[6]

Here, "honest" simply means obeying the specified rules of consensus articulated in the protocol software. These rules are not rich, wooly, and subject to interpretation like social norms. Nor are they comprehensive, flexible, or exhaustive as found in many common law or statutory law traditions. Instead, the rules are mathematical and simple: for example, two transactions spending the same source coins cannot be included in the same block. Software can detect that double spend unequivocally thanks to cryptographic hashes. No investigation into the state of

---

[5] On Ethereum, to become a validator, you must "stake" 32 ETH. A validator can be slashed or lose some of that 32 ETH for (i) proposing two different blocks in the same slot, (ii) surrounding votes, and (iii) double-signing (*i.e.,* attesting conflicting blocks). *See Proof-of-Stake Rewards and Penalties,*" ETHEREUM (Aug. 25, 2025), https://ethereum.org/developers/docs/consensus-mechanisms/pos/rewards-and-penalties/.

[6] Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*, BITCOIN, https://bitcoin.org/bitcoin.pdf (last visited Oct. 31, 2025).

mind or motives of the double spender need be made; it is simply self-evident that the rules of the software have been broken because the math of certain hash functions and cryptographic data schemes show it. Bitcoin has no penalties for "dishonest" mining because miners' contributions will simply be ignored by the larger "honest" chain. Key to understanding these norms is that dishonesty in the colloquial sense is *expected*, but cryptographic and economic tools are leveraged to discourage it or render it harmless. At no point do any participants expect to need the government or really anything in the physical world as a backstop to avenge "dishonesty" in the cryptographic sense—as in actions that are invalid vis-a-vis the software protocol.

Although this may not be the most intuitive understanding of "honest" for a lay person, it is unequivocally the common understanding of the blockchain industry and its participants. As one early Bitcoin core protocol developer succinctly remarked, "the protocol assumes that [block creators] profit maximize more or less up to the limit of consensus rules."[7]

Ethereum is a protocol that was directly inspired by Bitcoin. It takes from Bitcoin the same expectation that competitive validator behavior will be honest or desirable according to the bare rules of the protocol and not some larger "social consensus" over what "expectations" users should have of validators beyond selfish profit maximization up to the limits of the protocol. As Ethereum inventor Vitalik Buterin has summarized:

> If you're designing a protocol where, even if everything completely breaks, the losses are kept contained to the validators and users who opted in to participating in and using your protocol, this is low-risk. If, on the other hand, you have the intent to rope in the broader Ethereum ecosystem social consensus to fork or reorg to solve your

---

[7] Greg Maxwell, Comment to *Removing OP_Return Limits Seems Like a Huge Mistake* (May 2, 2025), https://bitcointalk.org/index.php?topic=5539943.msg65335891#msg65335891.

> problems, this is high-risk, and I argue that we should strongly resist all attempts to create such expectations.[8]

And speaking generally of the need for block creators to aggressively compete on all margins rather than collude to achieve ulterior ends, Mr. Buterin has said:

> [I]t is much harder, and more likely to be outright impossible, to make mechanisms that maintain desirable properties in a model where participants can collude, than in a model where they can't.[9]

Amongst thinkers in the cryptocurrency space, the goal of making miners or validators compete under minimal and crystal-clear constraints with automatic penalties for non-conformity is not some inherent prejudice toward markets or greed being good in the Gordon Gecko sense. Instead, it is a recognition that self-interest will always exist and that simpler rules for competition that are not subject to unverifiable outside information or pressure (as in outside the mathematical verification of the blockchain) will better ensure that said self-interest is cabined for a simple and politically-neutral purpose: mere mathematical transaction validation. As Mr. Buterin puts it:

> A blockchain's "purity," in the sense of it being a purely mathematical construct that attempts to come to consensus only on purely mathematical things, is a huge advantage. As soon as a blockchain tries to "hook in" to the outside world, the outside world's conflicts start to impact on the blockchain too.[10]

---

[8] Vitalek Buterin, *Don't Overload Ethereum's Consensus,* MEDIUM (May 24, 2023), https://medium.com/@Xmultiverse_org/vitalik-buterin-dont-overload-ethereum-s-consensus-e4a0eb6fd057.

[9] Vitalek Buterin, *On Collusion*, VITALEK.ETH.LIMO (April 3, 2019), https://vitalik.eth.limo/general/2019/04/03/collusion.html.

[10] Vitalek Buterin, *Don't Overload Ethereum's Consensus*, VITALEK.ETH.LIMO (May 21, 2023) https://vitalik.eth.limo/general/2023/05/21/dont_overload.html.

The ethos of validators to ruthlessly profit maximize up to the limit of protocol rules has come to be known as "miner extractable value" or "maximum extractable value." As the Ethereum Foundation, steward of the protocol software describes it:

> [MEV] refers to the maximum value that can be extracted from block production in excess of the standard block reward and gas fees by including, excluding, and changing the order of transactions in a block.[11]

Behaving in any other way would be economically irrational and unexpected.

A reputable American software and infrastructure development company in this space has even published a three point argument for why selfish MEV behavior is a *good* thing: (1) it helps "realiz[e] the full value of the network"; (2) it enhances the "smooth operation" of complex and leveraged financial instruments on chain; and (3) it increases "network security" by offering larger rewards to the parties who validate blocks.[12]

To be clear, both the alleged victims in this case as well as Defendants were engaged in MEV; they were competitors in this effort to extract value. The alleged victims were, in fact, users of highly successful software bots that sought to engage in this ruthless competition over maximum extractable value up to the extreme limits of the protocol just as industry participants would and should expect. The alleged injury is simply that they were out-competed by Defendants who also sought multiple commercial and technical avenues to maximize their own block rewards up to the limit defined by the protocol's narrow consensus rules for "honest" participation. The magnitude of the amount in controversy in this case has little to do with

---

[11] *Maximal Extractable Value (MEV)*, ETHEREUM (Oct. 20, 2025), https://ethereum.org/developers/docs/mev/.

[12] Benjamin Thalman, *Ethereum: MEV – What is it and Why is it Such a Good Thing?*, FIGMENT (Sept. 22, 2022), https://figment.io/insights/ethereum-mev-what-is-it-and-why-is-it-such-a-good-thing/.

Defendants and much more to do with the alleged victims. The only way the alleged victims could lose such a substantial commercial expectancy is by gambling that much on their own software's ability to outcompete and exploit ordinary users of the Ethereum blockchain (which may be detestable but is also not a crime).

The alleged misrepresentations of Defendants, so-called "bait transactions" and "false signatures," are established and unremarkable practices of validators who engage MEV and are not prohibited by the consensus rules of Ethereum. Indeed the Ethereum protocol anticipates that validators will engage in these tactics and automatically implements economic disincentives to discourage the behavior without prohibiting it or resorting to outside mechanisms of regulation.

The only sanction Ethereum's protocol imposed on Defendants' validating node was an automatic slashing for "equivocation"—the production of two conflicting block proposals. This sanction is built into the consensus code and is the network's sole penalty for that form of transactional behavior and has been deemed sufficient by the Ethereum community. Beyond this internal, automatic consequence, the Ethereum software imposed no penalty for the underlying MEV block building that gave rise to the alleged losses. The government's effort to criminalize those tactics thus represents a dramatic and unnecessary extension of law beyond the protocol's own self-contained enforcement mechanisms.

As Mr. Buterin has written of MEV generally:

> [the] current transaction market … puts the block proposer in a position to use sophisticated strategies to choose which transactions to include, or even include their own, to take advantage of opportunities such as DEX arbitrage and liquidations

(hereinafter just called "MEV" for simplicity) to maximize their profits.[13]

It is widely understood that this behavior is not a violation of the underlying protocol rules, but that it should spur ongoing research and development into whether those rules should be recalibrated to discourage it in the future.[14]

To again be very clear, "honesty" in the Ethereum validator community refers only to following mathematical protocol rules. There is a presumption that validators may at times—whether through malice or negligence—behave "dishonestly" per those rules and therefore the protocol imposes carefully calibrated costs on non-conforming validation. Defendants' presentation of two conflicting blocks is the kind of expected non-conforming validator behavior that triggers a modest automatic fee in the form of slashing, which is a risk participants consider in calibrating their validating behavior. Imposing a felony criminal penalty on that behavior wildly recalibrates the incentives for non-standard block validation and utterly supplants the careful specifications developed in the open source research and implementation of the Ethereum network. Ethereum's slashing feature *is* the only community-wide accepted and anticipated consequence for the behavior of Defendants. It is automatically triggered and imposes a modest penalty. A criminal prosecution, by contrast, is extreme and well outside the expectations of the

---

[13] Vitalek Buterin, *State of Research: Increasing Censorship Resistance of Transactions Under Proposer/Builder Separation (PBS)*, NOTES.ETHEREUM.ORG, https://notes.ethereum.org/@vbuterin/pbs_censorship_resistance (last visited Oct. 31, 2025).

[14] *See* Julian Ma, *Introduction to MEV Mitigation*, MIRROR (Dec. 11, 2024), https://mirror.xyz/julianma.eth/rcXa7B5y14tbfFWwOqSVHcNOzzmNKOG0EfZJAn_qom4?utm (suggesting that it may be impossible and undesirable to holistically prevent MEV because "Ethereum cannot obtain a transitive global ordering satisfying 'fairness'" and "the consensus protocol is unaware of the MEV games played on the execution layer"). In other words, there may be no mathematical check that could robustly discourage these anticipated behaviors beyond the existing consensus rules, and that such state of affairs is tolerable and preferable to injecting normative judgements into a network that aspires to neutrality.

ecosystem's participants, which are otherwise calibrated by the individual participants' economic cost-benefit considerations.

Notably, Ethereum completed its transition from proof-of-work to proof-of-stake consensus (known as the Merge) on September 15, 2022. The events underlying this prosecution occurred in approximately April 2023—barely seven months later. At that early stage in the life of Ethereum's proof-of-stake system, community norms governing validator and block builder conduct were still emerging and under active technical debate. Even setting aside the fact that the community's usage of the word "honest" is technical rather than normative, it would be unreasonable to treat then fluid and unsettled expectations of a new market as if they were established standards of more general "honest" behavior capable of giving rise to legal duties or supporting criminal allegations of misrepresentation or unfair dealing.

In the wake of Defendants' evident victory in MEV competition, no one—to Coin Center's knowledge—within the Ethereum community, apart from their bested competitors (and the prosecution), has argued that their actions in block creation violated the Ethereum consensus rules, or that the protocol's designated response (slashing) is an insufficient response warranting outside intervention from protocol developers let alone law enforcement.

Were the inverse true, had Defendants actually found a way to transgress the rules of the Ethereum protocol, there would be a roiling debate in the community over whether a flaw in those rules had allowed dishonest participation and whether that flaw should be adjusted in some radical and disruptive rewriting of those rules (often referred to as a hard fork). Such crises have befallen the Ethereum community (and other blockchain networks) in the past, for example during the so-called "DAO hack," when partisans argued over rolling back the chain to return certain hacked funds. That debate ultimately resulted in a contentious fork of Ethereum into two

11

separate and henceforward incompatible camps, Ethereum Classic (did not rollback the hacking transactions) and Ethereum (did rollback the hack).

Again, no such debate has even started in the Ethereum community as a result of Defendants' actions and, indeed, the statements of Ethereum's inventors and developers argue against any attempt to inject into Ethereum's consensus rules novel checks for more fair competition or other goods over which there is only some level of social consensus rather than actual mathematical and verifiable technical consensus.[15]

In short, the Ethereum protocol already embodies its own compact of honesty and discipline. Validators compete under a mathematically explicit and self-executing rule set; those rules alone define both the boundaries of permissible conduct and the penalties for deviation. Defendants' behavior fell squarely within that design. Their validator was slashed automatically when it equivocated—exactly as the software prescribes—and the event ended there. No consensus rule was breached, no invalid transactions were confirmed, and no technical debate arose within the community about amending the protocol.

To import a separate, prosecutor-made code of "honest dealing" into that environment would be to replace verifiable protocol enforcement with the vagaries of after-the-fact moral judgment. It would punish actors who conformed to the only standards that the network itself recognizes and relies upon. The genius of open blockchain systems lies in their ability to translate honesty into mathematics and sanction into code. When external authorities substitute that precision with ex-post expectations about fairness or intent, they do not reinforce the

---

[15] *See infra* n.10.

system—they destabilize it. Ethereum has already adjudicated Defendants' conduct through its own consensus process; the law should respect the finality of that resolution.

## II. Permitting Prosecutorial Hubris to Override Emergent Community Protocols is Dangerous & Does Not Allow for Due Process

All in all the actions of Defendants have triggered not even a tempest in a teapot. And yet, the prosecution wishes to vindicate the alleged victims (who are in fact only victims of competition that is manifestly recognized as fair by the relevant industry) by rejecting industry practice and substituting an unprecedented imposition of prosecutorial preference upon all of Ethereum. In this case—as in any civil or criminal case dealing with industry custom—it would be highly irregular for the government to impose upon these communities duties that are alien to their widespread practice, contradictory to established norms, and indeed corrosive of the underlying technical design the community has sought to achieve.

In the civil context the closest support for such an intervention is the well-known holding of Judge Learned Hand in *The T.J. Hooper v. Northern Barge Corporation*, where the Second Circuit found that barge operators should have a duty to have working receiving radios on board so as to be warned of unsafe conditions, and that said duty should exist even if only some barge pilots of the day were yet using these technologies.[16]

As a general guide, that case is not applicable to the facts here. Here, there is no indication that anyone in the community accepts that validators must engage in a particular form of MEV, indeed MEV itself is understood as an inherently cut-throat competition with in-built

---

[16] *See The T.J. Hooper et al. v. N. Barge Corp. et al.*, 60 F.2d 737, 739–740 (2d Cir. 1932) ("It is not fair to say that there was a general custom among coastwise carriers so to equip their tugs. One line alone did it; as for the rest, they relied upon their crews, so far as they can be said to have relied at all.").

and automatic protocol disincentives for otherwise unprohibited tactics. In *Hooper*, many had already adopted the use of radios, and the defendants in that case had radios but had failed to maintain them in working order.[17] The court-imposed duty to have working radios may have been in advance of industry practice but it traced, at least, a growing trend of having radios in industry. In contrast, the duty the prosecution seeks to impose is not merely in advance of industry practice; it directly contradicts that practice.

The principle in *Hooper* was never extended to situations where a court—in the absence of clear statutory law—was asked to impose duties that had no reflection in existing industry practices. As Justice Cardozo confirmed in a subsequent case, *Pokora*:

> Standards of prudent conduct are declared at times by courts, but they are taken over from the facts of life. . . . Illustrations such as these bear witness to the need for caution in framing standards of behavior that amount to rules of law. The need is the more urgent when there is no background of experience out of which the standards have emerged. They are then, not the natural flowerings of behavior in its customary forms, but rules artificially developed, and imposed from without. Extraordinary situations may not wisely or fairly be subjected to tests or regulations that are fitting for the common-place or normal."[18]

In sum, while it would be troubling enough for the government to invent new duties alien to established technical practice in a civil setting, it is profoundly more dangerous to do so through the criminal law. Criminal liability carries moral condemnation and the stigma of dishonesty, as well as the loss of liberty. To graft such penalties onto conduct that the relevant technical community regards as permissible—and that the governing protocol itself anticipates and sanctions internally—would raise grave due process concerns. Citizens must have fair notice

---

[17] *See id.*

[18] *Pokora v. Wabash R. Co.*, 292 U.S. 98, 104–06 (1934).

of what the law forbids.[19] No validator could reasonably foresee that actions tolerated and disciplined only by the protocol would later be treated as felonies. When industry custom and protocol rules are this clear, the Constitution's demand for clarity and restraint is at its zenith. This Court should decline to let criminal prosecution substitute for the organic evolution of technical standards within an open, self-governing network.

## III. Conclusion

Defendants did not engage in conduct that diverged from industry practice or the expectations of the Ethereum community. Their alleged misrepresentations were no more than anticipated hard-dealing from competitors in the MEV market and their actions were even anticipated by protocol rules.

Coin Center submits that while the prosecution has many important competencies to commend it, open source software development and distributed consensus protocol specification is not one of them. And yet, the prosecution asks the Court to abandon these emergent rules and standards and substitute the prosecution's own contradictory expectations that would carry full criminal consequences when broken by persons using and experimenting with these technologies. Coin Center thus humbly urges the Court to reject the prosecution's call to supplant the rules of the Ethereum network with the "honest validator" theory of fraud.

---

[19] *See Fed. Commc'n Comm. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.").

Respectfully submitted,

    /s/ Tami Stark
Tami Stark
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
tami.stark@whitecase.com

OF COUNSEL
Peter Van Valkenburgh
Coin Center
700 K Street NW
Washington, DC 20001
peter@coincenter.org

Pratin Vallabhaneni
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
prat.vallabhaneni@whitecase.com

Rachel Rodman
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
rachel.rodman@whitecase.com

*Counsel for Amicus Curiae Coin Center*