LAW OFFICES
## WILLIAMS & CONNOLLY LLP®

PATRICK J. LOOBY
(202) 434-5150
plooby@wc.com

680 MAINE AVENUE SW
WASHINGTON, DC 20024
202.434.5000
WWW.WC.COM

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

November 3, 2025

<u>Via ECF</u>
The Honorable Jessica G. L. Clarke
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Courtroom 11B
New York, NY 10007

  Re: *United States v. Anton Peraire-Bueno, et al.*, 24 Cr. 293 (JGLC) – Defendants' Letter Motion Regarding Government's Closing Argument

Dear Judge Clarke:

  Defendants Anton Peraire-Bueno and James Peraire-Bueno respectfully move to limit the scope and duration of the government's rebuttal closing argument and to preclude the following improper arguments from the government during both its principal closing argument and rebuttal.

**I.**  **Scope and Duration of Rebuttal Argument**

  "Rebuttal provides the government with the opportunity to respond to defendant's arguments. It does not allow the government to bring in new matters." *United States v. Giovanelli*, 945 F.2d 479, 495 (2d Cir. 1991) (Newman, J., concurring) (citation omitted). In rebuttal, the government "may not use the defense's comments to justify the reference to facts or the assertion of claims which it could have, but did not, introduce at trial unless defense counsel's remarks assert collateral, exculpatory alibis or defenses which the government would not have been expected to negate previously." *United States v. Faisal*, 282 Fed. Appx. 849, 850 (2d Cir. 2008) (citation omitted).

  If the government crosses this boundary in rebuttal, "some brief opportunity should … [be] afforded the defense to respond." *Giovanelli*, 945 F.2d at 496 (Newman, J., concurring).

  Moreover, as a matter of fairness and in the Court's discretion, the combined duration of the government's principal closing argument and rebuttal should not be permitted to exceed the combined duration of the defendants' closing arguments.

WILLIAMS & CONNOLLY LLP®

November 3, 2025
Page 2

## II. Argument Regarding "Shell Companies"

The terms "shell company" or "shell corporation" "could be perceived to have a pejorative meaning" and have little to no probative value. *United States v. Watts*, 934 F. Supp. 2d 451, 482 (E.D.N.Y. 2013) (precluding government witnesses from using the term). Even where the term is permitted, courts require a sufficient factual foundation that a company meets the technical definition of a "shell company." *United States v. Motovich*, 2024 WL 3303723, at *3 (E.D.N.Y. July 2, 2024); *United States v. Guo*, 2024 WL 1862022, at *4 (S.D.N.Y. Apr. 29, 2024). That technical definition is "a corporation that has no active business and usually exists only in name as a vehicle for another company's business operations." *Guo*, 2024 WL 1862022, at *4 (cleaned up).

At the final pre-trial conference, the defense noted its concern that the government was seeking the admission of certain corporate formation documents for the Peraire-Buenos' companies so it could argue they are "shell companies," when they are in fact "not shell companies." 10/9/25 Hr'g Tr. 11. The government acknowledged that any argument regarding shell companies would be "made as to the facts permitted in the evidence itself." *Id.*

On this record, neither Pine Needle Inc. nor Birch Bark Trading LLC meets the definition. Pine Needle was the entity through which the Atomic Arbitrage and other strategies were pursued. *See* Tr. 703, 898. Birch Bark was created to pursue the Omakase strategy. Tr. 878. Both companies thus ran active cryptocurrency businesses. *See* Tr. 902 ("Q. And as you previously testified, trading through 18Decimal and Pine Needle and Birch Bark was done through bots, right? A. Yes.). And both had multiple "employees" performing that work; Mr. Chen was an employee of Pine Needle, Tr. 837; 895, and a partner at Birch Bark, Tr. 898. That the government (incorrectly) claims the Omakase strategy was fraud does not make Birch Bark a shell company. There is no factual foundation that could justify the use of the term in closing argument.

## III. Argument that the Ethereum Protocol or MEV-Boost "Function Like Rules"

At the June 17, 2025, hearing on the Peraire-Buenos' pre-trial motions, the government made the following analogy between MEV-Boost and traffic rules (6/17/25 Hr'g Tr. 49-50):

> And, again, in fact, I want you to think of MEV-Boost similar to traffic rules. You can imagine a field of cars going in every direction. It creates confusion. It creates chaos. It creates inefficiency. What MEV-Boost was designed to do, what the protocols that are outlined in paragraphs 11 through 15 of the indictment and also outlined in paragraph 15 of the search warrant affidavit, was to add structure to that confusion, to provide predictability through rules.
>
> So when you drive, there's a double yellow line. You don't have to worry that someone's just going to cross randomly and hit your car, that there is a traffic light that cars will stop at, that there will be a stop sign. That is the purpose of the MEV-

WILLIAMS & CONNOLLY LLP®

November 3, 2025
Page 3

Boost software, and that's what the users using that MEV-Boost software, including the validators, are expected to behave with.

The Court should preclude any similar analogy equating either the Ethereum protocol or MEV-Boost to binding rules of conduct like traffic rules. These arguments would lack any factual basis. None of the government's witnesses testified that the Ethereum protocol or MEV-Boost software function like rules in this sense. Indeed, the only government witness who defined "protocol" did so in a way that would not permit these arguments. *See* Tr. 2004-05 (Hoffmeister).

Moreover, regarding MEV-Boost, the government's witnesses testified only about how the software was "designed" to function or was "intended" to be used. *See, e.g.*, Tr. 254 (Miller) ("Q. If a validator is using MEV-Boost, is it designed to alter the block that it receives. A. That's not the intended behavior, no."); *see also, e.g.*, Tr. 177-78, 196-97, 243-46, 550-51 (similar testimony from Miller);[1] Tr. 691, 710-11 (similar for Chen); *cf.* Tr. 921 (Chen) ("Q. And you understood that that was how the protocol encouraged or discouraged behavior? A. Yes. Q. You didn't see the incentives as rules, right? A. Not prior to omakase."). The government therefore may argue only that the technology was made to function in a way inconsistent with its purported "intended" design—whatever relevance that claim may have here—but may not argue that MEV-Boost's (or Ethereum's) design features are like "rules" that someone could break, or that were broken here.

### IV. Argument that Knowledge of the Israeli Investigation Can Satisfy the Money Laundering Statute's Third Element

The third element of the money laundering offense that is the alleged object of the Count Three conspiracy requires that the defendant knew "the property involved in the transaction represented proceeds from some form of activity that **_constitutes a felony_** under state, federal, **_or foreign law_**." Court Exhibit 14 (Proposed Final Jury Instructions) at 61 (emphases added). The Court will instruct the jury that the wire fraud alleged in Count Two is such a qualifying "form of activity." *Id.* It will not similarly instruct on the unknown offense underlying the Israeli investigation. *See id.*

The government should not be permitted to argue that the Peraire-Buenos' knowledge of the Israeli investigation satisfies this element because there is no evidence concerning the nature of the investigation (other than the fact that it related to Omakase), including about what violations of law were even under investigation. As a result, there is **_no evidence_** to support the inference that the investigation concerned a felony under Israeli law. The government did not call an expert on Israeli law or any witnesses from Israeli law enforcement or from Tether to explain the nature of the investigation, and it did not elicit any information beyond the bare existence of the

---

[1] In response to a question about honest validators to which the defense objected, Mr. Miller commented that "there are rules for how the different computers in the network are supposed to interact and the different actions that actors must take and they should take." Tr. 281-82. But this limited testimony defining the term "honest validator" is insufficient to support the traffic rules or similar analogies, including because the testimony did not even relate to MEV-Boost.

WILLIAMS & CONNOLLY LLP

November 3, 2025
Page 4

investigation from Mr. Yakira. *See, e.g.*, Tr. 1672 ("Q. Mr. Yakira, did you have to reach out to anyone else, aside from Tether, in your efforts to get the Tether frozen? A. Yes. So Chainalysis recommended to make a report with the Israeli police, so we did, and shortly thereafter, Tether froze the USDTs."). The government successfully resisted the Peraire-Buenos' efforts to elicit the fact that the investigation was closed on the grounds that doing so would unfairly require the government to introduce evidence concerning the nature of the investigation. *See* Tr. 1711-12.

On this record, the jury could only speculate that the investigation concerned an offense that constitutes a felony under Israeli law. A conviction may not rest on such speculative leap on an element of the offense. *See, e.g.*, *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("[A] conviction based on speculation and surmise alone cannot stand."); *see also United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("[W]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible.").

## V. Argument Regarding the Honest Validator Theory

For the all the reasons already discussed, the government may not argue that a supposed implicit promise to behave as a "honest" validator may suffice to prove the material misrepresentation aspect of the scheme-to-defraud element. *See* ECF 185; Tr. 2684-90; *see also* ECF 203-01. The theory is not alleged in the Indictment, is legally invalid under *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008), and is factually unsupported. *See* Tr. 2684-90. It is undisputed that validators never agree to be "honest" when using Ethereum and/or MEV-Boost.

## VI. Burden-Shifting Arguments

During its redirect examinations, the government has repeatedly posed questions to its witnesses that explicitly or implicitly criticized defense counsel for not asking certain questions or exploring certain topics. *See, e.g.*, Tr. 1555, 1560; *see also* Tr. 1684-85 (explaining basis for defense objections). The government should not be permitted to make any similar arguments in its closing argument (or rebuttal). *See United States v. Cruz*, 797 F.2d 90, 93 n.1 (2d Cir. 1986) (describing "prosecutor's use of the phrase 'the defense … has to convince you' in his summation" as "indefensible" (alteration omitted)); *cf. United States v. Wihbey*, 75 F.3d 761, 768-70 (1st Cir. 1996) (concluding that prosecutor "impermissibly suggested that [defendant] bore the burden of proof" when he stated, "Now, if [defendant's lawyer] can stand up and explain away that conversation to you, then you should let [defendant] walk out of here with a verdict of acquittal. But he can't do that, ladies and gentlemen, because that is not a conversation that an innocent man, who's been falsely accused, would have under those circumstances.").

## VII. Allusions to Uncharged Crimes

The government should be precluded from calling the alleged offense a "hack," a "theft," or analogizing the conduct to the uncharged offense of insider trading. *See* Tr. 85 (arguing in opening that defendants used "insider information about the trade details to tamper with the trades"); Tr. 1165 (sustaining objection to government question regarding insider trading). The

WILLIAMS & CONNOLLY LLP

November 3, 2025
Page 5

government should also be precluded from describing the Omakase strategy as a "bait-and-switch." Tr. 76 (using that phrase in opening). As shorthand for some kind of crime, "bait-and-switch" requires privity—a direct connection between a buyer and seller. If a defendant promises to sell a Rolex to a victim, takes the victim's money, but then gives the victim a Timex instead, that would be a bait-and-switch. But here, the Peraire-Buenos did not promise the sandwichers anything. They never even communicated with the sandwichers. The use of the "bait-and-switch" phrase is therefore both inapt and misleading to the jury, which is likely to conjure an immediate association between the phrase and what is commonly understood as a "*per se*" crime.

Any such argument would unfairly prejudice the Peraire-Buenos and distract the jury from evaluating whether the government has proven the charged offenses beyond a reasonable doubt.

\*    \*    \*

For the foregoing reasons, the Court should limit the government's rebuttal argument and preclude the identified improper arguments from the government during its closing argument.

Respectfully submitted,

By: */s/ William Fick*             By: */s/ Patrick J. Looby*
Fick & Marx LLP                                          Williams & Connolly LLP
*Counsel for Defendant*                *Counsel for Defendant*
*Anton Peraire-Bueno*                  *James Peraire-Bueno*

cc: Counsel of Record via ECF