UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                          :
  UNITED STATES OF AMERICA,               :
                                          :
            - v. -                        :          **S1 24 Cr. 293 (JGLC)**
                                          :
  ANTON PERAIRE-BUENO and                 :
  JAMES PERAIRE-BUENO,                    :
                                          :
            Defendants.                   :
                                          :
                                          :
-----------------------------------------------------x

# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE, TO DISMISS THE INDICTMENT

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Jerry Fang
Danielle Kudla
Benjamin Levander
Ryan Nees
Assistant United States Attorneys
        *- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

I.    Ethereum and MEV-Boost ........................................................................................ 4

II.   MEV-Boost Protocols and Bundled Transactions ................................................... 6

III.  The Victim Traders' Trading ................................................................................... 9

IV.   The Defendants' Criminal Scheme ........................................................................ 11

      A. The Exploit ...................................................................................................... 11

      B. Laundering the Proceeds ................................................................................. 19

V.    The Trial ................................................................................................................. 20

STANDARD OF REVIEW .................................................................................................. 21

ARGUMENT ...................................................................................................................... 22

I.    The Defendants Planned and Executed a Scheme to Defraud to Steal Ethereum Traders'
      Money .................................................................................................................... 22

      A. The Evidence Established Material Misrepresentations and False and Misleading
      Pretenses ............................................................................................................... 24

             1.    The Bait Transactions                                                      24

             2.    The Invalid Signed Blockheader                                             40

             3.    The Defendants Used False Pretenses and Made Implied
                   Misrepresentations as a MEV-Boost Validator                                48

      B. The Object of the Defendants' Fraud Scheme Was Property ..................... 55

      C. The Defendants Intended to Defraud Their Victims ................................. 59

II.   The Defendants Laundered the Stolen Proceeds ...................................................... 65

III.  The Defendants' Renewed Due Process Challenges Should Be Denied .................... 68

      A. Applicable Law ............................................................................................... 69

      B. Discussion ...................................................................................................... 70

             1.    The Statute As-Applied Is Not Unconstitutionally Vague             70

             2.    The Indictment's Application of the Wire Fraud Statute Is Not Novel   75

      CONCLUSION                                                                              77

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Baggett v. Bullitt*,
   377 U.S. 360 (1964)............................................................................................ 74

*Bouie v. City of Columbia*,
   378 U.S. 347 (1964)............................................................................................ 69

*Ortiz v. N.Y.S. Parole in Bronx, N.Y.*,
   586 F.3d 149 (2d Cir. 2009) ............................................................................. 70

*Ciminelli v. United States*,
   598 U.S. 306 (2023)....................................................................................... 57, 74

*Durland v. United States*,
   161 U.S. 306 (1896)............................................................................................ 56

*Jackson v. Virginia*,
   443 U.S. 307 (1979)............................................................................................ 21

*Kousisis v. United States*,
   605 U.S. 114 (2025)...........................................................................25, 56, 58, 60

*Liebowitz v. Cornell University*,
   584 F.3d 487 (2d Cir. 2009) ............................................................................. 32

*Loughrin v. United States*,
   573 U.S. 351 (2014)...................................................................................... 45, 46

*McNally v. United States*,
   483 U.S. 350 (1987).................................................................................32, 50, 74

*Neder v. United States*,
   527 U.S. 1 (1999)......................................................................................... passim

*Porcelli v. United States*,
   404 F.3d 157 (2d Cir. 2005) ............................................................................. 45

*Schmuck v. United States*,
   489 U.S. 705 (1989).................................................................................23, 39, 49

*Skilling v. United States*,
   561 U.S. 358 (2010)...................................................................................... 74, 75

*United States v. Abelis*,
   146 F.3d 73 (2d Cir. 1998) ............................................................................... 22

*United States v. Abu-Jihaad*,
   630 F.3d 102 (2d Cir. 2010) ............................................................................. 68

*United States v. Adler*,
   186 F.3d 574 (4th Cir. 1999) ........................................................................... 57

*United States v. Altman*,
   48 F.3d 96 (2d Cir. 1995) ................................................................................. 73

*United States v. Amico*,
   486 F.3d 764 (2d Cir. 2007) ............................................................................. 28

*United States v. Amrep Corp.*,
   560 F.2d 539 (2d Cir. 1977) .....................................................................25, 33, 41

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000) ..........................................................................26, 51

*United States v. Bases,*
  18 Cr. 48, 2022 WL 3586142 (N.D. Ill. Aug. 22, 2022) ...................................... 34, 35, 36, 63
*United States v. Bohn,*
  281 F. App'x 430 (6th Cir. 2008) ............................................................................................ 67
*United States v. Brown,*
  555 F.2d 336 (2d Cir. 1977) .................................................................................................... 75
*United States v. Bruchhausen,*
  977 F.2d 464 (9th Cir. 1992) .................................................................................................... 57
*United States v. Cassese,*
  428 F.3d 92 (2d Cir. 2005) ...................................................................................................... 64
*United States v. Chanu,*
  40 F.4th 528 (7th Cir. 2022) ...................................................................................... 25, 27, 29
*United States v. Coplan,*
  703 F.3d 46 (2d Cir. 2012) ...................................................................................................... 39
*United States v. Cordero,*
  205 F.3d 1325, 2000 WL 227818 (2d Cir. 2000) .................................................................... 44
*United States v. Coscia,*
  866 F.3d 782 (7th Cir. 2017) .................................................................................................... 35
*United States v. Cote,*
  544 F.3d 88 (2d Cir. 2008) ...................................................................................................... 22
*United States v. Cuti,*
  720 F.3d 453 (2d Cir. 2013) .................................................................................................... 21
*United States v. Daniel,*
  749 F.3d 608 (7th Cir. 2014) .................................................................................................... 54
*United States v. Davila-Perez,*
  19 Cr. 91 (DLC), 2025 WL 3551486 (S.D.N.Y. Dec. 11, 2025)............................................ 52
*United States v. Denkberg,*
  139 F.4th 147 (2d Cir. 2025) ...................................................................................... 27, 34, 63
*United States v. Diggles,*
  928 F.3d 380 (5th Cir. 2019) .................................................................................................... 67
*United States v. Eisenberg,*
  784 F. Supp. 3d 579 (S.D.N.Y. 2025) ................................................................................ 36, 38
*United States v. Farhane,*
  634 F.3d 127 (2d Cir. 2011) .................................................................................................... 69
*United States v. Finnerty,*
  533 F.3d 143 (2d Cir. 2008) ................................................................................ 49, 50, 51, 63
*United States v. Foxworth,*
  334 F. App'x 363 (2d Cir. 2009) ............................................................................................ 44
*United States v. Gentile,*
  21 Cr. 54 (RPK), 2025 WL 777090 (Mar. 11, 2025) .............................................................. 54
*United States v. Goffer,*
  721 F.3d 113 (2d Cir. 2013) .................................................................................................... 21
*United States v. Goklu,*
  19 Cr. 386 (PKC), 2023 WL 184254 (E.D.N.Y. Jan. 13, 2023)............................................ 47
*United States v. Gole,*
  158 F.3d 166 (2d Cir. 1998) .................................................................................................... 45

iii

*United States v. Greenberg,*
  835 F.3d 295 (2d Cir. 2016) ................................................................ 51, 59

*United States v. Guadagna,*
  183 F.3d 122 (2d Cir. 1999) ......................................................... 22, 39, 52

*United States v. Halloran,*
  821 F.3d 321 (2d Cir. 2016) ...................................................................... 69

*United States v. Hassan,*
  578 F.3d 108 (2d Cir. 2008) ...................................................................... 21

*United States v. Hicks,*
  15 Cr. 33, 2018 WL 817868 (W.D.N.Y. Feb. 12, 2018) ........................... 21

*United States v. Hild,*
  147 F.4th 103 (2d Cir. 2025) ............................................................. 25, 64

*United States v. Houtar,*
  980 F.3d 268 (2d Cir. 2020) ............................................................. 69, 73

*United States v. Ingredient Tech. Corp.,*
  698 F.2d 88 (2d Cir. 1983) ........................................................................ 75

*United States v. Isola,*
  548 F. App'x 723 (2d Cir. 2013) ............................................................... 28

*United States v. Jabar,*
  19 F.4th 66 (2d Cir. 2021) ........................................................................ 60

*United States v. Jones,*
  99 Cr. 264 (AHN), 2003 WL 1986929 (D. Conn. Feb. 28, 2003)............. 21

*United States v. Jordan,*
  19 Cr. 669, 2023 WL 12130999 (N.D. Ill. Sept. 14, 2023) ........... 25, 35, 36

*United States v. Kogan,*
  283 F. Supp. 3d 127 (S.D.N.Y. 2017) ...................................................... 53

*United States v. Landesman,*
  17 F.4th 298 (2d Cir. 2021) ............................................... 21, 22, 64, 66

*United States v. Lanier,*
  520 U.S. 259 (1997).................................................................................. 68

*United States v. LaPlante,*
  714 F.3d 641 (1st Cir. 2013) .................................................................... 54

*United States v. Levy,*
  11 Cr. 62 (PAC), 2013 WL 3832718 (S.D.N.Y. July 15, 2023)................ 50

*United States v. Lorenzo,*
  534 F.3d 153 (2d Cir. 2008) ...................................................................... 63

*United States v. MacKenzie,*
  777 F.2d 811 (2d Cir. 1985) ...................................................................... 71

*United States v. Manzano,*
  945 F.3d 616 (2d Cir. 2019) ...................................................................... 73

*United States v. McElroy,*
  910 F.2d 1016 (2d Cir. 1990) .................................................................... 71

*United States v. Morgenstern,*
  933 F.2d 1108 (2d Cir. 1991) ............................................................. 41, 42

*United States v. Morrison,*
  686 F.3d 94 (2d Cir. 2012) ........................................................................ 69

*United States v. Nadi*,
  996 F.2d 548 (2d Cir. 1993) ........................................................................ 73
*United States v. Pacilio*,
  85 F.4th 450 (7th Cir. 2023) .......................................................... 25, 34, 49
*United States v. Peraire-Bueno*,
  S1 24 Cr. 293 (JGLC), 2025 WL 2753560 (S.D.N.Y. Sept. 29, 2025) ............ 54, 55
*United States v. Persico*,
  645 F.3d 85 (2d Cir. 2011) .......................................................... 22, 26, 39
*United States v. Petrossi*,
  786 F. App'x 286 (2d Cir. 2019) ................................................ 29, 31, 32, 51
*United States v. Pukke*,
  No. 23 Cr. 168 (JPO), 2025 WL 2089261 (S.D.N.Y. July 25, 2025) ..................... 59
*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007) ........................................................................ 54
*United States v. Roberts*,
  363 F.3d 118 (2d Cir. 2004) .................................................................. 71, 74
*United States v. Runner*,
  43 F.4th 146 (2d Cir. 2025) ........................................................................ 60
*United States v. Rybicki*,
  354 F.3d 124 (2d Cir. 2003) ........................................................................ 71
*United States v. Sampson*,
  371 U.S. 75 (1962) ........................................................................................ 45
*United States v. Santos*,
  541 F.3d 63 (2d Cir. 2008) ........................................................................... 22
*United States v. Smith*,
  150 F.4th 832 (7th Cir. 2025) ....................................................................... 25
*United States v. Strauss*,
  999 F.2d 692 (2d Cir. 1993) .................................................................. 68, 72
*United States v. Taormina*,
  97 Cr. 1120 (MBM), 1998 WL 702341 (S.D.N.Y. Oct. 8, 1998) ...................... 53
*United States v. Teman*,
  465 F. Supp. 3d 277 (S.D.N.Y. 2000) ........................................................... 54
*United States v. Thomas*,
  377 F.3d 232 (2d Cir. 2004) ........................................................................ 28
*United States v. Triana-Mateus*,
  98 Cr. 958 (SWK), 2002 WL 562649 (S.D.N.Y. Apr. 15, 2002) ...................... 53
*United States v. Tuzman*,
  15 Cr. 536 (PPG), 2021 WL 1738530 (S.D.N.Y. May 3, 2021) ...................... 27
*United States v. Vorley*,
  18 Cr. 35, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021) ....................... 34, 35, 36
*United States v. Wasylyshyn*,
  979 F.3d 165 (2d Cir. 2020) ........................................................................ 69
*United States v. Weaver*,
  860 F.3d 90 (2d Cir. 2017) ................................................................... passim
*United States v. Wey*,
  15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ...................... 64

*United States v. Williams,*
  553 U.S. 285 (2008)..................................................................................... 70, 71

*United States v. Zhang,*
  833 F. Supp. 1010 (S.D.N.Y. 1993) ........................................................... 53

*Universal Health Servs. v. United States,*
  579 U.S. 176 (2016)........................................................................... 29, 44, 51

*VanCook v. SEC,*
  653 F.3d 130 (2d Cir. 2011) ....................................................................... 51

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982)..................................................................................... 71

## PRELIMINARY STATEMENT

Overwhelming evidence at trial proved that defendants Anton and James Peraire-Bueno conspired to defraud cryptocurrency traders using a particular software, MEV-Boost, out of more than $26 million and laundered those proceeds.  The defendants' scheme involved deception at every step along the way: baiting targeted victim traders with misleading transactions; becoming, in their words, "MEV-Boost validators" without any intent to validate blocks as received; feeding false data to MEV-Boost Relays to trick them into releasing private transaction data; falsely certifying the validity of a blockheader; propagating their own "poison" block to the Ethereum consensus network; deceiving their colleagues and friends about their conduct; and concealing the proceeds of their fraud behind an obscure web of financial transactions.

In the face of all this duplicity by the defendants—remarkably little of which is factually disputed—the defendants assert that no rational jury could find that any of their conduct constituted fraud.  Seeking to hide their deceptive practices behind the novelty of cryptocurrency technology, they claim it was impossible for their conduct to deceive, trick, or convey a false or misleading impression, and feign surprise that the wire fraud statute—which they expressly discussed as they planned how to "trap [their victims] all at once"—could be invoked against them.  The defendants abstractly reconceptualize property; obtusely redefine words like "validity"; dismiss witness testimony that contradicts their version of events; and assert that other traders—who were actually tricked, trapped, and lost millions in the defendants' scheme—could have no rational expectation that the software they used for the express purpose of preventing their transactions from being unbundled would actually work as intended.

But following the defendants down any of their baroquely constructed syllogisms would lead the Court to do what the law says it may not: seize upon slivers of the record in isolation;

weigh competing evidence for itself; make credibility assessments of witnesses; and draw inferences in the defendants' favor. Those are tasks exclusively reserved to the jury.

Rather than respect the jury's role, the defendants ask the Court to substitute its own judgment and find that only one conclusion may possibly be drawn from a vast record of evidence. But the Court may not impose a stilted interpretation of the record of the defendants' choosing. Because the record must instead be viewed in its totality, and in the light most favorable to the Government, the Court must deny the defendants' motion.

## **BACKGROUND**

The evidence at trial established that the defendants perpetrated a fraudulent scheme to steal over $26 million of cryptocurrency from particular Ethereum traders (the "Victim Traders"). As described further below, the defendants induced the Victim Traders to trade millions of dollars' worth of cryptocurrency, then exploited a coding bug they had discovered in widely used trade-processing software to gain early access to the Victim Traders' private transaction data and obtain the Victim Traders' money. The defendants' scheme (the "Exploit," referred to by the defendants as "Omakase") relied on false pretenses and representations, including:

- **The Bait Transactions**. The defendants submitted cryptocurrency transactions that falsely signaled a profitable trading opportunity *only* to the targeted Victim Traders. These Bait Transactions induced the Victim Traders to propose specific bundles of transactions that included the Bait Transactions. The defendants then—as they planned to do from the start—swapped out the Bait Transactions for essentially opposite transactions that allowed the defendants to spend hundreds of dollars to obtain the millions that the Bait Transactions tricked the Victim Traders into trading. (*E.g.*, Tr.621–22, 651–52, 717–18, 723, 727, 1662-65, 2715–16; GX4101, 611, 3682, 3407, 3409).

- **The Invalid Blockheader**. To gain access to private transaction data submitted by the Victim Traders in response to the Bait Transactions, the defendants, taking advantage of a coding bug they had discovered, intentionally signed and sent a "blockheader" with incorrect data to a third-party in the MEV-Boost system known as a relay. By submitting incorrect data, the defendants falsely

2

represented their commitment to the relay's block, caused the relay's block to fail, and tricked the Relay into giving them access to private transaction data contained in the relay's block, which the defendants used to create their own block of trades that stole millions from the Victim Traders. (*E.g.*, Tr.179, 214, 256–57, 261–65, 625–28, 665–71; GX503, 504, 3439 at 4, 3478 at 4).

- **The MEV-Boost Validator Pretense**. To take advantage of the coding bug and obtain a block of transactions from a MEV Boost Relay, the defendants spent about $1 million to become "validators," knowing that their sole purpose doing so was to carry out the Exploit. The defendants' validators registered with MEV-Boost relays, requested a block from relays, and misrepresented their commitment to propose the relay's block by submitting the Invalid Blockheader, all while concealing their intent to use private transaction data from the relay to steal the Victim Traders' money. (*E.g.*, Tr.179, 214, 606–08, 624–26, 702–03, 1167, 2597–98; GX4101, 3451, 503, 6701 at 15).

To carry out the Exploit, the defendants (i) targeted the Victim Traders, (Tr.577, GX3409, 4101); (ii) identified and studied the specialized MEV-Boost code specifications that the Victim Traders relied upon, (Tr.600–01, 1576–77; GX4101); (iii) designed and refined the Bait Transactions that targeted the Victim Traders and induced them to trade, (Tr.621–22, 651–52, 717, 727, GX4101); (iv) registered validators with MEV-Boost Relays with no intention of publishing the Victim Traders' private transactions as structured and protected by the MEV-Boost system, (Tr.624–25, 702, GX501 at 14, 3451); (v) intentionally transmitted false data to exploit a MEV-Boost coding vulnerability to trick the Relay into giving the defendants control of the Victim Traders' otherwise private transactions, (Tr.626–28, 654, GX602, 3439, 3442, 3518); (vi) once in possession of the Victim Traders' private transaction data, manipulated those trades to take the Victim Traders' money (the "Proceeds"), (Tr.652, 655–56; GX501, at 19–23, GX5012-AA), and (vii) published their manipulated block to the Ethereum network to steal the Victim Traders' money, (Tr.652, 655–56, 745–46; GX501 at 19–23, 5012-AA). Following the Exploit, the defendants executed hundreds of transactions over the course of nine months in order to obfuscate

the origins of the Proceeds from law enforcement, the Victim Traders, and the financial institutions the defendants used to off-ramp the Proceeds, (Tr.802, 2032–33; GX501, 3495).

The Government's evidence at trial established an extensive factual record detailing the functionality of the Ethereum Network and MEV-Boost system, and how both are used by cryptocurrency traders including both the defendants and their victims. That record included design protocols and user documentation, the computer code implementing those protocols, and testimony from the architect of the MEV-Boost software.

## I.    Ethereum and MEV-Boost

The Ethereum Network is a decentralized blockchain platform run by participants across the world who interact with each other through smart contracts. (Tr.157–58). The blockchain is comprised of blocks, which are data structures where transaction information is permanently stored. (Tr.158–61). A new block is proposed to the Ethereum blockchain every 12 seconds, containing cryptocurrency transactions submitted by traders. (Tr.599). In 2023, there were two ways for Ethereum traders to execute cryptocurrency transactions on the Ethereum blockchain. (Tr.158–59). The first was to submit a cryptocurrency transaction to the "mempool," a publicly visible "waiting room" for pending transactions that can be added to any given block in any order. (Tr.159). The second was to utilize MEV-Boost, specialized software designed to optimize the Ethereum block-building process. (Tr.148, 159, 1575–78). The MEV-Boost software was built by Flashbots, a cryptocurrency infrastructure company. (Tr.148).

The central feature of MEV-Boost is proposer-builder separation ("PBS"). (Tr.163–64, 167–78, GX3232 at 1–2). Without MEV-Boost, validators can play two roles in the block-building process on the Ethereum Network: block-building, which involves ordering transactions in a block, and proposing, which involves selecting the next block for inclusion on the blockchain. (Tr.161,

4

GX3208). Using MEV-Boost, however, these two roles are separated because validators outsource the ordering of transactions to specialized block-builders, who are better able to maximize the potential profit that the validator can earn from each block (*i.e.*, the "maximum extractable value" or "MEV"). (Tr.163–64, 1575–76, GX3208). With MEV-Boost, a validator's role is limited to "proposal duties only," meaning the validator "blindly sign[s] a block without seeing the [transaction data] escrowed" by a MEV-Boost Relay. (GX3208, 3405, 3406-A, 4101 ("Validators never see these blocks"); *see* Tr.163–64, 173 ("selecting and proposing" the next block does not "include any of the [block] building functions" for validators using MEV-Boost)), 240–41 (validators do not play any role in "choosing what goes in the bundles" in MEV-Boost), 1576–77 (MEV-Boost Relay "keeps the bundle . . . hidden and secret from the validator and from the rest of the world until there's a confirmation for this block")). In April 2023, 95% of validators used MEV-Boost to propose blocks. (Tr.166).

MEV-Boost implements PBS through a MEV-Boost Relay, which acts as an intermediary between the block-builder and the validator to ensure that (i) the block-builder can trust the validator will not be able to see the transactions in the block-builder's block and potentially use those transactions for the validator's own benefit, and (ii) the validator will be paid by the block-builder for proposing the block as structured by the block-builder. (Tr.169–70, 177–79, 196–97, 1576–77; GX3204, 3208, 3232 at 1). Specifically, a MEV-Boost Relay keeps the block's transactions private through a "commit and reveal scheme," which requires the validator to "signif[y]" his "commitment" to propose the block as structured by the block-builder before receiving the private transaction data from the relay. (Tr.177-80, 1576). This "commit and reveal" scheme was designed to prevent a validator from adding or re-ordering transactions to the block as structured by the block-builder. (Tr.177–78; 191-93, 196-97, 214–15, 243–46, 254, 596–98,

607–08, 691, 1576-77, GX3208, 3232 at 1–2, 3219 at 5; 3405 at 3, 5 (after a validator "submits a [Signed Blinded Block] to the [MEV-Boost Relay], binding the [validator] to the block. The [MEV-Boost Relay] is now able to unblind the transactions in the ExecutionPayloadHeader without the possibility of the validator modifying them")).

## II.    MEV-Boost Protocols and Bundled Transactions

MEV-Boost implements its PBS system through code, which allows the various Ethereum participants to communicate with each other and a MEV-Boost Relay to process cryptocurrency transactions. (Tr.163–65, 167–80, GX3232 at 1–3). MEV-Boost's user specifications and code are publicly available and explain "how [MEV-Boost] works" and how to "use it." (Tr.164-65, GX3204, 3208, 3219, 3232, 3406-A).

Using the MEV-Boost system, traders may submit multiple transactions as a "bundle"— an ordered list of transactions that must be executed in order, or not at all. (Tr.168–69, 207, *accord* GX3002 & 3002-A at 8, lines 33–37 (Anton Peraire-Bueno ("APB") circulating Flashbots specifications defining a "MEV bundle" or "bundle" as "[a] list of transactions that MUST be executed together and in the same order as provided in the bundle")). A trader can send bundled transactions to a block-builder using the "eth_sendBundle" specification, which allows searchers to request that bundles be executed in the trader's requested order or not at all—"all or nothing." (Tr.203–04, 207, 240, 1648–49, 1654–66, 1648–49, 1654–66; GX3002-A at 8, line 33, GX3221 (Builder0x69 API specifications for submission of bundled transactions using eth_sendBundle)). Upon receipt of the searcher's instructions, a block-builder will construct a block using the bundles and other transactions that maximize MEV. (Tr.164, 190, 1575–76; GX502, 3002-A at 8, lines 33–37, GX3221).

After the block-builder has constructed a block, it transmits the proposed block, including the private transaction data, to the MEV-Boost Relay, which keeps the private transaction data hidden from the validator until the validator commits to proposing the block by providing its signature. (Tr.169–70, 177-79, 191-92, 246, 1575–76, GX502, 3208, 3232 at 1).

As part of this "commit and reveal" scheme, the MEV-Boost Relay and validator communicate through standardized coding instructions called the "Builder API." (Tr.209–15, 606; GX508, 3204 (explaining that MEV-Boost implements the "Builder API"), 3219 (Builder API), 3405 at 2–3 (APB explaining Builder API's implementation in MEV-Boost); 3518). Consistent these specifications, the MEV-Boost Relay and validator interact as follows:

*First*, to receive a block from a MEV-Boost Relay, the validator must register with the MEV-Boost Relay, which "tell[s]" the Relay that the validator is "outsourcing [the] block ordering" process to the block-builder and provides a "fee address" indicating where the validator should be paid by the block-builder. (Tr.171–72; *see* Tr.178–79, 2597-98; GX601, ln. 294; DX505-H, ln.196).

*Second*, the validator "call[s]" the MEV-Boost Relay using the function "getHeader" to receive a "blinded" blockheader. (Tr.174–75, 211–13; GX508, 3405, 3406-A).

*Third*, in response to the "getHeader" request, the MEV-Boost Relay sends the validator a blinded blockheader containing information about the block, pre-filled by the block-builder—but, importantly, not including the private transaction data (*i.e.*, the "execution payload"). (Tr.175–77, 212–15, 253–54; GX508, 3405, 3406-A).

*Fourth*, once the validator receives the blinded blockheader from the MEV-Boost Relay, the validator inputs certain data which are incorporated into a signature used by the validator to sign the blinded blockheader, thereby "committing" or "binding" the validator to that block.

(Tr.172–73, 176–79, 213–15, 253–54, 795–96; GX508, 3405, 3406-A; *see* GX602, at lines 1-85 (incorporating data fields into signature at line 74)).  As part of the signed blockheader, the validator must enter values for the "parent root" and the "state root." (Tr.176, 193, 242–43; GX602 lns.1–85).  The parent and state root fields contain unique information about state of the blockchain—*i.e.*, there is a singular and identifiable value for each field that is calculated and provided by the validator.  (Tr.193–94, 242–43, 609, GX602 lns. 1–85).

*Fifth,* after completing these steps, the validator returns the signed blinded blockheader to the MEV-Boost Relay using the Builder API function "submitBlindedBlock."  (Tr.213–15; GX508, 3406-A).

*Sixth*, upon receipt of the signed blinded blockheader, the MEV-Boost Relay verifies the validator's signature before "unblinding" the private transaction data to the validator.  (Tr.180, 194–95, 610–11, 623, 778, 1166–67, 1576–77, GX3406-A, 3405 at 3, 5 (APB explaining the MEV-Boost Relay unblinds the private transaction data only after verifying the validator's signature because "they consider that block finalized and ready to propagate [*i.e.*, publish to the blockchain]")).  Once the private transaction data is revealed, the MEV-Boost Relay and the validator each propagate (or "publish") the block as structured by the block-builder to the Ethereum consensus nodes for approval.  (Tr.194–95, 610–12; GX502).

The block is published to the blockchain—thereby executing the transactions submitted by the traders—after two-thirds of Ethereum consensus nodes approve it.  (Tr.611, GX502).  If the Ethereum consensus nodes do not approve the block, it will not be published, and the cryptocurrency transactions submitted by the traders will not be executed.  (Tr.611, 654–56; *see* GX503).

In the MEV-Boost system, if a validator modifies the unblinded block transactions after it has committed to the block with a cryptographic signature, it will be slashed by the Ethereum Network.  (Tr.179, 254–55, 280–82, 607–08, 610, 678–80, 2094–95; GX5012-BD).  A slashing penalty is imposed when a validator signs for two different blocks for the same blockchain slot. (*Id.*).  Slashing penalizes a validator for failing to behave as an "honest validator," meaning a validator who acts in accordance with the specifications outlining how computers in a particular cryptocurrency system are supposed to interact. (Tr.281–82 (Robert Miller defining the term "honest validator"), 677–79 (Travis Chen defining the same); GX3208 ("The Ethereum consensus-specs have well defined expectations of honest validators")).  The slashing penalty results in both an economic penalty—resulting in a one-Ether ("ETH") fine—and the validator's forceful removal from the Ethereum Network.  (Tr.2106–07, 3126).

## III.    The Victim Traders' Trading

The defendants' fraudulent scheme targeted Ethereum traders who acted as searchers to make particularly ordered trades, known as sandwich trades.  (Tr.576–77, 591, GX3409, 4101, 3682).  One such trader was David Yakira, the Chief Executive Officer of Savannah Technologies ("Savannah").  (Tr.1566).  Savannah created and operated trading bots which scanned the mempool for trading opportunities based on preprogrammed parameters.  (Tr.1568–69, 1769).

Sandwich trading involves executing three cryptocurrency swap transactions consecutively as part of a bundled transaction. (Tr.1571).  As part of this strategy, an automated trading "bot" scans the mempool for a profitable swap transaction ("Trade 2"), which when executed on chain, increases the value of a particular cryptocurrency token ("Token A"). (Tr.755–61, 1571–74, 1592–94; GX502, 504).  Once such a transaction is identified, a sandwich bot "bundles" Trade 2 with a swap transaction immediately before it ("Trade 1"), buying Token A in exchange for another

cryptocurrency token; and another swap transaction immediately after it ("Trade 3"), selling Token A in exchange for another cryptocurrency. (*Id.*). As part of the sandwich bundle, (i) Trade 1 swaps a cryptocurrency token to purchase Token A at a lower price than Trade A is valued in Trade 2 (*i.e.*, a buy transaction); (ii) Trade 2's swap transaction then increases the price of Token A (*i.e.*, another buy transaction); and (iii) Trade 3's swap transaction sells Token A at a higher price than the sandwich trader purchased it in Trade 1 (*i.e.*, a sell transaction). (*Id.*). The trader makes a profit because he sells Token A at a higher price than he purchased it. (Tr.592, 755–761, 1571–74, 1595–1608; GX504). The profitability of sandwich trading "relies critically on bundling" to ensure that the sequential trades—Trades 1, 2, and 3—are executed in order, without intervening transactions. (Tr.1574, *see* Tr.592, 755–61, 1571–74; GX504, 3221).

Savannah relied on MEV-Boost to securely process trading bundles. (Tr.1575–77). Using MEV-Boost, Savannah submitted approximately 10,000 bundled transactions per day. (Tr.1575, 1656). Yakira trusted MEV-Boost to process Savannah's bundles because the system reliably ensured that each of the block-building participants executed the bundled transactions in accordance with the trader's coded instructions. (Tr.1574–77, 1593, 1648–49, 1654–67; GX3221 ("Builder0x69 API specifications for the trader submission of atomic bundled transactions")).

Yakira used the MEV-Boost system because he knew, based on Savannah's trading activity and his knowledge of the MEV-Boost open-source code and public documentation, that a MEV-Boost Relay was designed to conceal his valuable transaction data from validators until the validator committed to the block as structured by the block-builder. (Tr.1574–77). Because the profitability of sandwich trading depends entirely on the execution of the bundle "as is," Yakira would not have submitted bundled transactions using MEV-Boost if he knew that the validator would unblind and unbundle the block before it was published to the blockchain. (Tr.1574–77,

1608–09 ("[W]e would not propose bundles had we known that validators can see them . . . the whole purpose [of MEV-Boost] is to keep those transactions or these bundles hidden from [validators].")).

## IV.  The Defendants' Criminal Scheme

### A.  The Exploit

Over a period of approximately four months, the defendants designed, tested, and executed a fraudulent scheme intended to steal millions of dollars from the Victim Traders through deceptive trades and the exploitation of MEV-Boost system, including a MEV-Boost Relay coding vulnerability.  The defendants' fraud was built into their computer code Omakase.  The code was designed to execute a precise sequence of deceptive trades—the Bait Transactions (trades that would cause the Victim Traders to part with their money with a "buy" transaction) that were switched out with the "Dump Transactions" (the defendants' name for inverse trades that would then take the Victim Traders money with a "sell" transaction)—which could only occur by posing as "MEV-Boost" validator to gain access to the Victim Traders' private transactions.  (Tr.586–602, 620–22, 671–72, 739–40; GX4101 ("[f]igure out correct bait (systematically) to get them to trade" and "set up a[] mev-boost validator that has the relay unblind the block to us"), 601 (executing the Omakase code), 602 (Omakase "unblinding" code setting parent and state root values to zero)).  Exploiting the MEV-Boost system was key to the defendants' fraud because it was the trade processing system that the Victim Traders used to execute their bundled trades. (Tr.591, 593; GX4101).

The defendants intensively researched MEV-Boost's specifications, including by studying MEV-Boost user guides, the Builder API, and Flashbots's code repository, as well as how other traders, like Yakira, relied on them.  (Tr.591 (Omakase was designed to "profit at the expense of

sandwich traders using . . . MEV-Boost"), 600–01 (defendants understood bundles to be executed "in order or not at all" based on their own "trading bundles" and "documentation of how the block Builder API specs worked"), GX3403 (APB tracking MEV-Boost Relays and block-builders); GX3405 (APB explaining how bundled transactions are processed using MEV-Boost, and circulating the Builder API specifications); GX3406 and 3406-A (JPB and APB circulating the Builder API specifications, and Flashbots diagram outlining intended interaction behavior between a validator and MEV-Boost Relay); GX3439 (circulating MEV-Boost Relay code relevant to coding vulnerability); GX3449 (same); *compare* GX3523 (APB circulating the hyperlink to the eth_sendBundle specifications outlining coding parameters traders use to submit bundled transactions to builders), *with* GX3221 & Tr.1648 (eth_sendBundle specifications Yakira used to submit his transactions at the same hyperlink); *compare also* GX508 (Miller's MEV-Boost summary), *with* GX4101 (defendants' MEV-Boost summary)).

On December 29, 2022, the defendants called a meeting with two of their employees, Chen and Jad Elmourad, to direct the Exploit. (Tr.585–86, GX3605). Chen took notes of the defendants' directions at the Omakase meeting, including their directive to "tell nobody." (Tr.589–90; GX4101). The defendants outlined how they planned to "trap [the sandwich traders] all at once" using MEV-Boost to take millions of dollars at the Victim Traders' expense. (Tr.591–602; GX4101, 3682 (identical Omakase plan as reflected in GX4101 but saved to APB's Google drive)). The core components to the success of the defendants' scheme were, in their own words, the Bait Transactions and the "MEV-Boost Validator." (Tr.591–602; GX4101, 3682).

As to the Bait Transactions, the defendants relied both on the attractiveness of the bait and the secrecy of the trap. Identifying particular Victim Traders they wanted to "trap all at once," the defendants tested and perfected the Bait Transactions in order to entice the Victim Traders to

submit bundled sandwich transactions that included the Bait—(*i.e.,* getting their victims to part with their money in a manner essential to the success of the fraud scheme). (Tr.621 (putting "trigger transactions" into the mempool to "cause the [sandwich traders] to trade"), 651–52, 710, 717–18, 727, 746 (Victim Traders parted with money because of the Bait Transactions), 1662–64; GX4101). The defendants chose their victims based on the tokens they traded, the liquidity pools they traded in, and the slippage amounts they set, (Tr.717, 1610–13), placing each victim on a "menu" according to the variables most likely to cause them to trade. (Tr.710–14, GX3409).

To further entice the Victim Traders to trade, the defendants designed the Bait Transactions such that they appeared profitable only to their intended target. (Tr.620–22; GX4101). In particular, the defendants used coded logic to ensure that when a Victim Trader "simulated a [Bait Transaction] specifically within a sandwich bundle" it would appear "profitable," even though the defendants knew that the trades could never, in fact, be profitable because the defendants planned to switch out the Bait Transactions for "dump trades" after the Victim Traders submitted bundles. (Tr.620 (only purpose was "to get the sandwich bots to submit a bundle"), 721–22 (defendants wanted the Bait Transaction to appear profitable in a Victim Trader's simulation so the victims would submit a bundle with the Bait Transaction, which the defendants intended to switch out with the Dump Transaction such that the Victim Trader lost money), 751 (same), 755–61 (false price signal sent to the mempool with the Bait Transaction), GX504, 601, Lns. 51–56 (pre-signed dump transactions to replace the bait), 611 ("we will replace our trigger no matter what"), 3405 (referring to the Dump Transactions as "poison")). This design caused the Bait Transactions to appear *un*profitable to all other traders apart from the targeted victim. (Tr.723).

The defendants kept both the testing and execution of the Bait Transactions a secret because they knew their victims would not trade if they knew the truth. (Tr.724 (concern that the

targets would catch on that they were being baited), 726 (concerned victims would "stop sandwiching transactions that were sent from a particular contract" if discovered the bait), GX3494 (discussing an "abundance of paranoia" if the sandwich traders found the bait tests suspicious)). Using XOR logic, the defendants disguised the fact that each Bait Transaction had a Victim Trader's unique contract address hard-coded into the Omakase code.  (Tr.724–25, 2715–16, GX3494 (describing "XOR" logic to hide the bait)).  In preparation for the Exploit, the defendants tested dozens of Bait Transactions to increase the probability that the fraud was successful. (Tr.727, 1662).  Based on their testing, Chen estimated that of the thousands of transactions in the mempool at any given moment, the defendants expected an 80–90% chance that the Bait Transactions would cause the Victim Traders to bundle them.  (Tr.726–27).  In fact, on April 2, 2023, all eight Bait Transactions successfully baited the Victim Traders.  (Tr.727).

The Bait Transactions were essential to the scheme because the theft depended on two-steps:  getting the Victim Traders to part with their money by trading valuable cryptocurrency for the Bait Transactions in a liquidity pool, and then, taking the Victim Traders' valuable cryptocurrency by trading the Dump Transactions (*i.e.*, the inverse of the Bait Transactions) in the same liquidity pool—in sum, "[the Victim Traders] transferred the tokens from [their] wallets to the liquidity pool" as a result of the Bait Transactions, and then "[the defendants] took [the Victim Traders' money] from the liquidity pool to their own wallets."  (Tr.599, 755–61 (Chen explaining the liquidity pool price dynamics of the Bait and Dump Transactions using GX504)), 1595–1606 (Yakira (same)); 1606).

Because the Victim Traders used MEV-Boost to ensure that their bundled transactions would be kept private and executed in the precise order requested (or not at all), the defendants' fraud scheme relied on "set[ting] up a[] MEV-Boost validator that has the relay unblinding the

14

block to [them]" in order to pull off their fraudulent bait-and-switch.  (Tr.168, 203–04, 240–41, 592–93, 624–25, 1167 (Omakase validator had to register with a MEV-Boost Relay operating a version of the MEV-Boost open-source software code), 1572–74, 1576 (MEV-Boost Relay is "critical to protecting bundled atomicity" by keeping the bundles "hidden and secret from the validator" until there is "confirmation for this block"), 2597–98 (Omakase code registered with MEV-Boost Relays), GX3002-A at 8 & line 33 (APB circulating the definition of a "MEV bundle" or "bundle"), GX3221 (eth_sendBundle specifications), 3523 (APB circulating eth_sendBundle specifications),  GX4101, DX505-H, ln. 196).

Accordingly, the defendants "set up a[] MEV-Boost validator" even though they had no intention of publishing the block—and the Victim Traders' bundles—as revealed by the MEV-Boost Relay.  (Tr. 624–25 (registering with MEV-Boost Relays in order to receive Victim Traders' bundles), 702 (validators intended only for use in Omakase); GX3451 (registering Omakase validators with "fee recipient address set to zero" because defendants did not expect to earn rewards for honestly validating transactions), 501 at 14 (receiving penalties for failing to attest because Omakase validators were never actually used to validate blocks), 5012-BC (same)).   To "set up a MEV-Boost validator," meaning a validator that communicated with MEV-Boost Relays through the commit and reveal scheme protocols, (Tr. 606–08, 624–25, 653, 1167, GX3406 and 3406-A), the defendants "staked"—*i.e.*, deposited—32 ETH to a particular smart contract, (Tr. 702, 2086–87; GX501 at 11).  In total, the defendants covertly created 16 "Omakase" validators—whose sole purpose was to "unblind" the Victim Traders' bundles—using a series of pass-through accounts, a cryptocurrency mixer, and staggered transactions to conceal their identities.  (*Compare* Tr. 164 (using MEV-Boost, validators "outsource block building to a marketplace full of specialized actors" and "are no longer ordering transactions, they are only selecting the next block

15

for inclusion"), *with* Tr. 625 (using MEV-Boost, defendants "did not intend to publish the block that was unblinded," but rather "intended to propagate a version of the block that had our dump transactions rather than the trigger transactions"); *see also* Tr. 702 (set up 16 "MEV-Boost validators" "to run Omakase"), 704–05; GX501 at 9, 11, GX3428, 3451 (registering validators with "fee recipient address set to zero")).

Validators were critical to the defendants' fraud because the Exploit relied on a MEV-Boost coding vulnerability to assure the success of the scheme. (Tr. 765 ( "we wanted [the Exploit] to succeed," and relied on the exploitation of the "parent and state root" coding vulnerability), 778 (unblinding the block was "important to the success of the omakase plan" "because [it is] a mechanism by which you receive all the transactions," which was needed to switch the Bait and Dump Transactions)). Namely: the defendants discovered that when verifying the validator's signature, the MEV-Boost Relay verified that the validator had signed the blockheader, but failed to verify if the validator had provided accurate data in certain blockheader fields before releasing private transaction data. (Tr. 241–42, 627–29, 668, 769; GX608 (JPB code setting the parent and state root values to zero), 3439, 3449, 3518 (APB messaging JPB that the relays "aren't checking for proposers")). And if the data in the blockheader fields, including the parent and state roots, were incorrect, the block as propagated by the MEV-Boost Relay would be always rejected by the Ethereum consensus nodes. (Tr. 280–81, 679, 769, 792–93; GX3439 (APB: "setting some fields incorrectly" to ensure that the "fake block" to get the unblinded transactions is "rejected by the nodes"); 3449 (JPB: "since a 0-parent has should always be invalid," the MEV-Boost Relay block would always fail)). The defendants could then propose an alternative block—manipulated to contain the Dump Transactions—instead. (Tr. 626–27, 654–55, 667–68, 778). On the day of the Exploit, and as part of their fraud scheme, the defendants fed incorrect data to the MEV-Boost

Relay by setting the parent and state roots to zero, relying on the MEV-Boost coding vulnerability not only to gain access to the Victim Traders' bundles, but also to guarantee that their newly constructed block with the Dump Transactions was published to the blockchain, enabling them to take more than $26 million from the Victim Traders. (Tr. 623, 626–27, 654–55, 769-70, GX501, 503, 3439, 3449, 3478 (JPB confirming that they sent the MEV-Boost Relay "a block hash of 0 so anything would've won")).

On April 2, 2023, the defendants executed the Omakase code in "Final" mode. (GX601, Ln 337, GX3458 (JPB messaging, "final version is running live now")). Upon receiving notification that their MEV-Boost validator had been selected, the defendants (i) submitted their Bait Transactions (the buy transactions) to the mempool and held their Dump Transactions (the sell transactions) in reserve for later use, (Tr. 788–92, GX601, Lns. 29-56 (releasing Bait Transactions and generating Dump Transactions as a package)); (ii) unblinded the MEV-Boost Relay block using their validator by transmitting false data to the MEV-Boost Relay to gain access to the Victim Traders' private bundled transactions, including the Bait Transactions, (Tr. 788–96, GX601, Lns 66–81 (calling a function to unblind the block, which relied on the coding vulnerability), GX602, Ln. 45–54 (unblinding code that set the parent and state roots to zero)); (iii) constructed a new block that switched out the Bait Transactions with the Dump Transactions, (Tr. 788–92, GX601, Lns. 83–92 (calling a function to "construct new beacon block," which switch out the Bait for the Dump Transactions); (iv) published their manipulated block to the Ethereum consensus nodes to steal the Victim Traders' money, (Tr. 789–92, GX601, Lns. 94–106 (proposing block to the consensus nodes)); and (v) obtained more than $26 million in the Dump Transaction cryptocurrency wallet addresses, (Tr. 760, GX501 at 23)—all within 12 seconds, (Tr. 671–72, 1170).

The defendants knew that their actions were wrong.

Upon successful execution of the fraud scheme, APB privately messaged JPB, "25mn executed." (GX6701 at 14). Within less than ten minutes, APB instructed JPB to lie—"If Bert [Robert Miller, the designer of MEV-Boost] messages or asks, we're on vacation." (GX6701 at 15). In response, JPB responded, "take down the validstors rn [right now]," to which APB confirmed, "kill validator client," indicating that they took the Omakase validator offline to reduce the risk their identities were discovered. (GX6701 at 15). In the weeks prior to the Exploit, the defendants deliberately avoided publicly testing or disclosing the MEV-Boost vulnerability in fear that it would be patched before they executed the fraud.[1] (Tr. 777–82, GX604, at lines 1102–14 ("Unblinded Block" code only run in "Final Mode"), 3442 (discussing how to continue to conceal the coding vulnerability in the event of an abort, referring to "good" and "bad" signatures)). As predicted, within less than 24-hours after the Exploit, Flashbots patched the software. (Tr. 811; GX3460 at 16). The defendants understood, in other words, that the Exploit was hack that could be taken advantage of once—not a euphemistic "trading strategy" that might be deployed again and again. (Tr. 560 (use of a coding vulnerability had nothing to do with trading), GX3441 (devising an abort plan, describing the scheme as "suss [suspect]" and hoping Victim Traders "wouldn't even catch onto our scheme")). And when designing and testing their deceptive Bait Transactions, the defendants privately conspired to change the name of the Bait Transactions to "trigger" to "avoid any wirefaud-like situations (sbf reference)." (GX6012 at 2 (JPB messaging APB via Signal on February 19, 2023)). Shortly after the Exploit, the defendants—as they predicted from the outset—were slashed by the Ethereum Network for signing two blocks in the same slot: the block the defendants signed for and received from the MEV-Boost Relay using the

---

[1] The defendants even concealed the vulnerability from Chen and Elmourad for weeks into the planning of Omakase. (Tr. 764–66, GX3518).

false data, which contained the Bait Transactions, and their manipulated block that they published to the Ethereum consensus nodes, which contained the Dump Transactions. (Tr. 280, 680, 770–71, 1164, GX4101, 5012-BD).

Following the Exploit, the defendants concealed their identities from those inquiring about the Exploit, including Miller, their friend and Flashbots steward, who oversaw MEV-Boost's development, (Tr. 323 ("I felt deceived"); GX6701 at 15 ("If Bert messages or asks, we're on vaca"), and one of their own employees who had not participated in Exploit, (GX3461 ("[t]he goal here is plausible deniability/don't ask don't tell[.])). The defendants even extorted Miller, threatening that if Flashbots failed to "recant" their description of the April 2, 2023 events as an "exploit," the defendants would exploit another MEV-Boost code vulnerability, (Tr. 317 ("it felt like an implicit threat"), GX3478 (JPB discussing how to make Flashbots "recant")).

## B.    Laundering the Proceeds

Before and after carrying out the Exploit, the defendants conspired to ensure that the Victim Traders, cryptocurrency exchanges, and the financial institutions they depended on to "off-ramp" the Proceeds would not learn their identities or the source of the Proceeds. The defendants did so in order to avoid losing access to the Proceeds, alerting law enforcement, and becoming subject to civil suits. (Tr.803; GX3513 (JPB explaining that "not making [] obvious" "who we are" to Coinbase had benefits because, even if Coinbase "might personally be convinced [of the Exploit's legality] . . . the us gov from the outside might not be"); 3775 (Googling "how to wash crypto"), *id.* (visiting "11 No KYC Crypto Exchanges" website), 3495 (explaining that "if there is some prosecutor out there with their eye on this, the longer we wait the better")).

After the Exploit, and over the course of nine months, the defendants engaged in more than 500 financial transactions, transferring funds through unnecessary intermediary accounts,

(GX501; Tr.2113–14); burning and repeatedly re-issuing cryptocurrency proceeds, (GX501 at 25, 31; Tr.2161); executing multi-call swaps of the proceeds with no apparent purpose, (Tr.2235–37; GX501 at 29); returning funds to a Coinbase account through a Safe protocol address not previously used in the Exploit (GX501 at 32–34); structuring transfers to avoid triggering compliance alerts (GX501 at 34 (breaking a $20 million deposit into more than a dozen staggered transfers), 36 (repeating the same pattern)); 6701 at 16 (defendants describing plan to send funds "in slugs")); monitoring public awareness of the cryptocurrency addresses they utilized in order to assess the effectiveness of these steps, (*compare* Tr.at 2037, 2106, 2118, 2243 *with* GX3775 at 20, 23–25, 3800 at 7 (defendants searching Google for the addresses receiving proceeds of the Exploit)); and transferring assets into cryptocurrencies that could not be frozen, (GX3508 (JPB Peraire-Bueno answering "yeah" to the question, "[w]hy are we switching USDC to DAI?  Is it just that USDC is blacklistable?")).  During the defendants' debate over the ideal time to off-ramp the stolen cryptocurrency, APB explained that "if there is some prosecutor out there with their eye on this, the longer we can wait the better."  (GX3495).  He further explained that even if the defendants delayed by a few weeks, that "very same prosecutor could then have their hands busy with something else[.]"  (*Id.*).  By the time the defendants off-ramped the Proceeds, they had lost $5 million.  (Tr.875–76).

## V.    The Trial

On October 14, 2025, the defendants were tried by jury on three counts: conspiracy to commit wire fraud, substantive wire fraud, and money laundering.  During trial, the Government presented testimony from eight witnesses, including Robert Miller, the leader of the Flashbots team that oversaw the development of MEV-Boost and investigated the Exploit; Travis Chen, a cooperating witness, who worked for the defendants as a coder on the Exploit; and David Yakira,

a MEV-Boost trader who lost approximately $14 million as a result of the fraud.  During its case-in-chief, lasting nearly twelve days, the Government also offered more than 750 exhibits showing how the defendants planned, committed, and then concealed their criminal scheme.

The case was submitted to the jury on November 4, 2025, following fourteen days of evidence.  On November 7, 2025, the Court declared a mistrial after the jury had not reached a verdict following two-and-a-half days of deliberations.

## STANDARD OF REVIEW

A defendant challenging the sufficiency of the evidence under Rule 29 bears a "heavy burden," *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021), because the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). This Court must give "full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact," *Landesman*, 17 F.4th at 319.  The Court "must view the evidence presented in the light most favorable to the government" and draw all permissible inferences "in the government's favor."  *Id*.  Ultimately, "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court."  *United States v. Cuti*, 720 F.3d 453, 462 (2d Cir. 2013).

A motion for a judgment of acquittal must be denied if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This standard applies even where the jury failed to return a unanimous verdict.  *See United States v. Hicks*, 15 Cr. 33, 2018 WL 817868, at *2, 4 (W.D.N.Y. Feb. 12, 2018) (hung jury does not change the Rule 29 standard); *see also United States v. Jones*, 99 Cr. 264 (AHN), 2003 WL 1986929, at *1 (D. Conn. Feb. 28, 2003) (same).  In resolving a Rule 29 motion, the sufficiency of evidence test "may be based entirely on circumstantial evidence," *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013), and this Court must analyze each piece

of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011). The sufficiency test also applies "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

It is not the Government's burden to "disprove every possible hypothesis of innocence." *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998). Rather, "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008). A Rule 29 challenge "does not provide the [court] with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129; *see also United States v. Cote*, 544 F.3d 88, 93, 98–101 (2d Cir. 2008) (holding that the district court erred in granting the defendant's Rule 29 motion where it rejected the government's evidence as not credible and failed to draw inferences in favor of the government or consider the evidence in its totality, not in isolation); *Landesman*, 17 F.4th at 327–30 (same).

## ARGUMENT

### I.    The Defendants Planned and Executed a Scheme to Defraud to Steal Ethereum Traders' Money

The evidence at trial plainly established that the defendants agreed to engage in, and carried out, a scheme to defraud the Victim Traders: the purpose of Omakase was to trick the Victim Traders into parting with more than $26 million of cryptocurrency, and to take that money for themselves. (GX4101 "opportunity size is enormous . . . if you trap them all at once")). The scheme relied on targeting Victim Traders for their money (Tr.577, GX4101); submitting deceptive Bait Transactions to induce the Victim Traders to part with that money (Tr.620–22, 651–52, 717, 727, GX4101, 5012-AA); and exploiting the design and intended purpose of the MEV-

Boost system through false pretenses and representations.  Those false pretenses and misrepresentations included purporting to honestly validate transactions, only to intentionally transmit incorrect data to MEV-Boost Relays, falsely signing and certifying such data, and then propagating deceitfully manipulated transactions (Tr.600–01, 626–28, 654, GX3518 (recognizing flaw in MEV-Boost Relay code), 4101 (Omakase meeting notes), 3439 (APB admitting "setting some fields incorrectly"), 3443 (JPB describing "sign[ing] the bad block" and "double signing which is a no no"), 3442 (JPB admitting "replacing all sandwich transactions with dump transactions"), 3405 (acknowledging that by "propagat[ing] the poison block as validator . . . we get slashed [] for the network getting 2 signed blocks of ours but the poison one still stands")). Under these circumstances, the evidence was sufficient for a reasonable jury to conclude that the defendants engaged in a scheme to defraud in violation of the wire fraud statute.

Despite the highly coordinated nature of their fraud scheme—deployed by the defendants' Omakase code to move from start to finish within seconds—the defendants ask this Court to scrutinize each step of the crime in isolation, including the Bait Transactions, the MEV-Boost Relay coding vulnerability, and the defendants' use of, in their own words, a "MEV-Boost validator," (GX4101).  That is not the law.  *See Schmuck v. United States*, 489 U.S. 705, 715 (1989) (determining the scope of a multi-step fraud scheme not in isolation, but by how the steps interacted to dupe the intended victims for money).  Regardless, each step of the defendants' scheme was designed to fraudulently trick and mislead the Victim Traders, the MEV-Boost Relay, and other actors in the Ethereum consensus system for the purpose of obtaining money.

**A.    The Evidence Established Material Misrepresentations and False and Misleading Pretenses**

      **1.    The Bait Transactions**

          **a)    The Bait Transactions Were False and Misleading**

The evidence was sufficient for a reasonable jury to conclude that the defendants used the Bait Transactions to falsely signal a profitable trading opportunity to the Victim Traders that would (and did) cause them to part with their money, when in reality, the defendants knew that the Bait Transactions were anything but profitable.  (Tr.620–21 (only purpose of the Bait Transactions was "to get the sandwich bots to submit a bundle" to switch them out with the Dump Transactions), 681 (referring to the Dump Transactions as "poison"), 755–61)).  Instead, they were merely a means to steal the Victim Traders' money.

In fact, the Bait Transactions—"buy" transactions designed to create the false appearance of a profitable trading opportunity—were in fact tailor-made misrepresentations for each Victim Trader.  They appeared profitable to the Victim Trader based on a misrepresentation that the defendants knew was false at the time it was made—namely, that the Bait Transaction would be executed on-chain as part of a Victim Trader's bundled transaction.  In fact, the defendants knew from the outset that those transactions would be removed from the published block and replaced with "dump" transactions. (Tr.620, 681, 721, 723, 755–61 (Chen explaining the liquidity pool price dynamics of the Bait and Dump Transactions), GX504, 601 (Omakase code pairing Bait and Dump Transactions), 611 (Omakase code directing the replacement of the Bait Transactions "no matter what"), 3405 (Chen and APB describing Omakase plan, including Dump Transactions as "poison")).  The defendants' placement of the Bait Transactions therefore conveyed to the Victim Traders (or, at a minimum, made an implied representation to them) that the defendants intended to go through with the proposed transactions and were not simply proposing them to trick other

24

market participants by swapping in secret Dump Transactions. (Dkt. 112 ("MTD Op.") at 20 (noting that "order placement signals a trade's intent to buy or sell" and that "by obscuring their intent to cancel . . . [defendants] advanced a quintessential half-truth or implied misrepresentation" (quoting *United States v. Pacilio*, 85 F. 4th 450, 460 (7th Cir. 2023))).

Based on this evidence, a rational jury could have concluded that the defendants intentionally misled the Victim Traders by placing the Bait Transactions in the mempool, knowing full well that they never intended to execute them, and therefore concealing the material fact that the Bait Transactions were actually part of a ruse to trick the Victim Traders into trading. *See United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022) (reaffirming well-settled law that "failure to give the whole story . . . especially when a defendant actively conceals information" to his financial advantage amounts to a "false representation" for purposes of the wire fraud statute); *see also Kousisis v. United States*, 605 U.S. 114, 125 (2025) (affirming conviction when defendant "tricked [victim] into a bargain materially different from the one they had promised"); *United States v. Hild*, 147 F.4th 103, 110 (2d Cir. 2025) ("deceptive course of conduct" may constitute wire fraud); *United States v. Amrep Corp.*, 560 F.2d 539, 543–44 (2d Cir. 1977) ("Declarations of opinion as to future events which the declarant does not in fact hold may be . . . fraudulent."); *United States v. Jordan*, 19 Cr. 669, 2023 WL 12130999, at *5 (N.D. Ill. Sept. 14, 2023), *aff'd sub nom. United States v. Smith*, 150 F.4th 832 (7th Cir. 2025) (finding that spoof orders were misrepresentations to other market participants about defendant's intent to trade, noting "[n]o market could long survive if traders could just enter bogus orders to trick others into thinking there is more supply or demand than there really is").

The defendants make multiple attempts to spin the evidence and the law to contend that the Bait Transactions were not false or misleading misrepresentations, and even if they were, they

somehow were not material.  Those arguments are wrong on the merits and improperly rely on drawing inferences in favor of the *defendants'* arguments, contrary to the Rule 29 standard.

The defendants begin by asserting that there was nothing literally false about the Bait Transactions because they were "valid, signed, and successfully added to the blockchain after Omakase's conclusion."  (Dkt. 226 ("Br.") at 9).  But the jury was not required to make that inference.  Indeed, there was not a shred of trial evidence suggesting that the defendants designed the Bait Transactions with any other intention except to deceive the Victim Traders.  (Tr.620–21 (sole purpose of the Bait was "to get the sandwich bots to submit a bundle"), 681 (Dump Transactions were "poison" because they were "harmful to the sandwichers"), 762–63 (immaterial how Bait Transactions landed on chain after they were switched with the Dump Transactions), GX601, Lns. 41–55 (pairing "trigger transactions" with Dump Transactions), 611 ("we will replace our trigger no matter what"), 3407 ("design the bait that captures the most sandwiches"), 3682 (describing the Bait as the means to "systematically" get the Victim Traders to trade)).

Far from evaluating the Bait Transactions in a vacuum, the jury was entitled—indeed, instructed—to consider these facts holistically, as part of the defendants' entire scheme, including the Dump Transactions, the exploitation of the MEV-Boost Relay code vulnerability, the defendants' concealment, and the defendants' own statements regarding their intent to deceive the Victim Traders.  *See Persico*, 645 F.3d at 104.  Overwhelmingly, the sole inference from the evidence—and certainly a permissible inference—was that the Bait Transactions were never intended to be an arms-length, fair market trade, but rather were intended solely to manipulate other traders into believing the trades were something they were not.  That the Bait Transactions were ultimately published to the blockchain after the fraud was complete does not make them any less misleading or less essential to the fraud scheme.  *See United States v. Autuori*, 212 F.3d 105,

119 (2d Cir. 2000) (fraud where defendant "makes partial or ambiguous statements that require further disclosure in order to avoid being misleading"); *United States v. Tuzman*, 2021 WL 1738530, at *40 (S.D.N.Y. May 3, 2021) (denying Rule 29 motion for a wire fraud conviction noting that "even where statements allegedly made in furtherance of a scheme to defraud were literally true, [the jury] can still find that the first element of the wire fraud statute has been satisfied if the statements and/or conduct of the defendant were deceptive," noting that this "proposition is hardly controversial"); (Tr.3255 (the Court's instruction that "conduct alone can deceive another, even in circumstances where a person's statement contains no misrepresentation, but only where that conduct creates a false impression as to a material fact or matter")).  The key misrepresentation was not that the Bait Transactions would be ultimately published full-stop, but that the transactions would be published *as part of the bundle* submitted by the Victim Trader.  (Tr. 720–21 (Bait Transactions appeared profitable if simulated as a "sandwich bundle")).  This was clearly, at a minimum, a false and misleading impression purposely given by the defendants to the Victim Traders.  *See Chanu,* 40 F.4th at 541.

None of the evidence the defendants cite required a rational jury to reach a different result. Relying heavily on the claims that the Bait Transactions appeared as "raw bytecode data" that would appear the same to every mempool viewer if simulated to infinity, and that the XOR coding logic used to conceal the Bait Transactions could be "reversed" during a simulation,  (Br. at 9–11), the defendants ignore the powerful evidence of their own fraudulent intent—namely, to "get [the Victim Traders] to trade," (GX4101), so that they could replace the Bait Transactions with the Dump Transactions, (Tr.620–21, 681–82; GX3405 ("We construct the poison sandwich full block, we send the poison block to relays")).  Indeed, whether the defendants' conduct "was calculated to deceive," and not what the victims understood, is the only evidence that matters.  *United States*

*v. Denkberg*, 139 F.4th 147, 159 (2d Cir. 2025) (misrepresentations exist where there is a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered," focusing on the intent of the "violator, not the victim").

The defendants' argument to the contrary boils down to the legally impermissible inference—and certainly not one that is legally *required*—that the Bait Transactions were literally true because the Victim Traders, if they tried hard enough in pre-simulating trades, could have discovered the fraud scheme. But that is at odds with the Court's jury instruction that it was immaterial "whether the intended victims [were] . . . negligent, or that they might have uncovered the scheme on their own had they probed more deeply[.]" (Tr.3255–56). And it is at odds with well-settled law regarding the "ordinary prudence" standard. *See Neder v. United States*, 527 U.S. 1, 24–25 (1999); *United States v. Isola*, 548 F. App'x 723, 724–25 (2d Cir. 2013) ("any evidence that [victims] . . . were unreasonable . . . is not relevant to how a reasonable [victim] would have viewed defendant's misrepresentations"); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) ("a victim's lack of sophistication" or "the 'reasonable victim' defense does not apply to allegations of mail fraud"); *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (noting that the "ordinary prudence standard" focuses "on the violator, not the victim," by "referring to the defendant's motivations in making the representations").

Next, the defendants contend that the Bait Transactions could not contain a falsehood or half-truth because the Victim Traders' bots (i) traded on "flawed" assumptions that their bundled transactions would be successful (*i.e.*, they had no reasonable expectation regarding the successful execution of their bundled transactions) because there could be no guarantees about future placement in yet-to-be constructed block (Br. at 13), and there was no "contract" between a

searcher and validator (*id.* at 14); and (ii) were preprogrammed to trade before encountering them in the mempool (*id.* at 11), and thus, could not convey any falsehood.   But fraudulent misrepresentations need only be material, not contain "guarantees," and need not be expressed in contract.  *Cf. United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (even contractual *disclaimers* "do not bear on [a] defendant's criminal liability").   And once again, each claim ignores the overwhelming evidence of the defendants' fraudulent intent when designing, testing, and submitting the Bait Transactions, demanding this Court to draw inferences against, rather than in favor, of the Government's evidence.

Here, when the defendants submitted Bait Transactions, which were specifically designed by the defendants to appear profitable *only* as a bundled transaction to the Victim Traders, (Tr.717, 720–21), while concealing their intent to remove the Bait Transactions such that they would never be part of a bundled transaction, (Tr.620, 681, 722, 755–61, GX611 ("we will replace our trigger no matter what")), through an orchestrated scheme, the defendants advanced a "quintessential 'half-truth' or implied misrepresentation."  *See Chanu*, 40 F.4th at 540 (7th Cir. 2022) (holding that a manual spoofing scheme based on half-truths and implied misrepresentations that pre-dated the *Dodd-Frank* Act, which formally criminalized spoofing, fell within the wire fraud statute as a scheme to defraud).  The Bait Transactions were "misleading in context" because the recipient of the information "would probably—but wrongly—conclude" that their bundled transactions would be processed as requested, or not at all, using the MEV-Boost system.  *Universal Health Servs. v. United States*, 579 U.S. 176, 189 (2016); *accord United States v. Petrossi*, 786 F. App'x 286, 288–89 (2d Cir. 2019).  That was certainly a permissible inference for the jury to draw.

The overwhelming trial evidence established that it was, in fact, more than reasonable for the Victim Traders to expect that their bundled transactions would be executed in accordance with

their coded preferences and free from validator manipulation. Miller—the Flashbots steward who oversaw the development of the MEV-Boost system—explained that the very purpose of the MEV-Boost Relay was to ensure that valuable transaction data remained private until the validator committed to publishing the block as structured by the block-builder. (Tr.179, 281–82 (Miller expressly referencing "rules" in cryptocurrency systems expressed through "specifications"); GX508). MEV-Boost's commit and reveal scheme was designed to prevent a validator from modifying the block as structured by the block-builder—a fact known and material to both the defendants and the Victim Traders. (Tr.245–46 (Miller describing that based on the MEV-Boost design, a validator is not supposed to modify the block-builder's ordered transactions after signing for the block); GX3405 at 6 (APB explaining that the MEV-Boost Relay unblinds the private transaction data only after verifying the validator's signature because "they consider that block finalized and ready to propagate [*i.e.*, publish to the blockchain]" and circulating the Builder API, which states that after signing for the block, the private transactions can be "unblind[ed] . . . without the possibility of the validator modifying them"), 1609 (Yakira explaining that the entire purpose of proposing bundles through MEV-Boost is to "keep those transactions or these bundles hidden" from the validator)).

The purpose of the MEV-Boost system—to separate the roles of the block-builder and validator—is evident not only in its design, but also in MEV-Boost's publicly available user specifications and computer code, which the defendants knew, reviewed, and relied upon in devising their scheme. *See supra* at Background Section II–IV.A (discussing MEV-Boost's protocols, transaction bundling, and the Exploit's reliance on MEV-Boost's protocols; *see also* (Tr.164, 601 (knowledge regarding MEV-Boost was obtained through public documentation), GX3204 (MEV-Boost specifications), 3208 (same), 3219, 3221 (eth_sendBundle specifications),

3232 (MEV-Boost GitHub code repository), 3405 (APB circulating Builder API specifications), 3406-A (defendants circulating the Builder API specifications and Flashbots's diagram outlining intended validator/relay interaction); 3439 (circulating MEV-Boost Relay code), 3449 (same), 3523 (eth_sendBundle specifications), 3775 (Google searches regarding MEV-Boost specifications)).

The defendants' assertion that "nobody testified that MEV-Boost operated like rules," (Br. at 16), and that "bundles" are somehow a "foreign concept," (*id.*), not only turns a blind eye to this testimony and evidence, but also flies in the face of common sense. The defendants and *amici* repeatedly assert that the Ethereum Network is a "decentralized trustless blockchain" that operates "without rules." (Br. at 52). This argument fails. First, the argument ignores the evidence at trial. The evidence at trial established that there are rules within the MEV-Boost protocol, and demonstrated how the defendants used those rules to execute their fraud scheme. Indeed, the principal relevance of those MEV-Boost rules at trial was how the defendants used them to execute the Exploit. It is those rules that enabled the defendants to know how to trick the Victim Traders. Knowing that the Victim Traders relied on the common understanding that a MEV-Boost validator would propose the transaction to the relay *as ordered*, the defendants were able to predict with near certainty how the Victim Traders would react to the misleading Bait Transactions. (Tr.727). Knowing how the MEV-Boost Relay's code would rely on a blockheader's signature to validate a block, the defendants were able to obtain private trading data. And knowing how the Ethereum consensus nodes would reject blocks containing certain falsely manipulated data fields, the defendants were able to unbundle the Victim Traders' transactions and use that private data to propose a "poisoned"—and immensely profitable—block of their own instead. Indeed, the protocols that collectively form the MEV-Boost system impose rules precisely in order to prevent

31

the kind of unbundling misconduct the defendants committed, and they have historically worked so well that millions of traders around the world have relied on them (including, in other contexts, the defendants themselves) to successfully executed countless bundled transactions without incident and in accordance well-defined coding specifications. (Tr.600–01, 1575–76, 1593, 1648–49, 1656-57; GX3221, 3683; *accord* Tr.281–82 (Miller discussing "rules" expressed through "specifications" in cryptocurrency systems). They have proven so useful and popular that, in April 2023, 95% of the blocks published to the Ethereum blockchain used MEV-Boost. (Tr.166).

Moreover, continued references by the defendants and the *amici* to decentralization is a red herring. While the Department of Justice has in recent months publicly weighed the policy argument that the *host* of a fully decentralized network should not be held criminally responsible for fraud committed by others in the network, that policy argument stops far short of suggesting immunity for individuals like the defendants who intentionally commit fraud using that network. At bottom, laws prohibiting fraud protect victims across contexts, including in the sphere of decentralized finance.

In any event, the defendants' insistence that formalized "rules" akin to a contract are required, (Br. at 14), is legally incorrect, because they are not "under the circumstances" necessary to make a representation misleading. *Petrossi*, 786 F. App'x at 288. As a matter of law, a contractual promise is not necessary for fraud. *See McNally v. United States,* 483 U.S. 350, 357–58 (1987); *Weaver*, 860 F.3d at 95–96 (affirming a fraud conviction based on oral claims about plans for the future or expected profits, even when those promises are not contractual); *see also* Rest. (Second) Contracts §§ 4-6 (explaining that assent to, and the terms of, a contract can be "expressed in the language of the parties or implied in fact from other conduct"); *accord Liebowitz v. Cornell University*, 584 F.3d 487, 506–07 (2d Cir. 2009) (even contracts may be implied or

32

express).  Here, the jury reasonably could have found that the defendants fraudulently expressed their intention to publish the block as structured by the block-builder in accordance with the design of the MEV-Boost system by posing as a MEV-Boost validator; by registering with the MEV-Boost Relay; by submitting fake data to the MEV-Boost Relay; and by signing the blinded blockheader with a signature derived from the fake data.[2]

Next, the defendants try to downplay the significance of their deceptive trading, contending that the Bait Transactions cannot be misleading (nor material) because the Victim Traders' bots were "pre-programmed *before* the bots encountered [the Bait Transactions]" based on their own "flawed" "assumption" that their bundles would be executed. (Br. at 10–11, n.6).  But that the Victim Traders' bots were preprogrammed is by definition true of all software: it must be coded before it is used.  To argue that the Bait Transactions could not have "influenced the assumptions the bots made" because they were preprogrammed, (Br. 10), is to merely repackage the defendants' already-rejected argument that computers cannot be defrauded.  (Tr.2892 (Government explaining that pre-programmed slot machines, ATMs, online bank accounts, and algorithmic traders may all be subject to fraud)).  Software is necessarily designed based on expectations about how it will work in the future, and such expectations are actionable as fraud.  *United States v. Amrep Corp.*, 560 F.2d 539, 543–44 (2d Cir. 1977).  (*See* Tr. 1569 (Yakira testifying that trading strategies depend on "the terms or the rules and the parameters that we programmed into the bots")). The evidence was more than sufficient to support a conclusion that despite the automated nature of any

---

[2] The defendants' passing reference to a Flashbots' disclaimer, (Br. at 11), also does not change this analysis.  While the existence or nonexistence of such contractual language may be "relevant to the jury's determination," it cannot render otherwise fraudulent statements "immaterial or without tendency to influence" as a matter of law.  *Weaver*, 860 F.3d at 95.  Indeed, it would be a bizarre rule of law to permit "[f]raudsters [to] … escape criminal liability for lies told to induce gullible victims" simply by virtue of a "contract containing disclaimers of reliance."  *Id.* at 96 (quoting *Neder* for proposition that the "common-law requirements of justifiable reliance and damages plainly have no place in the federal fraud statutes").

given trade, the Victim Traders' algorithms relied on expectations about what the defendants' Bait Transactions appeared to be—and those expectations were then intentionally betrayed when the defendants stalked the Victim Traders' trades, executed dozens of test transactions designed to predict their future behavior with near certainty, and then successfully lured them to transact on false pretenses.  (Tr.717–18, 727, 1659).  *See United States v. Vorley*, 18 Cr. 35, 2021 WL 1057903, at *6–19 (N.D. Ill. Mar. 18, 2021) (rejecting argument that spoofing trades could not be deceptive nor material because they were based on preprogramed algorithms where "evidence showed that the impact of the defendants' spoofing orders was not just theoretically expected, but actually observed:  the scheme worked"); *United States v. Bases*, 18 Cr. 48, 2022 WL 3586142, at *5 (N.D. Ill. Aug. 22, 2022), *aff'd sub nom. Pacilio*, 85 F.4th 450 (rejecting argument that algorithms "were not designed to determine the subjective intent behind an order placed on" the exchange and thus, could not be "influenced by defendant's subjective intent" where victim testified that his trading algorithms were affected by the defendants' "coordinated deceptive trading activity," and defendants' own statements and trading patterns established an intent to deceive and materiality).

Moreover, as *Denkberg* again makes clear, what matters is what the defendants *intended* would materially affect a decision, not what actually did.  139 F.4th at 159.  A reasonable jury could conclude that the Bait Transactions were intended to—and, as Yakira testified, in fact did— "trick[] [the Victim Traders'] bots into trading" by "present[ing] a profitable trading opportunity for a sandwich, and so the bots reacted as they always do, which is to submit a bundle with the sandwich."  (Tr.1940–41).  *Cf. Vorley*, 2021 WL 1057903, at *12–13 (scheme to defraud sufficiently supported by testimony that spoof trades were intended to "trick" other market participants and defendant chats noted that their trading strategy "involved tricking, triggering, or

34

otherwise manipulating their [] counterparties, especially high-speed algorithmic traders" (cleaned up)); *Bases*, 2022 WL 3586142, at *7 (fraudulent trades sufficiently supported by defendant chats describing their spoofing trades as "trick[ing]" the algorithms); *see also United States v. Coscia*, 866 F.3d 782, 800 (7th Cir. 2017) (holding that materiality was established where defendant's large orders tricked trading algorithms).

The defendants in *Chanu, Vorley*, *Bases*, and *Jordan* raised nearly identical challenges in their Rule 29 motions as the defendants do here. Those arguments were universally rejected, including defense arguments that (i) their future contract orders, which they had no intention of executing, did not contain an implicit misrepresentation, *Bases*, 2022 WL 3586142, at *7, *Jordan*, 2023 WL 12130999, at *4; *Vorley*, 2021 WL 1057903, at *3–6; (ii) their future contract orders were not fraudulent because some of their orders were, in fact, executed (*i.e.*, their orders were "valid"), *Bases*, 2022 WL 3586142 at *5; (iii) there were no rules prohibiting orders with the intent to cancel before execution, and thus, it was irrational for a counterparty to believe an order contained an implicit and genuine interest to trade, *Jordan*, 2023 WL 12130999, at *4, *Vorley*, 2021 WL 1057903, at *6–7, *19, and (iv) their future contract orders were not material because the victim traders were using "algorithms [that] were not designed to determine the subjective intent" behind a trade, and thus, could not have been influenced by the defendants' trades, *Bases*, 2022 WL 3586142, at *6; *cf. Jordan*, 2023 WL 12130999, at *3, *Vorley*, 2021 WL 1057903, at *8.

In rejecting each of these challenges, the district courts turned to similar sources of evidence that were presented at this trial, including testimony from (i) traders and market participants with first-hand knowledge of the market rules—like Miller and Yakira, *Bases*, 2022 WL 3586142, at *2, *5; *Jordan*, 2023 WL 12130999, at *2, *5; *Vorley*, 2021 WL 1057903, at *4, *8; (ii) cooperators with first-hand knowledge of how the scheme worked in practice—like Chen,

*Bases*, 2022 WL 3586142, at *2; *Vorley*, 2021 WL 1057903, at *4, 11; (iii) the defendants' trading activity, which was indicative of their fraudulent intent and the materiality of their misrepresentations—like the testimony regarding the Bait and Dump Transactions, including the effectiveness of the bait testing, *Bases,* 2022 WL 3586142, at *6; *Jordan,* 2023 WL 12130999, at *2, *Vorley*, 2021 WL 1057903, at *6–7 , and (iv) the defendants' own statements evidencing their knowledge and intent—like GX4101 ("figure out correct bait (systematically) to get them to trade"), GX3407 ("design the bait that captures the most sandwiches"), GX3432 ("go through bots one by one and get each of them to trigger"), GX6012 at 65–68 ("it's possible though that the triggers get include in the block after ours and then that would be a suspicious block"), *Bases*, 2022 WL 3586142, at *7,  *Jordan,* 2023 WL 12130999, at *4, *6, *Vorley*, 2021 WL 1057903, at *13).   Notably, none of these cases required any particular form of proof to establish the defendant's fraudulent intent.

The defendants' analogy to *Eisenberg*, (Br. at 16) is also inapposite.  In *Eisenberg*, the Government alleged that the defendant deceived Mango Markets, a cryptocurrency platform, by "borrowing" $100 million in cryptocurrency based on both the false pretense of borrowing funds with the intention to repay them, as well as making false representations regarding the value of his collateral at the time of certain loans.  *See* 784 F. Supp. 3d 579, 613 (S.D.N.Y. 2025).  In *Eisenberg*, the district court found there was no false representation to support a wire fraud conviction based on its finding that there was "no evidence that the 'borrow' function on Mango Markets . . . entailed an obligation to repay—or any other obligation for that matter," and its finding that defendant's collateral was accurately calculated at the time of the borrow.  *See id.* at 614–18 (further holding that an implied representation could not have been made where "Mango Markets

had no rules and no one testified that Mango Markets users understood borrowing to reflect an intent to repay").

The Government has appealed the decision in *Eisenberg*, which is currently pending before the Second Circuit, *United States v. Eisenberg,* 25-1782 (2d Cir. 2025). However, even applying *Eisenberg* on its own terms, it is plainly distinguishable. The evidence in this case was more than sufficient for a reasonable jury to conclude that MEV-Boost users understood that bundled transactions would be (i) executed "all or nothing," in accordance with coded specifications and (ii) protected from validator manipulation through MEV-Boost's commit and reveal scheme. Based on the MEV-Boost specifications detailed *supra* Background Section II–III, Miller, who oversaw MEV-Boost's development, and Yakira, a MEV-Boost user, testified as much. (Tr. 168, 177–78, 203–04, 207, 214–15, 245–46, 607–08, 1574–77, 1593, 1648–49, 1654–66). This testimony was corroborated by MEV-Boost user guides and specifications, which defined a "MEV bundle" or "bundle" as "[a] list of transactions that MUST be executed together and in the same order as provided in the bundle," (GX3002-A at 8, Lns. 33–37; 3221 (ETH_sendBundle specifications)), and made clear that a validator's role was limited to "proposer duties only" by "blindly sign[ing] a block," (GX3208, 3232, 3406-A, 3405 (validator submits a "signedblindedbeaconblock" to the relay, "binding" the validator to the block; "the [relay] is now able to unblind the transactions . . . without the possibility of the validator modifying them.")). Far from no "obligations," "policies," or "rules" applicable to the defendants' conduct, the proof at trial established that MEV-Boost created an obligation by the validator to publish the block as structured by the block-builder, including bundled transactions—in fact, that was the entire purpose of MEV-Boost. (Tr.161, 177, 179, 196–97, 240–41, 245–46, 596–98, 607–08, GX3204, 3208, 3232 at 2, 3405, 3406 and 3406-A, 4101 ("Validators never see these blocks")). The MEV-

Boost Relay was specifically designed to enforce this proposer builder separation through a commit and reveal process expressed in code specifications that the defendants knew and reviewed. (Tr.170, 177; GX3405, 3406 and 3406-A; GX4101). This is exactly the type of evidence that the District Court in *Eisenberg* found to be missing. Thus, *Eisenberg* does not support the defendants' position here, and there was ample evidence from which reasonable jury may have concluded that the defendants made an implied representation to market participants.

Moreover, unlike the defendant in *Eisenberg*, the defendants here cannot make the same claim that they "didn't make any [literally] false representations." 784 F. Supp. at 616. To the contrary: the defendants intentionally communicated false representations in the form of the incorrect parent and state roots as part of their scheme to steal the Victim Traders' money. (Tr. 627–29, 668, 679, 769, 792–93, GX608 (JPB code setting parent and state root values to zero), 602 (same)). Indeed, the defendants themselves described the data they replaced those values with (*i.e.*, zeroes) as literally false at the time they were made. (Tr. 242–43 (Miller testifying that the fields' values are "specific things" with "particular meaning" and for which there exists a "right answer . . . for what those fields should be"), GX3439 (APB calling fields as set in the Exploit "incorrect[]"); 3449 (JPB calling same fields "invalid").

Thus, the fact that the *Eisenberg* Court found insufficient evidence based on a different set of facts is of no moment here. There was ample evidence for a reasonable juror to conclude the defendants' scheme involved multiple misrepresentations and false pretenses when viewed in context of the MEV-Boost system's purpose, design, and code specifications.

### b)    The Bait Transactions Were Material

Finally, the defendants make the familiar argument that even if the Bait Transactions were misleading, they were not in any event, material. In denying the materiality of the Bait

Transactions, they recycle many of the same arguments as to falsity: that the Bait Transactions were not capable of conveying any future intent; the Victim Traders were wrong to believe their trading data would remain private (*i.e.*, no reasonable trader could believe that bundled transactions would be executed as requested), and the Bait Transactions could not be material because they could not influence preprogrammed bots. (Br. at 17–18). For the reasons detailed above, these arguments ignore the extensive evidence at trial that proves the very opposite. As Yakira explained, he never would have parted with his money based on the Bait Transactions if he knew the MEV-Boost validator would unblind and unbundle the block before it was published to the blockchain. (Tr.1574–77, 1608–09). Instead, the defendants' materiality arguments hinge on ignoring evidence of regarding the defendants' clearly intended purpose and effect of the Bait Transactions—including the defendants' own words that the "correct Bait" would "get them to trade," (*see, e.g.*, GX4101), and Yakira's testimony that it actually did just that, (*see, e.g.*, Tr.1940–41)—and drawing inferences that the jury had good reason, and certainly was entitled, to reject.

This approach to the evidence is at odds with the law requiring that evidence be "view[ed] in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). This Court should reject the defendants' effort to "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129.

### 2.    The Invalid Signed Blockheader

#### a)    The Invalid Blockheader Was False and Misleading

Although the Court must assess the defendants' scheme as a whole in evaluating the defendants' sufficiency challenge, *Persico*, 645 F.3d at 104; *Schmuck*, 489 U.S. at 715, the evidence was also more than sufficient for a rational jury to conclude that the invalid signed blockheader constituted two false and misleading representations: (i) when the defendants sent a MEV-Boost Relay a signed blinded blockheader for a block that they knew could not be published, a rational jury could have concluded that the defendants falsely represented their commitment to publish that block as is; and (ii) that the defendants sent the false representation that the parent and state root values were a string of zeroes, rather than the undisputedly correct values.

*First*, as the trial evidence established, prior to gaining access to the transaction information in the block, the validator must return the signed blinded blockheader to the MEV-Boost Relay, with its cryptographic signature. (Tr.171–72, 211, 253–54, 795–96; GX 508, 3406, 3406-A). Miller explained in no uncertain terms that sending a signed blockheader to a MEV-Boost Relay "signifies the validator's commitment that this is the block that they have selected" to "propos[e] for the slot." (Tr.179, 214 (Miller explaining that "by providing their signature," the proposer "is making a commitment to that block that is enforceable with financial penalties," such that they are "bound to the block"). But the evidence also showed that the defendants never intended to propose the un-manipulated block because they knew it contained an invalid blockheader that would ensure its rejection. (GX3439 (APB explaining they are "setting some fields incorrectly" to ensure that the "fake block" to get the unblinded transactions is "rejected by the nodes"); 3449 (JPB stating "since a 0-parent has should always be invalid," the MEV-Boost Relay block would always fail)).

When viewed in the light most favorable to the Government, a reasonable inference—in fact, the correct inference—is that the defendants sent a MEV-Boost Relay a signed blockheader, which contained false data and represented a false commitment to propose that block as is, when the defendants intended to propose a different block from the very start. (*See* GX4101). The evidence was amply sufficient for a reasonable jury to conclude that when the defendants sent a MEV-Boost Relay an invalid signed blinded blockheader for a block that they knew could not be published, they misrepresented their intent to propose that block. *Amrep Corp.*, 560 F.2d at 544 ("The expression of an opinion not honestly entertained is a factual misrepresentation."); *see also United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (finding fraudulent misrepresentation because "by mixing negotiations of legitimate checks with unauthorized deposits of fraudulently procured checks, [defendant] sought to convey [a] misleading impression").

The defendants' arguments to the contrary, which all mischaracterize the Government's fraud theory, fall flat. For example, the defendants assert that the validator's cryptographic signature could not be false because it only serves to identify the validator. (Br. at 19). But this argument requires the Court to draw an inference in the defendants' favor—*i.e.*, as to what sending a signed blockheader is intended to convey. The jury was entitled to reject that inference, particularly in light of Miller's testimony, which the jury was permitted to credit. (Tr.173 (a validator "say[s] [that] [t]his is the block that I want to be next on the Ethereum chain" by "providing a signature" containing "data for a unique block")). The defendants also claim that submitting a signed blinded blockheader does not commit the validator to not sign a second block. Again, however, this argument requires the Court to make inferences that are in the defendants'

favor, while ignoring the permissible inference that the defendants misrepresented their commitment to propose the *first* block.

*Second*, the evidence showed that the defendants intentionally misrepresented the parent and state roots.  There is no dispute that the signed blockheader that the validator sends to the MEV-Boost Relay includes data necessary for the block to be successfully published, including unique parent and state root identifiers that the validator must fill out.  (Tr.176, 193, 242–43, 609; GX 602 at lns. 1–85 (incorporating "parent and state root" data to signature in ln. 74)).  There was also no dispute at trial that the values for the parent and state root fields are unique and identifiable for each block.  As Miller explained, there is a "right answer" and "specific answer for what [the parent and state root] should be for a specific block," and "if there is not the correct parent and state root, that means that the commitment is not valid."  (Tr.242–44).  The Government also presented evidence that the defendants set these fields to values that they knew were invalid as part of their plan to obtain the block's private transaction information and use it to take the Victim Traders' money.  (GX3439 (APB explaining that they are "setting some fields incorrectly" to ensure that the "fake block" to get the unblinded transactions is "rejected by the nodes"); 3449 (JPB stating "since a 0-parent has should always be invalid," the MEV-Boost Relay block would always fail).  The defendants' own words are plainly sufficient for a rational juror to find that the invalid blockheader contained false information.

Unable to escape their own words, the defendants resort to a grab bag of arguments, none of which are persuasive.  The defendants first argue that the Ethereum protocol does not obligate the validator to validly complete the parent and state root fields.  (Br. at 22).  This argument is irrelevant, however, because it has no bearing on the falsity of the parent and state root values and thus no bearing on the falsity of the representation.  The defendants' second argument—that the

fact that the parent and state roots were *visibly* incorrect—also has no bearing on their correctness, and as explained below, it also has no relevance to their materiality. (*Id.*).

### b)    The Invalid Blockheader Was Material

The evidence was amply sufficient for a rational juror to find materiality based on the defendants' submission of an invalid blockheader, which misrepresented their commitment to propose the first block, misrepresented the parent and state roots, and concealed their true intent to exploit a software vulnerability to propose a separate block. The evidence showed that a validator's transmission of a signed blockheader represents its commitment to propose that block. (*See, e.g.*, Tr.179, 1576). There is no dispute that the attesting validators rejected the block because of the incorrect parent and state root values. (*See* Tr.280–82, 679, 792; GX 503, 5012-BD). Indeed, the defendants knew that "setting [those] fields incorrectly" would ensure that the "fake block" would be "rejected by the nodes" because "a 0-parent should always be invalid," thereby enabling the defendants to obtain the Victim Traders' cryptocurrency without any risk that the block would be published first. (*See* GX3439, 3449).

Recognizing the importance of this software vulnerability to their fraud scheme and the possibility that it could be fixed if known by Flashbots or MEV-Boost Relays, the defendants took numerous steps to conceal it. (Tr.778 (did not test the coding vulnerability in a dry run because they did not want it to be "patched" by Flashbots or another party), GX3442 (discussing how to conceal Omakase plan in the event of an "abort")). Indeed, within hours after the defendants executed their fraud scheme, following a number of emergency meetings among key stakeholders, Flashbots and the MEV-Boost Relay implemented a patch to the MEV-Boost Relay software that ensured that a block was valid before its transaction contents were returned to a validator—permitting the jury to draw the reasonable inference that the coding vulnerability was material to

the MEV-Boost Relay.  (Tr.151–52, 284).  On these facts, the evidence at trial was more than sufficient to support an inference that if the MEV-Boost Relay knew about the defendants' fraudulent scheme, the MEV-Boost Relay would not have released the Victim Traders' private transactions and Flashbots would have taken steps *before* the Exploit to patch the software vulnerability.[3]

In contesting materiality, the defendants, once again, rely on their argument concerning falsity—namely, that the incorrect parent and state root fields were "so obviously incorrect" that it could not have been material.  (Br. at 25).  As an initial matter, the obviousness of the lie does not defeat materiality.  *Accord United States v. Cordero*, 205 F.3d 1325, 2000 WL 227818, at *1 (2d Cir. 2000) (holding that the fact that defendant's scheme to submit false claims for tax refunds "was obvious and easily detectable . . . [did] not . . . render" false statements regarding income immaterial); *United States v. Foxworth*, 334 F. App'x 363, 366 (2d Cir. 2009) (holding in § 1001 context that the FBI's "[knowledge] that the statements were false when they were made is irrelevant to their materiality" because materiality requires only that the false statement "be of a type capable of influencing a *reasonable* decisionmaker").  Instead, materiality focuses on the capacity of the statement or misrepresentation.  *Weaver*, 860 F.3d at 94  (statement is material "if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct"); *Universal Health Servs.*, 579 U.S. at 193 (observing that "[u]nder any understanding of the concept, materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation").

---

[3] The defendants contend that the fact that the MEV-Boost Relay's code was "changed after Omakase only demonstrates the immateriality."  (Br. at 26 n.13).  But this argument merely suggests that there is a competing inference that can be drawn from the facts—one that a rational jury is entitled to reject.

### c)    The Defendants "Obtained" Money "By Means Of" the Invalid Blockheader

The defendants also claim that the "False Signature" (*i.e.*, the invalid blockheader with fake data that they submitted) could not have caused the Victim Traders to part with their money or property because the invalid blockheader was made after the Victim Traders' preprogrammed trades were already sent to the blockbuilder.  Because the evidence was sufficient for a reasonable juror to conclude that the defendants' submission of the invalid blockheader enabled them to obtain the Victim Traders' cryptocurrency, the defendants' motion must be denied.

A wire fraud conviction requires only that the defendant "obtain[]" money or property "by means of" false or fraudulent pretenses, representations, or promises.  18 U.S.C. § 1343.  That is precisely what the evidence showed: that the invalid blockheader enabled the defendants to drain the liquidity pools of the Victim Traders' cryptocurrency by giving the defendants premature access to the Victim Traders' trades.  (*See* Tr.623, 626–27, 654-55, 769–71; GX 501, 503, 504 3439, 3449).  There is no categorical requirement that a misrepresentation occur before a victim's decision to part with money or property.  Indeed, the defendants' interpretation of the wire fraud statute to include such an extratextual temporal requirement is foreclosed by instances in which the Second Circuit has upheld a wire fraud conviction based on a misrepresentation designed to retain money or property that the victim has *already* relinquished.  *See, e.g.*, *Porcelli v. United States*, 404 F.3d 157, 162–63 (2d Cir. 2005) (wire fraud conviction in which the tax scheme involved defendant keeping money he already had by virtue of his not paying taxes); *United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998) (scheme to defraud where defendant "intentionally misrepresented his income in order to retain pension overpayments"); *cf. United States v. Sampson*, 371 U.S. 75, 78 (1962) (reversing mail fraud dismissal premised on allegations that "the defendants' scheme contemplated from the start the commission of fraudulent activities which

45

were to be and actually were carried out both before and after the money was obtained from the victims").

The defendants' reliance on *Loughrin v. United States*, 573 U.S. 351 (2014), is unavailing. The "single question presented" there was whether the *bank fraud* statute's provision that prohibits obtaining bank property "by means of false or fraudulent pretenses, representations, or promises" required proof of intent to defraud a bank.  573 U.S. at 353, 356.  The Supreme Court held only that the intent to defraud a bank was not an element of Section 1344(2).  *Id.* at 356–57.  But the defendants here are not charged with bank fraud, so *Loughrin*'s analysis of that statute's "by means of" language is inapplicable.  That language, as used in the bank fraud statute, was a textual limitation on Section 1344(2)'s scope—that is, a "relational component" that "typically indicates that the given result . . . is achieved, at least in part, through the specified action, instrument, or method . . . ."  *Id.* at 363.  In the bank fraud context, *Loughrin* explained that the "by means of" language could be satisfied when the "defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with the money in its control."  *Id.*

Whatever gloss *Loughrin* may have added to the bank fraud statute did not pronounce any categorical definition or interpretation of the "by means of" language or impose any extratextual causation requirement for the fraud statutes generally.  That is clear from *Loughrin* itself, which explained that "[l]anguage like 'by means of' is inherently elastic," and "[i]t does not mean one thing as to all fact patterns—and certainly not in all statutes, given differences in context and purpose."  *Id.* at 365 n.8.  Moreover, *Loughrin* explicitly cabined its holding to the bank fraud statute, remarking that "[a]ll we say here is that the phrase, as used in § 1344(2), is best read, for the federalism-related reasons we have given . . . as drawing a line at fraud that have some real

connection to a federally insured bank—namely, frauds in which a false statement will naturally reach such a bank (or a custodian of the bank's property)." *Id.*[4]

At bottom, the Court properly repudiated the defendants' attempt to import *Loughrin* into its jury instructions, and it should also deny defendants' effort to relitigate the issue under the guise of a Rule 29 motion. *See United States v. Goklu*, 19 Cr. 386 (PKC), 2023 WL 184254, at *4 (E.D.N.Y. Jan. 13, 2023) (rejecting Rule 29 argument that the evidence was insufficient to satisfy defendant's interpretation of the term "transfer" in Section 1960 prosecution because "Rule 29(c) is not an open-ended opportunity to relitigate unfavorable rulings, contest jury instructions, or advance new legal theories"). The Court accurately instructed that a scheme to defraud is "any plan, device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations, or promises . . . ." (Tr.3254). Drawing all inferences in the Government's favor, a reasonable juror could conclude that the defendants obtained the Victim Traders' cryptocurrency "by means of" the invalid blockheader, which enabled them to gain premature access to the Victim Traders' transactions and construct their own block that drained the liquidity pools of the Victim Traders' cryptocurrency.

---

[4] *Loughrin*'s federalism rationale also explains why its "naturally inducing" formulation does not apply to wire fraud. There, the Supreme Court observed that it "should not construe § 1344(2) as a plenary ban on fraud, contingent only on use of a check." *Loughrin*, 573 U.S. at 362. But it recognized that Section 1344(2)'s reach already contained "a significant textual limitation"—that is, the statute's requirement that a defendant obtain bank property "by means of" a misrepresentation. *Id.* The wire fraud statute, in contrast to the bank fraud statute, already contains its own textual, jurisdictional limitation: the use of interstate wires in furtherance of the scheme. Because the federalism concerns that animated *Loughrin*'s interpretation of the bank fraud statute are not present here, there is no need to read that interpretation into the wire fraud statute.

3.    **The Defendants Used False Pretenses and Made Implied Misrepresentations as a MEV-Boost Validator**

a)    **The Government's Theory Is Legally Valid and Factually Supported**

The defendants also used false pretenses and implied misrepresentations to further their fraud through their conduct as a MEV-Boost validator.  The core function of MEV-Boost—as reflected in public MEV-Boost materials—was to separate the block-building and block-proposing roles, such that a validator using MEV-Boost would only propose blocks and play no role in block-building (Tr.163–64, 173, 240–41 GX3208, 3405, 3406-A, 4101); and the design of MEV-Boost required validators to submit a signed blinded blockheader, signifying the validator's commitment to propose that block sight unseen, before the MEV-Boost Relay released the block's private transaction data (Tr.177, 179–80, 1576, *see* Tr.177–78; GX 3405 at 3, 5).  In this context, a rational jury could clearly find that the defendants engaged in a false pretense when they misleadingly sent the invalid blockheader under the guise of "validating" the MEV-Boost Relay's block, knowing that the false parent and state roots they put in the blockheader would cause the MEV-Boost Relay's block to fail.  Because they had purported to serve as a MEV-Boost validator, these same actions allowed them to "unblind" and seize control of the transactions in the Relay's block in order to use them for their own benefit by posting their own manipulated block in its place.  Moreover, viewed in the light most favorable to the Government, the evidence was also sufficient for a rational jury to conclude that the actions the defendants necessarily took to be able to receive the block containing the Victim's trades from the MEV-Boost Relay—*i.e.*, registering as a validator with MEV-Boost Relays and requesting a block to validate (*see* Tr.168, 174–75, 203–04, 211–13, 240–41, 592–93, 624–25, 1167; GX508, 3405, 3406-A)—created a false and misleading impression because the defendants secretly intended from the outset to register their

validator with MEV-Boost Relays solely to seize control of a blinded block that they never intended to propose.[5]

This deception was critical to advance the fraud: the defendants knew that their victims relied on MEV-Boost to submit their trade bundles and to keep those trades blinded to a potential validator unless the validator committed to proposing that block, consistent with MEV-Boost's "commit and reveal" design. But the defendants' conduct conveyed the false appearance that they had registered a validator with MEV-Boost Relays and requested a block to perform their role using MEV-Boost code functions in the same way that a validator using MEV-Boost is supposed to, when in reality that was only a ruse to seize control of the MEV-Boost Relay's block containing the Victim Traders' bundles. (*E.g.*, GX3682, 4101 (describing "[n]eed to set up an mev-boost validator that has the relay unblind the block to [defendants]"). Indeed, the defendants knew that pretending to use MEV-Boost as designed was so integral to their scheme that they took extensive steps to conceal the true identities behind their validators (GX501), treated the validators as virtually disposable because they had no other function, and—immediately upon discovery of their heist—instructed the group to "take down the validators" (GX6701). Consistent with its jury instructions, the Court should reject the defendants' argument that this conduct cannot constitute a false pretense or implied misrepresentation covered by wire fraud statute. (*See* Tr.3254–55 (instructing that "conduct alone can deceive another, even in circumstances where a person's statements contain no misrepresentation," where "that conduct create a false impression as to a

---

[5] Specifically, (i) the defendants staked sixteen validator accounts that they intended to use only for their fraud scheme (Tr.702); (ii) the defendants registered their validators with null fee addresses, which "shouldn't matter much for [their] purposes here" (GX3451); (iii) fourteen of the defendants' validators proposed no blocks, and seven of those fourteen missed their slots (GX501); (iv) of the two validators that proposed blocks, one proposed an unprofitable block used for an Omakase dry run, while the other validator only proposed the block that enabled the defendants to take the Victim Traders' cryptocurrency; and (v) the Omakase validator's activity ceased one day after the Exploit.

material fact or matter"). *Accord Schmuck*, 489 U.S. at 714–15 (conduct of rolling back odometers constitutes fraud); *Pacilio*, 85 F.4th at 460–61 (placing trades with intent to cancel them constitutes fraud). Though the facts underlying the defendants' scheme may have been novel, the Government's charging theories were not.

Defendants joust at a strawman of their own creation, claiming that the Government seeks to criminalize the act of equivocation (*see* Br. at 28 (characterizing fraud theory as "signing two blocks and getting slashed as a result"), 29 n.15 (same)), and that its charging theory is foreclosed by the Second Circuit's decision in *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008). Both arguments fail.[6] To start, the Government's argument was not that the defendants committed wire fraud simply by signing a second block in contravention of Ethereum rules, or that any violation of software protocol automatically constitutes fraud. As described above, the record shows that the defendants took specific misleading actions as part of their false pretense of using MEV-Boost as designed, to further their fraud. While the defendants feign confusion at the concept of a "MEV-Boost validator," those are the defendants' own words. (GX3682, 4104). Nor does it matter that the defendants did not sign terms of service for MEV-Boost or download its software client, because a contractual promise is not necessary for a fraud conviction. *McNally*, 483 U.S. at 357–58; *Weaver*, 860 F.3d at 95-96.

Nor does *Finnerty* support the defendants' position. There, the defendant was charged with securities fraud for engaging in certain trading practices that enabled the defendant to profit from

---

[6] In addition to being irrelevant, the defendants' arguments regarding the strawman fraud theory are not properly brought in a Rule 29 motion. *Cf. United States v. Levy*, 11 Cr. 62 (PAC), 2013 WL 3832718, at *3 & n.2 (S.D.N.Y. July 15, 2023) (rejecting defense arguments for "acquittal under Rule 29" based on the Government's "novel" theory of prosecution and defendant's view that "her activities should not be considered as illegal as a matter of law" because "these arguments do not address the sufficiency of the evidence presented").

his customers' trades, but which were prohibited by NYSE rules. *Finnerty*, 533 F.3d at 145–46. In affirming the district court's judgment of acquittal, the Second Circuit found that the defendant's conduct was not deceptive because the defendant did not communicate anything false or misleading to his customers—in other words, it was "garden variety conversion," but not fraud. *Id.* at 149–50. The court also rejected the argument that the defendant "[held] himself out as a specialist obligated to follow NYSE rules and refrain from [the subject trading practices]," explaining that even though "some customers may have expected that [defendant] would not engage in the practice," there was no indication that "their understanding was based on a statement or conduct by [the defendant]." *Id.* at 150.

Unlike in *Finnerty*, however, the defendants here *did* convey a false impression. They gave the false impression that they intended to perform a validator's function in the MEV-Boost system as designed (*i.e.*, one that is limited to proposing a block without seeing its contents, as opposed to building a block) when they communicated their commitment to propose the Relay's block to be published, and they took affirmative actions to curate and further that false pretense (*e.g.*, registering with MEV-Boost Relays and requesting the block containing the Victim Traders' bundles), all while misleadingly hiding their true intent to do the opposite of validate the MEV-Boost Relay block, in order to fraudulently seize control of the block in order to switch the transactions and obtain the Victim Traders' cryptocurrency. *Accord id.* at 148 (deception "irreducibly entails some act that gives the victim a false impression");[7] *see also Petrossi*, 786 F.

---

[7] *Finnerty*'s characterization of deception is phrased in terms of giving a victim a false impression because the issue in that case was whether the defendant gave any false impression to his customers (*i.e.*, the victims). However, it is settled Circuit law that "the party whose money or property is the object of the scheme [need not be] the same party whom a fraudster seeks to deceive." *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016). In other words, a wire fraud conviction can also be premised on the defendants' acts to convey a false impression or implied

App'x at 288–89 (affirming wire fraud theory based on omissions of facts that made affirmative representations misleading under the circumstances); *Autuori*, 212 F.3d at 118 (same).  In other words, the defendants' pretense was "misleading in context" because the MEV-Boost Relay and block-builder "would probably—but wrongly—conclude" that the information communicated misrepresented the defendants' true intentions.  *See Universal Health Servs.*, 579 U.S. at 189; *accord VanCook v. SEC*, 653 F.3d 130, 139–40 (2d Cir. 2011) (distinguishing *Finnerty* on the basis that "VanCook did not merely violate an NYSE rule that customers might or might not have expected him to follow," but also "violated [his customers'] own express wishes" that trades would be executed by a certain time, and that he "took steps to make it appear to any outside observer" that his customers' trades "had been finalized by [that time]").

The *amicus* brief filed by Coin Center does not salvage the defendant's arguments, or aid in resolving the defendants' Rule 29 motion.  Coin Center's brief purports to provide "sound legal arguments" and "industry perspective" on the meaning of honest validators and "explain the consequences" of the Government's prosecution.  (Dkt. 203-1 ("Coin Center Br."), at 2).  But Coin Center's "legal argument[s] [are] not a proper subject of a Rule 29 motion, which must be limited to claims that 'the evidence is insufficient to sustain a conviction.'"  *See United States v. Davila-Perez*, 19 Cr. 91 (DLC), 2025 WL 3551486, at *4 (S.D.N.Y. Dec. 11, 2025).  So, too, for Coin Center's policy arguments, such as the wisdom or consequences of the Government's prosecution; how Ethereum or other emerging technology should be regulated; or the wisdom of Ethereum's design, and arguments for promoting "selfish MEV behavior."  (*E.g.*, Coin Center Br. at 2–4, 7–8, 10 & n.14, 13).

---

misrepresentation to the MEV-Boost Relay, the nodes operating on the Ethereum Network, or other MEV-Boost participants as a means to obtain the Victim Traders' money.

Most importantly, Coin Center's factual arguments regarding Ethereum's economic incentives, the expectations of participants, and validator behavior (*see, e.g.*, *id.* at 2, 8, 9, 10–11) cannot be considered in the Court's Rule 29 determination, which is limited to the evidence presented to the jury at trial. Coin Center's brief, moreover, purports to tell the Court how to weigh the evidence and what conclusions to draw, which a court may not do in resolving a Rule 29 motion. *Guadagna*, 183 F.3d at 129. There is no basis to consider such arguments attempting to opine on the defendants' conduct as "no more than anticipated hard-dealing from competitors in the MEV Market," (Coin Center Br. 15)—which are substantially refuted by the trial record, particularly when viewed in the light most favorable to the Government. Whether it would be reasonable or not for a MEV-Boost user to assume anything about a validator's conduct boils down to an argument that a MEV-Boost user (for example, the MEV-Boost Relay) was unjustified in relying on the defendants' false pretense, an argument which "plainly [has] no place in the federal fraud statutes." *Neder*, 527 U.S. at 24–25 (justifiable reliance not an element of wire fraud).

### b)    There Is No Constructive Amendment

Finally, there is no constructive amendment if the jury were to convict based on the defendants' false pretenses as a MEV-Boost validator. To begin, the Indictment did not forgo an "implied misrepresentation" theory as the defense claims, and the proof at trial clearly concerned the same course of conduct described in detail in the Indictment. Regardless, the defendants' claims that the Government "pivot[] to an implied misrepresentation theory" are legally irrelevant. (Br. at 28). The defendants point to no authority—and the Government is aware of none—for the proposition that the Government must exhaustively disclose its legal theories to the defense before trial or confine its proof to a singular theory of how the charged crime was committed. To the contrary, the Government is not required to "disclose the precise manner in which the crimes

charged in the indictment were committed" or "provide the defendant with a preview of the Government's case or legal theory." *United States v. Kogan*, 283 F. Supp. 3d 127, 132 (S.D.N.Y. 2017); *accord United States v. Triana-Mateus*, 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002); *United States v. Taormina*, 97 Cr. 1120 (MBM), 1998 WL 702341, at *4 (S.D.N.Y. Oct. 8, 1998) (Government not required to "specify its legal theory," "preview [its] evidence or trial strategy," or "specify the minutiae of how it will prove the charges"); *United States v. Zhang*, 833 F. Supp. 1010, 1020 (S.D.N.Y. 1993) (there "is no requirement that the Government reveal its precise legal theory of the fraudulent statements by identifying which components of [facts disclosed to the defense] are false").

Defendants' constructive amendment arguments are also wrong on the merits. There is no constructive amendment if "the government's proof at trial does not modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007). The Second Circuit "has repeatedly held that the specific means used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense, and therefore, proof of specific means apart from those charged in the indictment does not constructively amend the indictment." *United States v. Teman*, 465 F. Supp. 3d 277, 298–99 (S.D.N.Y. 2000). That alone is fatal to the defendants' arguments because the specific false or fraudulent statement, representation, pretense, or act "is properly classified as a means, rather than as an element, of wire fraud." *United States v. Gentile*, 21 Cr. 54 (RPK), 2025 WL 777090, at *33 (Mar. 11, 2025); *accord United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (explaining that "fraudulent representations or omissions committed by [defendant] were 'underlying brute facts'"—*i.e.*, the means the defendant used to commit an element of the crime); *United States v.*

*LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013) (characterizing the "specific false statement" as "the means . . . [defendant] used to carry out her fraudulent scheme").

At bottom, what the defendants seek is for the Court to ignore evidence of their fraud in considering their Rule 29 motion.  (*See* Br. at 39).  The Court should reject this repackaging of the defendants' failed attempt to preclude evidence of misrepresentations not listed in the Indictment's to-wit clause on constructive amendment grounds.  *See United States v. Peraire-Bueno*, 24 Cr. 293 (JGLC), 2025 WL 2753560, at *7 (S.D.N.Y. Sept. 29, 2025) (denying motion and explaining that the "Second Circuit has never suggested that a 'to-wit' clause binds the government to prove the exact facts specified in a criminal indictment").

### B.    The Object of the Defendants' Fraud Scheme Was Property

A rational jury clearly could have concluded that the defendants' scheme sought to obtain, and did obtain, money or property—in the form of cryptocurrency—from the Victim Traders, because that is undisputably what the facts showed happened.  (*See, e.g.*, GX501 at 23; Tr.591 (defendants described the Exploit as "a strategy we could use to profit at the expense of sandwich traders"); Tr.599 (by "adding in the dump transaction[s] to [their] proposed block," the defendants "profit[ed] at the [sandwichers'] expense" by taking the "*money* the [sandwichers] had traded" (emphasis added)); *id.* (defendants induced the Victim Traders to trade "one cryptocurrency for another into what's known as a liquidity pool," and then the defendants "traded on that same liquidity pool to receive the crypto [the victims] had traded away"); Tr.1567 (Yakira explaining that "[o]ur wallets were drained in a sophisticated exploit" in which "[a]lmost $14 million were taken"); Tr.1606 (defendants obtained the Victim Traders' cryptocurrency in "a two-phase transaction, where first [victims] transferred the tokens from [their] wallet to the liquidity pool, and then [defendants] took from the liquidity pool to their own wallet"); Tr.1758, 1939 (similar);

Tr.269 (Miller explaining that the defendants' Exploit "caused users to lose a lot of money to the gain of the person that used the bug"); Tr.384 (by inducing the Victim Traders to sell cryptocurrency into a liquidity pool and then buying from that pool, the defendants and Victim Traders effectively "trad[ed] with one another because they're both trading against the same liquidity pool"); GX4101 (notes from defendants' first meeting explaining that the "opportunity size is enormous")).

The defendants nonetheless argue that "the Government failed to prove that a qualifying property right was the object of the alleged scheme."  (Br. at 39).  The Court should reject this preposterous theory, which is so far removed from the law, the trial record, and common sense that the defense did not bother presenting it to the jury in closing arguments.

As this Court has already held, the "wire fraud statute protects money and property."  (Dkt. 112 ("MTD Op.") at 22 (citing *Kousisis*, 605 U.S. at 134–35)).  Accordingly, the property element is satisfied by proof of a "scheme[] to obtain the Victim Traders' money in the form of $25 million worth of cryptocurrency."  (MTD Op. at 22–23 (explaining that "a fraudulent inducement to obtain the Victim Traders' money[] comports with the wire fraud statute")); *see* Dkt. 61 (Gov't MTD Opp.) at 24–26 (collecting cases).

Ignoring the overwhelming evidence that the defendants set out to take money, and in fact made millions off their scheme, the defendants nonetheless argue that "[a]t best for the government, the evidence showed an interference with a contingent expectation of profits."  (Br. at 39–40).  But the loss charged and proven here wasn't some calculation of missed profits the Victim Traders hoped to make; it was the money they actually lost.  Following the defendants' argument to its logical conclusion, scenarios where victims part with their money based on false promises of "future financial gain" (*i.e.*, the basis for countless fraud schemes, such as sweepstakes

scams falsely promising riches upon an initial investment, *Ponzi* schemes falsely promising lucrative returns, or any scheme for that matter where a defendant directs a victim to give their money to an intermediary based on false promises knowing the defendant would ultimately obtain that money) would fall outside the purview of the fraud statutes.  The defendants' argument cannot be squared with the facts or the law.  *See Durland*, 161 U.S. at 313 (punishing schemes to defraud based on suggestions and promises as to the future).

Indeed, because the defendants' scheme sought to obtain the Victim Traders' cryptocurrency, the cases cited by the defense in support of its argument are completely inapposite. *See, e.g.*, *Ciminelli v. United States*, 598 U.S. 306, 309 (2023) (insufficient for victims in "right-to-control" case to be deprived merely of "potentially valuable economic information necessary to make discretionary economic decisions"); *United States v. Adler*, 186 F.3d 574, 575, 577–80 (4th Cir. 1999) (oral promise to repay a debt owed to victim with anticipated settlement proceeds belonging only to defendant did not deprive victim "of anything that [victim] actually owned"); *United States v. Bruchhausen*, 977 F.2d 464, 467–68 (9th Cir. 1992) (manufacturers who "received the full sale price for their products," and whose only "loss was in control over the destination of their products after sale," had not been deprived of "property" under the wire fraud statute).

A rational jury clearly could conclude that the defendants' scheme aimed to deprive the Victim Traders of their money, a traditional property interest.  The defendants argue that the Victim Traders "traded away their existing cryptocurrency by selling it to a liquidity pool, not the Peraire-Buenos"; that the Victim Traders "received the currency they agreed to purchase from the pool"; and that the defendants merely "purchased cryptocurrency from the liquidity pool at the advantageous price that the sandwich attackers' frontruns had created," as if this sequence of events was mere happenstance.  (Br. at 40–41).  The reality is that all of those steps were carefully

orchestrated by the defendants, and their "purchase" from the liquidity pool—which allowed them to spend hundreds to steal millions—was only made possible by their own fraudulent bait-and-switch scheme. (Tr.1758 (Yakira rejecting assertion that the defendants did not take his money, explaining: "It's a scheme. . . . They build the block from start to end . . . and before it, the money was in our wallet; and after it, the money was in their wallets.")). Indeed, the testimony of Miller and Yakira makes clear that the defendants in fact took the Victim Traders' cryptocurrency in two-phase transactions, involving the same source of liquidity, in which each trade affected the others. (Tr.384, 1606). Moreover, the law is clear that a defendant need not receive proceeds directly from a victim to commit wire fraud, and it is no defense that a victim received something in return for their property. *See, e.g.*, *Kousisis*, 605 U.S. at 123 (defining "obtain" as "to gain or attain possession" and explaining that money or property "is no less 'obtained' simply because something *else* is simultaneously given in return").

Similarly, the defendants' argument that the Victim Traders "had no property interest in their bundle or the [Bait] Transactions they attacked" because a "searcher can only express a preference for a bundle to the builder" and that their scheme "did not alter or otherwise interfere with alleged victims' trades," (Br. at 40–41), is refuted by the evidence. The testimony and evidence at trial made clear that the "Eth_SendBundle" function used by the Victim Traders and others "[a]llow[s] searchers to send ordered lists of transactions"—*i.e.*, bundles—"that are included [in a block], all or nothing." (Tr.207; *accord* GX3002-A at 8, Ln. 33 (APB circulating Flashbots GitHub Specifications defining a "MEV bundle" or "bundle" as "[a] list of transactions that MUST be executed together and in the same order as provided in the bundle")). Bundles are "like this glued series" of transactions that "you can't unglue and then change the order," which "is critical for the success of a sandwich trade." (Tr.1573–74). Indeed, the builder whose block

the defendants exploited had expressly assured searchers online that they could send "a list of signed transactions to execute in an atomic bundle"—*i.e.*, a bundle that is "all or nothing" and that "nonrelated transactions cannot interfere [with] or sneak in the middle [of]." (Tr.1653, GX3221). And the testimony at trial—including the defendants' own chats—made clear that the Exploit unbundled the Victim Traders' transactions. (*See, e.g.*, GX3478 at 4). More to the point, the Victim Traders' relevant property interest was in the cryptocurrency stolen by the defendants. It is no more relevant that the scheme purportedly "did not alter or otherwise interfere with alleged Victim Traders' trades," (Br. at 41), than that a *Ponzi* schemer who induced investors to wire him funds "did not alter" those wire transfers; what matters is that—as was proven at trial—the fraudster intended to obtain property through his scheme.

As this Court already explained, "a fraud is complete when a defendant induces the deprivation of money or property under materially false pretenses, regardless of whether the victim received something of equal value in return," and a wire fraud conviction "requires nothing more" than "scheming to obtain the victim's money or property." (MTD Op. at 23). Viewing the evidence in the light most favorable to the Government, it is clear that the defendants' scheme sought to obtain, and did obtain, the Victim Traders' property, in the form of millions of dollars' worth of cryptocurrency. The Victim Traders had a legitimate and traditional property interest in their cryptocurrency, which they were deprived of a result of the defendants' scheme. "And that is all that is required for this element." (*Id.* at 22).

### C.    The Defendants Intended to Defraud Their Victims

The defendants' argument that the Government failed to prove intent to defraud is equally unavailing. The defendants' primary argument regarding intent to defraud is purely derivative of their material misrepresentations argument: "Because the Government failed to prove any material

misrepresentations, it necessarily failed to prove fraudulent intent." (Br. at 42). But, as explained above, *supra* at 22–53, the Government proved a scheme to defraud involving material misrepresentations, half-truths, and false pretenses.

To prove a "scheme to defraud," the Government must show "that the defendant possessed a fraudulent intent." *Greenberg*, 835 F.3d at 305–06. "[W]hile intent to deceive is required, a fraudster need not cause 'harm' going to the 'nature of the bargain itself.'" *United States v. Pukke*, No. 23 Cr. 168 (JPO), 2025 WL 2089261, at *3 (S.D.N.Y. July 25, 2025) (quoting *United States v. Runner*, 43 F.4th 146, 154–58 (2d Cir. 2025)); *see, e.g.*, *Kousisis*, 605 U.S. at 118 ("[A] defendant commits federal fraud whenever he uses a material misstatement to trick a victim into . . . handing over her money or property—regardless of whether the fraudster . . . seeks to cause the victim *net* pecuniary loss.").

"Fraudulent intent may be inferred when the necessary result of the actor's scheme is to injure others." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (reversing district court's judgment of acquittal and finding sufficient evidence of defendant's fraudulent intent). Here, a rational jury could plainly find the defendants acted with intent to defraud: the defendants targeted particular Victim Traders, used "bait" to "trap them all at once," and plotted to trick the relay into revealing confidential trading information that the defendants used to "profit at [the Victim Traders'] expense." (Tr.591, 710, 717–18, 723, 727, 2715–16; GX3409 at 2, GX4101). Victim Traders were seriously harmed by the fraud: millions were stolen in a matter of seconds.

Myriad facts demonstrated the defendants' intent to defraud. *See generally supra* Background Section IV. From their first meeting, the defendants instructed their employees to "[t]ell nobody outside the people working on it" about their "[s]andwich [t]rapping" scheme. GX4101. The defendants targeted particular victims—tracking their trading patterns and account

balances on a "menu," designing Bait Transactions tailored to each victim, and even hardcoding victims' contract addresses into the Omakase code.  (Tr. 717–18, 723, 727, 2715–16; GX3409 at 2 (menu), 3407 ("Design the bait that captures the most sandwiches.").)  They spent nearly $1 million to stake sixteen validators, but (i) set the validators' fee address to zero, since actually getting paid to properly serve as a validator "shouldn't matter much for our purposes here," (GX3451), and (ii) "t[oo]k down [the] valid[a]tors" as soon as they learned their scheme had succeeded, (GX6701).  The defendants knew from the start that they would be "slashed" (GX4101)—an exceptionally rare penalty imposed by the Ethereum network for "provable misbehavior," which results in both a fine and getting "kicked off the network" (Tr. 2106–09, 3125–26)—but decided to proceed anyway.  And the defendants took extensive steps to conceal their scheme before, during, and after the Exploit.  (*See, e.g.*, GX3461 (describing "goal" as "plausible deniability"), GX6012 at 32–33, 35–36 (JPB reassuring his father, a co-conspirator, that the defendants were "actually obscuring our tracks much more carefully than I described"), GX3428 (APB assuring that they were "being quite cautious with the on chain funding of omak[a]se"); *see also supra* at 21–22 (discussing steps taken to launder the proceeds)).

Indeed, the defendants' own words every step of the way lay bare their intent to defraud. In January 2023, APB searched online for, *inter alia*, "how to wash crypto" and "exchanges with no kyc."  (GX3775 at 3.)  After using the term "bait" in their early descriptions of their method of inducing victims to trade, in February 2023, JPB messaged APB via Signal: "we should avoid using terms like 'bait' . . .to avoid any wirefraud-like situations (sbf reference)."  (GX6012 at 2.) Later that day, the defendants settled on using the term "trigger" instead for the exact same deception.  (GX6012 at 3.)  On March 3, the defendants discussed the need "to anonymize" (again via Signal, after explaining that the app was a preferred place to chat, while "delet[ing] the other

messages on slack," (GX6012 at 9, 58)), and compared their plan to "sbf and do kwon"—perhaps the two most famous cryptocurrency fraudsters, (GX6012 at 59). The defendants and their co-conspirators repeatedly referred to the false blockheader they sent to the relay to unblind the block as "the bad block," (GX3443), and to portions of their plan as "suss" and "nefarious," (GX3442). And, after the Exploit was complete, the defendants described the victims as having been "scammed," (GX3496), searched for "wire fraud statute of limitations," (GX3775), and stated that their "goal here is plausible deniability," (GX3461).

Rather than grapple with this mountain of intent evidence,[8] the defendants' motion half-heartedly gestures toward two "[a]dditional facts [that] preclude a rational jury from finding this element beyond a reasonable doubt." (Br. at 42).

*First*, the defendants argue that there was "no evidence" that Chen "believed before Omakase that there was anything even wrong about the strategy—much less fraudulent, dishonest, or illegal." (Br. at 42). But this argument is both factually inaccurate and of limited probative value to actual issue in dispute—the defendants' own intent. To begin, Chen acted at the direction of the defendants, and referred to the scheme as "suss" and "nefarious" in contemporaneous chats. (GX3442). Moreover—and highly probative of the *defendants'* intent—the defendants withheld key information from Chen. Although the defendants knew from the start about the coding vulnerability, they initially told their employees they planned to "race" the relay—write code fast enough to "compete on speed" with the relay "to get our block accepted first," (Tr.764)—rather than revealing that they would be exploiting a coding bug. Indeed, Chen testified that the first he heard of the coding bug at all was months later. (Tr.980). The defendants hid the full scope of their plan from their own coders until the scheme was deep underway, and Chen was not included

---

[8] The due process concerns about fair notice raised by *amici*, discussed *infra* at 72–73, are particularly inapt in this case given the significant evidence of the defendants' fraudulent intent.

on the defendants' most damning chats or incriminating Internet searches.  Whether or not *Chen* believed the strategy was "wrong" in no way precludes a rational jury from finding that the *defendants* had an intent to defraud.  *See Landesman*, 17 F.4th 298 (vacating judgment of acquittal and finding error in court viewing the "evidence in isolation," and concluding that "evidence of [one] alleged co-conspirators' intent [did] not constitute evidence of [another's]").

*Second*, the defendants argue that the "unique context of Ethereum" itself disproves the defendants' "fraudulent intent."  (Br. at 42).  Unsurprisingly, the defendants do not cite a single case in support of this outlandish argument that fraud is impossible in Ethereum.  More to the point, even taking this argument on its own terms, the record is replete with evidence from which a reasonable jury could conclude that the defendants had a specific intent to defraud, even within the purportedly unique context of Ethereum.  (*E.g.*, Tr.560 (Miller explaining that the Exploit was not a "trading strategy" because "there was a bug in the MEV-Boost relay that [the defendants] triggered that caused unintended use, and none of that has anything to do with cryptocurrency trading"); 283 (defendants' validator was only validator blacklisted in Flashbots's history); 2106–09 (slashing penalties like the one imposed on the defendants are rare and result in expulsion from Ethereum); 3125–26 (Falk conceding that slashing is a penalty for a validator's "provable misbehavior" that not only results in a financial penalty but also "the forceful removal of a validator from the network").  There was overwhelming evidence—including the defendants' own words and actions—that, even in the purportedly "unique context of Ethereum," the Exploit was wrong, and the defendants knew it.

On this point, too, the defendants' cases are inapposite.  The defendants primarily cite *United States v. Lorenzo*, 534 F.3d 153, 160 (2d Cir. 2008), a drug conspiracy case (repeatedly distinguished by the Circuit) in which there was not "any indication from which a jury could

reasonably infer that [the defendant] knew of the nature and specific object of the conspiracy." The defendants' citation to *Finnerty* is equally unavailing. In that case, the "sole issue on appeal" was "whether the government proved that [the defendant's] conduct was deceptive" within the meaning of Section 10(b), and the Circuit held that the defendant had not "communicated anything to his customers, let alone anything false." *Id.* at 145, 148–49. In that context, the limited consciousness of guilt evidence adduced by the prosecution could not on its own establish a deceptive scheme. *Id.* at 151; *see, e.g.*, *Bases*, 2022 WL 3586142, at *12 (distinguishing *Finnerty* as a case in which "the government presumed that a violation of a [stock exchange] rule alone was sufficient to establish intent" and failed to adduce other evidence "probative of [the defendant's] criminal intent"); *United States v. Wey*, 15 Cr. 611 (AJN), 2017 WL 237651, at *6–8 (S.D.N.Y. Jan. 18, 2017) (Judge Nathan similarly distinguishing *Finnerty*).[9]

Viewing the evidence in the light most favorable to the Government, there was more than sufficient evidence at trial of the defendants' intent to defraud. *See, e.g.*, *Hild*, 147 F.4th at 112–13 (holding that "evidence of the scheme, which may itself speak to a defendant's fraudulent intent," together with "circumstantial evidence of [the defendant's] state of mind," such as "direct[ing] [his] employees to take steps to prevent discovery of the scheme" was sufficient evidence of intent to defraud)); *Landesman*, 17 F.4th at 327 (vacating district court's judgment of acquittal where district court "erroneously viewed the evidence in isolation, weighed the evidence, and drew inferences against the government" in concluding that defendant lacked requisite intent).

---

[9] Similarly, in *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005), the question was whether the evidence established that the defendant "willfully violated the securities laws"—a different *mens rea* than that at issue here. In *Cassese*, the only intent evidence adduced was the "use of two brokerage accounts," the "timing of the [stock] purchase," the defendant's "desire to cancel the trades" and reference to the purchase as a "mistake," and the existence of a confidentiality agreement. *Id. Cassese* thus has little bearing here.

## II.    The Defendants Laundered the Stolen Proceeds

The Government also introduced overwhelming evidence at trial that the defendants conspired to launder money as charged in Count Three, by executing financial transactions designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the wire fraud charged in Count Two.

First, the defendants took extensive steps in advance of carrying out the Exploit to undermine the ability of others to later identify them, including by (i) researching means of money laundering, (GX3775 (Googling, *e.g.*, "how to wash crypto" and "tornado cash alternative")); (ii) establishing a series of pass-through accounts to stake, and then return funds from, validators later used to carry out the Exploit, (Tr.2044, GX501 at 8–9, 13); (iii) pre-funding addresses that would transact during the Exploit using disconnected exchange accounts, (Tr.at 709–10, 2130; GX501 at 8, 17; 3494 (utilizing different addresses "for each bot even if we're using the same pool just to reduce association")); (iv) using the Aztec Network—functionally, a cryptocurrency mixer—to obscure the source and destination of funds, (Tr.at 2045, 2049, GX501 at 8–11); and (v) staggering transfers across hundreds of transactions with no independent economic purposes, (Tr.at 2041, 2046–48, 2051, 2089, GX501 at 10, 3428 ("waiting 12h between transfers . . . such that if you were to look at all mev contracts you still couldn't align amount in and aggregate amount out"); GX3458 (defendants explaining they would "spread out funds" and "move in slugs"), 3428 (same, moving funds "late at night," and "across the global time")).

A rational jury could certainly conclude that the purpose of these steps was to prevent others from identifying the defendants and, later, the source of the funds they planned to steal. (*See, e.g.*, Tr.704 (Travis Chen testifying that "we didn't want people to know" who created validators used in the Exploit, and so used technology to "disintermediate[] the link between the

deposits and the withdrawals" so that "[n]ot everybody can see that you set up a validator"), 710

(creating and funding wallet addresses through separate exchanges without Know Your Customer

("KYC") requirements was done to "make our addresses comparatively more anonymous");

GX6012 at 32–35; 3437 (to-do list including moving "funds thru exchanges to anonymize"); 3460

(APB downplaying ability for KuCoin to "reveal[] our id" because addresses had been established

with "non kyc account + funded thru bybit").  As described above, *supra* at Background Section

IV.B, the defendants continued such concealment after the carrying out the Exploit, including by

again transferring funds through unnecessary intermediary accounts, (Tr.2113–14); returning

funds to a Coinbase through a new, anonymous address (GX501 at 32–34); structuring transfers

(Tr.2247 (moving $20.5 million in fourteen, successively larger transfers over three days), 2253

(same), 2359 (expert testimony describing such structuring as potentially motivated by

concealment); and transferring assets into cryptocurrencies that could not be frozen, (GX501 at

25, 28–29, 31 (converting more than $20 million to DAI)).

Once more, the defendants openly discussed the purpose of their post-Exploit transactions.

Namely: they sought to prevent their identities and the source of their funds from becoming known,

lest the funds be frozen or seized, or they be arrested.  (Tr.804 (Chen testifying that the defendants

believed Coinbase would not "off-ramp anything associated with a hack"), 827; GX3513

(defendants discussing whether "coinbase uses chainalysis," because "if we're flagged there we're

pretty fucked"); *id.* (JPB asking, "what do we think the chances are of coinbase going to usgov

with info like 'yo we think these guys are bad' . . . that's worst case scenario here."); 3631 (APB

requesting call with Circle representative to determine if the company "uses TRM labs and other

compliance software to mark addresses" which could link defendants to the Exploit); 3699 (APB

Peraire-Bueno misleadingly describing source of funds in response to Coinbase compliance

inquiry); 3475 (same); 3476 (JPB explaining, "I don't love putting money on coinbase tbh" because "what if israel comes knocking"). At trial, a Coinbase investigations manager testified that indeed, Coinbase compliance flagged the defendants' accounts and made further inquiries about the defendants' transfer of the fraud proceeds.[10] The defendants never gave Coinbase the information they requested and faced closure of their Coinbase account as a result. (Tr.1196–97, 1220–25, 1239). A rational jury could easily have inferred from this mass of evidence that the defendants at a minimum agreed to make at least one financial transaction to conceal the source and their control over the proceeds of the Exploit, and undertook at least one overt act to that end involving the Proceeds.

Rather than dispute the sufficiency of this evidence, the defendants dwell on the incorrect claim that a jury would have had to find "that the Peraire-Buenos knew Omakase was unlawful," (Br. at 44–46), disputing whether any jury could have concluded the defendants specifically knew they had violated the law. In fact, as the Court correctly instructed, a jury need only find that, if the defendants "knew that the proceeds came from [the] activity" charged in Count Two, that conclusion would be "sufficient . . . to find that the defendant believed that the proceeds came from unlawful activity." (Tr.3277); *United States v. Diggles*, 928 F.3d 380, 389 (5th Cir. 2019); *United States v. Bohn*, 281 F. App'x 430, 441 (6th Cir. 2008) (same). Because as explained in Argument Section I, *supra*, there was sufficient evidence for a rational jury to convict on Count Two, it follows that a rational jury could find the element of knowledge as to the proceeds of an unlawful

---

[10] The defendants were aware of Coinbase policies, researching and discussing them while the conspiracy was ongoing. (GX3775 at 25 (Googling "coinbase freezing funds" and visiting webpage titled "Does Coinbase freeze accounts?"); 3510 (planning to deposit funds staked for slashed validator "as a soft test" of Coinbase's account monitoring); 3513 (discussing possible outcomes if Coinbase identified funds as connected to the Exploit); *id.*, 3775 at 16 (Googling "coinbase chainalysis" and "what does coinbase use for on chain security checks trm labs" after discussing "how we can check" whether "coinbase uses chainalysis")).

activity satisfied merely upon its conclusion that the laundered proceeds in fact came from that activity. That connection was easily proven by the Government at trial—and indeed has never been seriously disputed, then or now. As the Government's expert forensic witness testified, the proceeds of the Exploit were indeed the same funds that the Government alleged in Count Three the defendants conspired to launder.[11] (GX501 at 10).

The Court should deny the defendants' Rule 29 motion in its entirety.

### III.    The Defendants' Renewed Due Process Challenges Should Be Denied

The defendants finally invite the Court to re-visit their pre-trial motions to dismiss the Indictment on vagueness and novelty grounds. (Br. at 49). As to vagueness, the Court should deny the defendants' motion because the wire fraud statute provides reasonably adequate notice that the alleged scheme was prohibited. As to novelty, the defendants now merely repeat the same arguments the Court already rejected pre-trial when accepting the facts as alleged in the Indictment. (MTD Op. at 13–16). Because those allegations continue to await a jury's verdict— and a rational jury could have found them proven in any event—the Court has no occasion now to depart from its prior ruling.

---

[11] Even accepting the defendants' faulty legal premise—built upon a single out-of-Circuit case, (Br. at 45)—a rational jury nonetheless could still have inferred that the defendants knew the Exploit was illegal. *See, e.g.*, GX3499 ("Everything you say now could potentially become a record in a trial."); 3496 ("If you send this to the FBI right now they'll tell you to go blow yourself."); 3495 (APB explaining, "I think the reasoning for when we off-ramp needs to be dominated by minimizing odds of a potential criminal prosecution since that scenario outweighs the others."). To argue otherwise, the defendants merely cite their own prior statements to claim, for example, that they "sincerely" believed their scheme was not an "exploit" and that it would be "illogical" for a jury to believe that a defendant's online searches for "money laundering" could be evidence of money laundering. (Br. at 45–46). A rational jury plainly may have chosen to discredit such self-serving statements as falsely exculpatory, and such credibility assessments are classically and "exclusively" for the jury. *United States v. Strauss*, 999 F.2d, 692 696 (1993). The Rule 29 context is no different. *See United States v. Abu-Jihaad*, 630 F.3d 102, 134 (2d Cir. 2010) (requiring courts on a motion for acquittal to "resolve[] all questions of witness credibility and competing inferences in favor of the prosecution").

### A.    Applicable Law

"There are three related manifestations of the fair warning requirement": the vagueness doctrine; the rule of lenity; and a bar on courts "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

"The void-for-vagueness doctrine springs from the Fifth Amendment's due process clause," *United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020), and "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Morrison*, 686 F.3d 94, 103 (2d Cir. 2012). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016).[12] Under the "fair notice" prong, a court must determine "whether the statute, either standing alone or as construed, made it *reasonably clear* at the relevant time that the defendant's conduct was criminal." *Id.* (emphasis added).

"When a vagueness challenge alleges lack of notice, the relevant inquiry is whether the statute presents an ordinary person with sufficient notice of what conduct is prohibited." *Houtar*, 980 F.3d at 273. "This requirement assures that statutes do not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *Id.* "Statutes need not, however, achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Id.*; *accord United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011).

---

[12] The defendants do not argue that the wire fraud statute encourages arbitrary or discriminatory enforcement. Because "all vagueness challenges—whether facial or as-applied—require [the Court] to answer [both] separate questions," *United States v. Wasylyshyn*, 979 F.3d 165, 175 (2d Cir. 2020), the defendants have forfeited their vagueness challenge.

Even where a statute's language may be "precise on its face," due process requires that it also not be "unforeseeably and retroactively expanded by judicial construction." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964). Such a construction violates due process where it is so "unexpected" as to be "indefensible," *id.* at 354. "[T]he unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement." *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 159 (2d Cir. 2009). Fair notice is "not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Id.*

## B.    Discussion

### 1.    The Statute As Applied Is Not Unconstitutionally Vague[13]

Because the wire fraud statute provided the defendants with fair warning that their conduct was criminal, the Court should deny the defendants' motion to dismiss for vagueness.

At the outset, as the Supreme Court has explained, vagueness challenges are not directed at the question of whether any given conduct in fact would satisfy the elements of a criminal statute. That is a question for the jury. Rather, a statute may be void for vagueness, as applied to a defendant, only where it is legally impossible to tell whether the given conduct possibly could fall within the scope of the statute. As the Supreme Court has explained:

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was

---

[13] Although the Government addresses below the defendants' void-for-vagueness arguments on the merits, the Court has no occasion to depart from its prior ruling deferring consideration of the motion until after trial, (Dkt. 112 at 12–13), because additional factual development will occur at a second trial.

"annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

*United States v. Williams,* 553 U.S. 285, 306 (2008). The wire fraud statute does not invite such "wholly subjective judgments" here.

In their pre-trial motions and now, (Dkt. 49 at 10–11, Br. at 50–54), the defendants do not even attempt to identify how the wire fraud statute so lacks "statutory definitions, narrowing context, or settled legal meanings," *Williams,* 553 U.S. at 306, as to violate due process. Instead, making the same conceptual error the Supreme Court identified in *Williams*, the defendants' arguments amount to nothing more than the claim that the defendants' conduct factually falls outside the scope of the statute—not that the statute's scope is impossible to determine. So, for example, the defendants do not contend that the terms "false or fraudulent pretenses, representations, or promises" are indeterminate (a legal vagueness challenge)—but argue, rather, that the defendants' deceptive conduct simply did not constitute "pretenses, representations, or promises in the normal sense" (a question of fact for the jury). (Br. at 50).

Properly analyzed, the wire fraud statute as-applied here is not impermissibly vague. The Second Circuit has explained that a statute's *mens rea* requirement is nearly dispositive in countering possible arguments of "surprised innocence," strongly "bearing on an analysis of vagueness." *United States v. MacKenzie,* 777 F.2d 811, 816 (2d Cir. 1985); *see also United States v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004) ("Because the statute at issue here contains a scienter requirement, . . . the defendants' vagueness challenge must be met with some measure of skepticism, at least with regard to the 'fair notice' prong."). As the *Roberts* panel explained, "[A] scienter requirement [in a criminal statute] may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499 (1982)). Any vagueness

analysis must be "limited to acts that are done" with the requisite *mens rea*. *United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990); *see also United States v. Rybicki*, 354 F.3d 124, 132 (2d Cir. 2003) (en banc) (analyzing for vagueness "conduct of the type in which the defendants engaged with the specific intent to defraud"). Accordingly, a defendant who acted with a knowing intent to defraud is almost certainly on "reasonably adequate" notice that his actions may violate the fraud statute, regardless of the precise factual means used to carry out a scheme. *See, e.g.*, *Strauss*, 999 F.2d at 698 (rejecting vagueness claim "because the terms 'intent to defraud and mislead' . . . are commonly used words with definite meanings" in fraud case where defendants argued that "no regulatory standards or existing objective criteria" governed the misbranding of dog food).

The defendants' *amici* present no stronger due process arguments. Coin Center, for its part, advances factually disputed claims as to what contravenes, or not, the "clear rules or controls found within the Ethereum protocol," (Coin Center Br. at 2)), and appears to argue that any application of the wire fraud statute to the defendants' conduct violates due process because the defendants could not be on notice that "conduct that the relevant technical community regards as permissible" could be proscribed. (*Id.* at 14). Again entirely ignoring the text of the wire fraud statute, Coin Center's argument is properly construed as Coin Center's opinion on whether the defendants in fact acted with fraudulent intent. Coin Center's opinion, however, is irrelevant to any of the questions properly before the Court. Arguments about the defendants' innocence were made to the jury, and the Court instructed the jury in evaluating them. Namely, the Court instructed that the existence of Ethereum protocols do not create an opt-out from the criminal law, and it is for the jury to weigh the significance of their violation—whether for failing to attest, for double-attestation, or for otherwise failing to behave as an "honest validator." (*See, e.g.*, Tr.3260 ("[I]f

you find such a violation has occurred, it may be considered by you in determining whether the defendant you are considering engaged in a scheme to defraud . . . a defendant can be guilty of fraud even if he or she carried out a fraudulent scheme in ways permitted by computer code."), 944 ("There will be no arguments later about code is law."); *contra* Coin Center Br. at 13 ("Ethereum has already adjudicated Defendants' conduct through its own consensus process; the law should respect the finality of that resolution.")).

DeFi Education Fund, meanwhile, appears to contend that implicit representations are not reached by the wire fraud statute, (Dkt. 228-1 ("DeFi Br.") at 2); that only a new "law or regulation" specifically addressing cryptocurrency may proscribe the defendants' conduct, (*id.* at 5–7); and that, in the absence of such lawmaking, the wire fraud statute may at most penalize conduct violating "clear," "binding rules," "express rules," or "express representations." (*Id.* at 4, 7–8). But as explained in Argument Section I, *supra*, the wire fraud statute may be violated by means of implicit representations, and was designed to expansively reach all manner of frauds. *See United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) (the meaning of "to defraud" is as "versable as human ingenuity"). Due process, moreover, permits "reasonable breadth"—it does not require "express rules." *Houtar*, 980 F.3d at 273. Equally frivolous is the argument that the Government was required to proceed by charging a violation of the CFAA, rather than the wire fraud statute. (DeFi Br. at 10–12). *See In re United States v. Manzano*, 945 F.3d 616, 627 (2d Cir. 2019) (Government constitutionally vested with charging discretion).

In any event, because a rational jury could conclude the defendants deceived other traders and tricked cryptocurrency software and network actors in order to obtain money, their conduct falls plainly within the scope of the wire fraud statute. *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993) ("[O]ne whose conduct is clearly proscribed by the statute cannot successfully

challenge it for vagueness."). Moreover, as the Government explained pre-trial, (Dkt. 61 at 39–40), the fact that the defendants themselves actually understood that the Exploit was proscribed is strong evidence that an ordinary person would be on reasonable notice the statute prohibits such conduct. As the Government proved at trial, the defendants, among other things, laundered the fraud proceeds for the express purpose of evading "some prosecutor out there with their eye on this," (GX3495); were on actual notice during the laundering conspiracy that the Victim Traders (and, potentially, Tether and a foreign government) considered their conduct illegal, (GX3624-A, 4201); proactively researched the wire fraud statute, statutes of limitations, and extradition, (GX3775 at 12–13, 15, 3800 at 9); and themselves previously described analogous exploits as constituting "stealing," (GX6004). Far from having to "guess at [a statute's] meaning," *Baggett v. Bullitt*, 377 U.S. 360, 367 (1964), there was substantial evidence that the defendants "actually believed what they were doing was illegal." *Roberts*, 363 F.3d at 123. Under such circumstances, a defendant could not lack reasonably adequate notice of the criminality of their conduct.

Tellingly, nothing in the trio of Supreme Court cases the defendants cite, (Dkt. 49 at 11), holds otherwise.[14] *Ciminelli* and *McNally* both interpreted the statutory term "property" as a matter of text, not constitutional vagueness, *Ciminelli,* 598 U.S. at 315; *McNally*, 483 U.S. at 360; and the only case to even implicate vagueness, *Skilling*, addressed itself to the meaning of a specific statutory definition (*i.e.*, "honest services") while still upholding the statute's constitutionality. *Skilling v. United States*, 561 U.S. 358, 408–09 (2010). The Court should deny the defendants' motion.

---

[14] As the Government explained in its first opposition, (Dkt. 61 at 39 n.11), the cases that the defendants previously cited are similarly distinguishable.

## 2.    The Indictment's Application of the Wire Fraud Statute Is Not Novel

Nor does the Indictment involve a radical expansion of the wire fraud statute implicating due process.  As the Court already ruled pre-trial, due process does not require a factually "analogous prior prosecution."  (MTD Op. at 14).  As the Court observed, the "essence of the Government's case is that Defendants devised a scheme to defraud . . . and obtain money or property . . . under false pretenses."  (*Id.* at 15).  Accepting the Indictment's factual allegations as true, the Court then concluded that "the wire fraud statute provided Defendants with adequate notice that their alleged conduct was criminal, despite any novel means used by Defendants."  (*Id.*). Rejecting the defendants' insistence that no "rules or protocols" expressly prohibited their conduct, the Court correctly ruled that such an argument went to "the adequacy of the facts to satisfy the elements of the charged offense"—not the novel construction doctrine.  (*Id.* at 16).

The Court should not reverse its prior ruling, the basis for which only strengthened during trial.  Most significantly, the Government introduced sufficient evidence to prove each of the facts the Court accepted as true when deciding the defendants' virtually identical prior motion.  Rather than contest those facts, the defendants argue instead that various aspects of the Government's proof are factually distinguishable from prior cases involving spoofing.  (Br. at 51–53).  But, as the Court has already held, (MTD Op. at 14), that is beside the point: "the fact that there is no litigated fact pattern precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved[,] but hardly provides an escape from the penal sanctions."  *United States v. Brown*, 555 F.2d 336, 339–40 (2d Cir. 1977).  The Second Circuit has held as much even where, unlike here, the most demanding standard of intent is at issue.  *See, e.g.*, *United States v. Ingredient Tech. Corp.*, 698 F.2d 88, 96 (2d Cir. 1983) (rejecting an argument that "the applicable tax law

was at least in such dispute that it was not sufficiently clear at the time" the conduct was proscribed, and holding instead that "[w]illful intent was a question of fact" to be decided by the jury).

Though the defendants' chosen factual means may have been novel, the Government's legal theory was nonetheless traditional: the defendants are alleged to have made fraudulent misrepresentations as part of a scheme to obtain money.  In blithely contending that "objective meaning" cannot be conveyed in new and rapidly changing cryptocurrency markets, (Br. at 15), the defendants look past the obvious economic logic of their scheme: if the Victim Traders could not be relied upon to hold fundamental expectations about the integrity of their trades' processing, those expectations could not be betrayed, and the Exploit—in which the defendants invested nearly $1 million and months of clandestine surveillance and preparation—would not work.  If, indeed, the defendants' conduct was "typical and expected" among Ethereum traders, they would not have succeeded in stealing millions from them.  (Br. at 52).[15]

For the reasons the Court has already set forth, the defendants' motion should be denied.

---

[15] The defendants' claims about the cryptocurrency environment are also inaccurate and refuted by the evidence.  They were banned by Flashbots, blacklisted by Tether, and their validator addresses were slashed and removed from the Ethereum Network itself, and the defendants knew at the inception of the Exploit that their wrongful conduct would result in slashing.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the defendants' motion for judgment of acquittal under Rule 29, and their renewed motion to dismiss the Indictment.

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York

By: /s/ _____
    Jerry Fang
    Danielle Kudla
    Benjamin Levander
    Ryan Nees
    Assistant United States Attorneys

Dated: January 16, 2026
     New York, New York

## CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing document contains 24,998 words calculated consistent

with Federal Rule of Appellate Procedure 32(f).


_/s/ Jerry Fang_____
Jerry Fang