**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ANTON PERAIRE-BUENO, and JAMES
PERAIRE-BUENO,

      Defendants.

---

Case No.:  1:24-cr-00293-JGLC

**DEFENDANTS' REPLY IN SUPPORT
OF JOINT MOTION FOR JUDGMENT OF ACQUITTAL OR,
<u>ALTERNATIVELY, TO DISMISS THE SUPERSEDING INDICTMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................3

I.  THE COURT MUST CONSIDER THE WHOLE RECORD TO DETERMINE WHETHER ALL ELEMENTS WERE PROVEN BEYOND A REASONABLE DOUBT ...........................................................................................................................3

II.  THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL ON COUNTS 1 AND 2 ..............................................................................................................................4

    A.  The Government Failed to Prove Any Material Misrepresentation ....................4

        1.  Lure Transactions ...........................................................................6

        2.  False Signature .............................................................................15

        3.  "MEV-Boost validator" theory ....................................................20

    B.  The Government Failed to Prove that a Qualifying Property Right Was the Object of the Alleged Scheme. ........................................................................23

    C.  The Government Failed to Prove an Intent to Defraud ....................................24

III.  THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL ON COUNT 3 ............................................................................................................................27

IV.  IN THE ALTERNATIVE, THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT ................................................................................30

    A.  The Government Misstates the Law. ...............................................................30

    B.  The Government Fails to Respond on the Merits. ...........................................32

CONCLUSION .................................................................................................................34

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Ciminelli v. United States*, 598 U.S. 306 (2023)...........................................................................23

*Kousisis v. United States*, 605 U.S. 114 (2025)..........................................................................23

*Loughrin v. United States*, 573 U.S. 351 (2014)........................................................................19

*Porcelli v. United States*, 404 F.3d 157 (2d Cir. 2005)..............................................................19

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000)................................................................5

*United States v. Ayewoh*, 627 F.3d 914 (1st Cir. 2010)...............................................................9

*United States v. Bases*, 2022 WL 3586142 (N.D. Ill. Aug. 22, 2022)......................................5, 6

*United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017)...............................................................19

*United States v. Bohn*, 281 F. App'x 430 (6th Cir. 2008)...........................................................28

*United States v. Carson*, 560 F.3d 566 (6th Cir. 2009)..............................................................18

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005)................................................................27

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022)..........................................................4, 5, 6

*United States v. Cross*, 113 F. Supp. 2d 1253 (S.D. Ind. 2000)................................................28

*United States v. Denkberg*, 139 F.4th 147 (2d Cir. 2025).......................................................5, 18

*United States v. Diggles*, 928 F.3d 380 (5th Cir. 2019)..............................................................28

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008)......................................................*passim*

*United States v. Freedman*, 317 F. App'x 22 (2d Cir. 2008).......................................................18

*United States v. Gole*, 158 F.3d 166 (2d Cir. 1998)...................................................................19

*United States v. Hancock*, 103 F.4th 1261 (7th Cir. 2024).........................................................31

*United States v. Houtar*, 980 F.3d 268 (2d Cir. 2020)................................................................30

*United States v. Jaensch*, 678 F. Supp. 2d 421 (E.D. Va. 2010)................................................31

*United States v. Lancaster*, 185 F. App'x 48 (2d Cir. 2006).......................................................27

*United States v. Lanier*, 520 U.S. 259 (1997)................................................................32

*United States v. Levy*, 2013 WL 3832718 (S.D.N.Y. July 15, 2023) ...........................21

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ...................................................18

*United States v. Maher*, 108 F.3d 1513 (2d Cir. 1997)..................................................27

*United States v. Martinez*, 2023 WL 2118081 (S.D.N.Y. Feb. 17, 2023) ....................19

*United States v. Martinez*, 54 F.3d 1040 (2d Cir. 1995)..................................................4

*United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019)...................................................4

*United States v. Percoco*, 317 F. Supp. 3d 822 (S.D.N.Y. 2018)................................21

*United States v. Stein*, 37 F.3d 1407 (9th Cir. 1994) ...................................................28

*United States v. Torres*, 604 F.3d 58 (2d Cir. 2010)......................................................3

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) ......................................................3

*United States v. Vorley*, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021).......................5, 6

*United States v. Wasylyshyn*, 979 F.3d 165 (2d Cir. 2020) .........................................30

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) ....................................................8

*United States v. Williams*, 553 U.S. 285 (2008) ..........................................................31

*VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011)..............................................................22

*Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir. 2018) ..................................5, 30

**RULE**

Fed. R. Crim. P. 29 .................................................................................... *passim*

## INTRODUCTION

The opposition confirms the government's failure to prove this case beyond a reasonable doubt. The government fails to confront the totality of the evidence, and its legal arguments remain novel and legally flawed. Its attempted defense of the alleged misrepresentations is a circular morass that ultimately collapses into a "victim expectations" theory that is precluded by Second Circuit precedent (*Finnerty*), among other problems. The Court should grant judgment of acquittal and end this misguided prosecution for good, or, alternatively, dismiss the Indictment based on its unconstitutional theories.

The government ignores entire swaths of testimony the Peraire-Buenos cited in their opening brief and repeatedly mischaracterizes the cherry-picked evidence it does address. This evasion is particularly egregious when it comes to the existence of supposed "MEV-Boost rules." It suggests that a single instance where Miller used the word "rules" to refer to Ethereum "honest" behavior specifications was referring to "MEV-Boost rules" that were broken here. But that's not true. There was no evidence of any MEV-Boost rules. The government's other citations for these supposed rules are replete with irrelevant documents—Slack chats, schematic drawings, Google searches—many of which were not even admitted for their truth.

The government also attempts to dodge Chen's testimony that he didn't think there was anything wrong with Omakase by suggesting, without a shred of evidence, that the Peraire-Buenos misled Chen about the nature of the strategy. But Chen's testimony and the government's own exhibits refute that baseless contention by showing that Chen was fully aware of every aspect of the strategy before its execution—and he still lacked the requisite intent to defraud.

The government frames these and similar arguments as turning on "permissible inferences" and "credibility." These arguments are misplaced. This is not a "reasonable inference" case. This

is a case where the government's own witnesses and evidence comprehensively refuted its novel theories. A body of substantially undisputed facts shows that Omakase was not fraud.

The government's obfuscation is not limited to the facts. Its legal theories remain a moving target, and none succeed. On material falsity, the opposition's arguments are so circular that it's unclear where one alleged misrepresentation ends and another begins. Pressed to identify what was false about the Lure Transactions, the government rattles off a list of other actions whereby the Peraire-Buenos allegedly deceived *somebody (or something) else* "by posing as a MEV-Boost validator; by registering with the MEV-Boost Relay; by submitting fake data to the MEV-Boost Relay; and by signing the blinded blockheader with a signature derived from the fake data." Opp.33.[1] Addressing the falsity underpinning the "MEV-Boost validator" theory—supposedly a stand-alone "pretense"—the government points back to the False Signature: "the defendants engaged in a false pretense when they misleadingly sent the invalid blockheader under the guise of 'validating' the MEV-Boost Relay's block." Opp.48. These circular arguments don't add up to proof of a single material falsehood that the wire fraud statute requires.

The collapse of these alleged misrepresentations into one mass reveals the true nature of the government's overarching theory. At bottom, the government seeks to vindicate the sandwichers' upset expectations about how the MEV-Boost "system" worked. *See, e.g.*, Opp.10 ("Yakira trusted MEV-Boost[.]"); Opp.29 (it was "more than reasonable for the Victim Traders to expect that their bundled transactions would be executed in accordance with their coded preferences"); Opp.33 ("Software is necessarily designed based on expectations about how it will work in the future, and such expectations are actionable as fraud."); Opp.76 (Omakase "betrayed"

---

[1] Opp. refers to the government's opposition. ECF 236. Br. refers to the Peraire-Buenos' opening brief. ECF 226.

the alleged victims' "fundamental expectations about the integrity of their trades' processing"). These erroneous expectations underpin all the government's theories. But the evidence established that the Peraire-Buenos had nothing to do with setting or influencing those expectations about MEV-Boost or sandwich attack bundles and never communicated to the alleged victims (or anyone else) anything about MEV-Boost or bundles. Without a statement or action by the Peraire-Buenos fostering the sandwichers' expectations or some other deception, the government's theories fail even if their precise contours remain unclear.

## ARGUMENT

### I.    THE COURT MUST CONSIDER THE WHOLE RECORD TO DETERMINE WHETHER ALL ELEMENTS WERE PROVEN BEYOND A REASONABLE DOUBT.

The opposition fights the Rule 29 standard in two significant ways. First, it pays lip service to the requirement that the Court assess the entire record, Opp.22, but its arguments routinely cherry-pick parts of its witnesses' testimony or exhibits while ignoring the evidence cited in the Peraire-Buenos' brief. This selective approach is contrary to Second Circuit law. *See, e.g.*, *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) ("[I]n assessing whether the government has met its burden, we view pieces of evidence not in isolation but in conjunction." (citation omitted)). This standard constrains the government, which cannot simply ignore evidence that undermines its case. *See, e.g.*, *United States v. Valle*, 807 F.3d 508 (2d Cir. 2015). In *Valle*, The Second Circuit affirmed a judgment of acquittal for conspiracy to kidnap where the government highlighted one set of incriminating chats but ignored that they "were part of a much larger set of chats and emails" (introduced by the defendant) that, when considered "contextual[ly]," undermined the government's interpretation of the supposedly incriminating chats. *Id.* at 516.

Second, the government overplays the maxim that the Court must draw all reasonable inferences in its favor. It mislabels contrary evidence, including the testimony of its own

witnesses, as "inferences." *See, e.g.*, Opp.26 (whether the Lure Transactions were valid); Opp.41 (Miller testimony regarding "commitment"). The evidence is what it is. An inference, in contrast, is "a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (citation omitted). The government also argues that certain inferences going to elements are "permissible." Opp.29 (falsity of Lure Transactions); Opp.41 (falsity of signature). But that is "not enough." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Such inferences must be "sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id*. Applying the correct standard, the government's evidence was insufficient.

## II.    THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL ON COUNTS 1 AND 2.

### A.    The Government Failed to Prove Any Material Misrepresentation.

The government does not meaningfully dispute that a scheme to defraud requires proof of a material misrepresentation—whether a false statement, a half-truth, or deceptive conduct. *See, e.g.*, *United States v. Connolly*, 24 F.4th 821, 833-34 (2d Cir. 2022). Yet it makes two erroneous legal arguments that seek to deflect from its failure to prove this element.

First, it wrongly faults the Peraire-Buenos for supposedly scrutinizing the alleged deceptive conduct "in isolation" and not "as a whole." Opp.23, 26, 40. The Peraire-Buenos dispute that characterization but, in any event, this semantic point leads nowhere. The opposition contains no alternative framework to assess allegedly deceptive conduct for a material falsehood.

Nor do the cited cases supply one. *Schmuck v. United States* did not "determin[e] the scope of a multi-step fraud scheme … by how the steps interacted," Opp.23; rather, the Court applied the rule that "'innocent' mailings—ones that contain no false information—may supply the

mailing element" of mail fraud in a scheme that involved straightforward misrepresentations (rolling back odometers). 489 U.S. 705, 715 (1989). *United States v. Persico* did not involve wire (or mail or bank) fraud at all. *See* 645 F.3d 85, 104 (2d Cir. 2011). Neither case—nor any other case cited in the opposition—relieves the government of its burden to prove at least one material misrepresentation. The Second Circuit has squarely rejected the contrary argument. *See Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125 (2d Cir. 2018) (holding that wire fraud requires "proof of a material misrepresentation" and finding that element *not met* where civil RICO plaintiff merely argued that scheme was "deceptive overall").

Second, the government attempts to distract from the lack of evidence of material falsity by pointing to evidence of supposed fraudulent *intent* like the use of the term "trap" in Slack messages. *See* Opp.26, 27, 28, 29; *see also* Opp.36 (drawing from the spoofing cases a supposed rule that there is no "particular form of proof [required] *to establish the defendant's fraudulent intent*" (emphasis added)). The government even says that intent evidence is "the only evidence that matters." Opp.27. That is incorrect. Falsity and intent are separate components of the scheme-to-defraud element. *See, e.g.*, *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). The Second Circuit has reversed wire fraud convictions for failure to prove falsity where there was evidence the co-conspirators understood their conduct was "wrong." *See Connolly*, 24 F.4th at 830, 835-36, 841, 843. The trio of cases the government cites—*United States v. Denkberg*, 139 F.4th 147 (2d Cir. 2025), *United States v. Vorley*, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021), and *United States v. Bases*, 2022 WL 3586142 (N.D. Ill. Aug. 22, 2022)—provide no support for its "only intent matters" approach. None held that evidence of fraudulent intent could substitute for falsity. The defendant in *Denkberg* challenged only the intent element on appeal, *see* 139 F.4th at 155-56, and the courts in *Vorley* and *Bases* addressed falsity, materiality, and intent separately,

highlighting different evidence for each, *see* 2021 WL 1057903, at \*3-15; 2022 WL 3586142, at \*3-7. The cited portions of *Vorley* and *Bases*, moreover, don't even concern falsity. *See* 2021 WL 1057903, at \*12-13; 2022 WL 3586147, at \*7. The Court must decide whether the government presented sufficient evidence of any material falsehood.[2]

The government failed to prove any alleged misrepresentation beyond a reasonable doubt.

### 1.    Lure Transactions

*Falsity*. The government barely contests that the Lure Transactions were not literally false. It asserts the jury was "not required to make that inference," but then pivots to "intent" evidence like the Slack chats and urges the Court to view the transactions "holistically, as part of the defendants' entire scheme." Opp.26. For the reasons stated above, these evasive tactics fail.

The government cites *no evidence* that made the transactions literally false. Instead, it seeks to dismiss the undisputed fact that the transactions appeared as the same "raw byte-code data" to every observer by inaccurately suggesting that this identical appearance would require "simulat[ion] to infinity." Opp.27. But Chen testified that the byte-code appears the same regardless of simulations. Tr.948-49. (Indeed, the byte-code is merely an input to any simulation a MEV-Bot may run. Tr.1080-81.) The government also misstates Chen's testimony about XOR logic. Chen did not testify that simulations *could reverse* the XOR logic; he testified that they in fact *did reverse* the logic, making the logic incapable of concealing anything. *Id.*

---

[2] Even if the "intent evidence" could prove falsity, it is more equivocal than the government suggests. *See infra* pp.24-27. Notably, the government ignores that, unlike the defendants in the spoofing cases, the Peraire-Buenos' messages did not use terms like "trick." *See* Br.42. And unlike in those cases, there is unrebutted testimony from the only alleged co-conspirator to testify that he didn't think the conduct was wrong. *Cf. Connolly*, 24 F.4th at 843 (holding that even co-conspirator testimony that the conduct was "wrong" was insufficient to prove falsity).

The government misunderstands the Peraire-Buenos' argument regarding simulations. The significance of the simulations is not that enough would have allowed the alleged victims to "discover[] the fraud scheme." Opp.28. Rather, it is that an Ethereum transaction's behavior is determined by its byte-code, which by virtue of being public is unable to conceal any fact.

The government's implicit representation (or half-truth) theory fares no better, in no small part because it remains unclear what that theory even is. The opposition itself floats multiple formulations. It asserts that the transactions "conveyed to the Victim Traders … that the defendants intended to go through with the proposed transactions." Opp.24; *see also* Opp.25 ("knowing full well that they never intended to execute them"). But the transactions *did* "go through" and thus were "execute[d]" exactly as coded, which the undisputed evidence established.[3]

Instead, the government reframes the "key misrepresentation" as a promise "that the transactions would be published *as part of the bundle* submitted by the Victim Trader." Opp.27. For this proposition, it cites a two-page span of Chen's testimony about the fact that the transactions appeared profitable if "simulated … within a sandwich bundle." Tr.720-21. But simulations are run by others, not the entity that submitted the mempool transaction. That testimony therefore says nothing about an implicit promise, conveyed through a mempool transaction, that a future sandwich bundle targeting the transaction would succeed. No witness testified to that.

The government instead attempts to ground this implicit promise in expectations that Yakira supposedly drew from the "purpose" of MEV-Boost. *See* Opp.29-31. This argument has several flaws. First, the government's defense of the reasonableness of those expectations is

---

[3] The government also claims that the transactions were "never intended to be an arms-length, fair market trade," Opp.26, without explaining what those terms—which were never uttered at trial— could possibly mean in this context.

irrelevant. A trading adversary's expectations—reasonable or not—do not bind other traders. According to the government's logic, Yakira's assumption (coded into Savannah's MEV-Bots) that MEV-Boost effectively guaranteed the profitability of his sandwich attacks is controlling on any Ethereum trader such that it transforms every proposed mempool transaction into an implicit promise to be sandwiched, and any attempt to thwart the attack into a broken promise—and a federal crime. The record (and common sense) refutes that absurd claim.

Second, the government ignores evidence (discussed at length in the opening brief) that refutes the very notion that every Ethereum transaction makes an implicit promise to be sandwiched. This includes the facts that a sandwich attack leaves the victim worse off, that a trader has no knowledge or control over future bundling of transactions, and that only a validator (not a trader) chooses transaction ordering. *See* Br.13. The government also ignores Flashbots documentation warning searchers that MEV-Boost could not provide economic security against unbundling when their trades risked more than the slashing penalty could deter, *see* DX309, DX321-A;[4] and the testimony of Miller, Chen, and Falk about this economic constraint. Br.16, 19-21. Additionally, the theory is irreconcilable with the baseline expectations on Ethereum that untrusted validators will attempt to unbundle, Tr.368, 453, and the fact of highly publicized counter-sandwiching strategies on Ethereum, Tr.928. The relevance of these facts is not to suggest that Savannah's strategy was negligent (though perhaps it was, *see* Br.5); rather, these facts form

---

[4] The government mischaracterizes these Flashbots posts as akin to contractual disclaimers. *See* Opp.29, 33 n.2 (citing *United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017)). Flashbots' disclosure that something like Omakase was possible is nothing like a contractual term disclaiming a party's liability for prior misrepresentations. *Cf. Weaver*, 860 F.3d at 93. Rather, the posts are public information providing notice of MEV-Boost's functionality that undermines the government's argument about what the transactions represented. *See* Tr.461 (Miller).

the context—which the Court must consider under Rule 29, *see supra* p.3—in which the meaning of the Lure Transactions must be determined.

Third, unless the *Lure Transactions* themselves set or influenced Yakira's expectations, this theory runs headlong into *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008).  In *Finnerty*, the customers may have had reasonable expectations that Finnerty, as a NYSE specialist, would not interposition in violation of NYSE rules.  *Id.* at 150.  But that expectation did not turn his trades into fraud "unless their understanding was based *on a statement or conduct by Finnerty*."  *Id.* (emphasis added).  The Peraire-Buenos had never even met Yakira, and their first contact with Savannah's bots occurred *after* Yakira's assumptions had been baked into Savannah's bots' code.  Br.11.[5]

To be clear, the Peraire-Buenos do not contend that the act of placing a trade in a market can never convey an implicit message to other traders that could be deceptive.  But that theory has only been accepted in spoofing cases on a straightforward premise of price manipulation in regulated commodities markets where the facts bear no resemblance to this case.  The government notes that it relied on "similar sources" of evidence as in those cases, Opp.35, while ignoring the different *content* of the evidence.  A comparison of the substance is night and day.

Take *United States v. Jordan* (affirmed as *Smith*), for example.  The government there painstakingly established the objective meaning of a trade.  A representative of the exchange testified that its "rules barred" traders "from placing orders with the intent to cancel because 'when

---

[5] The government's cursory observation that fraud schemes may, in some circumstances, involve lies directed to machines like ATMs, websites, or slot machines, Opp.33, is irrelevant.  Software may be "designed based on expectations about how it will work," *id.*, but the government still must prove a material falsehood.  *See, e.g.*, *United States v. Ayewoh*, 627 F.3d 914, 922 (1st Cir. 2010).  Here, the government skips over the falsehood requirement to argue that the bots' pre-programmed expectations later were "betrayed" when the attack failed, Opp.34, but, as *Finnerty* makes plain, one can upset someone's (or, in this case, something's) expectations without defrauding them.

you submit an order that you do not intend to trade, it can provide false information to the marketplace.'" 2023 WL 12130999, at *5 (N.D. Ill. Sept. 14, 2023) (alteration omitted). Bank officials testified that the conduct violated their policies which were premised on similar rationales. *Id.* An expert witness testified that "a spoof order 'represents false trading interest' and entails the spoofing trader injecting 'false information' into the market." *Id.* (alteration omitted). That expert also provided competent testimony about objective "expectation[s] in the market." *Id.* Together, this evidence allowed the government to make a nuanced showing that the court broke out into three parts: "that (1) orders implicitly represent a genuine intent to trade, (2) this representation was widely understood during the relevant period, and (3) an order placed without that genuine intent to trade constitutes an implied misrepresentation." *Id.* at *4.

Turning to this case, in contrast, the government never directly asked its witnesses the key question—does a mempool transaction implicitly represent that it "would be published *as part of the bundle* submitted by the Victim Trader"? Opp.27. (Dr. Falk explained why this theory is nonsense, Tr.3077-78, 3081-82, and the government did not challenge that testimony.) The government did not even articulate this promise-to-be-sandwiched theory in closing. The government called no expert to testify about objective market expectations and did not establish any rules like those on the commodities exchanges.

The government disputes this last point (because, without rules, its analogy to the spoofing cases fails), *see* Opp.29-32, but its argument mangles the record beyond recognition. The Peraire-Buenos urge the Court to closely scrutinize the citations (or lack thereof) on these pages and the corresponding background pages, *see* Opp.6-8, 11-12. Many are documents that were not admitted for their truth. *See, e.g.*, GX3208; GX3219; GX3232; GX3406-A. The rest self-evidently contain no "rules," contain links to webpages admitted for a limited purpose, or even feature images of

linked webpages that did not appear as such in the metadata-version. *E.g.*, GX3405 (Slack chat with images that did not appear in the metadata-version); GX3221 (Builder0x69 "documentation");[6] GX3232 (MEV-Boost Github landing page); GX3439 (Slack chat discussing MEV-Boost relay code).

The government's sole citation to testimony using the word "rules" is to Miller's brief description of "honest" behavior on decentralized systems. *See* Opp.30 (citing Tr.281-82). The government's description of his testimony is tellingly vague—"Miller expressly referencing 'rules' in cryptocurrency systems expressed through 'specifications'"—because Miller was discussing *Ethereum* (not MEV-Boost) specifications regarding honest validator behavior, and only at the highest level. The government did not introduce those Ethereum honest validator specifications into evidence. Nor did it call any Ethereum witness. Miller never testified that MEV-Boost had its own rules or explained where they could be found, and the government introduced none into evidence. Chen testified that he did not see the Ethereum protocol and its economic incentives as "rules" prior to Omakase. Tr.921. Yakira did not use the word "rules" when discussing MEV-Boost. Falk explained that the Ethereum protocol doesn't function like rules, *see* Tr.3031-32 ("Q. Does the Ethereum protocol set rules by which users must abide? A. No, there aren't really rules as such."), and that it is assumed that users will act rationally, not "honestly" in the technical sense of following the protocol, *see* Tr.453 (Miller); *see also* Tr.969 (Chen); Tr.1609 (Yakira). And it was undisputed that validators don't need to agree to any terms or to abide by any rules as a condition of becoming a validator, Tr.348, 3027, running MEV-Boost,

---

[6] The Court deferred ruling on the Peraire-Buenos' hearsay objection to GX3221. *See* Tr.1650, 1686-87. The document does not advance the government's argument even if considered for its truth.

Tr.962, or interacting with relays, Tr.963. The government did not argue that the Ethereum protocol or MEV-Boost's design function like "rules" in closing.

With so little to go on, the government engages in sleight of hand to seek to turn things that are not rules into rules. After its out-of-context citation to Miller's honest-behavior testimony, the opposition labels a host of exhibits relating to MEV-Boost as "specifications" when that word does not appear in the documents nor were they described that way by any witness. *See* Opp.30-31; *see also* Opp.11-12.[7] (As just one egregious example, the government calls GX3775 "Google searches regarding MEV-Boost specifications," *id.*, when the search was for the relay code: "mev boost relay github," GX3775.) The misleading impression this labeling conveys is that these documents are the "specifications" that Miller referenced. This bank shot misses because the documents are not related to Miller's honest-behavior testimony. Several concern the builder API (GX3405, 3406), which was established to be a user interface that imposes no obligations on validators. Br.37 n.19. The eth_sendBundle command (GX3221; GX3523) is a message from the searcher to the builder (not the validator) about the searcher's bundle preferences that does not even bind the builder, let alone a validator. Br.5, 13-14, n.5.[8]

The government nevertheless claims that "there are rules within the MEV-Boost protocol" and repeatedly mentions "those MEV-Boost rules." Opp.31. These sentences, however, have ***no record citations***. And the government's remaining arguments betray that its definition of "rules" is essentially any design feature of the various software programs that make up the so-called "MEV-Boost system." *See* Opp.31-32 (referring to schematic drawings and code as rules). So

---

[7] GX3204 is titled "MEV-Boost specifications" but contains no relevant content.

[8] The Peraire-Buenos addressed the builder API and eth_sendBundle in their opening brief. Br.13-14, 37 n.19. As with much of the evidence inconsistent with its arguments, the government simply ignores this testimony. The Court, however, must consider it. *See supra* p.3.

expansively defined, these "rules" have nothing to do with the codified exchange- and employer-imposed rules in the spoofing cases. Even the "system" to which these "MEV-Boost rules" relate lacks coherence. MEV-Boost is software that validators can run but that was *not* used here. *E.g.*, Tr.163, 343 (Miller).[9] The relay at issue was *not* the "MEV-Boost Relay," as the opposition incorrectly asserts *ad nauseam*, *see, e.g.*, Opp.31, 40, 42, but the Ultrasound relay running its own modified code, Tr.268, 340-41. All the at-issue code was modifiable without restriction. Tr.341, 3031-32. Ethereum is a decentralized network that lacks an authority that could promulgate or enforce rules. Tr.348, 3027. Flashbots is a private company that is not affiliated with Ethereum and has no power to promulgate rules that could bind Ethereum users. Tr.148, 157-58, 351-52.

Like in *United States v. Eisenberg*, this failure to prove "rules" is dispositive of the implicit misrepresentation theory. *See* 784 F. Supp. 3d 579, 617-18 (S.D.N.Y. 2025). The government's attempt to distinguish *Eisenberg* merely rehashes its failed "rules" arguments discussed above. Opp.37-38. In fact, *Eisenberg* reveals the hollowness of these arguments. The record in *Eisenberg* contained evidence of the things that the government here incorrectly identifies as "rules"— software protocols and established steps for engaging with other users that engendered "expectations and beliefs" in other market participants. *See* 784 F. Supp. 3d at 616-17. For example, the Mango Markets "borrow" function prompted an automated "health check" that "would automatically conduct a risk calculation based on the user's account value to ensure that the user's withdrawal is sufficiently collateralized and covered based on the other assets in the account." *Id.* at 614 (cleaned up). The premise of the government's misrepresentation argument

---

[9] The opposition inaccurately refers to MEV-Boost as "trade-processing software," Opp.2, or a "trade processing system," Opp.11, despite no witness characterizing it that way. This framing mistakes the software's end-users, the validators who chose to run it, with searchers who don't download, use, or interact with MEV-Boost or the Flashbots relay.

was that Eisenberg's borrowing against his artificially inflated collateral defeated the very purpose of the health check, and the government elicited testimony that this upset expectations that "mattered" to other users. *See id.* at 615, 617. But proof that Eisenberg thwarted that design feature's purpose and defeated other users' expectations was insufficient to prove falsity in the absence of actual "rules, instructions, or prohibitions" forbidding his conduct. *Id.* at 617.[10]

*Materiality*.    The opposition is nonresponsive to the Peraire-Buenos' materiality arguments. The government does not dispute that materiality requires the misrepresentation be capable of influencing the decisionmaking body to which it is addressed, Br.17, but ignores that, here, that body is the pre-programmed MEV-Bots—not Yakira. The correct materiality inquiry is whether any falsehood in the Lure Transactions caused the bots to behave differently than they otherwise would have in the moment. Here, the answer to that question is no for two reasons. First, the government failed to identify anything false conveyed to the MEV-Bots—*i.e.*, there was no implicit misrepresentation. *See supra* pp.6-14. Second, there is no evidence that the MEV-Bots were checking for the supposedly undisclosed intent to thwart their attacks. The automated MEV-Bots were programmed to simply assume the success of any sandwich attack, Tr.721 (Chen); Tr.1568-69, 1803-04 (Yakira), and therefore would have attacked the Lure Transactions regardless of whether they "knew" the supposed truth. Yakira himself rejected the idea of reading intent into a mempool transaction when attempting to defend his conduct as a sandwicher. Tr.1816-17.

---

[10] The government bizarrely claims that "MEV-Boost created *an obligation* by the validator to publish the block as structured by the block-builder." Opp.37 (emphasis added). As is the case throughout its opposition, it is unclear what "MEV-Boost" refers to here: the validator software (which the Peraire-Buenos did not use), the relay code, something else? In any event, the string-cite establishes no such obligation. As with its other citations, many exhibits were not admitted for their truth (*e.g.*, GX3208, 3232, 3406-A) and others are irrelevant to the issue.

Yakira's testimony that, in retrospect, *he* would have altered the bots' code to embed different assumptions or functionality is irrelevant.  *See* Br.17-18.

### 2.    False Signature

*Falsity—promise theory*.  The government's defense of the False Signature on this theory ignores the overwhelming evidence—principally, the direct testimony of its own witnesses—that undercuts it.  The government's claim that Miller endorsed its promise theory "in no uncertain terms," Opp.40, is an obvious overstatement.  In fact, the government misconstrues Miller's testimony about "commitment," *see* Opp.40, without addressing his complete testimony—and Chen's and Falk's consistent testimony—detailed in the Peraire-Buenos' opening brief explaining what "commitment" means.  *See* Br.20-21.  To repeat: Miller explained that "commitment" has a technical definition "in the cryptocurrency industry" meaning that the validator will incur economic penalties if it signs another block, not that it promises not to do so.  *See* Tr.179 ("there is now a financial penalty for the validator in the Ethereum network if they provide another signature"); Tr.214 ("That's why we say the proposer is bound to the block, because there's kind of an enforceable guarantee backed by financial incentives."); Tr.551 ("[W]e call that a commitment because it is backed by economic incentives.").  Every time Miller was asked about the concept he emphasized this technical meaning.  Miller's complete answers are consistent with his explanation of Flashbots documentation noting that validators could always sign a second block and incur the slashing penalty when that penalty was insufficient to "discourage" equivocation.  *See* DX321-A; DX304; DX309; Tr.459-66.[11]  And his complete answers are fully consistent with Chen's and Falk's testimony on the same matter.  *See* Br.19-20.

---

[11] In another instance of the government fighting the evidence, the opposition contradicts this testimony by asserting that the signature served to "prevent" the validator from equivocating. Opp.5.

The government's contrary argument, which it frames as drawing "permissible inferences," Opp.42, misconstrues the Rule 29 standard. Miller's testimony is not an "inference"; it is the evidence upon which an inference could rest. *See supra* pp.3-4. The Court must consider Miller's complete testimony on this topic just as it considers the entire record to assess whether it bears the weight of the inferences the government urges. *See id*. And because the inference here is an element of the offense, it must be sufficiently supported, not merely "permissible." *See id*.

*Falsity—incorrect data*. The government continues to confuse invalid information with false or misleading information under the wire fraud statute. Fraud requires action that "gives the victim a false impression." *Finnerty*, 533 F.3d at 148. Here, there was no evidence that the "incorrect" fields could give the relay or any other user a false impression. As a matter of coding logic and protocol design, the "incorrect" data automatically made the potential block invalid and unable to be added to the chain, but it did not falsely represent anything about the block to the relay or to other nodes. The cited testimony does not suggest otherwise. Chen explained that he understood "incorrect" to be "defined as, [the block] would not be accepted by the consensus nodes in the network," Tr.654, which automatically occurred, Tr.656. And Miller's testimony about there being a "right" or "specific" answer came in his broader explanation that the "incorrect" data made the block invalid—*i.e.*, the same point that Chen conveyed. *See* Tr.241-44. There was no evidence that the signature functioned as a certification by the validator that the data would be "correct." Nor was there any evidence that any other validator or user was deceived (to the contrary, no validator attested to the invalid block). Tr.656, 670.

Considering these undisputed facts, the government is wrong to disregard the Peraire-Buenos' arguments as "irrelevant." Opp.42-23. The facts that the validator was not obligated under the Ethereum protocol to ensure a given block is valid (and thus did not certify the

"correctness" of the data), and that the zeros self-evidently did not claim to say anything "true" about the block to the automated bots that were its only audience fatally undermine the government's unsupported argument that the data could deceive. *See* Br.22.

*Materiality*.    The Peraire-Buenos identified at trial and in their opening brief "two independent bases on which the evidence of materiality was insufficient." Br.22. First, that the signed block was immaterial under either falsity theory because the Ultrasound relay was programmed not to check the fields that supposedly made the block false. Br.22-24. Second, that, even if the fields were considered, the alleged falsehood (the "incorrect" data) had no capacity to deceive the bot to which it was addressed. Br.24-26. The government fails entirely to respond to the first argument, effectively conceding immateriality.

On the second argument, the government agrees that the alleged falsehood must have had the "capacity" to alter the "likely or actual behavior of the recipient," Opp.44 (citations omitted), but ignores that the record conclusively showed that the supposedly "incorrect" data was incapable of doing so even if the relay had checked the fields. *See* Tr.656, 670, 979 (Chen). If the relay had checked the fields, it would have automatically determined the block could not be added to the chain. The government's citation to cases about "obvious" lies misses the point because this is not a case about a lie that was objectively capable of deceiving its intended audience but did not because its recipient subjectively did not believe it.

The government's muddled response makes the same mistakes as its closing arguments, misidentifying the alleged falsehood, the recipient, and the relevant timing. It claims the "coding vulnerability was material to the MEV-Boost Relay," Opp.43-44, but that "coding vulnerability" is not a misrepresentation by the Peraire-Buenos. The government also argues that the "fraudulent scheme" as a whole (rather than the False Signature) was material to the relay's decision to unblind

the block because *Flashbots* would have patched its software to prevent the unblinding if they had anticipated Omakase (and presumably would have passed that patch onto Ultrasound, which then would presumably have implemented it). Opp.44. This speculative argument—relying on multiple unsupported inferences—fails because it mistakes the question of what could deceive the relay (the actual materiality inquiry, governed here by objective computer code) for what mattered in a colloquial (and subjective) sense to Flashbots, a third party that was not the recipient of the False Signature. What mattered to Flashbots is irrelevant. *See Denkberg*, 139 F.4th at 158 n.36 (to be material, a false statement must have been "capable of influencing" the decision "of the decisionmaking body *to which it was addressed*" (cleaned up) (emphasis added)).

Even if the government's apples-to-oranges materiality approach were available, its reliance on the post-Omakase patch wrongly places the materiality inquiry after-the-fact. Courts have held that "[m]ateriality is ascertained on the basis of the situation at the time the statement was made." *United States v. Freedman*, 317 F. App'x 22, 25 (2d Cir. 2008) (discussing perjury); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (same); *see also Rigas*, 490 F.3d at 231 (when analyzing materiality under fraud statutes, "misrepresentations must be [judged] in the context in which they were made"). A post-hoc materiality inquiry is irreconcilable with Second Circuit precedent. In *Rigas*, the court found misstatements that "mattered to the [victim] banks" immaterial because the agreements in place at the time constrained the bank's discretion to change interest rates based on that information. *See* 490 F.3d at 234; *see also United States v. Litvak*, 808 F.3d 160, 173-74 (2d Cir. 2015) (Treasury Department's post-hoc decision to investigate defendant does not mean that any misstatement by him was material).

<u>Causation</u>. The government does not dispute that the False Signature did not *cause* the MEV-Bots to part with cryptocurrency. It contends, instead, that causation is not an element of

wire fraud. Opp.45-47. But this position runs up against *Loughrin v. United States*, 573 U.S. 351 (2014), which held that the term "by means of" in the bank fraud statute introduces an implicit causation element connecting the false statement to the property loss. *Id.* at 363-64. The mail and wire fraud statutes, which contain the same "by means of" language, have been held to import the same causation requirement. *See United States v. Berroa*, 856 F.3d 141, 149-54 (1st Cir. 2017) (applying *Loughrin* to mail fraud statute); *United States v. Martinez*, 2023 WL 2118081, at *3 (S.D.N.Y. Feb. 17, 2023) (applying *Loughrin* to wire fraud statute).[12]

The government cites *Porcelli v. United States*, 404 F.3d 157 (2d Cir. 2005), and *United States v. Gole*, 158 F.3d 166 (2d Cir. 1998), to suggest that the jury may convict based on a misrepresentation that occurred wholly after the property loss. This misreads both cases. *Porcelli* involved a gas station operator who lied on his tax returns to avoid paying taxes on gasoline. 404 F.3d at 158-59. *Gole* involved a recipient of disability benefits who underreported his other income to avoid refunding the government overpayments. 158 F.3d at 167. In both cases, the defendant was able to retain property the government was entitled to collect using lies that would "naturally induce" non-collection. In other words, the misrepresentation was causally antecedent to the victim's loss of (*i.e.*, failure to recover) property. *See, e.g., Porcelli*, 404 F.3d at 158 (convictions arose from fraudulent tax returns and "*resulting deprivation* of the State of New York of nearly $5 million in state sales taxes" (emphasis added)).

Finally, the government is incorrect that the Peraire-Buenos seek to relitigate the jury instructions. Opp.47. How to craft the instructions is a different question than whether the

---

[12] The government argues that *Loughrin*'s federalism rationale does not apply because wire fraud contains the jurisdictional limitation that the fraud involve the use of interstate wires. Opp.47 n.4. But the bank fraud statute also contains a jurisdictional limitation that the victim be a "federally controlled or insured institution," *Loughrin*, 573 U.S. at 366, and the First Circuit has rejected this same argument, *see Berroa*, 856 F.3d at 152.

evidence satisfied the causation element.  Regardless of the specific language in the instructions, the government must prove all elements (even implicit ones) beyond a reasonable doubt, and its failure to do so is grounds for acquittal.  *See, e.g.*, *Eisenberg*, 784 F. Supp. 3d at 618.

### 3.    "MEV-Boost validator" theory

The government's tepid defense of the MEV-Boost validator theory fails on the facts and the law.  It is less clear than ever what this theory means, as the opposition repeatedly collapses it with the False Signature.  *See* Opp.48 (identifying the central "pretense" of the theory "misleadingly sen[ding] the invalid blockheader under the guise of 'validating' the MEV-Boost Relay's block"); Opp.51 (attempting to distinguish *Finnerty* by pointing to the signature).  As best as the Peraire-Buenos can tell, the theory seems to be the signature plus two antecedent steps—registering with the Ultrasound relay and sending the relay the getheader command, actions which the opposition says "curate[d]" and "further[ed] that false pretense."  Opp.51.  It is unclear what "curate" means here, or how actions preceding the signature could "further" any misrepresentation the signature later supposedly conveyed.

In any event, the record conclusively refutes that these steps—individually or together—created a misimpression.  The False Signature fails for the reasons set forth above.  The government also ignores testimony from Miller, Chen, and Falk demolishing the premise that either registration or calling getheader conveyed some misleading message.  *See* Br.37-38 (collecting testimony).  It does not attempt to explain how either step was supposedly misleading.  Instead, it contends that these actions were "necessar[y] … to be able to receive the block," Opp.48, which confuses what is "necessary" with what is deceptive.  Or it merely asserts that the steps "create[d] a false and misleading impression" without naming that impression or who held it.  Opp.48.  Indeed, the government appears to concede the alleged victims did not observe (and thus could not have been deceived by) either the registration or getheader steps, insisting in a footnote

that these facts are no problem because the supposed deception could have been directed "to the MEV-Boost relay, the nodes operating on the Ethereum Network or other MEV-Boost participants."  Opp.51-52 n.7.  While it is true the deceived party may be someone other than the property owner, the government must still prove that the alleged misrepresentation could have deceived (and was material to) *somebody*.  The government's speculative list of potentially deceived parties is no substitute for evidence of deception.

To the extent the theory is something more than the signature (or the signature plus registration and getheader),[13] it appears to rest on a supposed violation of unwritten MEV-Boost (or perhaps Ethereum) "rules" that implicitly derive from MEV-Boost's "core function" or "design."  *See* Opp.48.  The government no longer argues that this theory is distinct from the "honest validator" theory that the parties and Court discussed at length during the trial and that the government promised it would not pursue at closing.  The government doesn't defend or even explain its conduct on that score; the opposition gives up the game when it frames the MEV-Boost validator theory as "purporting to honestly validate transactions."  Opp.23.  Whatever the label—legitimate, honest—the theory is the same one the Peraire-Buenos identified mid-trial and that *Finnerty* rejected.  *See* 533 F.3d at 149 (quoting the government's brief: "Finnerty, while holding himself out as a specialist obligated to follow NYSE rules and refrain from interpositioning, interpositioned on a massive scale under the guise of maintaining a fair and orderly market.").[14]

---

[13] The opposition at times highlights steps taken to fund the validators like staking ETH, *see* Opp.49 n.5, but that step is required to create any Ethereum validator.

[14] The failure to prove material falsity does not present a "legal" issue inappropriate under Rule 29. *Contra* Opp.50 n.6 (citing *United States v. Levy*, 2013 WL 3832718 (S.D.N.Y. July 15, 2023)). The Peraire-Buenos do not argue that their "activities should not be considered illegal as a matter of law," *Levy*, 2013 WL 3832718, at *3 n.2, but rather that the government did not prove wire fraud.  In any event, a defendant whose conduct is, in fact, "not a crime" is "entitled to a judgment of acquittal."  *United States v. Percoco*, 317 F. Supp. 3d 822, 838 (S.D.N.Y. 2018).

In *Finnerty*, the Second Circuit rejected the same argument that publicly assuming a role that is governed by a set of rules or norms makes the breach of those rules or norms fraud. That is so even if the alleged victims reasonably assume compliance with the rule or norms, or if someone other than the defendant leads them to believe compliance will be forthcoming. *See id.* at 149-50. Fraud requires something more; "it irreducibly entails some act that gives the victim a false impression." *Id.* at 148. Here, there is no such evidence.

Given this absence of evidence, the government's citation to *VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011), is unhelpful. There, misleading statements were made directly to the deceived party, Banc of America. The offending conduct involved late trades—those made after 4:00 PM— which were expressly prohibited by "SEC Rule 22c-1." *Id.* at 133-37. The petitioner submitted timestamped "trading sheets" to Banc of America that made it seem like late trades were made before 4:00 PM. *Id.* The Second Circuit held that the fact that the petitioner falsely informed the deceived party that he had complied with the rules made all the difference. *See id.* at 140. Here, no evidence proves that the Peraire-Buenos made similar assurances to the Ultrasound relay that they would interact with the relay code in a certain way. There is no evidence about how such an assurance could be made, how the automated relay would or could process such an assurance, or any "rules" that the Peraire-Buenos could have agreed to follow. The evidence was completely to the contrary: the relay doesn't trust the validator (nobody does), *see* Tr.1609, 3027, 3081, which is why it later requires the validator to sign the blinded blockheader so that Ethereum's financial incentives can discourage (but not prohibit or prevent) future equivocation, *see* Tr.466.

Finally, the government's retort that it is not required to disclose its legal theories misses the mark given the case's procedural history. On the eve of trial, the government stated that this case was about the two alleged misrepresentations, ECF 146 at 11, while apparently sitting on this

alternative theory until ordered by the Court to disclose it midtrial. To the extent that the theory is more than just "signature-plus" but one that relies on the upset expectations and assumptions of rule or norm compliance alone (as it seems to do), that is a category difference that constructively amended the misrepresentation theory the government charged. *See* ECF 128 at 4.

### B. The Government Failed to Prove that a Qualifying Property Right Was the Object of the Alleged Scheme.

The government deems it obvious that the alleged victims' cryptocurrency is the qualifying property they lost as a result of the alleged scheme. But this is only true if the Lure Transactions fraudulently induced their frontrun trades. If the Court finds that the government has not proven its inducement theory and considers only the False Signature or "MEV-Boost validator" theories, however, the property interest those theories seek to vindicate falls outside the reach of the wire fraud statute. *See Ciminelli v. United States*, 598 U.S. 306, 316 (2023). That is because once the transactions were signed and sent to the builder, the sandwichers retained no right in the cryptocurrencies they agreed to trade away. *See* Tr.1145, 3097. If fraud occurred when the proposed bundle was at the relay (it did not), the only thing the Peraire-Buenos could have interfered with was the success of the sandwich attack which relied on the order of transactions in the proposed bundle.[15]

This theory fails because the victim traders have no property right at all, let alone a traditional one, in the order of transactions. *See* Br.40. The government cites the "eth_sendBundle" function and the word "must" in Flashbots' GitHub documents as supposed proof that the alleged victims were entitled to have their bundles published as proposed. Opp.58.

---

[15] This is not an argument that the alleged victims suffered no net economic loss. *Kousisis v. United States*, 605 U.S. 114 (2025) is thus inapposite. Br.40 n.20. As is the government's comparison to Ponzi schemes, Opp.57, where false promises *induce* the initial investment.

But Miller explained that builders are not obligated to honor that at all, Tr.395-97, and their request is never even conveyed to the validator, Tr.3082.  The government's analogy of bundles to "glue" also fails given the undisputed facts about how bundles work.  *See* Tr.1573, 1776-77 (Yakira) (sandwich victim transaction "stays in the mempool" even after selected by a MEV-Bot for a potential bundle); Tr.3078 (Falk) ("[B]undles are not a thing under Ethereum.  They're just transactions[.]").  And though the government inaccurately asserts throughout its opposition that the Peraire-Buenos "manipulated" the sandwichers' transactions, its cooperating witness testified to the opposite.  Tr.988-89 (Chen: "Their data was not altered or canceled.").  The Peraire-Buenos simply included those transactions in the new block they constructed—which was their right to do as a validator.  Tr.791-92 (Chen); Tr.2628-29 (Madura).  The alleged victims had no right to the relative position of those or any other transactions on the block.

### C.    The Government Failed to Prove an Intent to Defraud.

The government has no serious response to Chen's testimony that he did not believe Omakase was wrong.[16]  Its first argument is that, despite Chen's testimony, he in fact knew it was wrong because in Slack chats he used words like "suss" and "nefarious."  Opp.62 (citing GX3442).  This post-hoc attempt to impeach its cooperating witness misreads the exhibit and ignores Chen's testimony about its context.  It did not define Omakase as "nefarious."  Tr.780-81.  Its second argument is that the Peraire-Buenos concealed how Omakase would work from Chen and therefore his lack of intent is not probative of theirs.  Opp.62-63.  This baseless argument—which the government made for the first time in rebuttal when the Peraire-Buenos could not respond—lacks any record support.  Chen testified that ***at the time Omakase was executed*** (and, indeed, after), he

---

[16] The government relies on other pieces of Chen's testimony, and, of course, provides no suggestion that it should not be credited.

did not think it was wrong, or problematic, or an exploit.  Tr.801, 1005, 1036.  It is undisputed that

Chen was fully aware of how Omakase would work ***more than three weeks before*** it was executed.

GX3442.  Moreover, there is no evidence that the Peraire-Buenos "knew from the start about the

coding vulnerability," as the government claims.[17]

 The government's argument that the Court must look at the evidence as a whole cannot be

squared with its cherry-picked approach to the evidence.  With respect to the trading environment,

*see* Br.42-43, the government's response relies on the facts that (1) the Peraire-Buenos knew they

would be slashed, (2) slashing also involves a validator's expulsion from the network, and (3)

slashing was rare.  Opp.63.  The first two points ignore the undisputed testimony that slashing is

an economic incentive, including, as Dr. Falk explained in the same portion of testimony cited by

the government, in the mechanism by which slashed validators are temporarily precluded from

participating in the validator lottery but can rejoin, Tr.3126.  The third fails to acknowledge that

there was no evidence that the frequency of slashing was known to or considered by the Peraire-

Buenos.  Meanwhile, the government entirely ignores the evidence identified by the Peraire-

Buenos in their opening brief about the trading environment, including its adversarial nature, the

history of counter-sandwiching activity, and the fact that validators are untrusted.  Br.43.

 The other evidence the government cites—including evidence that the Omakase team

hoped that particular sandwich attackers would try to sandwich them, evidence about anonymity,

and some words read out of context—doesn't advance the ball.  Targeting a specific sandwich

attacker does not show an intent *to deceive them*; anonymity is normal in this environment, *see*

---

[17] The government appears to believe that GX3518, in which the Peraire-Buenos discussed the publicly available MEV-Boost audit (DX304), provides that link.  The government is wrong as a factual matter.  But, at a minimum, its incorrect interpretation is unsupported and speculative, as no witness testified about its meaning.

Br.43-44; the use of the word "trap" cannot trump the actual substance of the Omakase strategy, which did not involve deception or force any sandwicher to do anything; and a plan to "profit at the sandwichers' expense" does not mean *to do so by fraud*.  On this last point, Chen clarified that it meant simply that the MEV-Bots would be the losing party in the trading strategy.[18]  Tr.922-23.

The government's attempt to take words or snippets of conversations out of context, or to speculate as to their meaning, cannot form the basis for any rational jury to find intent to defraud beyond a reasonable doubt.  *See supra* pp.3-4.  As just one example, the government repeatedly misinterprets GX6012, which reflects select one-sided notifications on Anton's phone.  The government claims that page 59 shows the Peraire-Buenos "compar[ing] their plan to 'sbf and do kwon'," which it describes as "the two most famous cryptocurrency fraudsters."  Opp.62.  There are two problems with the government's description.  First, there was no way a rational jury could make the inference the government seeks based on the evidence: there was no evidence as to Kwon's case introduced at the trial *at all*, and the Bankman-Fried references established only that his crimes had to do with misappropriating customer funds, which is not comparable to the allegations here, Tr.752-53, and the Peraire-Buenos were customers of his, Tr.896.  Second, the cited messages don't make the comparison the government claims: there is no reference to Omakase in the messages, which occur over 30 minutes after any message that could reasonably be read to be about Omakase.

Other documents are also mischaracterized.  GX3496 makes clear that the Peraire-Buenos did not think the sandwich attackers had been "scammed," but rather that their complaints that

---

[18] Under its reasoning, the government presumably would also take the position that Savannah had intent to defraud, since it (1) profited at its victims' expense every time it sandwiched a victim and (2) internally identified the trades it would target as "victims," its bot as an "attacker," the trade amount as the "attackAmount," and the process as "frontrunning."  GX4010.

they were scammed were inaccurate.  The government repeatedly suggests that Anton used the term "fake block" when he in fact called it "invalid."  *Compare* Opp.16 ("APB: 'setting some fields incorrectly' to ensure that the 'fake block' to get the unblinded transactions is 'rejected by the nodes'"), *with* GX3439; *see also* Opp.40, 42, 43 (repeating same misleading quotation from GX3439).

The Peraire-Buenos never denied that they planned and executed Omakase.  But the government did not prove that the planning of that strategy constituted an intent to *deceive* or that the Peraire-Buenos knew it was wrongful.  *See* Tr.3257-59.  To the contrary, the evidence indicated that an at least equal explanation was that the Peraire-Buenos believed that they were acting well within the expectations of the adversarial trading environment, using an untrusted position to get value in a way that involved no deception.  That well-substantiated alternative explanation means that "a reasonable jury must necessarily entertain a reasonable doubt."  *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (cleaned up).

## III.    THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL ON COUNT 3.

The Court should grant a judgment of acquittal on Count 3 first and foremost because the money at issue was not the proceeds of wire fraud.  Br.44 & n.21.  Even if it were, the evidence is patently insufficient to prove the Peraire-Buenos knew that Omakase was a crime or conducted any transaction for the purpose of concealment.  *See* Tr.3273-74.

Rather than addressing the copious evidence that the Peraire-Buenos believed Omakase was legal, the government contends that a defendant can be found guilty of money laundering conspiracy without knowing the funds were the proceeds of a crime.  Opp.67-68.  But money laundering under section 1956(a)(1) requires proof that the defendant knew "he [wa]s dealing with the proceeds of 'some' crime even if he d[id] not know precisely which crime."  *United States v. Maher*, 108 F.3d 1513, 1525-26 (2d Cir. 1997); *see also United States v. Lancaster*, 185 F. App'x

48, 50-51 (2d Cir. 2006) (element satisfied where defendant "confessed that he knew that the money was illegally gained"). A defendant who is aware of the activity that generated the proceeds but unaware that the activity is criminal lacks the requisite *mens rea*. *See United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994); *United States v. Cross*, 113 F. Supp. 2d 1253, 1257-58 (S.D. Ind. 2000).[19]

The only evidence the government can muster to show knowledge of *illegality* are a few out-of-context quotations relegated to a footnote. Opp.68 n.11. The quotes are from post-Omakase Slack conversations (GX3499, GX3496, GX3495), in which the Peraire-Buenos discuss how to respond to threatening communications from the sandwichers and (months later) off-ramping. In context, the communications show the Peraire-Buenos were concerned primarily about civil litigation by the sandwichers, GX3496 at 14; GX3499, and believed that any complaint to law enforcement would be frivolous. GX3496 at 24. The overwhelming evidence shows the Peraire-Buenos did not believe Omakase was an exploit, let alone criminal fraud. Tr.1034-37; *see also* Tr.1051, 1098; GX3478 at 1. To the extent they feared prosecution, it was a fear (borne out by this litigation) that the government would be misled by influential sandwichers or simply misunderstand the facts. Tr.1096. Indeed, they sought to "look at laws and make sure [off-ramping is] not money laundering," DX1185 at 4, planned to "comply with court orders," DX1058 at 4, and "would have come wherever [law enforcement] asked," DX4005-A. Contrary to the government's suggestion, Opp.68 n.11, these statements are not testimony requiring the Court to assess "credibility." They are direct and contemporaneous evidence of the Peraire-Buenos' state

---

[19] Neither of the cases the government cites held otherwise. *See United States v. Diggles*, 928 F.3d 380, 389 (5th Cir. 2019) (defendant's contention that he "did not know" that funds came from unlawful activity would negate knowledge element, if the evidence supported it); *United States v. Bohn*, 281 F. App'x 430, 441 (6th Cir. 2008) (inferring defendant's knowledge "that the money was from some form of unlawful activity" from his conscious avoidance of incriminating facts).

of mind (corroborated by Chen's testimony, *see* Tr.1110), in light of which no rational jury could conclude that they thought they committed a crime.

As to the concealment element, the government's arguments are utterly unmoored from the relevant legal standard. The government was required to prove that a transaction involving the proceeds of Omakase was executed for the *purpose* of concealing an attribute of the *unlawful proceeds*. Tr.3277-78. In lieu of such evidence, the government points to irrelevant pre-Omakase transactions (funding validators). Opp.65. But that is not evidence of an intent to conceal an attribute of the *Omakase proceeds*.

The government's arguments concerning the purpose of post-Omakase transactions fare no better. As the Court instructed the jury, "[t]he fact that a transaction was effected covertly in an effort to avoid the transaction being detected by third parties does not, on its own, mean that the purpose of the transaction was to conceal anything about the proceeds." Tr.3279. Rather than grapple with this crucial distinction, the government cites evidence that the Peraire-Buenos sought to avoid their cryptocurrency being frozen during the off-ramping process, as if that shows a purpose to hide where the cryptocurrency came from. Opp.66-67. The government also cites the Peraire-Buenos' alleged failure to respond to inquiries from Coinbase (made *after* off-ramping was complete). But it ignores that they had a choice of which cryptocurrency exchange to off-ramp with, understood that Coinbase was a highly regulated entity that knew their real identities, Tr.1175-77, 1244-46, knew using Coinbase would link their deposit address to Omakase, Tr.1102, and chose Coinbase anyway. And it ignores that the Peraire-Buenos did not use a mixing service like Aztec for off-ramping, Tr.2293 (Hoffmeister), and the tension this fact poses for its arguments that doing so beforehand was probative of criminal intent. *See* Br.47.

Finally, the government ignores the undisputed evidence that the purpose of off-ramping was to allow the Peraire-Buenos to pay a substantial tax liability that they did not previously know they would owe.  Tr.1040-42 (Chen); DX231; *see also* Br.47-48.  On this record, no jury could find beyond a reasonable doubt that any post-Omakase transactions were executed for the purpose of concealment.

## IV.    IN THE ALTERNATIVE, THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT.

### A.    The Government Misstates the Law.

The government makes a series of flawed legal arguments seeking to preclude review of the merits, most of which it did not raise at the motion to dismiss stage.  None succeeds.

The government's contention that the Peraire-Buenos "forfeited their vagueness challenge" because they did not argue that the wire fraud statute "encourages arbitrary or discriminatory enforcement," Opp.69 n.12, is factually and legally wrong.  In their initial motion to dismiss, the Peraire-Buenos argued that the government's application of the statute to Ethereum trading has been arbitrary.  *See* ECF 49 at 16-19.  But there was no requirement to make this argument.  *United States v. Wasylyshyn*, 979 F.3d 165, 175 (2d Cir. 2020), cited by the government, does not address forfeiture at all.   Cases cited by the government make plain that "[a] statute can be unconstitutionally vague if it *either* 'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' *or* is 'so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020) (emphases added).  As applied here, the wire fraud statute offends due process in both respects.

The government also contends that a statute is only vague "where it is legally impossible to tell whether the given conduct possibly could fall within the scope of the statute," Opp.70, citing *United States v. Williams*, 553 U.S. 285 (2008).  But *Williams* does not use the term "legally

30

impossible," and it involved a facial vagueness argument that is assessed under a different (and more demanding) framework.  *See id.* at 306-07.

The government overstates the law when it contends "that a statute's mens rea requirement is nearly dispositive."  Op.71.  While a court should take a scienter requirement into consideration, its presence alone does not save an otherwise unconstitutional application of a statute.  *See United States v. Hancock*, 103 F.4th 1261, 1270 n.2 (7th Cir. 2024) ("A specific-intent element is not necessarily a cure for an otherwise unconstitutionally vague statute.").

The government next makes the circular argument that there could be no vagueness problem because a rational jury could conclude that the Peraire-Buenos engaged in fraud.  Opp.73.  But the due process standard would do no work if every conviction that satisfies the Rule 29 standard necessarily defeats a vagueness challenge.  A defendant whose conduct is "clearly proscribed" will lose, *see, e.g.*, *Williams*, 553 U.S. at 304, but due process protects defendants whose conduct is on the margins.[20]

Finally, the government contends that the Court should defer until after a second trial (if there is one).  Opp.70 n.13.  The government does not say what additional evidence would cure the due process problems this case presents.  In any event, the motion is ripe.  *See United States v. Jaensch*, 678 F. Supp. 2d 421, 432 (E.D. Va. 2010) (considering vagueness challenge after declaring a mistrial following a hung jury).

---

[20] The government also passingly states that there is no vagueness problem because the Peraire-Buenos "believed what they were doing was illegal."  Opp.74.  As discussed above, *see supra* pp.24-27, the government seriously overstates this evidence and the reasonable inferences a rational jury could draw from it.

### B.    The Government Fails to Respond on the Merits.

The applicable test is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).  This prosecution flouts that rule.  Because the government largely ignores the merits, the Peraire-Buenos rest on the prior briefing and add the following.

The government's heavy reliance on the Court's pretrial ruling (which was without prejudice to renewal after trial, ECF 112 at 13, 16), ignores how the evidence failed to substantiate the government's allegations.  Take the collapse of the spoofing analogy.  The Court accepted the spoofing comparison pretrial based on the government's framing that the Peraire-Buenos "falsely induced the Victim Traders to execute transactions using Lure Transactions that Defendants never intended to execute as presented to the Victim Traders, in violation of the protocols established for MEV-Boost users on the Ethereum Network." *Id.* at 16.  Importantly, the Court observed that whether the Peraire-Buenos were "subject to any rules or protocols analogous to those in *Chanu*" was a "question of fact for trial." *Id.*

As discussed above, the government has shifted to a more convoluted alleged implicit representation—*i.e.*, that the Lure Transactions represented a commitment to be sandwiched in a particular order in a future bundle. *See supra* p.7.  It grounds that implicit meaning not in rules but in the expectations of other users based on the design of the MEV-Boost validator software and MEV-Boost relay code. *See id.*  The government's failed arguments labeling things "rules" that are not rules betrays its failure to prove the case it previewed.

Indeed, in the closing paragraph of its opposition, the government explicitly embraces the degree to which its case hinges on other users' upset expectations about how MEV-Boost worked.  The government states: "if the Victim Traders could not be relied upon to hold fundamental expectations about the integrity of their trades' processing, those expectations could not be

betrayed, and the Exploit … would not work." Opp.76. But the Peraire-Buenos made no representations about the "integrity" of the "processing" of sandwich attack bundles and had no role in setting the sandwichers' flawed expectations about MEV-Boost. They never agreed to be bound by any rules (either real rules or the government's expanded concept of "rules" trotted out in opposition) about those bundles.

Core concepts underpinning this theory were complicated by the facts. The government previously told the Court that the Peraire-Buenos and the alleged victims were "using" MEV-Boost, 6/17/25 Hr'g Tr.50, but that was proven false. And far from establishing an orderly marketplace akin to a regulated commodities exchange where traders assume compliance with clear, pre-existing rules, the evidence showed that Ethereum is an adversarial, unruly place—a "dark forest," Tr.3087—where it is assumed that untrusted validators will maximize their profits and where even the Flashbots representative conceded it should be assumed users would interact with its modifiable, open-source software in unintended ways. Tr.388, 368, 453. The alleged victims were revealed to be market manipulators who "attack" their "victims" by "frontrunning" mempool transactions (all Savannah's own words, GX4010) to extract trading profits. Yakira testified unapologetically about taking money from unsuspecting traders because the code allowed him to do it. *E.g.*, Tr.1818-19 ("We are all there to make money.").

It is hard to imagine a setting, or an array of what are essentially undisputed facts, farther afield from those in the already boundary-pushing spoofing prosecutions. The government's assertion that this case is "traditional," Opp.76, doesn't pass the smell test. It is every bit as novel as the Indictment and press release announcing the case claimed it to be. Because this unprecedented prosecution violates due process, the case should be dismissed.

## CONCLUSION

For all the reasons discussed above and in the opening brief, the Court should grant judgment of acquittal on all Counts in the Indictment or, in the alternative, dismiss the Indictment.

Date: January 30, 2025                    Respectfully submitted,

                                          By: */s/ Patrick J. Looby*

                                          Katherine Trefz (*pro hac vice*)
                                          Daniel Shanahan (*pro hac vice*)
                                          Patrick J. Looby (*pro hac vice*)
                                          Joseph Bayerl (*pro hac vice*)
                                          Ikenna Ugboaja (*pro hac vice*)
                                          Williams & Connolly LLP
                                          680 Maine Avenue SW
                                          Washington, DC 20024
                                          Tel: (202) 434-5000
                                          ktrefz@wc.com
                                          dshanahan@wc.com
                                          plooby@wc.com
                                          jbayerl@wc.com
                                          iugboaja@wc.com

                                          Jonathan P. Bach
                                          Shapiro Arato Bach
                                          1140 Avenue of the Americas
                                          17th Floor
                                          New York, NY 10036
                                          Tel: 212-257-4897
                                          jbach@shapiroarato.com

                                          *Counsel for Defendant*
                                          *James Peraire-Bueno*

                                          By: */s/ Daniel N. Marx*

                                          Daniel N. Marx
                                          William W. Fick (*pro hac vice*)
                                          Fick & Marx LLP
                                          24 Federal Street, 4th Floor
                                          Boston, MA 02110
                                          Tel: 857-321-8360
                                          dmarx@fickmarx.com

wfick@fickmarx.com

*Counsel for Defendant*
*Anton Peraire-Bueno*

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter who are on the CM/ECF system.

*/s/ Patrick J. Looby*
Patrick J. Looby

## CERTIFICATE OF WORD-COUNT

I hereby certify that the foregoing document contains 10,738 words calculated consistent with Federal Rule of Appellate Procedure 32(f).

*/s/ Patrick J. Looby*
Patrick J. Looby